**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | |
|---|---|
| NETCHOICE,<br><br>     *Plaintiff*,<br><br>v.<br><br>ALAN WILSON, in his official capacity<br>as the South Carolina Attorney General,<br><br>     *Defendant*. | Civil Action No.<br>3:26-cv-00543-SAL |

**PLAINTIFF NETCHOICE'S MEMORANDUM IN SUPPORT OF
<u>MOTION FOR PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

Table of Authorities.........................................................................................................iii

Summary & Nature of the Case .........................................................................................1

Statement of Facts...............................................................................................................4

    A.    Online services create, publish, and facilitate enormous amounts of protected speech.....................................................................................................4

    B.    User data and website design are integral to, and inextricable from, online speech..........................................................................................................6

        1.    Data is needed to create, disseminate, and publish online speech. .............. 6

        2.    Website design, personalization, and use of data reflect numerous expressive and editorial judgments about what types of content to present, when to present it, and to whom. .................................................. 7

    C.    Parents have numerous tools to supervise minors' online experiences. ..................9

    D.    South Carolina's Age-Appropriate Code Design Act ...........................................11

Legal Standard .................................................................................................................15

Argument .........................................................................................................................16

I.     NetChoice is likely to succeed on its First Amendment Claims. ......................................16

    A.    The Act's individual provisions impermissibly restrict speech. ...........................18

        1.    The duty of "reasonable care" (§ 39-80-20(A)) .......................................... 18

        2.    Restrictions on Personalization (§§ 39-80-30(B), 39-80-40(F)) ................ 22

        3.    Default disablement tools (§ 39-80-30(A), (C))........................................... 23

        4.    Compelled "audits" and disclosures (§ 39-80-60(E), § 39-80-70)............. 25

    B.    The Act forces websites to serve as censors. .......................................................26

II.    NetChoice is likely to succeed on its vagueness claims. ..................................................27

III.   NetChoice is likely to succeed on its preemption claims. ................................................31

    A.    Section 230 preempts the Act's application to third-party content. .......................31

    B.    COPPA preempts the Act's information restrictions.............................................35

IV.   NetChoice is likely to succeed on its Commerce Clause claim.........................................39

V.    NetChoice is likely to succeed on its claim that Due Process requires a reasonable opportunity to implement the Act. ....................................................................................42

VI.   The remaining preliminary injunctive factors are easily satisfied. ....................................42

    A.    NetChoice members will suffer irreparable harm absent preliminary relief. ........42

    B.    The balance of equities and the public interest strongly favor an injunction. .......43

VII.  The Court should enjoin the Act on its face and, at a minimum, as to NetChoice's covered members. .............................................................................................................44

Conclusion & Prayer.........................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis*,
   600 U.S. 570 (2023)........................................................................................1

*ACLU v. Johnson*,
   194 F.3d 1149 (10th Cir. 1999) ......................................................................3

*ACLU v. Mukasey*,
   534 F.3d 181 (3d Cir. 2008)...........................................................................28

*Am. Booksellers Found. v. Dean*,
   342 F.3d 96 (2d Cir. 2003)............................................................................40

*Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*,
   2025 WL 1249608 (4th Cir. Apr. 30, 2025) ..................................................43

*Am. Libraries Ass'n v. Pataki*,
   969 F. Supp. 160 (S.D.N.Y. 1997) ................................................................41

*Ams. for Prosperity Found. v. Bonta*,
   594 U.S. 595 (2021)......................................................................................19

*Anderson v. Sara Lee Corp.*,
   508 F.3d 181 (4th Cir. 2007) ........................................................................31

*Ass'n of Am. Railroads v. Hudson*,
   144 F.4th 582 (4th Cir. 2025) .......................................................................44

*Ass'n of Commty. Cancer Ctrs. v. Azar*,
   509 F. Supp. 3d 482 (D. Md. 2020)..............................................................43

*Backpage.com, LLC v. McKenna*,
   881 F. Supp. 2d 1262 (W.D. Wash. 2012).....................................................40

*Baggett v. Bullitt*,
   377 U.S. 360 (1964)...................................................................................2, 27

*New Mexico ex rel. Balderas v. Tiny Lab Prods.*,
   457 F. Supp. 3d 1103 (D.N.M. 2020) ......................................................36, 38

*Bantam Books, Inc. v. Sullivan*,
   372 U.S. 58 (1963)..........................................................................................1

*Bland v. Roberts,*
  730 F.3d 368 (4th Cir. 2013) .................................................................24

*Booksellers Ass'n v. McMaster,*
  371 F. Supp. 2d 773 (D.S.C. 2005)........................................................41

*Brown v. Ent. Merchs. Ass'n,*
  564 U.S. 786 (2011)............................................................... *passim*

*Bruni v. City of Pittsburgh,*
  824 F.3d 353 (3d Cir. 2016)....................................................................44

*Calise v. Meta Platforms, Inc.,*
  103 F.4th 732 (9th Cir. 2024) ................................................................35

*Carolina Youth Action Proj. v. Wilson,*
  60 F.4th 770 (4th Cir. 2023) .......................................................2, 27, 29

*Chamber of Com. of the U.S. v. Lierman,*
  151 F.4th 530 (4th Cir. 2025) ................................................................16

*Chandler v. Tech. Coll. of Lowcountry,*
  2022 WL 2670806 (D.S.C. July 11, 2022) .............................................42

*Chicago Lawyers' Comm. for C. R. Under L., Inc. v. Craigslist, Inc.,*
  519 F.3d 666 (7th Cir. 2008) ..................................................................34

*Citizens United v. FEC,*
  558 U.S. 310 (2010)..................................................................................1

*Comput. & Commc'ns Indus. Ass'n v. Paxton,*
  747 F. Supp. 3d 1011 (W.D. Tex. 2024)..................................................10

*Comput. & Commc'ns Indus. Ass'n v. Uthmeier,*
  2025 WL 1570007 (N.D. Fla. June 3, 2025) .....................................10, 16

*Counterman v. Colorado,*
  600 U.S. 66 (2023)..................................................................................28

*Crosby v. Nat'l Foreign Trade Council,*
  530 U.S. 363 (2000)................................................................................31

*CSX Transp., Inc. v. Easterwood,*
  507 U.S. 658 (1993)................................................................................31

*Ctr. for Individual Freedom, Inc. v. Tennant,*
  706 F.3d 270 (4th Cir. 2013) ..................................................................27

*Doe 1 v. Twitter, Inc.*,
    148 F.4th 635 (9th Cir. 2025) ...................................................34

*Doe v. Grindr Inc.*,
    128 F.4th 1148 (9th Cir. 2025) ..........................................32, 33

*Dyroff v. Ultimate Software Grp., Inc.*,
    934 F.3d 1093 (9th Cir. 2019) .................................................34

*Erznoznik v. City of Jacksonville*,
    422 U.S. 205 (1975)....................................................16, 19, 20

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*,
    521 F.3d 1157 (9th Cir. 2008) .................................................34

*Family PAC v. McKenna*,
    685 F.3d 800 (9th Cir. 2012) ...................................................44

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012)................................................................27

*FEC v. Cruz*,
    596 U.S. 289 (2022)................................................................17

*Fields v. Twitter, Inc.*,
    217 F. Supp. 3d 1116 (N.D. Cal. 2016) ...................................34

*Force v. Facebook, Inc.*,
    934 F.3d 53 (2d Cir. 2019)......................................................34

*Free Speech Coal., Inc. v. Paxton*,
    606 U.S. 461 (2025)................................................................45

*Freedom Path, Inc. v. Internal Revenue Serv.*,
    805 F. Supp. 3d 329 (D.D.C. 2025) ........................................44

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
    505 U.S. 88 (1992)..................................................................31

*Giovani Carandola, Ltd. v. Bason*,
    303 F.3d 507 (4th Cir. 2002) ...................................................42

*Goddard v. Google, Inc.*,
    2008 WL 5245490 (N.D. Cal. Dec. 17, 2008)..........................34

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972)................................................................27

*Grp. W Cable, Inc. v. City of Santa Cruz*,
669 F. Supp. 954 (N.D. Cal. 1987) ................................................................24

*Henderson v. Source for Public Data, L.P.*,
53 F.4th 110 (4th Cir. 2022) .........................................................................32

*Henry v. Greenville Airport Comm'n*,
284 F.2d 631 (4th Cir. 1960) ........................................................................42

*HIAS, Inc. v. Trump*,
985 F.3d 309 (4th Cir. 2021) ........................................................................33

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977)......................................................................................16

*Hustler Mag., Inc. v. Falwell*,
485 U.S. 46 (1988).......................................................................................29

*Intel Corp. Inv. Pol'y Comm. v. Sulyma*,
589 U.S. 178 (2020)......................................................................................38

*Interstate Cir., Inc. v. City of Dallas*,
390 U.S. 676 (1968)...........................................................................2, 18, 26

*John Doe #1 v. Reed*,
561 U.S. 186 (2010).................................................................................44, 45

*L.W. through Doe v. Snap Inc.*,
675 F.Supp.3d 1087 (S.D. Cal. June 5, 2023) ..............................................34

*Lamont v. Postmaster Gen. of U.S.*,
381 U.S. 301 (1965)......................................................................................25

*Mahanoy Area Sch. Dist. v. Levy*,
594 U.S. 180 (2021)......................................................................................19

*Medtronic, Inc. v. Lohr*,
518 U.S. 470 (1996)......................................................................................31

*Miami Herald Pub. Co. v. Tornillo*,
418 U.S. 241 (1974)...........................................................................22, 24, 25

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)........................................................................... *passim*

*Mtn. Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*,
915 F.3d 197 (4th Cir. 2019) ........................................................................43

*Nat'l Pork Producers Council v. Ross*,
    598 U.S. 356 (2023)..................................................................................39

*Nat'l Shooting Sports Found. v. Bonta*,
    718 F. Supp. 3d 1244 (S.D. Cal. 2024)..................................................44

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
    591 F.3d 250 (4th Cir. 2009) ................................................................32

*NetChoice v. Carr*,
    789 F. Supp. 3d 1200 (N.D. Ga. June 2025).................................9, 10, 35

*NetChoice v. Fitch*,
    134 F.4th 799 (5th Cir. 2025) ...............................................................16

*NetChoice v. Fitch*,
    787 F.Supp.3d 262 (S.D. Miss. 2025) ...................................................16

*NetChoice v. Griffin*,
    2023 WL 5660155 (W.D. Ark. Aug. 31, 2023)......................................16

*NetChoice v. Griffin*,
    2025 WL 3634088 (W.D. Ark. Dec. 15, 2025) ............................. *passim*

*NetChoice v. Jones*,
    2026 WL 561099 (E.D. Va. Feb. 27, 2026)................................. *passim*

*NetChoice v. Murrill*,
    2025 WL 3634112 (M.D. La. 2025) ......................................................16

*NetChoice v. Weiser*,
    808 F. Supp. 3d 1223 (D. Colo. 2025)................................................9, 10

*NetChoice, LLC v. Bonta*,
    113 F.4th 1101 (9th Cir. 2024) ................................................... *passim*

*NetChoice, LLC v. Bonta*,
    152 F.4th 1002 (9th Cir. 2025) ............................................................24

*NetChoice, LLC v. Bonta*,
    770 F. Supp. 3d 1164 (N.D. Cal. 2025) ..........................................10, 29

*NetChoice, LLC v. Griffin*,
    2025 WL 978607 (W.D. Ark. Mar. 31, 2025).......................9, 10, 16, 31

*NetChoice, LLC v. Reyes*,
    748 F. Supp. 3d 1105 (D. Utah 2024)......................................... *passim*

vii

*NetChoice, LLC v. Yost*,
    778 F. Supp. 3d 923 (S.D. Ohio 2025) ................................................. *passim*

*Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*,
    354 F.3d 249 (4th Cir. 2003) ............................................................... 42, 43

*Nken v. Holder*,
    556 U.S. 418 (2009) .................................................................................... 43

*Pac. Tel. & Tel. Co. v. City of Seattle, Wash.*,
    291 U.S. 300 (1934) .................................................................................... 41

*Packingham v. North Carolina*,
    582 U.S. 98 (2017) ............................................................................ 4, 16, 41, 43

*People for the Ethical Treatment of Animals, Inc. v. N.C. Farm Bureau Fed'n, Inc.*,
    60 F.4th 815 (4th Cir. 2023) ................................................. 17, 18, 21, 25

*Percoco v. United States*,
    598 U.S. 319 (2023) .................................................................................... 31

*PFLAG, Inc. v. Trump*,
    766 F. Supp. 3d 535 (D. Md. 2025) ......................................................... 33

*M.P. ex rel. Pinckney v. Meta Platforms, Inc.*,
    127 F.4th 516 (4th Cir. 2025) ................................................. 18, 32, 33, 34

*Planned Parenthood Great Nw., Haw., Alaska, Ind., & Ky., Inc. v. Cameron*,
    599 F. Supp. 3d 497 (W.D. Ky. 2022) ...................................................... 42

*Planned Parenthood of Wisconsin, Inc. v. Van Hollen*,
    738 F.3d 786 (7th Cir. 2013) ..................................................................... 42

*Platt v. Mansfield*,
    162 F.4th 430 (4th Cir. 2025) ................................................................... 15

*Platt v. Moore*,
    15 F.4th 895 (9th Cir. 2021) ..................................................................... 43

*PSINet, Inc. v. Chapman*,
    362 F.3d 227 (4th Cir. 2004) ........................................................... 3, 39, 41

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) .................................................................................... 17

*Reno v. ACLU*,
    521 U.S. 844 (1997) .................................................................................. 4, 5

*Reynolds v. Middleton,*
    779 F.3d 222 (4th Cir. 2015) ........................................................................21

*Sessions v. Dimaya,*
    584 U.S. 148 (2018)........................................................................................28

*Smith v. Goguen,*
    415 U.S. 566 (1974)........................................................................................27

*Snyder v. Phelps,*
    562 U.S. 443 (2011)...............................................................................19, 29

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.,*
    702 F. Supp. 3d 809 (N.D. Cal. 2023) ..............................................24, 34

*Tepeyac v. Montgomery Cnty.,*
    779 F. Supp. 2d 456 (D. Md. 2011) .............................................................43

*Turner Broad. Sys., Inc. v. FCC,*
    520 U.S. 180 (1997)...............................................................17, 21, 23, 25

*United States v. Carroll,*
    105 F.3d 740 (1st Cir. 1997) ........................................................................39

*United States v. Locke,*
    471 U.S. 84 (1985)............................................................................................3

*United States v. MacEwan,*
    445 F.3d 237 (3d Cir. 2006).........................................................................39

*United States v. Playboy Ent. Grp.,*
    529 U.S. 803 (2000)...............................................................................18, 19

*United States v. Runyan,*
    290 F.3d 223 (5th Cir. 2002) .......................................................................39

*United States v. Thomas,*
    74 F.3d 701 (6th Cir. 1996) ..........................................................................40

*United States v. Williams,*
    553 U.S. 285 (2008)........................................................................................31

*Univ. of Tex. v. Camenisch,*
    451 U.S. 390 (1981)........................................................................................15

*Virginia v. Am. Booksellers Ass'n,*
    484 U.S. 383 (1988)........................................................................................16

*Wash. Post v. McManus*,
    944 F.3d 506 (4th Cir. 2019) ................................................22

*Winter v. G.P. Putnam's Sons*,
    938 F.2d 1033 (9th Cir. 1991) ..............................................19

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .................................................................15

*Wooley v. Maynard*,
    430 U.S. 705 (1977) .............................................................25

*Wyeth v. Levine*,
    555 U.S. 555 (2009) .............................................................31

*X Corp. v. Bonta*,
    116 F.4th 888 (9th Cir. 2024) .........................................26, 44

*Young v. Am. Mini Theaters, Inc.*,
    427 U.S. 50 (1976) ...............................................................19

*Zeran v. Am. Online, Inc.*,
    129 F.3d 327 (4th Cir. 1997) ......................................2, 32, 33

**Statutes**

15 U.S.C. § 6501 ...........................................................11, 35, 36

15 U.S.C. § 6502 .............................................................2, 35, 36

15 U.S.C. § 6505 ...........................................................................36

47 U.S.C. § 230 ........................................................31, 32, 33, 41

S.C. Code § 39-80-10 ............................................................. *passim*

S.C. Code § 39-80-20 ............................................................. *passim*

S.C. Code § 39-80-30 ............................................................. *passim*

S.C. Code § 39-80-40 ............................................................. *passim*

S.C. Code § 39-80-50 ...................................................................13

S.C. Code § 39-80-60 ............................................................. *passim*

S.C. Code § 39-80-70 ........................................................14, 15, 25, 36

S.C. Code § 39-80-80 ...................................................................15

**Other Authorities**

16 C.F.R. § 312.2 ........................................................................................36, 37, 38

16 C.F.R. § 312.4 ..............................................................................................37, 38

144 Cong. Rec. S11651-02 (daily ed. Oct. 7, 1998) ..........................................35, 38, 39

144 Cong. Rec. S8482-03, 1998 WL 399521 (daily ed. July 17, 1998) ................35, 38

64 Fed. Reg. 59,888 (Nov. 3, 1999) ........................................................................36

89 Fed. Reg. 2034 (Jan. 11, 2024) ..........................................................................37

90 Fed. Reg. 16918 (Apr. 22, 2025) ..............................................36, 37, 38, 42

HB 3431, 126th Gen. Ass. § 4 (S.C. 2026) ......................................................17, 41

U.S. Const., art. I, § 8, cl. 3 ................................................................................39

U.S. Const. art. VI, cl. 2 ........................................................................................31

## SUMMARY & NATURE OF THE CASE

South Carolina has enacted sweeping restraints on speech. The State's hastily enacted Age-Appropriate Code Design Act (Act) imposes a morass of vague restrictions on how websites present speech and information, what speech they present, how they organize and curate that speech, and how hundreds of millions of Americans, both inside *and* outside the State, access that speech. The Act violates the First and Fifth Amendments, collides head-on with preemptive federal law, and impermissibly regulates a core medium of interstate commerce and communication. Courts nationwide confronting comparable laws have enjoined them. This Court should do the same.

*First*, the Act violates the First Amendment many times over. It limits websites' ability to create, disseminate, and facilitate online speech unless they exercise "reasonable care" to ensure the speech they publish does not offend, cause distress, or prove too engaging for even one South Carolina minor. That vague mandate "deliberately set[s] about to achieve the suppression of publications deemed [harmful]" by the State and bears a "heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67, 70 (1963). The Act also restricts websites' own speech by regulating their "design" and expressive "features"—such as "notifications," "likes," "reactions," "comments," and anything else that might "encourage" speech. The Act directly interferes with websites' ability to present personalized, curated content as part of a "distinctive expressive offering." *Moody v. NetChoice, LLC*, 603 U.S. 707, 738 (2024). And the Act compels websites "to speak [the government's] own preferred messages," *303 Creative LLC v. Elenis*, 600 U.S. 570, 586, 592 (2023), by submitting to intrusive third-party "audits" about their "safety for minors" that must be produced to the government and published to the public. Courts have repeatedly invalidated laws that sought to restrict speech at "different points in the speech process," *Citizens United v. FEC*, 558 U.S. 310, 336 (2010), and those that broadly burden expressive freedom in the name of protecting minors. This Act does both.

1

*Second*, the Act violates the Fifth Amendment vagueness doctrine, "which applies with particular force in review of laws dealing with speech." *Carolina Youth Action Proj. v. Wilson*, 60 F.4th 770, 781 (4th Cir. 2023). The Act relies on abstract and subjective terms—like "compulsive usage," "dark patterns," and "highly offensive"—that "set the censor adrift upon a boundless sea." *Interstate Cir., Inc. v. City of Dallas*, 390 U.S. 676, 684 (1968). As history and current debate reflect, reasonable minds inevitably disagree about what content, mediums, and expressive features are harmful, beneficial, or offensive. The Act's duty of "reasonable care" and other vague terms amplify this problem, requiring websites to guess at what speech might be too offensive, upsetting, engaging, or persuasive. Restricting speech based on its potential impact on audience members—each with their own sensitivities—gives no clear guidance as to what designs and content may subject websites to liability. To avoid severe penalties—including personal liability and mandatory treble damages—regulated entities will "steer far wider of" any speech the State could restrict "if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964).

*Third*, the Act conflicts with, and is preempted by, two federal laws that seek to protect the internet against a patchwork of state regulation. Section 230 of the Communications Decency Act immunizes websites' decisions about what third-party content "to publish, withdraw, postpone or alter." *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997). It thereby preempts the Act's requirements applicable to third party speech, including the duty of "care" and separate restrictions on design features, personalization, and advertising. The Children's Online Privacy Protection Act (COPPA), 15 U.S.C. § 6502, also preempts the Act's restrictions on design features, personalization, and privacy settings. Indeed, last year, the federal agency that implements COPPA determined such provisions to be both unsound and potentially unconstitutional, and it expressly

*declined* to adopt them. That decision supersedes the Act's contrary treatment.

*Fourth*, the Act violates the Commerce Clause. Unlike physical commodities, the internet's omnipresence in *every* state, simultaneously, makes it a unique medium of communication and interstate commerce. As courts have recognized, the "Internet . . . requires a cohesive national scheme of regulation." *ACLU v. Johnson*, 194 F.3d 1149, 1162 (10th Cir. 1999). This Act disrupts that national cohesion and burdens it with a single State's preferences. Indeed, "[g]iven the broad reach of the Internet, it is difficult to see how a blanket regulation of Internet material . . . can be construed to have only a local effect." *PSINet, Inc. v. Chapman*, 362 F.3d 227, 240 (4th Cir. 2004).

*Fifth*, the Act violates the Due Process Clause because regulated entities had no meaningful time to comply, even if they could. The Act took effect immediately, imposing sweeping duties that require websites to rebuild their services from the ground up, compliance builds that will take *at least a year* and likely longer. Yet the Act provided *no* time to comply, much less the "reasonable time" the Due Process Clause requires. *United States v. Locke*, 471 U.S. 84, 108 (1985).

Finally, the other preliminary injunction factors are met. NetChoice members face immediate and irreparable harm because the Act presents them with an impossible choice: (1) undertake immediate and massively burdensome changes to their services that systematically restrict and burden speech, (2) disable or limit service in South Carolina, or (3) face immediate liability for themselves and their employees. And the harm is not just to websites, but to millions of South Carolinians who will be cut off from vital channels of communication, information, and expression that their peers in other States may still access. Constitutional violations are never in the public interest, and the balance of equities strongly favors preserving the status quo here.

## STATEMENT OF FACTS

**A.    Online services create, publish, and facilitate enormous amounts of protected speech.**

Today, the "vast democratic forums of the Internet" are the "quintessential forum for the exercise of First Amendment rights." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017) (citing *Reno v. ACLU*, 521 U.S. 844, 868 (1997)). People everywhere employ online services "to engage in a wide array of protected First Amendment activity on topics 'as diverse as human thought.'" *Id.* at 105 (quotation omitted); Weber Decl. ¶¶ 6-18. This includes "not only traditional print and news services, but also audio, video, and still images, as well as interactive, real-time dialogue" such as "chat rooms" and "newsgroups." *Reno*, 521 U.S. at 870.

NetChoice's members facilitate, curate, and disseminate much of this speech. *See* Cleland Decl. ¶¶ 8-14. "On Facebook, for example, users can debate religion and politics with their friends and neighbors or share vacation photos." *Packingham*, 582 U.S. at 104. "And on Twitter [now X], users can petition their elected representatives and otherwise engage with them in a direct manner." *Id.* at 104-05. More generally, these and other "social media" websites permit users worldwide to engage in massive amounts of expressive activity generating "billions of 'posts' every day" on wide-ranging topics from "vacation photos" to "travel documentaries" to "writing, artwork, and innermost thoughts." *NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923, 932-33 (S.D. Ohio 2025); *see NetChoice v. Jones*, 2026 WL 561099, at *1 (E.D. Va. Feb. 27, 2026) ("[social media platforms] provide news, entertainment, and social interaction, serving a valuable purpose"). Social media services both facilitate this third-party expression and "engage[] in expression" themselves through their "display" and "compiling and curating" of protected content (text, audio, images, and video) created by others. *Moody*, 603 U.S. at 728, 731, 740; Cleland Decl. ¶ 12 (discussing services of NetChoice members Dreamwidth, Discord, Facebook, Goodreads, Instagram,

Nextdoor, Pinterest, Reddit, Snap, TikTok, Twitch, YouTube, and X); Weber Decl. ¶¶ 32, 38, 78; Paolucci Decl. ¶ 7; Baird Decl. ¶¶ 3, 11-13, 22-23, 30-31; Roin Decl. ¶¶ 2-11, 21.

Beyond social media exist many other online services that create, facilitate, publish, and disseminate protected speech. Cleland Decl. ¶¶ 8-11, 13-15. Many of these are NetChoice members as well. *Id.* Search services, like Google, engage in protected expression by allowing users to find information across the internet. *Id.* ¶ 9. Video streaming services like Prime Video and Netflix offer on-demand movies, shows, news, and other content. *Id.* ¶ 10. Audio streaming services, like Amazon Music, Audible, and Wondery, provide on-demand music, podcasts, news, and e-books. *Id.* ¶ 11. Kindle offers books, news, and periodicals with embedded dictionaries and features for taking notes, borrowing from local libraries, and integrating audio. *Id.* Learning platforms like Duolingo offer language courses. *Id.* ¶ 9. Automattic's "WordPress" service allows individual content creators, like bloggers and businesses, to host and maintain their own websites. *Id.*

Online services beyond NetChoice offer tremendous amounts of speech, too. These include streaming services like Hulu, Spotify, Apple Music, Apple TV, Fubo, DirecTV, Disney+, and Max; online news like nytimes.com and foxnews.com; sports services like ESPN; and online journals, databases, and digital libraries that publish scientific, historical, economic, and medical research. *Id.* ¶ 15; Weber Decl. ¶¶ 6-7. These are just a few examples of internet expression, which is "as diverse as human thought." *Reno*, 521 U.S. at 870 (citation omitted).

Online services also facilitate immense amounts of protected *commercial* speech. Weber Decl. ¶¶ 6-7, 10-11. NetChoice members' e-commerce websites—such as Airbnb, Amazon, Etsy, and eBay—connect customers with businesses, enabling businesses of all sizes to transcend geographic constraints and other barriers that once defined their markets. Cleland Decl. ¶¶ 13-14.

These websites (and many others) publish online product descriptions, reviews, pricing, advertising, and availability data that reduces informational asymmetries, democratizes markets, and empowers consumers to make informed purchasing decisions. Weber Decl. ¶¶ 10-11; Cleland Decl. ¶¶13-14. This free flow of commercial speech, in turn, fosters competition, drives down prices, spurs innovation, and expands choice across the broader economy. Weber Decl. ¶ 11.

Minors are significant users of online services, with a substantial portion of their time online devoted to expressive activities relative to non-expressive activities. Weber Decl. ¶¶ 12-19. And such services are substantially interstate, even global, in nature. Weber Decl. ¶¶ 6-26.

**B.     User data and website design are integral to, and inextricable from, online speech.**

**1.     Data is needed to create, disseminate, and publish online speech.**

Data from users orchestrates much of this online speech. Weber Decl. ¶¶ 27-30; Roin Decl. ¶ 13-21; Baird Decl. ¶¶ 5-13. At the most basic level, user data is necessary merely to deliver functional content, much like home addresses needed to deliver newspapers to subscribers. Weber Decl. ¶ 27. This includes data reflecting a user's IP address, device type, operating system, browser type, language preferences, and time zone. *Id.* Without such data, websites could not deliver functional services to users at all. *Id.* Websites also require user data to facilitate online communities and empower users. For example, many websites collect data—such as usernames and contact information—to enable users to create accounts through which they can adjust privacy and security settings, create networks of known contacts, and otherwise personalize their experience. Weber Decl. ¶ 29; Paolucci Decl. ¶¶ 16-18; Baird Decl. ¶¶ 5-7, 9.

Websites also collect data to tailor content to the diverse preferences of their users. Weber Decl. ¶ 36-49; Baird Decl. ¶¶ 10-13. As the Supreme Court observed in *Moody*, when a logged-in user accesses YouTube or Facebook, she "does not see everything—even everything from the

people she follows—in reverse-chronological order." 603 U.S. at 719. Of "the billions of posts or videos" that could wind up in a user's interface, "only the tiniest fraction do." *Id.* at 734. This "selection and ranking" of content relies in part "on a user's expressed interests and past activities," *id.* at 734-35, conveyed and shaped through user data. Weber Decl. ¶¶ 29, 31-38; Roin Decl. ¶ 15; Baird Decl. ¶¶ 10-12; Cleland Decl. ¶¶ 64-66.

Finally, for many websites—including news services, social media websites, and other websites that host third party speech—personal data can take the form of content posted directly to the website. These user contributions are akin to Letters to the Editor, classified postings, and opinion pieces published in traditional print newspapers. *See Yost*, 778 F. Supp. 3d at 948 (considering "social media operators … as publishers of opinion work—a newspaper limited to 'Letters to the Editor,' or a publisher of a series of essays by different authors"); Weber Decl. ¶ 30.

In all of these ways, "personal data," as the Act broadly defines it, *see infra* at 11, is both an essential *component* of the online speech process and also sometimes the speech itself.

### 2.  Website design, personalization, and use of data reflect numerous expressive and editorial judgments about what types of content to present, when to present it, and to whom.

Websites design their services to present content, connect users, promote dialogue, make recommendations, and offer expressive features that are useful, meaningful, and engaging for the audience they seek to foster. Cleland Decl. ¶ 60; Weber Decl. ¶¶ 50-56. These expressive judgments are executed in part through computer systems and website design features, but they reflect expressive choices akin to those long made in other mediums. Weber Decl. ¶¶ 33, 48, 50-56; Baird Decl. ¶¶ 10-13; Cleland Decl. ¶¶ 52-55.

For example, as noted above, personalized curation is broadly used by social media services, streaming services, online news sources, e-reading services, and e-commerce providers to implement and operationalize editorial judgments. Weber Decl. ¶¶ 36-49. Personalization seeks to

present users with content they will enjoy, while avoiding inappropriate content. Without such techniques, users would be lost in a "deluge" of content, *Moody*, 603 U.S. at 719, Weber Decl. ¶ 32. Virtually all NetChoice covered members use personalized curation, and personalization is a key tool in delivering age-appropriate content to users. Cleland Decl. ¶¶ 52-55; Weber Decl. ¶¶ 27-49; Paolucci Decl. ¶ 94.

When personalizing content for users, many websites use "algorithms," which are computer programs that implement human editorial choices. *Moody*, 603 U.S. at 734-35; Weber Decl. ¶¶ 33-34, 39-42, 48-49. These tools do not "respond solely to how users act online . . . without any regard to independent content standards." *Moody*, 603 U.S. at 736 n.5. Instead, websites design, monitor, and continuously adjust their algorithms to reflect human editorial preferences about the types of discourse they want to invite, the audience they want to attract, and the communities they want to foster. Weber Decl. ¶¶ 39-49. Although each algorithm differs, all algorithmic design entails such judgments, similar to how newspapers select certain fonts, craft headlines, and organize articles, games, and classified ads. *Id.* ¶¶ 39-41, 55-56; Cleland ¶¶ 52-54; Baird Decl. ¶¶ 10-14; Roin Decl. ¶ 15. Websites also make ongoing, expressive judgments about what feedback signals from users to integrate into these algorithms and how to weight them. Weber Decl. ¶¶ 42, 43, 50.

In addition to personalization, websites use interface "design" and features to present content in an engaging and useful way. Weber Decl. ¶¶ 50-56; Roin Decl. ¶ 16-17; Cleland Decl. ¶¶ 59-62. Many websites offer the ability to "like," comment on, and otherwise react to another user's posts. Weber Decl. ¶ 43, 50; Cleland Decl. ¶ 60. Other websites provide recommendations to connect users with other users, send notifications, offer "smart search" features, and present advertising based on material the user has previously engaged with. *See* Weber Decl. ¶¶ 26, 29, 37-38, 53; Cleland Decl. ¶ 52-54, 60-67. Websites also carefully design the visual layout of their

8

interfaces, for example, by focusing on specific color schemes and placing content and menus in particular locations. Weber Decl. ¶¶ 52-55; Cleland Decl. ¶ 60. These features and design choices are key editorial decisions that help websites provide users with an enjoyable, frustration-free experience that connects them to meaningful content and speakers. Weber Decl. ¶¶ 50-56. NetChoice members do all of these things. *See* Cleland Decl. ¶¶ 50-62.

A website's ultimate appeal to its audience hinges on how well it makes these design and content decisions. Weber Decl. ¶¶ 50-56; Cleland Decl. ¶ 50. And those decisions are inextricably intertwined with the content websites present. They reflect expressive choices not just about what to say, but how to say it and what not to say. Design decisions also affect decisions of third-party content creators to publish speech on the website. Weber Decl. ¶ 56. A website that makes these decisions successfully attracts both users and content creators, who reinforce each other to generate more online expression. *Id.* A website that makes the wrong decisions risks losing users and content creators alike. *Id.*

### C.    Parents have numerous tools to supervise minors' online experiences.

As courts have recognized, parents have many choices to regulate and oversee how their minor children use the internet.[1] Cleland Decl. ¶¶ 16-44. Parents may restrict "the amount of time [children] spend on [a website], the content they may access, or even those they chat with. Many tools exist to help parents with this endeavor." *NetChoice, LLC v. Griffin*, 2025 WL 978607, at *3 (W.D. Ark. Mar. 31, 2025) (collecting evidence) *(Griffin I)*. Parents decide whether and when to let their minor children use computers, tablets, smartphones, and other devices. Internet providers,

---

[1] *E.g.*, *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024) (*Bonta I*); *Jones*, 2026 WL 561099, at *11; *NetChoice v. Weiser*, 808 F. Supp. 3d 1223, 1239 (D. Colo. 2025); *NetChoice v. Carr*, 789 F. Supp. 3d 1200, 1230 (N.D. Ga. June 2025); *Yost*, 778 F. Supp. 3d at 956-57; *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105, 1127 (D. Utah 2024); *Griffin I*, 2025 WL 978607, at *3-4.

browsers, wireless routers, extensions, and many devices and third-party applications allow parents to block online services, monitor minors' internet usage, control time spent online, and filter content. *Id.* ¶¶ 41-44; Weber Decl. ¶ 57.

Websites also expend significant resources to ensure the content they present is safe and appropriate for the communities they seek to foster, especially for minors. Cleland Decl. ¶¶ 16-40; Weber Decl. ¶¶ 57-59. NetChoice members "cull and organize uploaded" content from third parties to conform with "content-moderation" policies that guide decisions "to remove, disfavor, or label various posts based on their content." *Moody*, 603 U.S. at 719-20; Weber Decl. ¶¶ 58-59. This includes removal and downranking of violent and sexual content, hate speech, harassment, and content that encourages body shaming or eating disorders. *See Moody*, 603 U.S. at 735; Weber Decl. ¶ 59; Cleland Decl. ¶ 38. In addition, many websites seek to promote beneficial speech, such as content that encourages a healthy self-image or that is educational and age appropriate. *See* Cleland Decl. ¶ 38-40; Baird Decl. ¶¶ 14-18; Weber Decl. ¶¶58-59. Data from users supports these efforts, both by providing feedback about content and permitting websites to deliver user-specific experiences. *Id.*

Many websites and apps also provide content or age ratings that help parents make decisions for children and family-oriented features. *See* Cleland Decl. ¶¶ 18-20, 24-26, 29, 31, 33; Weber Decl. ¶ 47; Paolucci Decl. ¶ 18. For example, NetChoice members Amazon, Google, Instagram, Meta (which operates Facebook, Instagram, and Threads), Pinterest, Snapchat, TikTok, and YouTube all offer controls to tailor minors' experiences to align with individual parenting styles, control privacy settings, and monitor the content kids see, the features they access, time spent on the website, and who they interact with. Cleland Decl. ¶¶ 16-33. All NetChoice members prohibit minors under 13 from accessing their main services, and many offer separate tailored experiences

10

for such users. *Id.* ¶¶ 34-40.

### D. South Carolina's Age-Appropriate Code Design Act

Following other States that have unlawfully restricted online speech,[2] the South Carolina Legislature passed the Act on January 26, 2026, H.B. 3431 (2026). The Act took effect immediately when Governor McMaster signed it on February 5, 2026.

***Coverage****.* The Act regulates "[c]overed online service[s]," meaning online services that do business in South Carolina, satisfy size or revenue thresholds, are "reasonably likely to be accessed by minors," and control the purposes and means of processing consumers' "personal data." § 39-80-10(4)(a).[3] "Personal data" means "any information, including derived data and unique identifiers, that is linked or reasonably linkable, alone or in combination with other information, to an identified or identifiable individual" or a "device" that is, or could be, linked to an individual. § 39-80-10(11)(a). Despite this facially broad definition of "covered online service," the Act's preamble, substance, and exceptions make clear that it targets "Social Media" companies and other online expression. ECF 1-1 at 2. The Act exempts many non-expressive websites and activities, including "the sale, delivery, or use of a physical product," § 39-80-10(9)(c), and data controlled by financial institutions, insurance providers, lenders, securities firms, health plans, healthcare clearinghouses, doctors, hospitals, clinics, pharmacies, and similar medical providers along with

---

[2] *See Carr*, 789 F. Supp. 3d at 1223-34; *Comput. & Commc'ns Indus. Ass'n v. Uthmeier*, 2025 WL 1570007, at *15 (N.D. Fla. June 3, 2025); *Yost*, 778 F. Supp. 3d at 956; *Griffin I*, 2025 WL 978607, at *10 (W.D. Ark. Mar. 31, 2025); *NetChoice, LLC v. Bonta*, 770 F. Supp. 3d 1164, 1177 (N.D. Cal. 2025); *Comput. & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011, 1021 (W.D. Tex. 2024); *Reyes*, 748 F. Supp. 3d at 1110-11; *Weiser*, 808 F. Supp. 3d at 1227.

[3] This Motion uses the word "service" or "website" to include all regulated "[c]overed online service[s]," § 39-80-10(4), including applications and other software. Unless otherwise noted, all statutory citations are citations to the South Carolina Code of Laws. Citations in the form "HB 3431 § _" refer to the as-enacted version of the Age-Appropriate Code Design Act. *See* ECF1-1.

their agents and vendors. § 39-80-20(D)(2). The Act also exempts government entities. *Id.*

A service is "reasonably likely to be accessed by a minor" if it is "reasonable to expect that [it] would be accessed by [a minor]" because: (i) the individual user "is known to the covered online service to be a minor," or (ii) the service "is directed to children" within the meaning of COPPA. § 39-80-10(17)(a). "Minor" is a "consumer" under eighteen, § 39-80-10(8). Under COPPA, a "child" is an individual under 13. *See* 15 U.S.C. § 6501(1). The Act does not define "consumer." But a "user" is "an individual . . . located in South Carolina." § 39-80-10(20).

The Act's broadest restrictions apply when a service "know[s]" that even one of its users is a minor, even if the site is not aimed at minors and minors make up only a fraction of its audience. § 39-80-10(7). The Act defines "know[]" in a sweeping way to include all "information" and "inferences" "known to the service," including "attribut[ions]" and "associations" about a user's age formed "for any purpose." § 39-80-10(7); § 39-80-10(17)(b). This definition appears to encompass data a website possesses anywhere in its digital systems, even if no employee has *actually identified* the user as a minor. The Act thus forces covered services to consider when they will be deemed to have "actual knowledge" of a user's age by virtue of information in their computer systems, how to avoid liability for treating undetected minors as adults, and how to avoid treating adults as minors. § 39-80-10(7). Weber Decl. ¶¶ 69-73; Baird Decl. ¶ 34. The Act also requires child-directed services to treat *every* user as a minor unless they have "actual knowledge" the user is *not* a minor. § 39-80-10(17)(b). This pressures mixed-audience services to either childproof all offerings or implement burdensome, imperfect, and unwanted age-sorting mechanisms. *See* Paolucci Decl. ¶¶ 16-17, 33-45, 96-99; Baird Decl. ¶¶ 34-39; Weber Decl. ¶¶ 69-73.

***Substantive provisions***. The Act imposes five categories of problematic requirements.

*First*, covered services must "exercise reasonable care" in their "use of a minor's personal

data" and "design and operation . . . to prevent" specified harms to minors, including "compulsive usage," "severe psychological harm," "severe emotional distress," "highly offensive intrusions" on privacy, discrimination, and "material financial or physical injury." § 39-80-20(A). This duty of care applies to, but is not limited to, "covered design feature[s]," defined as any features that "encourage or increase" minors' engagement with the website, such as "infinite scroll," "auto-playing videos," "quantification of engagement," and "appearance altering filters." § 39-80-10(3). "Compulsive usage" means a "persistent and repetitive use" that "substantially limits" "major life activities." § 39-80-10(1). Websites are not required to exercise reasonable care for content a minor "deliberately and independently search[es] for or specifically request[s]." § 39-80-20(C).

*Second*, the Act broadly restricts personalization. It requires a service to allow users to "opt out of personalized recommendation systems" and establish such opt-out as the default setting for known minors. §§ 39-80-30(B), 39-80-40(F). A "personalized recommendation system" is a "fully or partially automated system used to suggest, promote, or rank content . . . based on the personal data of users." § 39-80-10(12). The Act also restricts data "processing" and "profiling" with similar effect. § 39-80-40(F). To "process" data is to engage with it "by manual or automated means," including "but not limited to, collecting, using, storing, disclosing, analyzing, deleting, sharing, or modifying" it. § 39-80-10(14). "Profiling" is "automated processing of personal data to evaluate, analyze, or predict" traits such as "preferences" or "interests," § 39-80-10(15). The Act prohibits profiling for known minors unless it is "necessary" to provide specific "aspects" of a service the minor has "knowingly requested" and with which the minor is "actively and knowingly engaged." § 39-80-40(F). The Act does not define what it means to "knowingly" request or engage with personalized aspects of a service or how to assess when personalization or profiling is "necessary."

*Third*, the Act requires services to disable all of their "design features" by default for known

13

minors unless the feature is "necessary" to the service. §§ 39-80-30(A), (C); 39-80-40(E), (G); 39-80-50. Again, the Act does not define "necessary." Nor does it define "design feature," a term that could be understood to encompass practically every aspect of any given online service— ranging from the font and emphasis of text displayed, to the layout of headings, buttons and drop down menus, and the layout of feeds. These mandatory defaults must, at a minimum, limit time spent on the service, block messages and reactions from non-connected accounts, restrict account visibility, hide "quantification of engagement" such as visible "likes, comments, clicks, views, or reactions"; disable search engine indexing of a profile; limit visibility of connections; and restrict notifications and push alerts. *See* § 39-80-30(A); § 39-80-40(E), (G). These requirements apply even if technologically infeasible or a poor fit with the particular service a website offers. *E.g.*, Paolucci Decl. ¶¶ 35-82, 95-99; Baird Decl. ¶ 32.

*Fourth,* the Act prohibits miscellaneous speech-related activities, including "facilitating" certain third-party advertisements to minors and use of so-called "dark patterns." § 39-80-60(B), (C). A covered service may not "facilitate targeted advertising to minors." § 39-80-40(C). By its plain text, this provision imposes strict liability for any type of facilitation, even if the service itself prohibits targeted ads, has no awareness a recipient *is* a minor, and plays only an indirect role in facilitating the ad. The Act also prohibits websites from facilitating "ads directed to minors for products prohibited for minors," including "narcotic drugs, tobacco products, gambling, and alcohol," when the service "know[s]" the user is a minor. § 39-80-60(B). But again, the term "facilitate" reaches ads originating with third parties that are delivered through automated systems, not just ads the service directly creates. § 39-80-40(C). The prohibition thus imposes strict liability with no requirement the service know the content of the ad and no safe harbor for websites that work to prevent such ads. Separately, the Act bars "dark patterns," defined as a "user interface

14

designed or manipulated with the substantial effect of subverting or impairing user autonomy, decision making, or choice." This definition is untethered to any particular use or impact. § 39-80-10(5). The Act provides no guidance to determine when an interface crosses the line from engaging to subverting user autonomy. *See* Cleland Decl. ¶ 49; Paolucci Decl. ¶¶ 27, 59.

*Fifth*, the Act compels services to issue a "disclosure," and publish the speech of a third-party "auditor" (and various "experts" the auditor must consult), about their "design safety" for minors. *See* § 39-80-60(E); § 39-80-70(A)(5), (B). The "audit" must cover items such as the service's purpose, whether minors are likely to access it, how reports of harm are handled, "design safety," "privacy protections," "age verification" methods, and other speech-chilling topics. § 39-80-70(A). After giving auditors full access to their operations, services must "issue [the] public report" to the Attorney General for public posting. § 39-80-70(A).

*Enforcement.* The South Carolina Attorney General "shall enforce" the Act, and covered services "shall be liable for treble the financial damages incurred as a result of a violation." § 39-80-80(A)-(B). A service's "officers and employees" "may be held personally liable for wilful and wanton violations" of the Act. § 39-80-80(C). The Act provides no opportunity to cure. Websites that violate the "dark patterns" provision are subject to substantial penalties. § 39-80-60(C).

In light of these penalties, guessing wrong about what the Act means (or what Defendant says the Act means) is prohibitively expensive—even ruinous for employees and officers. Many services will not risk it. Instead they will either ban minors in South Carolina altogether or refrain from publishing content, disable editorial features, and forgo efforts to connect users. *See* Paolucci Decl. ¶¶ 21, 95-105; Baird Decl. ¶ 41; Roin Decl. ¶ 20.

## LEGAL STANDARD

A plaintiff seeking a preliminary injunction must establish (1) a likelihood of success on the merits; (2) irreparable harm absent preliminary relief; (3) the balance of equities tips in its

favor; and (4) an injunction is in the public interest. *Platt v. Mansfield*, 162 F.4th 430, 438 (4th Cir.

2025); *see Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Preliminary relief seeks

"to preserve the relative positions of the parties" pending judgment, and "given the haste that is

often necessary," it "is customarily granted on the basis of procedures that are less formal and

evidence that is less complete" than a trial on the merits. *Univ. of Tex. v. Camenisch*, 451 U.S. 390,

395 (1981). NetChoice is "not required to prove [its] case in full" at this preliminary stage. *Id.*

## ARGUMENT

### I.     NetChoice is likely to succeed on its First Amendment Claims.[4]

"Whatever the challenges of applying the Constitution to ever-advancing technology, the

basic principles of the First Amendment do not vary." *Moody*, 603 U.S. at 733 (cleaned up). The

"government has no power to restrict expression because of its message, its ideas, its subject mat-

ter, or its content." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790 (2011). All persons must "have

access to places where they can speak and listen, and then, after reflection, speak and listen once

more." *Packingham*, 582 U.S. at 104. And today, those places unquestionably include the "vast

democratic forums of the Internet." *Id.*; *see Chamber of Com. of the U.S. v. Lierman*, 151 F.4th

---

[4] NetChoice has associational standing to challenge the Act because: (1) many of its members have standing in their own right; (2) challenging the Act is germane to NetChoice's purpose; and (3) members' individual participation is unnecessary. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); Cleland Decl. ¶¶ 4-8, 35, 40, 69-73. Individual member participation is not needed because the "questions this Court must answer"—the application of the First Amendment, vagueness, preemption and Commerce Clause principles—"can all be answered without reference to the intricacies of each individual platform's operation[.]" *CCIA*, 2025 WL 1570007, at *9; *accord Jones*, 2026 WL 561099, at *4-5; *Reyes*, 748 F. Supp. 3d at 1118-19; *NetChoice v. Fitch*, 787 F.Supp.3d 262, 272 (S.D. Miss. 2025); *Griffin I*, 2025 WL 978607, at *6. NetChoice also has standing to assert the rights of its members' users. *E.g.*, *NetChoice v. Fitch*, 134 F.4th 799, 805-07 (5th Cir. 2025); *Jones*, 2026 WL 561099, at *5-6; *Yost*, 778 F. Supp. 3d at 946 (citing *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988)); *CCIA*, 2025 WL 1570007, at *9; *NetChoice v. Murrill*, 2025 WL 3634112, at *15-20 (M.D. La. 2025); *NetChoice v. Griffin*, 2023 WL 5660155, at *11-12 (W.D. Ark. Aug. 31, 2023).

530, 533-34 (4th Cir. 2025) (similar).

These principles apply to minors—just as to adults—and "only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212-13 (1975). Protected speech "cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them," and States have no "free-floating power to restrict the ideas to which [they] may be exposed." *Brown*, 564 U.S. at 794-95.

"Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve [a] compelling state interest[ ]." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Laws are content-based if they draw distinctions based "on the message a speaker conveys" or the government adopted them "because of disagreement with the message." *Id.* Laws are also content-based if they "cannot be justified without reference to the content of the regulated speech." *Id.* (cleaned up). A "regulation of speech cannot escape classification as facially content based . . . simply by swapping an obvious subject-matter distinction for a 'function or purpose' proxy that achieves the same result." *People for the Ethical Treatment of Animals, Inc. v. N.C. Farm Bureau Fed'n, Inc.*, 60 F.4th 815, 830 (4th Cir. 2023) (*PETA*) (citation omitted).

Content neutral laws are subject to intermediate scrutiny and unconstitutional unless they advance "important governmental interests unrelated to the suppression of free speech and [do] not burden substantially more speech than necessary to further those interests." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997). And where a State restricts protected speech, it "bears the burden of proving the constitutionality of its actions." *FEC v. Cruz*, 596 U.S. 289, 305 (2022).

The Act triggers and fails First Amendment scrutiny on numerous grounds. The entire Act

is content-based and speaker-based because, in the Legislature's words, it is a "Social Media Reg-ulation Act."[5] *See Yost*, 778 F. Supp. 3d at 953 (concluding that law regulating websites that "allow users to … interact socially with other users" was content-based). Numerous individual provisions also independently violate the First Amendment as content-based restrictions that directly and de-cidedly suppress, burden, and compel speech. Collectively, these provisions create a censorship regime that forces websites, on pain of onerous penalties, to "determin[e] whether material is suit-able for kids," and restrict it accordingly. *Bonta I*, 113 F.4th at 1118 (citing *Interstate Cir., Inc.*, 390 U.S. at 684).

## A.     The Act's individual provisions impermissibly restrict speech.

### 1.     The duty of "reasonable care" (§ 39-80-20(A))

The Act requires websites to "exercise reasonable care . . . to prevent" "harm[s] to minors," including "compulsive usage," "anxiety," "severe emotional distress," and "highly offensive in-trusions" on privacy. § 39-80-20(A). As the Fourth Circuit recently recognized, such "care" obli-gations necessarily require websites to "prioritize[] the dissemination of one type of content over another." *M.P. ex rel. Pinckney v. Meta Platforms, Inc.*, 127 F.4th 516, 525 (4th Cir. 2025).

*Strict scrutiny applies*. This duty is content based because it uses a "proxy"—the impact of speech on its listener—to target content the State disfavors. *PETA*, 60 F.4th at 830. Websites must evaluate the content they publish and then predict how minors—of different ages, sensitivities, and maturity levels—might react to it. Specifically, websites must consider whether content could con-tribute to "anxiety, depression, self-harm or suicidal ideations," "severe emotional distress," or "compulsive usage," and adjust their publication accordingly. § 39-80-20(A). News reports on cli-mate change, famine, or genocide might not make the cut. Videos of classical ballet dancers could

---

[5] *H3431*, S.C. Gen. Assembly (Feb. 11, 2026), https://perma.cc/D6ZL-5ZRY.

be removed for fear they might encourage eating disorders. Violent video games and movies will be suspect. The list is endless. *See* Cleland Decl. ¶¶ 44-46; Weber Decl. ¶¶ 74-76; Roin Decl. ¶¶ 13-14; Baird Decl. ¶ 29; Paolucci Decl. ¶¶ 83-94. As courts have held, requiring websites to decide whether "certain types of content" are "associated with certain [harmful] results" and avoid that content is "a content-based" and "viewpoint-[ ]based restriction on . . . speech." *NetChoice v. Griffin*, 2025 WL 3634088, at *7-8 (W.D. Ark. Dec. 15, 2025) (*Griffin II*). Where "[t]he overriding justification for the regulation is concern for the effect of the subject matter on young viewers," the law "is not justified without reference to the content of the regulated speech," and it must satisfy strict scrutiny. *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 811-12 (2000).

*The duty fails any form of heightened scrutiny*. Because this "reasonable care" mandate "is a content-based restriction, the State bears the burden of showing" that it is "the least restrictive means of achieving a compelling state interest." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) ("*AFP*") (citation omitted). There is no dispute that South Carolina has a compelling interest in protecting minors, and NetChoice members share that interest. But the Supreme Court has consistently held that such an interest does not extend to "protect[ing] the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik*, 422 U.S. at 213-14; *e.g.*, *Brown*, 564 U.S. at 795. The First Amendment protects speech that causes "anguish," *Snyder v. Phelps*, 562 U.S. 443, 456 (2011); speech that is "offensive or disagreeable," *Mahanoy Area Sch. Dist. v. Levy*, 594 U.S. 180, 205 (2021) (Alito, J., concurring) (citation omitted); speech that "invites dispute," *Young v. Am. Mini Theaters, Inc.*, 427 U.S. 50, 64 (1976); speech that is "interactive," *Brown*, 564 U.S. at 798; and speech that is "unwanted," *Playboy Ent. Grp.*, 529 U.S. at 811. Where "the designed benefit of a content-based speech restriction is to shield the sensibilities of [minor] listeners [from protected speech], the general rule is that the right of expression prevails,

*even where no less restrictive alternative exists.*" *Id.* at 813 (emphasis added); *see Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1036 & n.6 (9th Cir. 1991) ("[W]e decline to expand products liability law to embrace the ideas and expression in a book." (collecting cases)).

The duty of care fails any test of narrow tailoring. It governs many websites that offer significant informational value and pose little risk of harm, such as language apps, online calculators, and dictionary apps—and it would cover a website if even one "individual minor" accessed the service. § 39-80-10(17)(a); *see* Baird Decl. ¶¶ 21-23, 26-27, 29; Paolucci Decl. ¶ 65. The Act thus pressures websites to restrict speech that may be tremendously *beneficial* for most users (including minors) simply because that speech could be considered controversial or disturbing by *one or some* user(s) in *some* contexts. This includes online news, harm reduction information, health and fitness information, documentary films, books, and much more. *See* Paolucci Decl. ¶¶ 83-94; Cleland Decl. ¶¶45-46. But States cannot force websites "to censor potentially sensitive, but protected, speech as to all users for the benefit of some subset of particularly susceptible users." *Griffin II*, 2025 WL 3634088, at *8. Rather, "the burden of avoiding [sensitive] speech should normally fall upon the viewer . . . simply by averting (his) eyes." *Id.* (cleaned up); *Erznoznik*, 422 U.S. at 210-11 ("[T]he Constitution does not permit government to decide which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer."). That is particularly true here, where websites already offer extensive tools enabling parents to guide and oversee their minors' online experiences. *See supra* at 9-10; *Brown*, 564 U.S. at 803 (law not narrowly tailored where the "system [already] does much to ensure that . . . parents who care about the matter can readily evaluate the [content] their children" consume).

At the same time, the duty is substantially underinclusive. It allows minors to access even the *most* harmful content so long as the minor "search[es] for or specifically request[s]" it. § 39-

80-20(C). And it exempts potential harms posed by the "sale, delivery, or use of a physical product," § 39-80-10(9)(c), and myriad healthcare providers, financial institutions, insurers, and government websites. § 39-80-20(D). The Act thus targets one type of online activity—*private speech*—while leaving unaddressed a wide array of potentially harmful conduct and activities that take place on unregulated websites and in the physical world. Such lack of fit "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring" particular speech. *Brown*, 564 U.S. at 802; *Griffin II*, 2025 WL 3634088, at *8.

The State also ignored (and even prohibited) less-restrictive alternatives. Laws may not "chill an alarming amount of speech without any 'actual evidence' in the legislative record that lesser restrictions will not do—a nonnegotiable requirement in [the Fourth] Circuit." *PETA*, 60 F.4th at 831 (citing *Reynolds v. Middleton*, 779 F.3d 222, 229 (4th Cir. 2015)). The State here "could have easily employed less restrictive means to accomplish its protective goals, such as by (1) incentivizing companies to offer voluntary content filters or application blockers [(as many already do)], (2) educating children and parents on the importance of using such tools, and (3) relying on existing criminal laws that prohibit related unlawful conduct." *Bonta I*, 113 F.4th at 1121; *see Jones*, 2026 WL 561099, at *11 ("[E]ven if parents are not using the available parental controls, [the State] could work with companies and launch advertising campaigns to ensure parents know how to use the current tools effectively."). Indeed, permitting websites to use personalization to direct age-appropriate content to minors is a less restrictive alternative. But even as the Act directs "reasonable care" in delivering content, it hamstrings websites' ability to use that less restrictive tool. Weber Decl. ¶¶ 31-49; Cleland Decl. ¶ 46; Baird Decl. ¶¶ 30-31; Paolucci Decl. ¶ 94.[6]

---

[6] For all of the same reasons, even if this provision were subject to intermediate scrutiny, it would fail that scrutiny because it is aimed at the "suppression of free speech" and it "burden[s] substantially more speech than necessary." *Turner Broad. Sys.*, 520 U.S. at 189.

## 2.    Restrictions on Personalization (§§ 39-80-30(B), 39-80-40(F))

The Act requires covered websites to: (1) provide an "option [for users] to opt out of personalized recommendation systems"; (2) enable that option by default for minors; and (3) abstain from using automated processes to serve minors with content curated to their "personal preferences, interests, . . . behavior, location, or movements" unless "necessary." § 39-80-30(B), (C); § 39-80-40(F); § 39-80-10(15). The Act does not define "necessary," but, taken in context, the Act's clear implication is that South Carolina believes personalization is *un*necessary.

These provisions directly burden First Amendment rights by interfering with websites' choices about how "combin[e] 'multifarious voices' to create a distinctive expressive offering." *Moody*, 603 U.S. at 738 (citation omitted); *see also Wash. Post v. McManus*, 944 F.3d 506, 518 (4th Cir. 2019) (recognizing that the First Amendment provides "independent constitutional protection" over "the very choice of material to go into a [compilation]" (cleaned up)). Indeed, the Supreme Court has recognized that personalized content—including the curated feeds of "Face-book" and "YouTube"—are protected expressive offerings when they incorporate editorial judgments, *Moody*, 603 U.S. at 738, and all of them do, *see* Weber Decl. ¶ 39; Baird Decl. ¶¶ 30-31; Cleland Decl. ¶¶ 40-42; Roin Decl. ¶ 15. As the *Moody* Court explained, "[d]eciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity of its own." 603 U.S. at 731. Yet the Act severely limits use of these expressive systems to "suggest, promote, or rank content . . . based on the personal data of users," 39-80-10(12), or to suggest content for users based on predicted "pref-erences" or "interests," § 39-80-10(15). By dictating how covered websites can select, arrange, and present content, the Act "intru[des] into the function of editors" and interferes with "editorial control and judgment." *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974).

These provisions fail any level of heightened scrutiny. "It has yet to be demonstrated how

governmental regulation of [the editorial] process can be exercised consistent with [the] First Amendment." *Id.* And even if intermediate scrutiny supplies the test, the Act's personalization provisions fail it. The State must show that its law "further[s] an important or substantial governmental interest *unrelated to the suppression of free speech*" and does not "burden substantially more speech than is necessary to further." *Turner Broad. Sys.*, 520 U.S. at 186 (citation omitted) (emphasis added). The State can show neither. The Act's reference to "infinite scroll," "videos," "gameplay," "reactions," "notifications," and "engagement" and "deliberately" requested content leave no doubt that speech is the Act's target, § 39-80-10(3); § 39-80-20(C), § 39-80-30(B), as do its references to "social media" and exemptions for non-expressive websites. *See supra* at 11. And these provisions burden substantially more speech than necessary because they apply to *every* minor on every covered website (no matter how safe) and restrict countless *beneficial* uses of personalization to deliver core protected speech that users want to see, hear, and engage with. *See* Weber Decl. ¶¶ 45-47; Baird Decl. ¶¶ 30-31; Cleland Decl. ¶ 46; Roin Decl. ¶ 15.

### 3.      Default disablement tools (§ 39-80-30(A), (C))

The Act requires covered websites to "disable" each "design" choice unless "necessary"; set defaults that "limit . . . time the user spends" on the website; block all "messaging, requests, reactions, likes, comments, or other contact" from unconnected accounts; "restrict the visibility of [a] minor's account and information posted by the minor to only users with connected accounts"; "block, disable, and render nonvisible quantification of engagement"; "disable search engine indexing of a user's account profile"; and "prohibit any other individual from viewing the user's connections to other users, regardless of the nature of the connection." § 39-80-30(A)(1)-(2), (4)-(8). Although many websites—NetChoice members' included—offer settings and tools that overlap with these requirements, the Act removes websites' ability to design their controls differently to preserve access to connections and content in ways that reflect unique aspects of their service,

while maintaining safety. *See* Paolucci Decl. ¶¶ 44-47, 74-82; Cleland Decl. ¶ 50; Weber Decl. ¶¶ 77-79; Baird Decl. ¶¶ 32-33; Roin Decl. ¶¶ 16-17. Further, the Act mandates that these restrictive settings be enabled by default. § 39-80-30(C); Cleland Decl. ¶ 50; Weber Decl. ¶ 58.

These requirements regulate speech because they interfere with websites' protected "decisions about *how to construct and operate* their platforms." *Reyes*, 748 F. Supp. At 1120 (emphasis added). Again, government may not dictate editorial "choices" about "*whether—and, if so, how—*to convey" speech. *Moody*, 603 U.S. at 716, 719 (emphasis added); *see Tornillo*, 418 U.S. at 258; *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 702 F. Supp. 3d 809, 831 & n.16, 837 (N.D. Cal. 2023) (limits on "notifications," "continuous scrolling," and "auto-play" would "require [social media platforms] to publish less third-party content"); *Grp. W Cable, Inc. v. City of Santa Cruz*, 669 F. Supp. 954, 970 (N.D. Cal. 1987) ("[L]egislation requiring a newspaper to print a minimum number of pages [or] use paper and ink of only a certain quality . . . would certainly violate the First Amendment.").

The requirements also are presumptively invalid because they are content-based judgments about "how to display" speech. *Moody*, 603 U.S. at 716. For example, telling a website that "it cannot tell the minor [user] the *number* of likes or feedback that the [minor's] post has received" "is content discrimination" that triggers and fails strict scrutiny. *NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1016 (9th Cir. 2025) (*Bonta II*); *see Bland v. Roberts*, 730 F.3d 368, 386 (4th Cir. 2013) (Facebook's "like" button "constitute[s] pure speech" and "symbolic expression"). The same is true for "reactions," "clicks," and "views," § 39-80-10(3)(d), all of which convey information about how users are engaging with speech and invite participation. *See Brown*, 564 U.S. at 798 (protecting speech that is "interactive" and invites "participat[ion]"). And other restrictions—such as for "autoplay[]," "notifications," and "comments"—are content-based because they only count

as "[c]overed design feature[s]" if they would "increase" or "encourage" engagement with the website. § 39-80-10(3). To make this determination—and to understand whether a feature promotes engagement—websites must evaluate both the content of the feature itself and any underlying content it presents or facilitates. Weber Decl. ¶¶ 50-56; *supra* at 17-21.

These provisions therefore trigger and fail any level of First Amendment scrutiny for many of the same reasons as the duty of care and personalization restrictions: they interfere with editorial rights and require content-based judgments. *See supra* at 17-21; *Moody*, 603 U.S. at 718 (editorial restrictions are "unlikely to withstand First Amendment scrutiny"); *Tornillo*, 418 U.S. at 258 (similar). The purpose is to restrict free speech—which is not a valid interest—and the provisions "burden substantially more speech than necessary" to further *any* legitimate interest. *Turner Broad. Sys., Inc.*, 520 U.S. at 189.[7] The provisions are facially invalid because they apply even to *beneficial* speech. The State lacks "any 'actual evidence' in the legislative record that lesser restrictions will not do," *PETA*, 60 F.4th at 831 (citation omitted). And again, the provisions are underinclusive in light of the Act's many exceptions for government-owned services and websites that are not predominantly expressive. *See Reyes*, 748 F. Supp. 3d at 1128.

### 4.   Compelled "audits" and disclosures (§ 39-80-60(E), § 39-80-70)

The Act mandates that covered websites provide "comprehensive" disclosures "describing the[ir] design safety for minors" and submit to intrusive third-party audits evaluating their "safety," "business practices as they pertain to minors," reports about harms to minors, and how "those reports were handled," among several others. §§ 39-80-60(E), 39-80-70(A)-(C).

---

[7] The fact that minor users can undo the defaults does not solve the First Amendment problem. *See Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301, 305 (1965) (government-imposed default impediment on speech through the mail—requiring the addressee to first submit an "official . . . reply card"—burdened "First Amendment rights").

These requirements violate the First Amendment too. The First Amendment "protects 'the right to refrain from speaking at all.'" *Bonta I*, 113 F.4th at 1117 (quoting *Wooley v. Maynard*, 430 U.S. 705, 714 (1977)). So laws compelling companies to convey "policy views on intensely debated and politically fraught topics . . . and . . . how the company . . . applie[s] its policies" are subject to strict scrutiny. *X Corp. v. Bonta*, 116 F.4th 888, 901-02 (9th Cir. 2024) (mandatory reports requiring the company to "opin[e] on whether and how certain controversial categories of content should be moderated" were likely unconstitutional (emphasis added)). The Ninth Circuit has therefore held that California's similar compelled-speech and censorship requirements under that State's Age Appropriate Design law should be enjoined as likely violating the First Amendment. *See Bonta I*, 113 F.4th at 1116-22 (requirement that websites "opine on potential harm to children" arising from their services likely violated the First Amendment); *see* Paolucci Decl. ¶¶ 71-73; Baird Decl. ¶ 40; Roin Decl. ¶ 18.

**B.    The Act forces websites to serve as censors.**

Combined, all the Act's challenged speech restrictions create a regime of proxy censorship that forces online services to restrict speech in ways South Carolina could never do directly. It requires websites to predict whether protected speech might cause "harm"; to redesign features to suppress that speech; to disable access to speech that is too engaging; and to submit to ongoing "audits" of these speech-restricting efforts. But South Carolina cannot "deputize[] covered businesses into serving as censors for the State" by forcing them to decide whether "content" or "proxies for content" could expose children to "harm[]." *Bonta I*, 113 F.4th at 1108, 1118 (rejecting California's similar "Age-Appropriate Design" law); *Interstate Cir., Inc.*, 390 U.S. at 681-82 (invalidating as a "prior restraint" a law that required film exhibitors to decide whether films were "suitable" for children and restrict access for "not suitable" films); Weber Decl. ¶¶ 6-56, 63-101; Paolucci Decl. 26-105; Roin Decl. ¶¶ 13-18; Baird Decl. ¶¶ 26-41.

## II.    NetChoice is likely to succeed on its vagueness claims.

The Act is also unconstitutionally vague. "A fundamental principle in our legal system is that laws . . . must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). A law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement," *id.* (citation omitted), by failing to "provide explicit standards for those who apply [it.]" *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "When a statute 'is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts.'" *Ctr. for Individual Freedom, Inc. v. Tennant*, 706 F.3d 270, 280 (4th Cir. 2013) (alteration in original) (quoting *Smith v. Goguen*, 415 U.S. 566, 573 (1974)). Thus, a "stricter standard" of vagueness "applies with particular force in review of laws dealing with speech." *Carolina Youth Action*, 60 F.4th at 781 (citations omitted). Otherwise, vague laws risk chilling would-be speakers by forcing them "to steer far wider of the unlawful zone" than they would "if the boundaries of the forbidden areas were clearly marked." *Baggett*, 377 U.S. at 372.

The Act here raises so many "vagueness problems" that "[i]t is hard to know where to begin." *Carolina Youth Action*, 60 F.4th at 786. All the Act's challenged speech restrictions are invalid because they turn on inherently subjective and abstract definitions. Cleland Decl. ¶¶ 48, 56-62, 71; Paolucci Decl. ¶¶ 35-62, 83-94, 101; Roin Decl. ¶ 13; Baird Decl. ¶ 29. For example, the Act's "reasonable care" requirements include no guidance to assess what level of care is appropriate for minors—whether as to minors generally or minors in different age ranges. As the Third Circuit has recognized, a "definition of 'minor' as any person under [18] years of age creates vagueness . . . because materials that could have 'serious literary, artistic, political, or scientific

27

value' for a 16-year old would not necessarily have the same value for a three-year-old," and websites "cannot tell which of these minors should be considered." *ACLU v. Mukasey*, 534 F.3d 181, 205 (3d Cir. 2008). Moreover, even minors of the same age have differing sensibilities, and content moderation systems are not perfect, so websites must assess what level of risk is reasonable. Yet the Act fails to specify who the referent "minor" is that a covered service must consider. Is it the average minor? The median minor? Any minor—such that any one minor's increase in use on a service used by billions worldwide suffices? *See Sessions v. Dimaya*, 584 U.S. 148, 160-61 (2018) (holding that an "ordinary case" standard was unconstitutionally vague because "[h]ow does one go about divining the conduct entailed in a crime's ordinary case? Statistical analyses? Surveys? Experts? Google? Gut instinct?"). That is a fundamentally "unascertainable standard of conduct" because "violation entirely depends upon the sensitivities of some unspecified user and a judge or jury's determination about what the platform 'should have known' about those sensitivities." *Griffin II*, 2025 WL 3634088 at *13; *cf. Counterman v. Colorado*, 600 U.S. 66, 79-80 & n.5 (2023) (requiring more than negligence to punish dissemination of even *unprotected* speech).

Likewise, the Act's references to various "harm[s]" are subjective and dependent on reactions that will necessarily differ person-to-person across different ages, sensitivities, and backgrounds. *See* § 39-80-20(A)(1)-(7). Consider "compulsive usage," defined as "the persistent and repetitive use" of a website that "substantially limits" one of the user's "major life activities, including, but not limited to, sleeping, eating, learning, reading, concentrating, communicating, or working." §§ 39-80-10(1); 39-80-20(A)(1). How much use is "persistent and repetitive"—*e.g.*, does 5, 15, or 30 minutes per day count? When does that use "substantially limit[]" the specified "life activities"? Is it enough that the user prefers to watch an online movie than to go to sleep or do homework? If not, when do such ordinary behaviors cross the line to "compulsive"? What other

28

"life activities" count as "major"? And who decides?

The same problems are inescapable for provisions addressing "severe psychological harm" and "severe emotional distress." § 39-80-20(A)(2)-(3). Certainly, online posts discussing Anne Frank's *The Diary of a Young Girl* could cause some level of emotional and psychological distress for minor readers. But covered services have no way to know whether this discomfort rises to the level of "severe" "psychological harm" or "emotional distress" such that a covered service is failing to "exercise reasonable care" by allowing the group to continue. *See Snyder*, 562 U.S. at 458 ("outrageous" was too "malleable" a standard to impose liability for speech); *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 55 (1988) ("'outrageousness' . . . has an inherent subjectiveness about it"); *Bonta I*, 770 F. Supp. 3d at 1205 ("materially detrimental" and "best interests of children" were unconstitutionally vague); Weber Decl. ¶¶ 74-76; Paolucci Decl. ¶¶ 83-94; Roin Decl. ¶¶ 13-14.

The disablement requirements for "design features" (unless "necessary"), § 39-80-30(A)(1), are unconstitutionally vague for similar reasons. To begin, the Act never defines what a "design feature" *is*, much less when such a feature is "necessary." The term "design feature" arguably could extend to any of countless "feature[s] or component[s]" of a website, § 39-80-10(3), including font size and color; page layout; use of images, icons, and banners; settings and navigation structures; search bars and filters; content categories and warnings; and many more. The Act fails to explain what it would mean to "disable" all of these features by "default" (leaving, presumably, a blank screen). *See* Weber Decl. ¶¶ 76-79; Paolucci Decl. ¶¶ 60-62. Nor does it contain guidance on how to determine that any particular one—or all of them together—are "necessary." *See Carolina Youth Action*, 60 F.4th at 786 (law penalizing "unnecessary" conduct is unconstitutionally vague because "'unnecessarily' [is] a word steeped in its own vagueness problems"). And the related definition for "*covered* design feature" simply compounds this vagueness, apparently

referring to any design or content judgment a user might like, which again is user- and context-dependent. *See* § 39-80-10(3) (emphasis added).

Other core terms are just as vague. The Act restricts personalization except for "expressed preferences," § 39-80-30(B), defined as "freely given, considered, specific, and unambiguous indication of a user's preferences." § 39-80-10(6)(a). But it contains no guidance for how a website might decide—for millions of users influenced by countless external factors —whether a user's decision is "freely given" or "considered." The Act is therefore vague as "its violation entirely depends upon the sensitivities of some unspecified user." *Griffin II*, 2025 WL 3634088, at *13.

So too with the term "dark patterns," defined as interface designs that "subvert" or "impair" user "autonomy, decisionmaking, or choice." § 39-80-10(5). Protected speech has long encompassed expressive techniques that engage the reader or audience member, sometimes over their better judgment. Indeed, most "[l]iterature when it is successful draws the reader into the story." *Brown*, 564 U.S. at 798. For example, a page-turning novel might keep a reader up long after bedtime; a daily soap opera might distract from homework or exercise goals; and a compelling advertisement might persuade the viewer to make an impulse purchase of products they do not need or even want. In each case, the speech arguably "subvert[s]" choice or decisionmaking, yet the Act offers no guidance as to whether such expressive choices are dark patterns, and if not, what more would be required to cross the line. *See* Paolucci Decl. ¶¶ 27, 58-59; Cleland Decl. ¶ 61.

As a final example, the Act defines "personal data" as any data that "alone or in combination with *other information*" is linkable to a user. § 39-80-10(11)(a) (emphasis added). This renders *all* data "personal," because all data is "linkable" to a user via "other information." Avoiding that conclusion requires a definition of "other information" the Act does not supply, again creating a vagueness problem by leaving covered services to fill in the Act's gaps.

All this vagueness not only makes it impossible for covered online services to know what they must do to comply with the Act but also "authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). The State "cannot give the Judiciary uncut marble with instructions to chip away all that does not resemble David" while leaving covered services' users in South Carolina "to bear constitutional deprivation in the mean-time." *Griffin I*, 2025 WL 978607, at *17 (quoting *Percoco v. United States*, 598 U.S. 319, 337 (2023) (Gorsuch, J., concurring in the judgment)).

## III.    NetChoice is likely to succeed on its preemption claims.

Section 230 and COPPA preempt many of the Act's provisions. The Supremacy Clause of the Constitution establishes that federal law is "the supreme Law of the Land," U.S. Const. art. VI, cl. 2, empowering Congress "to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). "Pre-emption may be either expressed or implied, and 'is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.'" *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992). For express preemption, the legislative text "necessarily contains the best evidence of Congress' preemptive intent," *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993), and courts also examine the "structure and purpose of the statute as a whole." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996). Conflict preemption arises if, among other things, "the state law stands as an obstacle to the accomplishment of the full purposes and objectives of federal law." *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 191-92 (4th Cir. 2007) (cleaned up). The "purpose of Congress is the ultimate touchstone in every pre-emption case." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009).

### A.    Section 230 preempts the Act's application to third-party content.

Section 230 provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content

provider." 47 U.S.C. § 230(c)(1). Congress enacted this provision in recognition of the "staggering" amount of information communicated by online services, the "obvious chilling effect" of even the "specter of tort liability in an area of such prolific speech," and the infeasibility of screening "millions of postings for possible problems." *Zeran,* 129 F.3d at 331. Congress also provided that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3).

As the Fourth Circuit recently explained, Section 230 preempts state laws that seek to dictate "the manner in which [a website] sorts, arranges, or distributes . . . content"—such as by imposing liability on "design choice[s]" or "design and architecture" that "are inextricably intertwined with [the website's] role as a publisher of third-party content." *Pinckney*, 127 F.4th at 521, 525; *see also Doe v. Grindr Inc.*, 128 F.4th 1148, 1153 (9th Cir. 2025) (Section 230 applies if "the challenged features of [an online platform] are not independent of [its] role as a facilitator and publisher of third-party content"); *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 256-57 (4th Cir. 2009) (Section 230 protects a website's "structure and design").

The design choices that are "protected by Section 230" include "whether and how to display information provided by third parties," how to "arrang[e] and distribut[e] third-party information," and whether and how to monitor or "screen for . . . postings" by third parties. *Pinckney*, 127 F.4th at 525-26 (cleaned up). Equally, Section 230 protects websites' "exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content" generated by third parties. *Zeran*, 129 F.3d at 330. Section 230 preempts state liability based on (1) "the disseminating of [third party] information" and (2) the "information's improper content." *Henderson v. Source for Public Data, L.P.*, 53 F.4th 110, 123 (4th Cir. 2022). If state liability would undermine Congress's "policy choice" not to "impos[e] tort

32

liability on companies that serve as intermediaries for other parties' potentially injurious messages," it is preempted. *Zeran*, 129 F.3d at 330-31. The Act undermines that policy choice in three broad ways.

First, the Act requires covered members to "exercise reasonable care" in publishing third-party speech. § 39-80-20(A). But as the Fourth Circuit held in *Pinckney*, websites cannot decide whether they are exercising appropriate care "without also demonstrating that the [website] prioritizes the dissemination of *one type of content over another*." *Pinckney*, 127 F.4th at 525 (emphasis added); *see Grindr Inc.*, 128 F.4th at 1153 (rejecting similar state "duty" because it "would require Grindr to monitor third-party content").[8]

Second, the Act includes a litany of restrictions inextricably bound up with websites' publishing functions. It requires disablement "tools" and "default[s]" to control third-party speech and how users engage with it, such as "infinite scroll," "auto-play[]," "appearance-altering filters," "messaging," "requests," "reactions," "likes," "comments," "contact[s] from [other] account holders," "information posted by [a] minor," "quantifications of engagement," "searches initiated by a user," users' "location information," "personalized recommendation systems," and any "design feature" that increases engagement, § 39-80-10(3); § 39-80-30(A)(1), (4)-(9). The Act similarly requires tools to "limit the amount of time" a user spends engaging with third party speech, § 39-80-30(A)(2), and disable "notifications or push alerts" about such speech in their entirety and at

---

[8] As an afterthought, this section purports to define "harm" as "limited to [harms] for which liability is permitted" under Section 230, demonstrating the State recognized the preemption problem. But this provision simply injects further incoherence into the Act. Section 230 does not allow liability for some harms but not others; it provides that "*no liability may be imposed*" for the dissemination of third-party content. 47 U.S.C. § 230(e)(3) (emphasis added). The State cannot "immunize the [Act] from review through a savings clause" that "would nullify the 'clear and specific' substantive provisions of the" Act. *HIAS, Inc. v. Trump*, 985 F.3d 309, 325 (4th Cir. 2021); *PFLAG, Inc. v. Trump*, 766 F. Supp. 3d 535, 562 (D. Md. 2025).

certain times of day. § 39-80-30(A)(1), § 39-80-40(E). These are the very restrictions courts *have already held* are preempted by Section 230 because they "would necessarily require [websites] to publish less third-party content." *In re Soc. Media*, 702 F. Supp. 3d at 831.

Section 230 preempts these provisions, as they threaten liability for aspects of websites' "design and architecture" that are "inextricably intertwined with [their] role as a publisher of third-party content." *Pinckney*, 127 F.4th at 521, 525. To "permit liability for" such tools used to "facilitate communication" "would defeat the purposes of section 230 by swallowing up every bit of the immunity that the section otherwise provides.'" *Doe 1 v. Twitter, Inc.*, 148 F.4th 635, 646 (9th Cir. 2025); *see In re Soc. Media*, 702 F. Supp. 3d at 830-34 (Section 230 preempted claims based on "geolocation data provided by users," "recommend[ations] [of] accounts," "private messaging," "posted content," "notifications of third-party content," "[f]eed[s]," "algorithm[s] to connect a user with certain third-party content," and failing to put "protect limits" on sessions and "institute blocks to use during certain times of day"); *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1099 (9th Cir. 2019); *Force v. Facebook, Inc.*, 934 F.3d 53, 66 (2d Cir. 2019); *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1170-71 (9th Cir. 2008); *L.W. through Doe v. Snap Inc.*, 675 F.Supp.3d 1087, at 1096 (S.D. Cal. June 5, 2023); *Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116, 1128-29 (N.D. Cal. 2016), *aff'd*, 881 F.3d 739 (9th Cir. 2018).

Third, the Act strictly prohibits "facilitat[ing]" the publication to minors of targeted advertisements and advertisements for products "prohibited for minors." § 39-80-40(C), § 39-80-60(B). Yet the "broad scope of § 230 extends to multiple forms of putative 'involvement' by an interactive service provider in generating online content," including "advertisements." *Goddard v. Google, Inc.*, 2008 WL 5245490, at *3-5 (N.D. Cal. Dec. 17, 2008); *e.g.*, *Chicago Lawyers' Comm. for C. R. Under L., Inc. v. Craigslist, Inc.*, 519 F.3d 666, 671-72 (7th Cir. 2008) (Section 230 immunizes

"advertisements"). If the State can impose liability on "third-party advertising, then § 230(c)(1) is a dead letter." *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 744 (9th Cir. 2024); *see Carr*, 789 F. Supp. 3d at 1231-32 (enjoining targeted advertising ban on § 230 grounds); Cleland Decl. ¶¶ 63-67; Weber Decl. ¶¶ 80-81.

### B.    COPPA preempts the Act's information restrictions.

In COPPA, Congress created a uniform, nationwide regime to protect minors online while preserving the "extraordinary" benefits of the internet. *See* 144 Cong. Rec. S8482-03 (July 7, 1998), 1998 WL 399521. To achieve these dual aims, COPPA addresses the "collection, use, [and] disclosure" of data by any "online service" or "website" that operates "among the several States" and "collects or maintains personal information from or about" its "users" and "visitors." 15 U.S.C. §§ 6501(2), 6502(b)(1)(A)(ii). Although Congress defined this threshold coverage broadly, Congress defined COPPA's *regulatory* requirements surgically, making nuanced judgments about how to protect minors without hampering the internet as a global medium. COPPA achieved "consensus" only after "revisions to [the] original bill that were worked out carefully" with "online industries" and "first amendment organizations" to "preserve[] the interactivity" of the internet. 144 Cong. Rec. S11651-02, 1998 WL 694765 (daily ed. Oct. 7, 1998).

Rather than blanket the internet with rigid requirements, Congress created a notice and consent regime for websites "directed" to children or that have "actual knowledge" particular users are children. 15 U.S.C. § 6502(b)(1). Congress defined this regime around children younger than 13, for which COPPA-covered websites must provide parents with notice and obtain consent to collect and use personal information. *Id.* § 6502(b)(1)(B)(ii). But COPPA does not require websites to disable core services to accommodate non-consenting parents. Rather, where parents do not wish to consent, websites may "terminate service" to the child. *Id.* § 6502(b)(3).

To ensure federal uniformity, Congress adopted an express preemption provision, stating

that no State may impose "liability for commercial activities or actions by [online services] in connection with an activity or action described in [COPPA] that is inconsistent with [COPPA's] treatment." 15 U.S.C. § 6502(d). This broad language preempts any "state law that treats like conduct differently." *New Mexico ex rel. Balderas v. Tiny Lab Prods.*, 457 F. Supp. 3d 1103, 1121 (D.N.M. 2020). Congress also lodged implementation authority with the FTC, 15 U.S.C. §§ 6505, 6502(b)(2)(C), which for three decades, has administered COPPA with an eye to "maintaining children's access to the Internet, preserving the interactivity of the medium, and minimizing the potential burdens of compliance." COPPA Rule, 64 Fed. Reg. 59,888, 59,889 (Nov. 3, 1999). Last year, the FTC reaffirmed that commitment by carefully weighing the "benefits" of regulation against the "attendant burdens." COPPA Rule, 90 Fed. Reg. 16918, 16928 (Apr. 22, 2025) ("*2025 COPPA Rule*"). South Carolina's Act regulates the same data processing activities as COPPA,[9] and it treats those activities differently than COPPA in at least four ways.

*Personalization Restrictions (§§ 39-80-30(B); 39-80-40(F); 39-80-60(D)).* The Act requires websites to: (1) establish a "default setting" that opts minors "out of personalized recommendation systems," § 39-80-30(B); (2) restrict automated "profil[ing]" of minors' information to analyze user preferences, § 39-80-40(F); and (3) provide personalization opt-out disclosures. § 39-80-60(D). But COPPA "specifically permit[s]" websites to collect information "necessary to . . . *personalize the content on*, the website or online service" and conduct "passive tracking," 16 C.F.R. § 312.2. Just last year, the FTC rejected a proposal to narrow this provision to limit "operator-driven personalization" given "persuasive" concerns that "personalization can benefit

---

[9] Both laws regulate collection and use of information. *Compare* 15 U.S.C. §§ 6501-6502 ("disclosure," "release," "posting," "collect[ion]," "use," and "dissemination"), *with* S.C. Code § 39-80-10(14), (15); § 39-80-20(A); § 39-80-30(A)(4),(7)-(9); § 39-80-40(A)-(B), (D), (G); § 39-80-70(A)(4) ("processing," "collecting, using, storing, disclosing, analyzing, deleting, sharing").

children" and that restricting it "might violate the First Amendment." *2025 COPPA Rule*, 90 Fed. Reg. at 16935. South Carolina's restrictions are inconsistent with that treatment.

*"Design" Restrictions (§§ 39-80-30(A)(1), (4), (6); 39-80-40(E)).* The Act requires opt-outs for many "design features," including "notifications and push alerts" and other features that increase "engagement." §§ 39-80-30(A)(1), (4), (6); 39-80-40(E). But such features, notifications, and push alerts are permitted under COPPA. In the 2025 rulemaking, the FTC proposed to amend that longstanding treatment to require parental consent for features that "encourage or prompt use of a website [or] . . . optimize user attention or maximize user engagement," such as "notifications." *Proposed 2025 COPPA Rule*, 89 Fed. Reg. 2034, 2045, 2049 (Jan. 11, 2024). Again, the FTC ultimately *rejected* that proposal, concluding it would be "overly broad and . . . constrain beneficial prompts and notifications," such as "homework assignment reminders." *2025 COPPA Rule*, 90 Fed. Reg. at 16934-35. The FTC thus retained existing (preemptive) regulations that "specifically permit[]" such features without constraint. *Id.* at 16933; 16 C.F.R. § 312.2.

*Data Collection and Disclosure Restrictions (§ 39-80-30(A)(5), (7)-(9); § 39-80-40(D)).* The Act requires "tools" and "default" settings to restrict disclosure of a "minor's account," a "user's account profile," "information posted by the minor," "location information," and a "user's connections." § 39-80-30(A)(5), (7)-(9), (C). The Act also restricts collecting "precise geolocation information." § 39-80-40(D). This is inconsistent with COPPA, which allows websites to "release" and make "publicly available" minors' "online contact information," "user name," "geolocation" and other information so long as (where applicable) they provide notice and obtain parental consent. 16 C.F.R. § 312.4(a), (c); *id.* § 312.2. Again, COPPA is preemptive.

*Advertising Restrictions (§ 39-80-40(C), § 39-80-60(B)).* The Act strictly prohibits websites from "facilitat[ing] targeted advertising," defined as advertisements "selected based on

personal data obtained or inferred from [an] individual's activities over time and across non-affil-

iated websites." § 39-80-10(19). COPPA by contrast "specifically permit[s]" websites to collect

information to "[s]erve contextual advertising," 16 C.F.R. § 312.2; 16 C.F.R. § 312.4(d)(3), so long

as the website posts a notice to the public. COPPA also permits websites to passively track chil-

dren—including for advertising—where parents consent. *See 2025 COPPA Rule*, 90 Fed. Reg. at

16959 (COPPA "*does not prohibit operators from collecting personal information to engage in*

*targeted advertising . . .* [with] the parent's opt-in consent" (emphasis added)). South Carolina's

Act "treats [such advertising] differently" and is preempted. *Tiny Lab*, 457 F. Supp. 3d at 1121.

*Coverage Provisions (§§ 39-80-10(7), (17))*. South Carolina's Act also extends to activities

that Congress affirmatively chose *not* to burden with regulation at all. It does so in two ways. First,

the Act reaches data-processing for minors under 18, whereas COPPA leaves those activities *un*-

regulated unless they involve minors under 13. That careful selection of age group was no accident.

As initially drafted, COPPA would have applied to "personal information collected from children

13 to 16." 144 Cong. Rec. S8482-03, S8483, 1998 WL 399521 (daily ed. July 17, 1998) (Sen.

Bryan). But in the final bill—and after revisions "worked out carefully" among stakeholders, 144

Cong. Rec. S11651-02, S11657 (daily ed. Oct. 7, 1998)—Congress redrew those lines to reach

only children under 13. Congress's considered choice leaves no space for South Carolina to fill

with regulations directed to teens.

Second, the Act redefines "actual knowledge" to mean any "information [or] *inferences*

known to the . . . *service*" about the user's age. § 39-80-10(7). That is a constructive knowledge

standard, not actual knowledge. It departs from COPPA, which requires a "*sentient being*" to

"recogniz[e]" the user's age. *Tiny Lab*, 457 F. Supp. 3d at 1113-14, 1116; *cf. Intel Corp. Inv. Pol'y*

*Comm. v. Sulyma*, 589 U.S. 178, 186-87 (2020) ("Actual knowledge" means a natural *person*

38

"must *in fact* have become *aware* of th[e] information"). Again, this inconsistent treatment means the Act regulates data processing activities COPPA declines to regulate. And it pressures general audience websites to adopt age sorting mechanisms and similarly burdensome requirements that Congress and the FTC carefully avoided. *See* 144 Cong. Rec. S11651-02, S11658 (daily ed. Oct. 7, 1998) ("an online general interest bookstore or compact disc store will *not* be considered to be directed to children, *even though children visit the site*" (emphasis added)). *See* Weber Decl. ¶¶ 69-73; Paolucci Decl. ¶ 37; Baird Decl. ¶ 34.

## IV.     NetChoice is likely to succeed on its Commerce Clause claim.

The Act also violates the Commerce Clause, which vests Congress with the power "[t]o regulate Commerce . . . among the several States," U.S. Const., art. I, § 8, cl. 3, and protects "free private trade in the national marketplace." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 395 (2023) (Roberts, J., concurring) (cleaned up). The Clause includes a "negative" command that States may not "unduly burden[]" or "impede[]" interstate commerce. *PSINet, Inc.*, 362 F.3d at 239 (cleaned up). A law violates this command when it directly "restrict[s] [communications] in all states, not just the state in which [it] was enacted," or imposes burdens "on interstate commerce [that] are excessive in relation to the local benefits it confers." *Id.* at 239-40 (citation omitted).

"Internet transmission, in and of itself, constitutes interstate transportation sufficient to [constitute] interstate commerce." *United States v. Runyan*, 290 F.3d 223, 239 (5th Cir. 2002). When a user loads a webpage, the request does not travel in a straight line to a single server — it passes through a web of routers, internet exchange points, and backbone networks that cross state borders constantly, often without any awareness or control by the user or the platform. Weber Decl. ¶¶ 19-26. This architecture means that state attempts to regulate online services inevitably reach across borders and burden interstate commerce. *See, e.g.*, *United States v. MacEwan*, 445 F.3d 237,

244 (3d Cir. 2006) (once digital images "left the website server and entered the complex global data transmission system that is the Internet, the images were being transmitted in interstate commerce"); *United States v. Carroll*, 105 F.3d 740, 742 (1st Cir. 1997) ("Transmission of [information] by means of the Internet . . . constitutes transportation in interstate commerce." (citing *United States v. Thomas*, 74 F.3d 701, 706-07 (6th Cir. 1996))).

The same is true at the content and user level. Many websites have no ability to precisely ascertain whether a user is in South Carolina at any particular moment, so even attempting to comply with the Act would necessarily mean capturing users outside the State. *See* Paolucci Decl. ¶¶ 19-21, 65-67, 100; Weber Decl. ¶¶ 22-24, 82. Further, online services operate in a national information market reflecting the diverse and interstate nature of the customers they serve. The Act therefore directly reaches users in other States who will no longer be able to converse with, engage with, or receive content from South Carolinians in the same way. For example, the Act would directly affect a California aunt who wishes to use social media to engage with her South Carolina niece. By default, if the aunt is not already connected to her niece, she now cannot see whether her niece has an account on the service, send her niece a connection request, see the niece's other connections (such as additional family members), or send feedback (such as comments and reactions) that will be fully visible to the niece. § 39-80-30(A)(4)-(8). In this way, the Act affects both the information the aunt in California *sees* and what she can *send*. Weber Decl. ¶ 83. This is true across countless out-of-state users who will not be able to exchange information with South Carolinians as they can with users in other states.

Online services would be far less useful to interstate commerce if they had to develop entirely different services, user experiences, and interactive features in each State. *See Am. Booksellers Found. v. Dean*, 342 F.3d 96, 104 (2d Cir. 2003) (internet communications "protected

from State regulation because they 'imperatively demand a single uniform rule'" (cleaned up));
*Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1285-86 (W.D. Wash. 2012) ("the Internet
is likely a unique aspect of commerce that demands national treatment"); *see* Weber Decl. ¶¶ 25-
26, 82-85. "Haphazard and uncoordinated state regulation can only frustrate the growth of cyber-
space," which is why the "Internet . . . requires a cohesive national scheme of regulation." *Am.*
*Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 182-83 (S.D.N.Y. 1997).

For these reasons, both the Fourth Circuit and this Court have invalidated state laws just
like this one as violating the Commerce Clause. As the Fourth Circuit explained, state restrictions
on "harmful material" conveyed through the internet "in effect, *restrict commercial electronic ma-*
*terials in all states*, not just the state in which the statute was enacted." *PSINet, Inc.*, 362 F.3d at
238-39. Such laws therefore amount to a "direct regulation of interstate commerce" that subject
users and websites to "haphazard, uncoordinated, and even out-right inconsistent regulation by
states," and impose excessive burdens on interstate commerce. *Id.* at 239-40. In fact, "[g]iven the
broad reach of the Internet, it is difficult to see how a blanket regulation of Internet material . . .
can be construed to have only a local effect." *Booksellers Ass'n v. McMaster*, 371 F. Supp. 2d 773,
787-88 (D.S.C. 2005) (cleaned up) (invalidating similar law). It cannot. The Act's restrictions on
what South Carolina users can see and publish necessarily affects what users in other States see
and the audience they can reach. Weber Decl. ¶ 83.

In Congress's words: the internet has "flourished, to the benefit of all Americans, with a
minimum of government regulation." 47 U.S.C. § 230(a)(4). That hands-off federal policy worked,
fostering "a revolution of historic proportions." *Packingham*, 582 U.S. at 105. This Act's rigid
mandates are inconsistent with that scheme and the binding precedent in *PSINet, Inc.* If other States
follow South Carolina's lead, online information, contacts, content, and communications will

depend on the State users reside in, and the internet will fragment across state lines.

## V.     NetChoice is likely to succeed on its claim that Due Process requires a reasonable opportunity to implement the Act.

Finally, the Act is unlawful because it took immediate effect upon the Governor's signature on February 5, 2026. *See* HB 3431, 126th Gen. Ass. § 4 (S.C. 2026). Yet the "demands of due process" require that regulated entities be given a reasonable "*opportunity to comply*." *Pac. Tel. & Tel. Co. v. City of Seattle, Wash.*, 291 U.S. 300, 304 (1934) (emphasis added); *see Planned Parenthood of Wisconsin, Inc. v. Van Hollen*, 738 F.3d 786 (7th Cir. 2013) (affirming preliminary injunction where statute required compliance within days); *Planned Parenthood Great Nw., Haw., Alaska, Ind., & Ky., Inc. v. Cameron*, 599 F. Supp. 3d 497, 501-02 (W.D. Ky. 2022) (law likely violated due process "[b]y taking effect immediately, without providing . . . time to comply"). Immediate compliance is not possible here, much less would it be reasonable. Building and integrating the Act's many requirements will take *at least* one year, if not longer. Weber Decl. ¶¶ 87-101; Cleland Decl. ¶¶ 68-71; Paolucci Decl. ¶ 33-34. Indeed, when the FTC adopted far less burdensome amendments to the COPPA Rule, it provided a full year for regulated entities to bring their activities into compliance. *2025 COPPA Rule*, 90 Fed. Reg. at 16971. The State here cited no urgency necessitating immediate effect, nor could any urgency justify an impossible timeline.

## VI.     The remaining preliminary injunctive factors are easily satisfied.

Because NetChoice is likely to succeed on its claims, all the preliminary injunction factors tip in its favor. *E.g.*, *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 520-21 (4th Cir. 2002); *Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003).

### A.     NetChoice members will suffer irreparable harm absent preliminary relief.

By "show[ing] a likelihood of a constitutional violation, [NetChoice] has shown an irreparable harm." *Chandler v. Tech. Coll. of Lowcountry*, 2022 WL 2670806, at *8 (D.S.C. July 11,

2022) (citing *Henry v. Greenville Airport Comm'n*, 284 F.2d 631, 633 (4th Cir. 1960)). "[T]he Supreme Court has explained that 'loss of First Amendment freedoms, for even minimal periods . . . unquestionably constitutes irreparable injury.'" *Newsom*, 354 F.3d at 261 (citation omitted). The Act infringes on websites' and users' speech in numerous ways and forces websites to consider shutting off access. Paolucci Decl. ¶¶ 22-23; Baird Decl. ¶ 19, 41; Cleland Decl. ¶ 69.

Further, to the extent compliance with the Act is even feasible, it is extremely costly. Paolucci Decl. ¶¶ 21, 66, 95-105; Weber Decl. ¶¶ 97-101; Cleland Decl. ¶¶ 69-71; Baird Decl. ¶¶ 37-39, 41. These costs cannot be recovered if NetChoice eventually prevails in this lawsuit. Such "economic loss . . . constitute[s] irreparable harm where no remedy is available at the conclusion of the litigation." *Ass'n of Commty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 499 (D. Md. 2020) (citing *Mtn. Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019)); *see Platt v. Moore*, 15 F.4th 895, 910 (9th Cir. 2021).

### B.     The balance of equities and the public interest strongly favor an injunction.

The two final factors—"balance of the equities and weighing the public interest—merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 2025 WL 1249608, at *63 (4th Cir. Apr. 30, 2025). And they are "established when there is a likely First Amendment violation." *Tepeyac v. Montgomery Cnty.*, 779 F. Supp. 2d 456, 471 (D. Md. 2011), *aff'd in relevant part*, 683 F.3d 591, 595 (4th Cir. 2012). Protecting access to the "vast democratic forums" of the internet furthers the public interest, *Packingham*, 582 U.S. at 104, as does avoiding its balkanization.

The Act's negative effects are broad and severe. The Act sweeps in nearly every expressive service "likely to be accessed by minors," big and small. It then layers on amorphous and impossible duties to prevent "harm" and redesign every "design feature" that is not "necessary." The risk calculus is straightforward: either reengineer the service for a single State and the most sensitive

43

users at enormous cost or turn off the lights for minors in South Carolina. Cleland Decl. ¶¶ 69, 71; Paolucci Decl. ¶¶ 21-23, 26-28, 34, 95-105; Baird Decl. ¶¶ 19, 41; Roin Decl. ¶¶ 19-21. By contrast, the State is not "harmed by issuance of a preliminary injunction which prevents [it] from enforcing a [law] . . . likely to be found unconstitutional." *Newsom*, 354 F.3d at 261; *see Jones*, 2026 WL 561099, at \*13 ("upholding constitutional rights surely serves the public interest").

## VII.   The Court should enjoin the Act on its face and, at a minimum, as to NetChoice's covered members.

NetChoice raises both facial and as-applied challenges to the Act. *See* Compl. ¶ 115 (ECF No. 1). Facial relief is appropriate for NetChoice's preemption claims, vagueness claims, and Commerce Clause claims because those claims raise the same legal defects on the face of the Act and "in every [challenged] application." *X Corp.*, 116 F.4th at 899; *see Ass'n of Am. Railroads v. Hudson*, 144 F.4th 582, 592 (4th Cir. 2025) (recognizing "facial" preemption challenge that did not "turn[] on the 'specific operations'" of particular companies); *Freedom Path, Inc. v. Internal Revenue Serv.*, 805 F. Supp. 3d 329, 342 (D.D.C. 2025) (recognizing facial vagueness challenge based on "the text of the challenged regulation itself," not particular applications); *Nat'l Shooting Sports Found. v. Bonta*, 718 F. Supp. 3d 1244, 1256-57 (S.D. Cal. 2024) (where a law violates the Commerce Clause, it is facially invalid and "can no longer be constitutionally applied to anyone" (citing *Bruni v. City of Pittsburgh*, 824 F.3d 353, 363 (3d Cir. 2016)).[10]

Facial relief is also appropriate for NetChoice's First Amendment claims. First, the Act's relevant provisions are "unconstitutional in every conceivable application," because their purpose

---

[10] NetChoice brings its Section 230 and COPPA claims as applied to specific provisions and certain categories of applications, but these are also facial claims because the challenged provisions operate the same way as to all applications in that category. *See John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (entertaining facial challenge that was "not limited to plaintiffs' particular case" because it applied to all similar applications but did "not seek to strike the [law] in *all* its applications"); *Family PAC v. McKenna*, 685 F.3d 800, 808 n.5 (9th Cir. 2012) (similar).

is to restrict fully protected speech. *Jones*, 2026 WL 561099, at *7. The challenged provisions seek, both separately and collectively, "to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Brown*, 564 U.S. at 795 (cleaned up). They advance that objective through the duty of "care" to restrict speech, § 39-80-20; restrictions on expressive features like "personalized recommendation systems," "auto-playing videos," and others that "increase" or "encourage" engagement, §§ 39-80-10(3); 39-80-30(B); 39-80-60(D); and compelled "audits," disclosures, and "harm" reports about speech, §§ 39-80-60(E); 39-80-70. The Act makes this speech-suppressing purpose abundantly clear by calling out "social media" as its target, and by *exempting* websites that do not publish core protected speech. *See supra* at 11, 20. Such "direct targeting of fully protected speech" pervades the Act, and violates "'the fundamental principle that governments have no power to restrict expression *because* of its message, its ideas, its subject matter, or its content.'" *Free Speech Coal. v. Paxton*, 606 U.S. 461, 484-85 (2025) (cleaned up).

Second, the Act's relevant provisions are constitutionally overbroad because their "unconstitutional applications" are "substantial" judged "in relation to [any] plainly legitimate sweep." *Moody*, 603 U.S. at 723-24 (cleaned up). By focusing on minors and exempting non-expressive services, the Act's coverage definitions target the very services and activities that "are devoted to expressive activities," Weber Decl. ¶ 18, and carves out "non-expressive (functional)" activities such as banking and paying bills. *See id.* ¶¶ 13-18. The Act's speech-suppressing applications are therefore substantial "by comparison" to any hypothetical "non-expressive" applications. *Id.* ¶ 18.

At a minimum, the Act's challenged restrictions are unlawful and should be enjoined as applied to NetChoice members and their services (as defined *supra* at 44 & n.10). *See John Doe No. 1*, 561 U.S. at 194; Cleland Decl. ¶¶ 6, 9-14 (discussing coverage).

## CONCLUSION & PRAYER

This Court should grant the motion for preliminary injunction.

Dated: March 9, 2026

Serena M. Orloff*
Scott A. Keller*
Jeremy E. Maltz*
Jonathan E. DeWitt*
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW,
 Suite 700
Washington, DC 20001
Telephone: (512) 693-8350
serena@lkcfirm.com
scott@lkcfirm.com
jeremy@lkcfirm.com
jdewitt@lkcfirm.com

Joshua P. Morrow*
LEHOTSKY KELLER COHN LLP
7500 Rialto Blvd.
 Suite 1-250
Austin, TX 78735
Telephone: (512) 693-8350
josh@lkcfirm.com

*admitted *pro hac vice*

Respectfully submitted,

*/s/ Lucy Dinkins*

Lucy Dinkins (Fed I.D. # 11961)
James H. May (Fed I.D. # 11355)
Kathleen M. Stoughton (Fed I.D. # 12161)
WYCHE, P.A.
807 Gervais Street, Suite 301
Columbia, SC 29201
Telephone: (803) 254-6542
Facsimile: (803) 254-6544
jmay@wyche.com
ldinkins@wyche.com
kstoughton@wyche.com

46