Docusign Envelope ID: DF50F5B6-006C-4C5E-A1CE-AE07D83C9FC3

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# COLUMBIA DIVISION

| | |
|---|---|
| NETCHOICE,<br><br>   *Plaintiff*,<br><br>   v.<br><br>ALAN WILSON, in his official capacity as the South Carolina Attorney General,<br><br>   *Defendant*. | Civil Action No. 3:26-cv-00543 |

**DECLARATION OF DAVID BAIRD IN SUPPORT OF
PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

I, David Baird, hereby declare as follows:

1. I am over 18 years of age and am competent in all respects to make this Declaration. I possess personal, firsthand knowledge of the assertions made herein.

2. I serve as a Lead, Support Operations at Nextdoor. I have worked at Nextdoor for over 3 years. Nextdoor is a member of NetChoice.

**Background Information on Nextdoor & Nextdoor Users**

3. Nextdoor operates www.nextdoor.com and the Nextdoor app, an online service where neighbors around the world turn daily to receive trusted information, give and get help, get things done, and build real-world connections with those nearby-neighbors, businesses, and public services. By fostering these connections, both online and in the real world, Nextdoor builds stronger, more vibrant, and more resilient neighborhoods. Today, over 100 million verified users (hereafter, "users") rely on Nextdoor in more than 305,000 neighborhoods across 11 countries. In the US, 1 in 3 households uses the network. Nextdoor is used by over 1.7 million users in South Carolina in approximately 35% of households in South Carolina, across 9,275 communities.[1]

4. On Nextdoor, users are placed in a neighborhood based on their address and automatically receive updates from nearby neighbors, businesses, and public services.

5. Since Nextdoor launched in 2011, Nextdoor has required individuals to register with and use their real names and addresses on the platform to foster mutual accountability and ensure that connections and conversations are authentic.

---

[1] *See* Discover Your South Carolina Neighborhood, https://nextdoor.com/find-neighborhood/sc/.

1

**Steps Nextdoor Takes to Foster a Positive On-Platform Experience**

6.  To access all the content on Nextdoor and to interact with other users, users must first create an account with Nextdoor. This account creation and verification process requires Nextdoor to collect some personal data about its users.

7.  Nextdoor uses various forms of personal data to verify, with a reasonably high degree of confidence, that everyone signing up for an account on Nextdoor is a real person with a tie to the real neighborhood in which they are registering. More specifically, Nextdoor verifies this information about individuals and businesses by checking a number of signals, including device location and third-party data vendors. If Nextdoor cannot verify an individual or business through these methods, alternative verification steps are taken. For example, an individual may be verified using a postcard (mailed by Nextdoor to the individual's address, which includes a code for the user to input into the website or app). Nextdoor does not require users to report their age or submit government-issued identification documentation as part of this verification process—which, as explained below, Nextdoor has found users unwilling to provide and comes at an increased cost that we have found outweighs the marginal benefits to our users. Alternatively, individuals may remain unverified (hereafter, "unverified users"), with limited functionality.

8.  Nextdoor's Member Agreement prohibits people from using our platform if they are a registered sex offender in any jurisdiction.

9.  Nextdoor users must use their real name to establish their account on Nextdoor; meaning, the first name that they use when introducing themselves to users, friends, and colleagues, and their legal last name. Using an alias, initials, or an abbreviated version of their last name is prohibited except under limited circumstances. However, via privacy settings, users can control how their name (as well as other details) appears to other users on the Platform when posting content, searching, or messaging others.

10. By default, we have crafted our algorithms to show users posts primarily from their neighborhood and nearby neighborhoods. These algorithms also incorporate our content moderation standards, as further discussed below, and selective other data attributes designed to promote a quality experience for our users.[2]

11. For example, we collect the following data from our users to facilitate building local connections: when a user accesses our site (date and time); the address given at registration; how a user accesses our site (*e.g.*, device information, like operating system and web browser version); and what content a user interacts with on our site, like advertising links, groups the user joins, businesses the user recommends, or features they clicked on.[3] In short, to connect people who live and work near each other based on shared needs and interests, we collect information necessary to make those connections. We also use personal information to update people when new services and users join Nextdoor in their community. For example, if a person moves to an area where we do not yet provide services, that person can provide us their contact information and we will notify them when we do start operating there.[4] All these data-collection processes are clearly explained to users in our Member Agreement (Terms of Service) and Privacy Policy when they sign up for Nextdoor.[5]

12. We also use information collected from our users in coordination with algorithms that we design to reflect nuanced judgments about the kind of content we want to surface to our users and what we hope our users will contribute. We seek to disincentivize posts that are intended to get clicks and "go viral" on the larger internet and instead incentivize users to keep their posts

---

[2] *See* Nextdoor Privacy Policy 2026, https://help.nextdoor.com/s/article/Privacy-Policy-2026?language=en_US.
[3] *See id.*
[4] *See id.*
[5] *See id.*

focused on ways to get and give help locally and to share relevant information with their neighbors. That is the type of relevant, high-quality content that fosters the sense of community we seek to build, so we design our algorithms and features to promote it.

*Nextdoor's efforts to prevent harmful content*

13.     Nextdoor is committed to developing and implementing leading-edge technology to facilitate constructive neighborhood connections and conversations, and a safe experience for users online. Our active in-product features include:

   a. Kind Neighbor Pledge: Upon creating an account on Nextdoor, all users are asked to agree to our Kind Neighbor Pledge, which is a commitment to be helpful, to treat everyone in the Nextdoor community with respect, and to do no harm. It's an opportunity to establish norms and expectations and to encourage prosocial behavior.

   b. Kindness Reminder: The Kindness Reminder appears when a user drafts and attempts to publish a post that may violate Nextdoor's Community Guidelines. The tool automatically detects potentially offensive language that may violate Nextdoor's Community Guidelines and encourages the author to edit their content before they publish. It was the first of our core product features to introduce pre-post moments of friction aimed at slowing people down and promoting civility. While the Kindness Reminder is just a reminder and not a preemptive prohibition on posting offensive content, in 2023, users who received the reminder edited or withheld their post 36% of the time.

   c. Kindness Tips: Nextdoor Kindness Tips serve as a supportive tool to remind users who have had content previously removed about best practices for

fostering constructive conversations. These tips offer five specific, actionable pieces of advice with illustrative examples. Importantly, instead of just taking corrective action on repeat violators (such as removal from the app), Kindness Tips aim to keep users on the platform by proactively guiding them to reflect on how to engage in open and respectful discussions while aligning with our Community Guidelines.

d. **Feed Choice:** Nextdoor provides users with the option to view both posts and comments in reverse chronological order, rather than curated by feed-ranking, by filtering these feeds for "recent" activity. This option is not very popular; most use the curated feed. We do not yet have the ability for users to "save" their preferences for displaying posts or comments in strict chronological order.[6]

14. Nextdoor sets clear Community Guidelines that are designed to keep interactions on the platform safe and productive. These guidelines help promote thoughtful conversations and explicitly forbid racism, discrimination, misinformation, and other types of harmful content.

15. There are three main categories of guideline-violating content:

a. **Harmful**: Content that is illegal, fraudulent, or unsafe, *e.g.*, violent, graphic, or discriminatory.

b. **Hurtful**: Content that users consider uncivil, *e.g.*, insults, rudeness, or name-calling.

c. **Other**: Non-local content, spam, and content posted in error.

---

[6] *See* Sort and Customize Your Nextdoor Newsfeed, https://help.nextdoor.com/s/article/How-to-sort-your-newsfeed?language=en_US.

16. Efforts to address guideline-violating content include:

    a. Tools to automatically detect and report harmful content.

    b. Product features that enable users to report guideline-violating content.

    c. Volunteer community moderators who monitor community discussions and help keep dialogue on the platform civil.

    d. Our internal Neighborhood Operations Team of trained specialists who review content and accounts that have been flagged and take appropriate action to support the users involved.

17. We work regularly with leading experts including our Neighborhood Vitality Advisory Board to refine our Community Guidelines, iterate on our features and tools, and develop strategic research teams that further our work to create and maintain a welcoming platform.

18. Our annual transparency report discusses metrics around reported content from the year prior. In our recent report, published in March 2026, we disclose that in 2025:

    a. The subset of content reported for being "harmful" (as defined above) was less than 0.7% of total user-generated content on Nextdoor.

    b. Nextdoor's volunteer community moderators review the vast majority of all reported content (which constituted 2.81% of aggregate content). The remaining reported content was reviewed by paid Nextdoor Operations staff or automatically removed.

**Teenagers on Nextdoor**

19. Nextdoor's Member Agreement generally requires minors to be 13 years old or older in the United States to join Nextdoor. However, in Mississippi, Tennessee, and Texas,

Nextdoor requires users to be 18 years old or older to create an account. These changes were made in response to laws regulating minors' use of online services.[7]

20.     Nextdoor estimates that approximately 99% of its U.S. users are legal adults. Further, less than 1% of its users are between the ages of 13 and 17, and less than 10% are under 25 years of age. In contrast, Nextdoor estimates that approximately 40% or more of Nextdoor users are 55 and over.

21.     The overarching utility offered by Nextdoor does not, by nature, appeal to most minors. Nextdoor lacks games, cartoonish elements, minor-oriented music or activities, celebrities who are themselves minors or celebrities who appeal to minors, and the Platform is not advertised to minors. It is used overwhelmingly by legal adults who are looking to connect with other nearby residents. We have historically sometimes allowed users to enter their date of birth because it helps us provide age-appropriate experiences and provide more relevant content for our users. For example, we might use age data to recommend groups or content meant for seniors over the age of 65 to users in that age cohort. However, to respect our users' privacy, we do not affirmatively track age, and many of our users do not enter birthdate information.

22.     Teenagers make up a very small percentage of our user base. But we believe that teens can benefit from Nextdoor membership, learning the benefits of developing community, lending their voices to support local causes, contributing content, engaging in local events, and learning the responsibility of employment.

23.     For example, teenagers on Nextdoor have offered the following services: dog-walking and cat-sitting, selling crafts, gardening, snow shoveling, tutoring, babysitting, and offering

---

[7] *See* Member Agreement US, "2. Joining the Neighborhood," https://help.nextdoor.com/s/article/Member-Agreement-US-2026?language=en_US.

technical computer assistance to users, including a class on how to use the latest generative Artificial Intelligence technology. Nextdoor also allows teenagers to publicize their concerts, announce theatrical performances, and broadcast fundraisers for charitable and other causes.[8] For example, in February 2026, The Georgetowner magazine profiled a teenage user who started a nonprofit on Nextdoor to collect books for children undergoing cancer treatment.[9] And instead of broadcasting these events across the entire internet, on Nextdoor, they are targeted to people who live nearby and will thus be more likely to buy, attend, or give.

**South Carolina's Age-Appropriate Code Design Act**

24. I have reviewed South Carolina's Age-Appropriate Code Design Act, House Bill 3431 ("Act"), which went into effect on February 5, 2026.

25. Despite Nextdoor presenting little, if any, possibility of causing the purported harms the Act is aimed at eliminating, Nextdoor nonetheless falls within the Act's ambit based on the features our service offers.

*Burdens on Nextdoor Imposed by the Act*

26. The resources that Nextdoor would need to expend in order to comply with the Act's various requirements are disproportionate not only to the small number of minors on our platform (less than 1% of users), but also to the lack of harms Nextdoor poses to users generally, and to minors in particular. Moreover, there is no way for Nextdoor to avoid these costs because, even if Nextdoor were to update its Member Agreement to disallow minors from joining, that alone would not stop minors from using the site, thus subjecting Nextdoor to potential liability for so-called "harms" that minors might suffer while using the site, even without a valid account. And

---

[8] *See* Create and Find Events on Nextdoor, https://help.nextdoor.com/s/article/About-events-on-Nextdoor?language=en_US.

[9] "For Love & Buttercup Gives Comfort to D.C. Children," The Georgetowner (Feb. 19, 2026), https://perma.cc/RJX5-6ZD5.

8

the Act requires Nextdoor to make *available* to all users many of the changes the Act *requires* for minors.

27.   The Act requires Nextdoor to take "reasonable care" to prevent minors from experiencing various, largely subjective, psychological conditions that the Act designates "harm[s]." § 39-80-20(A). But, as discussed above, Nextdoor already takes significant steps to prevent these types of alleged "harms" to its users.

28.   Nevertheless, the South Carolina Attorney General *might* consider these steps insufficient, and he *could* bring an enforcement action under the Act if *even a single minor* complains of one of the Act's designated harms, no matter what precautions Nextdoor takes. Given all this, Nextdoor has no idea what the Attorney General will say Nextdoor has to do to comply with the Act.

29.   Relatedly, despite our significant efforts, Nextdoor has no way to ensure the content that its users post on the Platform will not affect some users in ways they might perceive as negative, particularly any users who might have greater sensitivities. For example, a local yoga studio's advertisements about the results their users have achieved might cause "anxiety" for a minor with body image issues. § 39-80-20(A)(2). And a support group for trauma survivors that posts descriptions about some of the challenges their members have overcome, in an effort to offer support to others, might cause "distress" to particularly sensitive users who read those descriptions. § 39-80-20(A)(3). Again, Nextdoor works hard to ensure it promotes respectful, beneficial content. But every user is different and has his or her own sensitivities, and Nextdoor has no way to measure the sensitivities of all of its millions of users. Moreover, designing our content moderation practices around the most sensitive users would restrict large amounts of beneficial content for many other users.

30.     The best tool we have found to ensure that users do not see content they find disturbing or unwanted is personalization tools.

31.     Yet the Act requires Nextdoor to abstain from using personalized recommendation systems for minors unless necessary and to disable that functionality as an option for adults. § 39-80-30(B), § 39-80-40(F). That means that Nextdoor cannot use an "automated system … to suggest, promote, or rank content" provided by other users. § 39-80-10(12). But recommending to users helpful information and services from people in their neighborhood—information that users would not otherwise know about—is one of Nextdoor's primary services. And Nextdoor cannot function without utilizing personal information (primarily location, but other information as well) to match users with content relevant to their neighborhood, interests, and needs. For example, the Act appears to bar Nextdoor from showing a minor relevant, local information until that user decides to affirmatively "opt in" to allowing Nextdoor to use their personalized information (*i.e.*, their location). But some users will not know how to turn on that new experience, and they might be turned off to our service before we have an opportunity to educate them about the experience we can provide through personalization.

32.     The Act also requires that various "features" be defaulted off for minors, like "messaging" and "contact from account holders that are not already among the minor's existing connected accounts." § 39-80-30(A)(4). This requirement effectively prevents minors on Nextdoor from communicating at all. Unlike other platforms, Nextdoor does not have the concept of "friends." Neighbors join Nextdoor to join an existing neighborhood community, and there is not a "friending" feature. No user has "existing connected accounts" and there is no way for minors, or anyone else, to establish "connected accounts." This requirement would thus effectively prevent minors on Nextdoor from messaging *anyone* or having their posts viewed by *anyone*. This blocks

Nextdoor's utility for minors in South Carolina because potential customers cannot find or communicate with minors who are selling products or services since any information from those minors' information is blocked from reaching anyone else, even their next-door neighbors. How, for example, could a high school senior obtain work on Nextdoor babysitting if they cannot post to families in the neighborhood that they are available? How could a family looking for a babysitter contact the available babysitter if they could not see that minor's post that she is offering babysitting services because it is hidden and could not message the babysitter asking about her rates, references, or availability at a particular time if their messages are blocked?

33. In short, Nextdoor seeks to connect members of the community so that people who *do not* know each other already can reach out to offer (or request) help and connection. The Act seeks to stop exactly those types of local connections, especially for minors.

*Problems that arise from the Act's age-specific requirements*

34. Various requirements under the Act are triggered by a website "know[ing]" that a user is a minor. § 39-80-10(7). We believe the better interpretation of these definitions is that age verification is not required. However, it is not clear whether Nextdoor could be charged with having knowledge that a user is a minor if information to that effect sits within our systems, to include if a user posts such information anecdotally in a post. If the law does have that effect, Nextdoor would need some way to affirmatively separate minors from adults to manage liability risk. But confirming a user's age has already proven highly problematic.

35. Nextdoor has tested asking users for date of birth on a voluntary basis, and it has observed that merely seeking the age of users in various ways is a barrier to platform access.

36. In fact, Nextdoor has received negative feedback from users regarding age collection.

11

a. Regarding date of birth collection in general, one user said: "*You do not need my birthday and I will not give it to you. Suffice it to say that when it comes to my age, all you need to know is that I am a Vietnam veteran.*"

b. Users who have been asked to share documentation to support their age (*i.e.*, something akin to age verification) have also shared concerns about providing personal information to Nextdoor:

　1. "*After having a Nextdoor account for a decade, I accidentally hit the wrong year and was told I couldn't have access anymore because I was under 13. I have provided plenty of information to indicate otherwise and was told the ONLY way to regain access was to submit my ID, which is unreasonable since you don't require one to set up a new account. Customer service sent me on a loop with AI bots with repetitive policy explanations. Did not solve the problem. Since I can't access my account, I wish for it to be deleted.*"

　2. "*Are you kidding me? You think I'm gonna send you my license or any personal ID.*"

　3. "*App rep wants my personal info to turn my account back on after using the app for over 5 years. I think this is a scam now....*"

　4. "*What?? I am over 60. There must be another way I do not have to give my actual pii info to be hacked.*" - "*I'm 60 years old and I am not sending a copy of my driver's license to anyone.*"

　5. "*I'm 57 years old and they're asking me for my government issued ID. This is totally insane. I put my age down to zero because I thought it was a scam. Next-door now thinks my age is zero, so they won't reinstate my Account.*

12

> *Because of fraud there's no reason that anyone in Nextdoor needs my Social Security number or my drivers license number. They didn't have school IDs when I went to school so unfortunately I don't have one. Graduated 1983."*

37. Beyond the requirements around age, Nextdoor also will have to create new processes and procedures (both technical and human) in order to satisfy the Act's requirements. Specifically, Nextdoor would need to create a new version of the site with the capability both to function without personal data from minor users and the capability for users to turn certain "features" on and off—assuming this even possible.

38. Creating these processes and procedures will involve cross-functional collaboration that demands the time of a large number of Nextdoor employees and likely outside experts and engineers. In addition, implementation of these processes and procedures will involve training of additional Nextdoor employees responsible for implementing them. Nextdoor would thus incur significant compliance costs.

39. The Act effectively requires that Nextdoor, and all covered websites, create multiple versions of their website to cater to users of different ages. That is entirely impractical if it is possible at all. And even assuming it is possible, Nextdoor would need to determine a user's age to determine which version of the site the user experiences. But verifying that information (as opposed to simply requesting it) is prohibitively expensive.

40. Finally, the Act's requirement that Nextdoor open its books, business practices, and internal procedures to a third-party auditor—and then to "issue" that auditor's report publicly—is also highly problematic. § 39-80-70(A). In addition to privacy concerns related to allowing third parties to review Nextdoor's sensitive information (like reports involving a purported "harm"), auditors may present inaccurate characterizations of Nextdoor's policies and operations,

13

conclusions with which we disagree, or outright mistakes. The Act provides Nextdoor no recourse to correct such errors by "auditors." And given the current highly charged public discourse around online services for minors, forcing Nextdoor to issue a report against its will on a controversial topic—a report that the Attorney General *must* then publicize on his website—could be very harmful to Nextdoor.

41.    Given all this, Nextdoor expects that it will have to bar users under 18 from use of the platform in South Carolina. That is because the burdens of compliance that the Act imposes and the way those burdens could change the experience for our adult users—*e.g.*, the "reasonable care" mandate, § 39-80-20(A), the default requirement not to use minors' personal data, § 39-80-30(C), and the bar on "facilitat[ing]" ads to minors, § 39-80-40(C), among others—would not be worth it, given the tiny percentage of Nextdoor users who are minors. Unfortunately, that would mean excluding minors and the attendant loss of community-oriented, informational, and expressive benefits that those minors, and their communities, currently enjoy.

*    *    *

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed on March 9, 2026, in Austin, TX.

*David Baird*

David Baird