**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | |
|---|---|
| NETCHOICE, | |
| *Plaintiff*, | |
| v. | Civil Action No. 3:26-cv-00543 |
| ALAN WILSON, in his official capacity as South Carolina Attorney General, | |
| *Defendants*. | |

**DECLARATION OF BARTLETT CLELAND IN SUPPORT OF
PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

I, Bartlett Cleland, declare as follows:

1.      I am the General Counsel and Director of Strategic Initiatives for Plaintiff NetChoice. In that capacity, I draft and deliver legislative testimony, regulatory comments, and position papers in support of NetChoice's objectives to preserve the internet as a forum for online innovation and expression. I represent NetChoice in public forums, at industry events, and in meetings with government officials and agencies.

2.      I have spent 28 years in the technology policy space as a thought leader, writer, and speaker on all issues of innovation, communications, and technology. Before my time at NetChoice, I served on the Internet Education Foundation Board of Directors, which involved working closely with the Internet Caucus on Capitol Hill. I also served two terms as the Chair of the Technology and Communications Taskforce of the American Legislative Exchange Council (ALEC) and as ALEC's General Counsel and Vice President for Innovation and Technology. I was previously a member of the Internet Safety Technical Taskforce, a group consisting of leading Internet businesses and organizations and formed by 49 state attorneys general to focus on identifying effective online safety tools and technologies. Other prior roles have included membership in the Federal Communications Commission's Consumer Advisory Council and the ISO 279 (Innovation Management) Technical Advisory Group. I also served as advisor to then-Commissioner Grover G. Norquist on the Advisory Committee on Electronic Commerce.

3.      I submit this declaration in support of Plaintiff's Motion for a Preliminary Injunction against South Carolina House Bill 3431 (the "Act"). I am over the age of 18 and am competent to make the statements herein. I have personal knowledge of the facts set forth in this declaration and, if called and sworn as a witness, could and would competently testify to them.

## I.     NetChoice

4.     NetChoice is a national trade association of online businesses that share the goal of promoting free speech and free enterprise on the Internet. NetChoice is a 501(c)(6) nonprofit organization. As our website explains, we "work[] to make the Internet safe for free enterprise and free expression," and we engage at the local, state, national, and international levels to ensure a bright digital future.[1] In particular, we are dedicated to preserving the Internet as a vibrant marketplace for communication, commerce, and the exchange of ideas.

5.     For more than two decades, NetChoice has worked to promote online speech and commerce and to increase consumer access and options through the Internet, while minimizing burdens on online businesses. We aim to help make the Internet more accessible and useful for both businesses and consumers.

6.     Our members include a broad array of popular online services who ascribe to those objectives as well, including: Amazon, Automattic, Discord, Dreamwidth, Duolingo, Google, Meta, Netflix, Nextdoor, Pinterest, Reddit, Snap Inc., TikTok Inc., TikTok USDS Joint Venture LLC, X, and YouTube.[2]

7.     NetChoice's decades of experience, combined with the practical applications of the law and declarations submitted by our members, leads us to conclude that the Act—were Defendant permitted to enforce it—would irreparably harm many of our members and members' users.

---

[1] *See* NetChoice, About Us, https://perma.cc/U6D4-7TFP.

[2] *See id.*

## II.    NetChoice members create and facilitate vast amounts of speech.

8.    NetChoice members' websites publish, disseminate, display, compile, create, cu-rate, and distribute a wide range of valuable and protected expression to their users.[3] They dissem-inate content (text, audio, graphics, and video) that allows users to, among other things, engage in political and social discourse, interact with neighbors, petition elected representatives, access up-to-the minute news, engage in cross-cultural dialogue, find religious teachings, supplement their education, learn new skills, find products and services, and access libraries of books, movies, mu-sic, games, and podcasts. These services collectively provide a broad ecosystem of on-demand entertainment, communication, education and information accessible across smartphones, tablets, computers, and smart TVs.

9.    For example, search services like Google allow users to find information across the internet. Learning services like Duolingo offer language courses. Automattic's WordPress service allows individual content creators, like bloggers and businesses, to host and maintain their own websites.

10.    NetChoice members Netflix and Prime Video focus on video-on-demand stream-ing, offering movies, television series, stand-up specials, documentaries, news, and other program-ming, including award-winning original productions.

11.    Audible provides one of the largest audiobook catalogs globally, along with exclu-sive spoken-word series and podcasts. Kindle enables users to purchase, download, and read mil-lions of e-books, magazines, and digital publications, supported by features such as adjustable

---

[3] The Act uses the terms "user[s]," "visitor[s]," "account holder[s]," and occasionally "in-dividual[s]." *See, e.g.*, § 39-80-10(2), (5)-(7), (12)-(14), (16)-(20); § 39-80-30(A)-(B), (E). NetChoice members normally refer to just their "users," and thus this declaration will refer to "users" unless necessary to distinguish the statutory terms.

fonts, bookmarks, highlights, embedded dictionaries, features for taking notes, borrowing from local libraries, audible integration, and cross-device syncing. Wondery specializes in premium narrative podcasts covering true crime, business, history, science, and entertainment. Amazon Music offers streaming music and podcasts.

12.     Some NetChoice member websites also offer their users the ability to participate in expressive and vibrant online communities through social media services. On Dreamwidth, users can share creative writing and read the works of others. On Discord, users can engage with voice, video, and text capabilities to build communities and connect with friends. On Facebook, users can find other like-minded users, including dance and music aficionados, political groups, book lovers, and religion and spirituality communities. On Goodreads, users can create and share book recommendations, log their reading, and engage in discussions about books with other users. On Instagram, users can share vacation pictures and short informative videos. On Nextdoor, users can connect with neighbors, share news, and learn about local events. On Pinterest, users can discover ideas for recipes, style, home decor, motivation, and more. On Reddit, users can create and lead their own communities, on all manner of subjects. On Snapchat, users can create stories and messages among friends. On TikTok, people can discover things they love, pursue their passions, find their digital communities, and experience content on topics ranging from philosophy to fashion. On X, users can engage with their elected representatives and read and post about the political, cultural, and social topics of the day. And on YouTube, users can watch documentaries, in addition to all manner of educational, informative, and entertaining content.

13.     NetChoice members also provide e-commerce services that facilitate valuable commercial speech by enabling businesses and individual sellers to communicate directly with consumers about products and services. These include Airbnb, Amazon, Etsy, and eBay, which host

5

billions of listings that provide detailed product descriptions, pricing information, customer reviews, seller policies, advertisements, and other information that connect consumers with proprietors and inform consumer decision-making. A core function of these websites is the dissemination of valuable commercial speech. Sole proprietors; small and medium sized businesses; independent artists, craftsmen, farmers, and artisans; property owners; service providers; and large retailers all use these services to present their offerings, describe product features, communicate brand values, request customer feedback and reviews, and respond to customer inquiries. Consumers, in turn, rely on this information to compare options, evaluate quality, read customer reviews and obtain information that informs purchasing decisions.

14.     Many NetChoice members, including Amazon, Google, Meta, and others, also display advertising and offer advertising services that enables third-party advertisers to inform diverse audiences about a wide range of lawful products and services.

15.     Online services beyond NetChoice offer significant amounts of online expression as well. These include streaming services like Hulu, Spotify, Apple Music, Apple TV, Fubo, DirecTV, Disney+, and Max; online news like nytimes.com and foxnews.com; sports services like ESPN; and online journals, databases, and digital libraries that publish scientific, historical, economic, and medical research.

## III.   NetChoice members provide numerous tools to protect minors online.

16.     **Parental resources and tools.** NetChoice members take the safety of all users extraordinarily seriously and place a special emphasis on minors' safety.[4]

---

[4] *See* Malena Dailey, *By The Numbers: What Content Social Media Removes And Why* 13 (2021), https://perma.cc/9GHD-46RE ("NetChoice, *By the Numbers*").

17.     Members offer significant information, educational materials, guidance, and online policies that are publicly available online for parents and caregivers to freely access.

18.     Members also provide users and the parents of minors extensive tools and controls to tailor their privacy settings, control who may contact them, control what content can be accessed, set time limits, and otherwise oversee and monitor use of the service.

19.     For example, Amazon offers a Parent Dashboard with easy-to-use tools that tailor children's experiences on Amazon devices to align with individual parenting styles, including decisions about the content children see and the features they can access on their own even when the grown up is not present.[5]

20.     Automattic, a web development company that owns Tumblr, also provides tools to protect their users. For example, all Tumblr accounts are automatically created in "safe mode," with mature content hidden.[6]

21.     Discord provides several resources for parents. Discord's "Family Center" includes information on Discord policy to protect minors and a downloadable "Guardian's Guide to Discord," explaining how Discord works, terms used on the site, community guidelines, and more.[7]

22.     Dreamwidth does not allow minor users under the age of 13 and provides privacy protections for members.[8]

---

[5] *See* Amazon, Parent Dashboard, https://perma.cc/X4BH-9STS.

[6] *See* Tumblr, Content Intended For Mature Audiences, https://perma.cc/9MSU-5JQQ.

[7] *See* Discord, Parent Hub, https://perma.cc/BD25-PN8R; Discord, A Guardian's Guide to Discord, https://perma.cc/8ZQ5-T2H7.

[8] *See* Dreamwidth, Privacy Policy (last revised June 6, 2010), https://perma.cc/4V89-YP6Z.

23.    Duolingo maintains a detailed privacy policy and provides a special "Family Plan" where the plan manager can invite and remove members.[9]

24.    Google has robust protections. Google's "Family Link" allows parents to manage and filter content, set time limits on apps, and more.[10] Google creates and updates its protections by "work[ing] directly with experts and," which "help[s] inform the types of parental controls [Google] offer[s]."[11]

25.    Meta, which owns Facebook, Instagram, and Threads, provides several similar tools on its services. On Facebook, Instagram, and Threads, parents can (among other things) set daily time limits for their teens or limit use to specific days and hours; set reminders to close the apps; see the average amount of time their teen has spent on Facebook and Instagram (which includes Threads) over the last week (including by day); approve or deny their teens' requests to change default safety and privacy settings to a less strict state; and see their teen's settings for account privacy, messaging, and sensitive content.[12] Meta has also announced that minors under 18 will automatically be placed into Facebook and Instagram (which includes Threads) "Teen Accounts," which default to the strictest privacy settings and have limitations on who can contact

---

[9] *See* Duolingo, Privacy Policy (Jan. 5, 2026), https://perma.cc/PKU7-PFRD; Duolingo, Family Plan, https://perma.cc/R2UX-AUHL.

[10] *See* Google, Google Family Link, *Help keep your family safer online*, https://perma.cc/9NLJ-SL9F.

[11] Google, Safety Center, Choose parental controls that are right for your family, https://perma.cc/3BC7-X7H5.

[12] *See, e.g.*, Instagram, Help Center, Parental Supervision (2026), https://tinyurl.com/356rttjy; Facebook, Help Center, Safety Resources for Parents (2026), https://tinyurl.com/yu9mvvv5; Instagram, Help Center, About safety settings for teens on Threads (2026), https://tinyurl.com/yhwescp3.

minors, and which will provide parents added supervision features, like allowing parents to see the topics their minors are viewing.[13]

26.     Netflix offers "Netflix Kids," which enables parents to create restricted profiles for their children, giving children access to a subset of Netflix content.[14] With this, Netflix has created numerous other parental controls. Parents can: set maturity ratings or block specific titles; require a pin to create new accounts; turn autoplay previews off; adjust autoplay settings for tv shows; and much more.[15]

27.     Nextdoor affords users several privacy and safety tools that allows the user to control who sees their posts, to block or report harassing neighbors, and more.[16]

28.     Pinterest provides information about age-requirements, their approach to safety for teens, and other resources in its Help Center.[17] For example, one tool Pinterest provides is a "parental passcode." This tool allows parents to "lock certain settings related to account management, privacy and data, and social permissions on your teen's Pinterest account."[18]

29.     Reddit has global protections for youth, including age verification requirements for certain threads or conversations on Reddit.[19] In addition, Reddit continues to add more safety and

---

[13] *See, e.g.*, Instagram, Introducing Instagram Teen Accounts: Built-In Protections for Teens, Peace of Mind for Parents (Sept. 17, 2024), https://perma.cc/AWE3-QSVU; Meta, We're Introducing New Built-In Restrictions for Instagram Teen Accounts, and Expanding to Facebook and Messenger (Apr. 8, 2025), https://tinyurl.com/3py5jbm9.

[14] Netflix, How to create a profile for kids, https://perma.cc/PA2L-SE8Z.

[15] *See* Netflix, Parental controls on Netflix, https://perma.cc/V7WL-3FPG.

[16] Nextdoor, Privacy and safety on Nextdoor (2025), https://perma.cc/LUD2-7ZVG.

[17] Pinterest, Help Center, *Resources for parents and care-givers of teens* (2026), https://perma.cc/6WV5-RZC2.

[18] *Id.*

[19] *See* Reddit, Why is Reddit asking for my age? (2026), https://tinyurl.com/3zeywk7r.

security controls for users, including ad personalization, flagging Not Safe for Work and mature content, and other tools like "Hide" an ad, to remove advertisements that may pop up on feeds.[20]

30.    Snap Inc. has a "Family Center" that allows parents insight into who their children are communicating with on the application.[21] In addition, Snap provides "Place Alerts" that send parent's notification when their child arrives or departs key locations like home or school and also has tools that enable parent's to stop "My AI" from replying to teen accounts.[22]

31.    TikTok Inc. and TikTok USDS Joint Venture LLC prohibit minors under 16 from accessing direct messages at all. For 16- and 17-year-olds, parents and guardians can restrict who can send messages to their teen or turn off direct messaging completely through the family pairing feature.[23] TikTok also offers additional safety measures, such as setting age limits for certain features and limiting content that it has judged potentially inappropriate for minors.[24]

32.    X defaults minor accounts to "protected posts," among other protections. "This means that known minors will receive a request when new people want to follow them (which they can approve or deny), that their posts will only be visible to their followers, and that their posts will only be searchable by them and their followers (*i.e.*, they will not appear in public searches)."[25]

33.    YouTube offers a "supervised experience" for teens, allowing parents (1) to receive email notifications when a teen uploads a video or starts a livestream; (2) to gain insights into their

---

[20] *See id.*; *see also* Reddit, Introducing Hide an Ad (2025), https://tinyurl.com/yck8s5xx.

[21] *See* Snapchat Support, *What is Family Center?*, https://perma.cc/F9RT-GVEC.

[22] *See id.*

[23] *See* TikTok, Safety Center, *Guardian's Guide* (Feb. 6, 2026), https://perma.cc/Q4RG-CZJ3.

[24] *See* TikTok, Youth Safety and Well-Being (Sept. 13, 2025), https://perma.cc/7JER-HMMR.

[25] X, Information for Parents and Minor Users, https://tinyurl.com/3newaxr3.

teen's channel activity (such as uploads, comments, and subscriptions); and (3) an option to link accounts between a parent and teen.[26] Finally, YouTube has multiple "features to support teen well-being," such as "[t]ake-a-break notifications," "bedtime reminders," auto-play being disabled by default, and limitations on "the recommendation of select types of content."[27]

34.     **Limiting access by age and minor-specific policies.** All NetChoice members prohibit minors younger than 13 from creating accounts on their main services. Some members also offer child-specific versions of their services for children under 13.

35.     YouTube provides a filtered version of the vast array of YouTube content called "YouTube Kids." This service was built just for children and presents "a variety of the best family-friendly videos from the broader universe of content on YouTube."[28] YouTube Kids allows parents to customize settings to restrict content by age range—choosing from preschool, younger, or older child profiles.[29]

36.     TikTok also offers a separate experience specifically designed for users under 13 that has heightened protections and that does not offer the ability to post publicly or to any third parties, to communicate with others, maintain a shareable profile, or have followers.[30]

37.     Amazon offers Kids tablets that provide a child-friendly experience with parental controls that allow parents to manage their child's time online (*e.g.*, only enabling games after 30 minutes of reading time); an associated subscription (Kids+) provides kids access to a curated set

---

[26] YouTube, My Family, https://perma.cc/73WE-T3TQ.

[27] YouTube, Choices for Every Family, https://perma.cc/7GKP-6MXA.

[28] YouTube Kids, A safer online experience for kids, https://perma.cc/T3F3-SBBY.

[29] *See id.*

[30] *See* TikTok, Support, TikTok Under 13 Experience (Mar. 6, 2026), https://perma.cc/N5PZ-VB8N.

of books, games, videos, and audiobooks. Services like Prime Video and Audible offer Kids pro-files that provide content and an experience tailored to younger audiences.

38. **General Content-Moderation Policies.** Members' minor-specific policies exist alongside a comprehensive set of generally applicable "content-moderation" policies that apply to their services. NetChoice members publish and enforce varied content-moderation policies that address the publication of content they consider harmful or objectionable—including content that promotes or glorifies suicide, self-harm, eating disorders, substance abuse, stalking, bullying, har-assment, grooming, trafficking, child pornography, sexual exploitation, abuse, or content that is sexually explicit or pornographic.

39. Based on NetChoice's research, the "rate of violative content removed from plat-forms and the level at which it is removed prior to being seen by users makes clear companies are successfully prioritizing the safety of their users."[31]

40. Members' content moderation affects both what is available on the website to those looking for it (*e.g.*, through search) and what shows up in users' feeds or on users' homepages.

## IV. Parents have multiple other options to oversee their minor children online.

41. In addition to tools offered by NetChoice members, parents and guardians have many overlapping and complementary choices to oversee and control their minor children's use of the Internet, including controlling whether their minor children have access to Internet-connected devices in the first place. There are sources that collect many of these resources, providing parents with a wealth of useful information in one place.[32]

---

[31] NetChoice, *By the Numbers* at 13.

[32] *See, e.g.*, Internet Matters, *Parental Controls Guides* (2025), https://perma.cc/BKA7-V23D (collecting guides to parental controls for, *e.g.*, mobile devices, gaming devices, browsers, operating systems, and social media services) ("Internet Matters, Parental Control Guides").

42.     **Network-Level Restrictions.** Many, if not most, cell service and broadband Internet providers have designed and advertised tools for parents to block Internet access altogether, to block certain apps, sites, and contacts from their children's phones, and to restrict screen time on their children's devices.[33] Similarly, there is much publicly accessible information about the many wireless routers that offer parental control settings parents can use to block specific online services, limit the time that their children spend on the Internet, set individualized content filters, and monitor the online services their children visit.[34]

43.     **Device-Level Restrictions.** Many devices themselves contain ways parents can restrict their use. *See* Internet Matters, Parental Control Guides (collecting parental-control guides for "devices"). Many of the most popular mobile phone and tablet manufacturers like Apple, Google, Microsoft, and Samsung publicize the ways they allow parents to limit screen time across their devices and provide parents with tools to control what applications their children can use, set age-related restrictions on those applications, filter content, and control privacy settings.[35] There are also many third-party applications parents can install on their children's devices to monitor

---

[33] *See, e.g., id.* (collecting parental-control guides for "broadband & mobile networks"); Verizon, Verizon Family, https://perma.cc/S3L3-54CS; AT&T, Secure Family, https://perma.cc/X35D-2YF9; T-Mobile, Family Controls and Privacy, https://perma.cc/FFK2-W38X; Comcast Xfinity, Set Up Parental Controls for the Internet, https://perma.cc/4GR2-6WCW?type=image.

[34] *See, e.g.*, Netgear, Circle Smart Parental Controls, https://perma.cc/JQ4B-SXJC; tp-link, How to Configure Parental Controls on the Wi-Fi Routers (Case 1), https://perma.cc/382E-SDV7.

[35] *See, e.g.*, Apple, Use Parental Controls on Your Child's iPhone and iPad, https://perma.cc/7WSD-4XYR; Google, Family Link, Help Keep Your Family Safer Online, https://perma.cc/KX52-U2A3; Microsoft, Getting Started with Microsoft Family Safety, https://perma.cc/98XS-HLDB; Samsung, Parental Controls Available on Your Galaxy Phone or Tablet, https://perma.cc/M3MZ-CC6N.

their activity, set limits on screen time, and filter content—as publicized in mainstream publica-tions.[36]

44.     **Browser-Level Restrictions.** There are also parental controls on Internet browsers that allow parents to control what online services their children may access.[37] Some browsers offer a "kids mode" or allow parents to see what online services their children are accessing the most.[38] Third-party software and browser extensions are also widely available to reinforce these tools.[39] Browsers also provide all users with "some control over the information websites collect."[40]

## V.     The Act's effect on NetChoice members.

45.     According to the Act's definitions, the Act regulates several services operated by NetChoice's member companies.

46.     Under the Act, "[o]nline service[s]," is defined as "any service, product, or feature that is accessible to the public on the internet including, but not limited to, a website or application. An online service may include any service, product, or feature that is based in part or in whole on artificial intelligence." § 39-80-10(9).[41] A "[c]overed online service" is any "sole proprietorship,

---

[36] *See, e.g.,* Alyson Behr, *The Best Parental Control Apps in 2025, Tested By Our Editors*, CNN underscored (Jan. 2, 2025), https://perma.cc/ETL2-EZED.

[37] *See, e.g.,* Internet Matters, Parental Control Guides (collecting parental-control guides for browsers); Mozilla, Block and Unblock Websites with Parental Controls on Firefox, https://perma.cc/Y2G5-NMV9.

[38] *See* Google, Safety Center, https://perma.cc/MSE3-LXNZ; Microsoft, Learn More About Kids Mode in Microsoft Edge, https://perma.cc/87QP-BFSQ.

[39] *See, e.g.*, Kim Key, *The Best Parental Control Software for 2025*, PCMag (Nov. 15, 2024), https://perma.cc/4QQX-NWAM.

[40] FTC, How Websites and Apps Collect and Use Your Information, https://perma.cc/SJ8X-7X4S.

[41] An "[o]nline service" does not include: "(a) a telecommunications service, as defined in 47 U.S.C. Section 153; (b) a broadband internet access service as defined in 47 C.F.R. Section 54.400; or (c) the sale, delivery, or use of a physical product." § 39-80-10(9)(a)-(c).

partnership, limited liability company, corporation, association, or other legal entity that": (1) "owns, operates, controls, or provides an online service that conducts business in [South Carolina]"; (2) "is reasonably likely to be accessed by minors"; (3) "determines the purposes and means of the processing of consumer's personal data alone, or jointly with its affiliates, subsidiaries, or parent company"; and (4) either

> (A) has annual gross revenues in excess of twenty-five million dollars, adjusted every odd-numbered year to reflect changes in the Consumer Price Index;
> (B) annually buys, receives, sells, or shares the personal data of fifty thousand or more consumers, households, or devices alone or in combination with its affiliates, subsidiaries, or parent company; or
> (C) derives at least fifty percent of its annual revenue from the sale or sharing of consumers' personal data.

§ 39-80-10(4)(a). "Covered online service[]" also includes "(i) an entity that controls or is controlled by a business that shares a name, service mark, or trademark that would cause a reasonable consumer to understand that two or more entities are commonly owned; and (ii) a joint venture or partnership composed of businesses in which each business has at least a forty percent interest in the joint venture or partnership." § 39-80-10(4)(b).

47.    Based on these definitions, § 39-80-10, the Act covers, or appears to cover, at least the following NetChoice members: Amazon, Automattic, Discord, Dreamwidth, Duolingo, Google, Meta, Netflix, Nextdoor, Pinterest, Reddit, Snap Inc., TikTok Inc., TikTok USDS Joint Venture LLC, X, and YouTube. Each of these members has features identified in Section 39-80-10(4).

48.    That said, aspects of the definition are vague and difficult for NetChoice members (and other websites) to gauge. Although determining what the Act even means is very difficult, it is clear that the Act will require all of our covered members to comprehensively overhaul their services. Members will be required to develop new processes to organize and curate content, make

wholesale changes to user interfaces, redesign a panoply of settings and features, and fundamentally change how their users may interact with both the website and other users.

49.     Our understanding is that the massive engineering changes that would be required to comply with these requirements will take over a year, at the low end.

50.     The Act specifically targets numerous "design features" of online services whenever they could purportedly "encourage or increase" a minor's engagement. Design features are central to how our members surface, prioritize, and distribute content to create a distinctive expressive and communicative offering.

51.     **Personalization opt out. § 39-80-30(B).** I understand that the Act requires that covered services "must provide to a user the option to opt out of personalized recommendation systems, except for optimizations based on the user's expressed preferences. A covered online service must establish this option as a default setting for any individual the covered online service knows to be a minor." § 39-80-30(B). I also understand that the Act requires covered websites to abstain altogether from using automated processes to serve minors with content curated to their "personal preferences, interests, . . . behavior, location, or movements" unless "necessary." § 39-80-10(15); *see* § 39-80-30(B), (C). The Act does not define what it means to be "necessary," but it appears that South Carolina believes personalization is *un*necessary in most situations.

52.     Nearly all of NetChoice's covered members use some degree of personalization. The amount of content on many services is far too vast for any one user to ever hope to see. Moreover, the content is incredibly diverse, such that any one user would only find a tiny fraction of the content useful to her. Personalization is one the most important ways in that covered websites can connect users with a manageable amount of useful and engaging content. And it is an important

way that covered websites deliver content that is *appropriate* to individual users, including minor users.

53.     None of NetChoice's covered members personalization systems respond solely to user behavior of preference, without regard to independent judgments. Instead, these personalization systems embody numerous human expressive judgments by our members themselves about what content is safe and appropriate, what type of experience our members want their users to have, and what type of content to remove and deprioritize.

54.     Accordingly, personalization features are deeply integrated into existing systems and cannot be toggled "off" without either designing some alternative way to organize, cull, select, and present content or else massively worsening the experience for users and content creators. Covered websites must replace these features with a new user experience that does not organize content according to user's expressed preferences through engagement with the website.

55.     Compliance appears to require covered services to restrict, replace, or redesign personalized recommendation systems that help users discover relevant content. Limiting them would materially reduce the effectiveness and usefulness of our members' existing services and hamper significant amounts of protected speech.

56.     **Duty of care. § 39-80-20(A).** I understand that the Act requires websites to exercise "reasonable care" to prevent specific enumerated "harm[s]" to minors. § 39-80-20(A). This vague command requires our members to alter the ways in which they disseminate expressive content— and what content they disseminate.

57.     This "reasonable care" mandate would necessarily require covered online services to prioritize disseminating certain expression over other expression, based on the content's impact on "a minor" that the Act does not define. Websites will be required to evaluate the content they

17

publish and then predict how minors—across a broad range of ages, sensitivities, and maturity levels—might react to it and whether it might contribute to "anxiety, depression, self-harm or suicidal ideations," "severe emotional distress," or "compulsive usage." § 39-80-20(A).

58.     The duty of care may also conflict with the Act's restrictions on personalization. It seems that fulfilling the duty of care could require covered services to tailor content review to individual users to catch what harms them specifically. That is just personalization, which the Act otherwise restricts. Take a couple of examples. Gymnastics videos might be inspiring and entertaining for most users but traumatic to a teen gymnast who recently injured herself in competition. True crime or graphic documentary content may interest certain adult viewers, while it is disturbing for minors and individuals with particular traumas. There are countless similar examples. This leaves our members at a loss about how to comply with the duty, especially without relying on personalization systems.

59.     **"Tools" restricting content. §§ 39-80-30(A); 39-80-10(3).** I understand that the Act requires that covered services build "easily accessible" user controls to limit or disable certain features, §§ 39-80-30(A), 39-80-10(3), and also bars "[d]ark pattern[s]," defined as "a user interface designed or manipulated with the substantial effect of subverting or impairing user autonomy, decision making, or choice." § 39-80-10(5).

60.     Websites design their services to present content, connect users, promote dialogue, make recommendations, and offer other expressive features that are useful, meaningful, and engaging for their audience. Websites also design the visual layout of their interface (for example, by focusing on specific color schemes, placement and presentation of content, search bars, and navigation controls). Many websites offer the ability to "like," comment on, and otherwise react to another user's posts. These tools are all features of covered services that are all integrated into

3:26-cv-00543-SAL     Date Filed 03/09/26     Entry Number 22-3     Page 19 of 23

websites; they cannot be flipped on and off like a switch. Accordingly, the changes the Act mandates will almost certainly have substantial effects for how users and content creators use and engage with the websites, including disseminating speech to their networks and communities. Further, it is not clear what it would mean to "disable" these features by default, as the Act requires. Such disablement could mean the user sees essentially a blank screen with no functionality.

61.     Even more, the definition for "dark patterns" provides no guidance on when an interface crosses a line and given its vagueness would require companies to over restrict their expressive functions.

62.     Covered websites must also develop new systems for parents to control the accounts of their minor users. Although NetChoice members offer various controls already, each member tailors those controls to their unique services and communities. In some cases, implementing the Act's mandatory controls would require members to undermine the core expressive offerings of their users, for example by preventing the service from indexing posts that would allow their users to later find and access old posts. In some cases, our members could not implement the required controls at all (or without extensive burden and redesigning of their service), for example, because they offer only browser-based services that cannot effectively track time spent on the service. And even those NetChoice members that already offer parental controls must adapt those controls to the Act's rigid standards and turn them on by default, essentially offering all minors (and in some cases all users) a restricted and (for some) less useful version of their service.

63.     **Advertising. § 39-80-40(C); § 39-80-60(B).** Many members use comprehensive processes to screen third-party ads for age-appropriateness and do not themselves use so-called "[t]argeted advertising." *See* § 39-80-10(19). But under this Act, these measures might not suffice. Absent a perfect process to screen third-party advertising, covered websites face the prospect of

strict liability for "facilitating" any such ad, § 39-80-60(B), even if the activity advertised would be entirely lawful for adults. The Act prohibits websites from facilitating "targeted advertising" to minors, § 39-80-40(C), and "ads directed to minors for products prohibited for minors," including "narcotic drugs, tobacco products, gambling, and alcohol," when the service "know[s]" the user is a minor. § 39-80-60(B).

64.     To comply with the Act's requirements, our members would be forced to develop processes to perfectly screen third-party advertising to avoid presenting, placing, or even offering ancillary tools and services that could support advertising that may qualify as "targeted" (even if the member has no way to know that it is) or for activities that are prohibited for minors (such as alcohol or tobacco) that could possibly be interpreted as "directed" to minors are served to minor users.

65.     These restrictions significantly burden modern-day advertising services needed to support the publication of vast amounts of online speech. Modern day ad services, including those offered by our members, often center around self-serve tools and highly automated systems to filter, screen, and place advertisements. Although NetChoice members invest substantial resources to ensure such ads are appropriate for minors, it is neither technologically feasible nor operationally possible to manually pre-screen every potential third-party ad. In practical terms, this requirement will force services to police each and every ad by monitoring and screening all ad content to avoid liability.

66.     The imposition of strict liability with no requirement that the service know the content of the ad or its provenance (in the case of targeted ads) will chill legitimate advertising activity and distorting the economic model that enables websites to provide expressive services, often at no cost to users.

67.     As with many of the Act's other sweeping requirements, the predictable result is overbroad suppression: The safest course for a covered online service is to block or restrict entire categories of ads and ad-delivery mechanisms rather than attempt continuous monitoring. The consequence will be a reduction in advertising viability, undermining the revenue streams that allow online services to support free expressive services at scale.

68.     **Time to come into compliance.** This Act took effect immediately after Governor McMaster signed it into law February 5, 2026. In other words, despite imposing significant changes that require significant time to study, build, test, and safely roll out to users, this Act provided zero time for covered websites to come into compliance. As of this moment, the Act is in effect, despite having been signed into law just a few weeks ago. That means all of the Act's onerous requirements are in effect *now*, immediately forcing many—if not all—covered websites into non-compliance through no fault of their own.

69.     The statute's immediate effectiveness exacerbates these speech burdens by forcing companies to make rapid, risk-averse changes without sufficient time for careful design, testing, or calibration. Faced with potential liability, services may disable features or limit functionality more broadly than the statute ultimately requires. Indeed, in response to similar laws passed in other states, NetChoice members and other websites have barred access to youth users or have stopped serving certain states altogether.[42] The Act irreparably harms NetChoice's members.

---

[42] *See, e.g.*, Nextdoor, Member Agreement 2024 (last updated Aug. 15, 2025), https://tinyurl.com/edjbsda5 ("[I]ndividuals who are under the age of 18 are not permitted to create an account starting on September 1, 2024, if they are residents of the State of Texas, starting on January 1, 2025, if they are residents of the State of Tennessee, and starting on August 15, 2025, if they are residents of the State of Mississippi.").

70.     Based on my decades of experience in technology policy and at NetChoice, as well as engagement with members, it is my understanding that NetChoice members would be irreparably harmed if they were required to comply with the Act's burdensome requirements.

71.     The Act's requirements make compliance unobtainable for most websites given the extensive costs and near-impossible technical feasibility. Any website that even attempted to comply would incur substantial, unrecoverable costs in reconfiguring their websites to comply with the law and would face significant uncertainty about their compliance with the law given the Act's ambiguities. In practice, compliance with the Act would largely require websites to overhaul their services, completely changing them from the services we know them as today.

72.     NetChoice members' users (current and prospective) will suffer harms as well. The Act affects users First Amendment rights, placing burdens on their access to protected and valuable speech. Specifically, the Act affects how users will receive speech, find speakers and information, and engage in or interact with protected speech. Notably, the Act's sweeping requirements and prohibitions may require websites to stop providing their current range of services to their current range of users and account holders all together, as has happened before. *See infra* ¶ 57.

*        *        *

73.     If Defendant is allowed to enforce the Act, NetChoice's mission to protect free speech and free enterprise online would be directly and substantially hurt—as would its affected member companies.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed on March 9, 2026, in Washington D.C.

_____
Bartlett Cleland