## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## COLUMBIA DIVISION

NETCHOICE,

*Plaintiff*,

v.

ALAN WILSON, in his official capacity as
South Carolina Attorney General,

*Defendants*.

Civil Action No. 3:26-cv-00543

## DECLARATION OF STEVEN WEBER IN SUPPORT OF
## PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION

I, Steven Weber, declare as follows:

1.    I am a Professor of the Graduate School at the University of California, Berkeley, where I hold joint appointments as Professor at the School of Information and in the Department of Political Science. I am also the founder and former faculty director of the Center for Long Term Cybersecurity at UC Berkeley, where for seven years I led a multi-disciplinary research group that worked on emerging digital security issues at the confluence of new technologies, human behavior, and risk calculations made by firms and governments. I received a Ph.D. in political science at Stanford University in 1989 and have been a professor at Berkeley since 1989.

2.    At Berkeley, in the last 15 years I have taught hundreds of Information Science Ph.D. and Masters students, with a special focus on applied behavioral economics and innovation for information systems. I have written two relevant university press peer-reviewed books, co-edited another book, and published a number of peer-reviewed journal articles on this subject, as well as many other articles in non-peer reviewed publications.

3.    In addition to my academic appointments, I am a Partner at Breakwater Strategy, a strategic insights and advisory firm, where I assist clients with strategic decision-making and public affairs issues in areas that involve the intersection of technology and public policy.

4.    I have served as a consultant to a wide variety of U.S. and global firms as well as U.S. government agencies and multiple civil society organizations including major foundations dealing with strategic issues at the intersection of emerging technology, national and international policy, platform economics, and the digital society.

Docusign Envelope ID: A5E34AE2-7BD9-4FA9-A2EF-95FD258600F0

5.     The statements contained in this declaration are based on my personal knowledge. I am over 18 years of age and competent to make the statements set forth herein. I make this declaration in support of NetChoice's motion for a preliminary injunction against the South Carolina Age-Appropriate Code Design Act, H.B. 3431 (2026) (the "Act").

## I.     The Internet as an Expressive, Communicative, and Informational Medium

6.     The modern internet is one of the most important expressive and informational media ever developed. Like earlier communications technologies, such as newspapers, broadcast television, and telephones, the internet enables people to share ideas, access knowledge, and communicate with others. But the internet has dramatically expanded these capabilities by enabling instantaneous, low-cost communication across geographic boundaries and by allowing virtually unlimited amounts of information to be created, stored, organized, and accessed.

7.     The internet has revolutionized the marketplace of ideas by connecting speakers and audiences across the world. Individuals, businesses, educators, academics, scientists, artists, journalists, and government entities rely on online services to disseminate information and conduct conversations quickly and efficiently among large and diverse audiences.

8.     Individuals can build political campaigns, disseminate information in emergencies, learn new skills, conduct research, and more, all at the click of a button.

9.     In addition, online services have transformed the news and entertainment sectors by enabling users—who can be both creators and consumers—to access and share content on demand. This includes streaming video, music, podcasts, books, and games. The internet also makes it possible to widely share scientific, academic, and literary work across online communities and audiences.

10. Online services also facilitate valuable commercial speech by enabling businesses of all sizes to communicate with customers, advertise products, provide customer support, and distribute goods and services. This has drastically expanded the marketplaces that businesses can reach, for example, allowing small farms in rural communities to sell artisanal products to markets across the United States and the world that previously would have been impossible to reach.

11. The informational value of this commercial speech is significant and multifaceted. Through detailed product descriptions, customer reviews and experiences posted by everyday users, increased pricing transparency, and up-to-date availability information, it helps reduce informational asymmetries between sellers and consumers. That, in turn, has led to a massive expansion of, and improvement in, the functioning of markets. Access to this breadth of data enables consumers to more accurately compare alternatives, assess quality and value, and evaluate whether a product aligns with their specific needs and preferences. As a result, consumers are better equipped to make confident, well-informed purchasing decisions, minimizing uncertainty and the risk of post-purchase dissatisfaction.

12. Minors are significant users of online services. Minors predominantly use the internet to express themselves, communicate with peers, consume expressive content (such as books, movies, and music), learn new skills, and locate information relevant to their education, hobbies, and personal development. Minors use websites and apps to, among other things, conduct research for homework and school projects, interact with family and friends, raise money for field trips, seek to be recruited for college athletics, engage in activism, hear from local government officials, entertain and be entertained, discover new interests (or explore existing ones), showcase their crea-

tive work, and form new communities. One notable community, for example, is TikTok's Book-Tok, where teens post video reviews, recommendations, and reactions to books. BookTok is credited with increasing the popularity of reading among teens and for spurring sales of print books.

13.   Although there is not a single, authoritative "taxonomy" of the internet, work has been done to categorize and quantify the ways in which people use the internet, including minors. For example, in an early but seminal study conducted in coordination with the passage of the U.S. Children's Online Privacy Protection Act ("COPPA"), the Federal Trade Commission took a comprehensive sample of websites across the internet, breaking websites down by industry. These categories included retail, travel, entertainment and news (including books, radio, television, online newspapers, and magazines), health, auto, and financial. When the FTC originally did this work in 1998, it concluded that the "Most Popular" websites were search engines, Internet service providers, e-mail services, software and computer companies, news and information companies, online directories, entertainment companies, and online retailers of consumer goods.[1]

14.   The internet has of course developed substantially since that 1998 survey, including with the advent of mobile apps. But this framework still provides a useful mental model for understanding the kinds of things people are doing on the internet.

15.   Today, there are strong reasons to conclude that a predominant use of online activities continues to be for online communications, news, information, and entertainment. I will refer to these informational, expressive, and communicative uses collectively as "expressive" uses. Although adults use the internet for some purposes we might consider less "expressive," such as

---

[1] Privacy Online: A Report to Congress, Federal Trade Commission (June 1998), at 19-24, https://www.ftc.gov/sites/default/files/documents/reports/privacy-online-report-congress/priv-23a.pdf.

Docusign Envelope ID: A5E34AE2-7BD9-4FA9-A2EF-95FD258600F0

online banking, paying bills, or scheduling doctors' appointments, there is plentiful evidence suggesting that even among adults, expressive activities count towards at least half, if not more, of overall time spent online. For example, a recent survey by Optum found that even adults spend roughly half of their daily time online consuming entertainment, such as watching videos, and the remainder on general browsing, shopping, and other activities. Other commercial and non-profit research efforts have similarly found that the internet makes up an increasingly large percentage of how adults access news and entertainment, with the top uses of internet falling across TV and online videos, gaming, and social media.

16.    There is good reason to conclude that minors' online activities trend even more heavily toward expressive activities than adults. In 2013, the FTC concluded that education, games, and entertainment defined the relevant universe of child-directed services for purposes of quantifying the regulatory burdens of COPPA.[2] Today, there continues to be plentiful data suggesting minors of all ages use the internet for these and other predominantly expressive purposes. These include use of online services for: (1) communicating with family and peers through messaging and social media; (2) organizing social events; (3) creative expression such as art, music, poetry, stories, blogposts; (4) entertainment such as reading an e-book, listening to a story, watching a video, or playing a game; (5) supporting homework and school projects (such as through online informational tools like search, dictionaries, and calculators); and (6) learning about trends, interests, hobbies, and news. In fact, recent reporting suggests that minors spend hours online daily for these activities.

---

[2] *See* Children's Online Privacy Protection Rule, 78 Fed. Reg. 3972, 4003 & n.353 (Jan. 17, 2013) ("[T]he Commission believes that the education, games, and entertainment categories in the iTunes App Store and the Google Play store adequately approximate the relevant universe of unique mobile app developers whose apps may be directed to children under 13.").

Docusign Envelope ID: A5E34AE2-7BD9-4FA9-A2EF-95FD258600F0

17.    Older teens are more likely to use online services for non-expressive (functional) purposes, such as to reserve a ride on Uber, order meals, make purchases, and make payments for services via platforms such as Venmo. Even when these more "functional" online activities of older minors are considered, they are likely relatively minimal when viewed in proportion to the expressive uses minors make of the internet overall. That would be particularly true when viewed across all age ranges and measured in terms of total time spent online, because the youngest users do not perform these more functional activities frequently, if at all. And even some "functional" activities contain both informational components (such as learning about products, comparing prices, and reading customer reviews) as well as commercial or functional components (such as placing the order, authorizing payment, managing delivery, or riding in the Uber or rideshare to a destination). The functional component of the activity tends to take far less time than watching a movie, reading a book, writing a story, or playing a game.

18.    For all these reasons, there are strong reasons to conclude that a substantial portion of minors' time spent online is devoted to expressive activities, and that any non-expressive online activities are minor by comparison.

## II.    The Interstate and Global Nature of Online Services

19.    Online services operate across state and national borders by their very nature, connecting users, speakers, and content from around the world in ways no prior medium could match. Users routinely access a service that they value from different states and countries; and valued services are created in various states and countries around the world and accessed and used by users around the world.

20.    Even a user who never leaves their home state sends and receives data packets across multiple states (and often countries) every time they go online. A single Snapchat session, for

Docusign Envelope ID: A5E34AE2-7BD9-4FA9-A2EF-95FD258600F0

example, routes data through a combination of Google Cloud and Amazon Web Services infrastructure scattered across the world. The data that informs what the app does and says crosses borders and moves through many states on its way to and from the user's device. But the user typically experiences one app, and the core elements of user experience remain stable regardless of whether the user is in California or South Carolina. This is the internet's basic architecture and part of what makes it so valuable as a medium of commerce and communication.

21.    Some countries have tried to constrain and bound these cross-border flows of data packets using data localization laws and other restrictions, which require that certain personal data—particularly sensitive categories—be stored and processed within national borders. Russia and China have each enacted such regimes in varying forms. But even those laws operate at the national level.

22.    Laws that require online services to change their experience by geography pose many functional challenges that render the medium less useful for cross-border information flows, and thus for users.

23.    First, in many circumstances, websites and applications do not even know a user's precise physical location. While services may have access to *approximate* location signals (such as IP-based geolocation or user-provided account information), these signals are inherently imprecise and probabilistic. More precise and reliable geolocation data, such as that made possible by GPS and GNSS systems in the phone, is considered highly personal and sensitive. Websites and apps generally do not have access to such information unless users choose to grant them permission to collect this data. For websites subject to COPPA, this means parents must choose to grant access. Many parents and users do not grant permission to access this information.

Docusign Envelope ID: A5E34AE2-7BD9-4FA9-A2EF-95FD258600F0

24.   Many websites also prefer not to collect this information, both to protect their users' privacy and security and because collecting such information requires implementing protocols to keep it secure, which carries major costs and complexities. Absent such protocols, an online service that logs precise user locations accumulates a sensitive dataset that becomes a high-value target for hackers. This poses a significant burden, even for the largest service providers, to say nothing of smaller services and start-ups. It is usually simpler, safer, and more cost effective to simply avoid collecting such information in the first place, even if users are willing to grant permission to collect it. This is particularly true for small and medium sized services. As a result, it is often difficult or impossible for an online service to reliably determine whether a particular user is located within a specific state at any given moment, particularly for users located near a border with another state.

25.   Second, even if it were feasible and desirable on balance to track users' precise location, delivering different user experiences state-by-state would be operationally complex and expensive and substantially undermine the value of the internet. It would be very burdensome for websites to build different design elements, content selections, content delivery techniques, and networking capabilities for 50 different states, and to swap out these experiences as users travel among states. Doing so would be so operationally expensive that it could drive all but the largest websites out of business or make it impossible for smaller websites to serve more than a few states. That would fundamentally decrease the value, choice, and range of voices and information across the internet.

26.   Third, and relatedly, an internet in which the user experience differed substantially across state lines would affect users in all states, not just one. That is because one of the tremendous values of the internet is that it opens up markets and audiences in a geographically agnostic manner.

Docusign Envelope ID: A5E34AE2-7BD9-4FA9-A2EF-95FD258600F0

A colloquial expression that accurately captured this modern feature of digital communications and expression is "the death of distance." For example, a blogger in South Carolina can make her voice heard not only in the State of South Carolina but to audience members across the other 49 States as well (and around the world). If the State of South Carolina shuts off access to this blogger, it affects those audience members outside the State, who can no longer benefit from the views and ideas of the blogger. Similarly, content creators and users *outside* the State benefit from access to audiences within the State of South Carolina. Again, if South Carolina cuts off or restricts access to users within the State, those creators outside the State are necessarily affected. And this has downstream impacts to other aspects of the internet, such as advertising campaigns that help support online services, which tend to be national or international in scope.

### III.    Collection, Use, and Disclosure of Information from Online Users

27.    Online services must collect and use other information to deliver content. When a user requests content, the service must process basic technical data—IP address, device type, operating system, screen resolution, browser type, language preferences, and time zone—to deliver it in a usable fashion. Some of this data (such as IP address) is necessary to deliver content to a user at all, and other data allows it to be delivered in a way that the user can engage with it. For example, this includes data about a user's device and preferences that allow a user to read the New York Times on a laptop, a tablet, or a phone—where, in each instance, the information is presented in a particular layout and navigation scheme that makes sense for the device.

28.    This data is the lifeblood of the modern internet. It is what enables seamless and continuous user experiences of the kind that consumers and businesses take for granted.

Docusign Envelope ID: A5E34AE2-7BD9-4FA9-A2EF-95FD258600F0

29.   Online services also use information to personalize and improve the user experience. Personalization helps services sort through the essentially infinite store of information now available online to ensure that users receive content that is relevant, useful, and appropriate for their interests and needs.

30.   Users themselves contribute a significant share of the information that websites and apps collect, organize, and use. This includes content created by users and shared with other users as part of the core service. Reviews, comments, recipe notes, ratings, and creator uploads also comprise user data and are essential components of commonly used platforms like YouTube, Amazon, and IMDb. They massively enrich interactivity and speech on what were once static broadcast news platforms like the New York Times.

## IV.   Organization of Information on the Internet

31.   Because the internet contains an immense and constantly growing volume of information, a core function of online services is to organize, curate, and present that information in a way that users can meaningfully navigate.

32.   Effective organization is at the center of digital services—what some refer to as "platforms"—it ensures content reaches users for whom it is relevant, and it makes it possible for creators to find interested audiences. Without platforms that perform this organization function, users would face an unnavigable volume of content. Niche content creators would suffer most because they depend on discovery tools to aggregate dispersed but interested audiences that would otherwise never find them.

33.   How to organize information is one of the most important judgements that website and app designers make in the course of building their services. These judgments are implemented

Docusign Envelope ID: A5E34AE2-7BD9-4FA9-A2EF-95FD258600F0

in part through computer systems and algorithmic processes, but humans define, in the first instances, how computer systems and algorithmic processes are to make those judgments, and those human judgments embody the same kinds of expressive and editorial choices that have historically been made in more traditional media, like newspaper editors determining the size of a headline's font or how many column inches a story gets. The use of digital infrastructure does not alter the fundamentally human elements of selection, organization, prioritization, and presentation that shape the resulting expression.

34.    The accelerating scale of online content requires increasingly dynamic systems for sorting and presenting information. Online services devote substantial engineering and editorial resources to designing user interfaces and systems that vet, organize, and present content.

35.    This process of curation and organization is also important to prevent minors and other from seeing information they *don't* want to see or that may be inappropriate for them.

36.    **Personalization algorithms.** Personalization systems are essential to making the vast quantity of online information meaningful and navigable. They are the very heart of the value that the digital economy creates, not only for companies but for consumers and, by implication, for society as a whole. The digital economy reduced the cost of collecting and distributing content to near zero, which expanded available content toward an asymptote of infinity. Considering just one popular online service, roughly 500 hours of video are uploaded to YouTube *every minute*. No human being could seek to navigate that volume without organization and curation.

37.    Put bluntly, personalization is not an extraneous or luxury feature for online services; particularly for larger services with more content, it is a necessity to provide the service's audience with a meaningful, engaging, and informative experience.

Docusign Envelope ID: A5E34AE2-7BD9-4FA9-A2EF-95FD258600F0

38.   For modern services operating at scale that allow third parties (like content creators, sellers, readers, customers, and other users) to contribute content, it is extremely difficult—if not impossible—to function effectively without some form of personalization. In a global internet that seeks to serve all types of users across state and country lines, absent personalization, users would be confronted with overwhelming volumes of irrelevant content. Without personalization, users would be lost in a sea of information that they do not care about or have signaled they do not want to see.

39.   While almost all online services use personalization, different companies design personalization systems in different ways. Those design decisions are a large part of how companies differentiate and compete to provide the greatest value to the users that they want to engage with their content. All these choices involve expressive and editorial judgments about how best to present information to users and what experience the service aims to provide. Even neutral-seeming organizational systems (like categories or chronological sorting) embed editorial judgments. They rest on inferences and assumptions about what users mean when they provide feedback of various kinds, and what categories are most meaningful.

40.   For example, newspapers—from large national brands like The New York Times to smaller, local outlets—routinely tailor homepage layouts, newsletter recommendations, and push alerts based on reader behavior.

41.   The same is true for major streaming platforms specifically identified in the complaint, including Prime Video, Hulu, and Netflix. These services do not merely host and present to users static libraries of content. They continuously rank and reorder titles, generate "Because you watched" rows, and highlight certain programs over others. Each of these steps reflects judgment

Docusign Envelope ID: A5E34AE2-7BD9-4FA9-A2EF-95FD258600F0

calls about relevance, similarity, and user preference. Those judgements are informed by, and improve with, the use of data from individual and aggregated users.

42.    Building and maintaining these systems at scale is not only technically and judgmentally complex, but it is also one of the most important sources of differentiation and value that digital services create for users. Although companies do not all agree on what are the most valuable categories, distinctions, and curation patterns that users will appreciate, what is true across all services is that making those decisions reflect a number of expressive judgment calls akin to traditional editorial discretion.

43.    Beyond delivering content that aligns with a website's expressive judgments about how to present content, personalization also protects users and advances their own expressive interests. Some personalization techniques allow users to dislike and note "not interested" in videos or posts, which are data points that enable services to further reduce non-relevant content from their feeds and creates time and space for relevant content. But relying on this manual feedback alone would substantially reduce the precision and value of the personalization services modern websites perform. Automated personalization techniques can quickly and precisely identify content areas that are relevant for particular users without the friction of users needing to identify, name in precise terms, and set their own preferences. They also are critical for quickly identifying, removing, or downranking content the website decides to restrict (*e.g.*, violent, sexually inappropriate, or hateful content).

44.    By connecting audiences with content that interests them, personalization offers immense value to niche and unknown content creators, those who offer insights, perspectives, or talents that have not yet become mainstream (or may never do so). Personalization and automated processing allow these content creators to connect to audiences that otherwise might never find

Docusign Envelope ID: A5E34AE2-7BD9-4FA9-A2EF-95FD258600F0

them, and conversely, allows users to find previously unknown voices, talents, and perspectives. Without personalization techniques that help connect creators with appreciative audiences, many unique voices on the internet would be lost. This is because users would not necessarily know these voices exist at all, so they would not be able to deliberately search for them or seek them out. And if they cannot find an audience, many creators will stop expressing themselves altogether.

45.    Automated personalization is also important for minors themselves. Online services increasingly incorporate personalization and adaptive design features that tailor content, recommendations, and user experiences based on age, interests, and prior interactions. These systems are essential in helping minors discover educational materials, age-appropriate entertainment, and supportive communities aligned with their developmental needs, often without requiring the child to consciously manage or even understand the underlying customization. By filtering, prioritizing, and organizing information in ways that account for a minor's likely preferences and maturity level, personalization tools meaningfully reduce exposure to content that is unsuitable for minors and make online spaces more accessible and constructive for them. In this way, thoughtful platform design not only supports parental oversight but also directly benefits minors by shaping a safer and more engaging digital environment.

46.    There are many examples of how personalization creates safer and more appropriate spaces for users. To take just one, services such as Amazon Music, Spotify, and other streaming providers routinely apply personalization filters that distinguish between explicit and non-explicit tracks. In many cases, users can choose settings intended to reduce or exclude explicit recommendations, just as easily as they can choose to populate their recommendations with 1980s rock music or Bach concertos.

47.    Personalization and tracking techniques also allow parents to monitor and guide their children's online activity. Many websites and applications provide content classifications, age ratings, and parental controls that equip parents with meaningful information and tools to make appropriate decisions on their children's behalf, or in consultation with their children. These controls are optimized partly through personalization and automated processing. In addition, numerous platforms incorporate family-oriented features (discussed further below) that are specifically designed to support parental oversight and to create safer, age-appropriate user experiences.

48.    The personalized user experience most of us have become accustomed to on the internet is the result of many complex algorithms operating together on different kinds of data, different points in the process of presenting content to end-users, and representing multiple objectives. These objectives include: relevance, safety and appropriateness, quality, accurate representation of the platform's "brand" and reputation, content standards, and preference discovery. All these factors combine to reflect a distinctive expressive offering that is an essential differentiating feature, brand, and product that each service provides.

49.    Accordingly, personalization is not a set of static rules that can be turned on and off; algorithms are not built once and then applied. Rather, algorithms are continuously learning, changing, and improving as they process data from the online service and as the people at online services make adjustments to calibrate the algorithms to their expressive objectives, which themselves may evolve over time. That's valuable to preference discovery and consumer "delight" and, it is equally valuable to cyber-security efforts to combat the tactics of bad actors (like spammers and hackers) that are constantly evolving. A static set of rules would be a pre-modern notion of an algorithm, and it would quickly become obsolete or worse, in that the rules would be discoverable and easy for attackers to design around and exploit.

Docusign Envelope ID: A5E34AE2-7BD9-4FA9-A2EF-95FD258600F0

50. **"Design features."** As further discussed below, the Act uses the term "design features." There is no universal definition of what constitutes such a design feature. But it could apply to a wealth of expressive judgments and elements of website design that are inextricably connected with the expressive user experience. These include engagement tools (such as likes, ratings, and feedback signals), and notifications and push alerts that help ensure users and creators can reach their intended audiences.

51.   These features play an important role in enabling speakers to be heard and audiences to discover content online.

52.   But the term likely also encompasses a wide range of additional elements, some of which are deeply integrated with the essential look, feel, and functionality of the service as a whole. User interfaces are designed by websites to be intuitive and navigable, enabling individuals to locate, create, and engage with speech in ways that feel seamless and responsive. So design features are not merely technical tools, but essential choices that shape the dynamics of user expression and interaction, and in many instances, define and differentiate the unique value that platforms offer to users.

53.   Features like user-to-user recommendations, notifications, smart search capabilities, and content surfacing mechanisms reflect deliberate decisions about how information is organized, prioritized, and presented.

54.   Even elements that may appear purely aesthetic—such as color schemes, typography, spacing, placement of content, and the configuration of search bars or navigation menus—play a substantive role in guiding attention, signaling importance, and influencing how users move through the platform and find content they enjoy and that is meaningful to them.

Docusign Envelope ID: A5E34AE2-7BD9-4FA9-A2EF-95FD258600F0

55.    Taken together, these structural, content-oriented, and visual design choices constitute an information architecture that functions like a symphony as a cohesive editorial framework. They determine not only what content is de facto accessible, but how it is surfaced, experienced, contextualized, and understood. In this way, website design features are expressive and intentional decisions that shape the overall character of the platform and help create a coherent, engaging, and user-centered environment for consuming information, communicating with others, and enjoying expressive content.

56.    A website's ultimate appeal to its audience depends, to a considerable degree, on how effectively it makes these design and content decisions. Those choices are inextricably intertwined with the speech the site presents because they reflect expressive judgments not only about what to say and how to say it but also what not to say. The design of a platform also influences the decisions of third-party speakers about whether to publish their own expression there. When a platform successfully calibrates these design and content choices, it attracts both users and creators. Their participation, in turn, produces more speech, draws in additional participants, and reinforces the platform's expressive ecosystem. This dynamic operates as an expressive fly wheel: Thoughtful design and curation attract speakers and audiences, whose engagement generates additional content and interaction, which further enhances the platform's appeal and expressive vitality. Conversely, design or content decisions that fail to resonate with users or creators can slow or reverse that fly wheel, leading participants to disengage and take their expression elsewhere.

## V.    Existing Safeguards and Privacy Protections Online

57.    Online services and internet providers offer extensive tools to monitor, guide, and limit how minors use the internet. Cellular carriers like Verizon, AT&T, and T-Mobile offer family controls that block specific services on specific devices. *See, e.g.*, Verizon, Verizon Smart Family,

https://tinyurl.com/56nm4atf; AT&T, AT&T Secure Family, https://tinyurl.com/4dvkxcze; T-Mobile, Family Controls and Privacy, https://tinyurl.com/2xhr7k3. Routers, browsers, and devices from Apple, Google, Samsung, Microsoft, and Amazon let parents filter content, set time limits, restrict applications, and monitor activity. *See* Google, Safety Center, *Choose parental controls that are right for your family*, https://perma.cc/8PGR-7HEC; Apple, *Use parental controls on your child's iPhone or iPad* (Dec. 12, 2025), https://perma.cc/2P39-W8BA; Samsung, *Manage Family groups and parental controls with your Samsung Account*, https://perma.cc/ABZ5-PSLR. Dozens of third-party apps offer stand-alone parental control systems (like Bark) that provide additional layers of oversight. These tools let parents tailor restrictions to their own families' views about what is appropriate, rather than submit to uniform government mandates.

58.   Many of NetChoice's members, specifically, have built substantial protections directly into their services. Meta automatically places minors under 18 into "Teen Accounts" on Facebook and Instagram, defaulting to strict privacy settings and limiting contacts, content, and notification hours. In these accounts, users under 16 need parental approval to relax any restriction. *See, e.g.*, Meta, *Giving Teens and their Parents More Ways to Manage Their Time on Our Apps* (June 27, 2023), https://perma.cc/GFA9-BRNT; Instagram, *Introducing Instagram Teen Accounts: Built-In Protections for Teens, Peace of Mind for Parents* (Sept. 17, 2024), https://perma.cc/T62T-KN2S; Meta, *We're Introducing New Built-In Restrictions for Instagram Teen Accounts, and Expanding to Facebook and Messenger* (Apr. 8, 2025), https://tinyurl.com/3py5jbm9. TikTok bans direct messaging for users under 16 and disables it by default for 16- and 17-year-olds. *See* TikTok, Safety Center, *Guardian's Guide* (Feb. 6, 2026), https://perma.cc/UW3B-QF75. Snapchat limits minor users to communicating only with existing contacts or mutual friends. *See* Snapchat Sup-

port, *What is Family Center?*, https://perma.cc/QB66-JEEY. YouTube offers supervised experiences for teens and a standalone YouTube Kids service for children under 13. *See* YouTube, *Exploration starts here: Choices for every family*, https://perma.cc/JXU2-HGXK. And Amazon offers a Parent Dashboard with tools that tailor kids' experiences on Amazon, allowing adults to manage a child's screen time and digital content in one central place. *See* Amazon, *Parent Dashboard*, https://perma.cc/JZ76-LVSB.

59.   Websites and apps also invest heavily in content moderation, removing violent and sexual content, bullying, harassment, and material that has been found to encourage unhealthy behavior patterns such as eating disorders or body shaming. These content-moderation decisions are implemented at enormous scale in near-real time with a mix of machine and human resources, and platforms here, too, must adjust in a dynamic way as content, preferences, norms and expectations, and the tactics of intentionally bad actors evolve. It would be virtually impossible—and extraordinarily expensive—to attempt to assemble a team of human reviewers that could approximate modern-day algorithmic moderation.

## VI.   South Carolina's Age-Appropriate Code Design Act Imposes Significant Burdens on Speech, Communication, and Access to Information and on the Usefulness of Online Services in Interstate Commerce

60.   I understand that the Act covers any online service that: (1) does business in South Carolina; (2) is reasonably likely to be accessed by minors; and (3) meets basic size thresholds (roughly, services with over $25 million in revenue or that handle data from 50,000 or more consumers). § 39-80-10(4), (9). The Act defines "minor" as anyone under 18 and defines actual knowledge of a user's age broadly to include any information or inference the platform possesses, even if no employee has affirmatively identified that user as a minor. § 39-80-10(7), (8).

Docusign Envelope ID: A5E34AE2-7BD9-4FA9-A2EF-95FD258600F0

61.    The Act's core requirements fall into several categories. First, online services must exercise "reasonable care" to prevent a wide range of harms to minors, including compulsive usage, psychological harm, emotional distress, and identity theft. § 39-80-20. Second, for "know[n]" minors, services must disable by default a sweeping list of ordinary features—autoplay, infinite scroll, engagement metrics like likes and comments, personalized recommendations, and search indexing—unless the minor affirmatively opts back in. Adults are also provided the option to default out of these features under the Act. §§ 39-80-30(B), 39-80-40(F). Third, the Act mandates that online services provide certain "tools" for use in restricting minor's access to certain content by default and provides adults the option to restrict certain content. Fourth, the Act prohibits facilitating certain advertisements to minors. § 39-80-30(A), (C).

62.    Last, services must commission and publicly release reports prepared by independent third-party auditors covering their design features, data practices, age verification methods, and algorithms as they relate to minors. § 39-80-70.

63.    Act would require covered online services to undertake a substantial rebuild and overhaul of core website features that enable users to access, discover, and engage with expressive content. Compliance would not involve minor adjustments; rather, it would necessitate fundamental changes to service architecture, product design, and user experience. In particular, the Act's restrictions on personalization, its expansive duty-of-care provisions, and its mandated user controls collectively interfere with fundamental elements of the ways modern online services organize, enable, and deliver speech.

64.    Numerous aspects of the law burden online services and the speech they produce and foster.

Docusign Envelope ID: A5E34AE2-7BD9-4FA9-A2EF-95FD258600F0

65.  **Size threshold for coverage definition.** The Act's size-based coverage thresholds appear designed to target medium and large online services (*i.e.*, those that have achieved meaningful scale and user adoption). As a practical matter, however, the definition likely also sweeps in many smaller websites that rely on analytics services to help service their users. Therefore, it is almost certain that the Act's restrictions will fall on websites both big and small, throughout the internet.

66.  **Personalization restrictions.** The Act's limits on personalized content delivery, however, will fall most heavily on medium and larger sized services, whose value depends most heavily on dynamic, individualized content delivery. This is because services operating at scale cannot meaningfully moderate content among the billions of inputs they receive without reducing their offering in such a way that it would appeal to only the most undifferentiated and mainstream preferences. These services must therefore rely heavily on design optimization, ranking systems, and personalization features to help users navigate vast quantities of user-generated and third-party content.

67.  The Act's personalization restrictions impose a major constraint that will require these websites to fundamentally redesign their services at significant cost and with reduced effectiveness for users. Because modern services rely on ranking and recommendation systems to help users navigate enormous volumes of speech, shifting to static or broadly segmented feeds will dramatically alter and materially degrade user experience.

68.  It is important to recognize that service design also deeply impacts the experience and incentives of creators, who provide much of the content that makes the digital economy so valuable. Content creators depend on personalization and ranking systems to enable their creative works to reach interested audiences. Limiting personalization would mean that many of the creative

Docusign Envelope ID: A5E34AE2-7BD9-4FA9-A2EF-95FD258600F0

voices websites currently enable by matching them with audiences will not find an audience (and their audience will not find them). Limiting these tools will make it harder for users to find relevant content and will, in turn, reduce incentives for creators to produce new expressive works. The overall effect is to reduce the number of voices and perspectives on the internet.

69.   **"[A]ctual knowledge" of minor users compliance burden.** The statute's expansive conception of "actual knowledge" creates a substantial compliance burden for otherwise covered entities. By defining actual knowledge to include not only information directly provided by the user or observed by a human reviewer but also reasonable inferences derived from a website's systems, the provision appears to effectively read the actual knowledge element out of the law by attributing knowledge to all websites based on data signals that most websites necessarily have in their systems (somewhere) even if no human has ever looked at them or had reason to do so. In practice, most online services maintain a wealth of analytics, device information, behavioral indicators, or account attributes that *could* be used to infer a user's likely age. But many websites specifically decline to analyze this information because (among other reasons) it would be privacy-intrusive to do so. Because these data points are ubiquitous in modern digital operations, the provision risks deeming many general-audience services to have "actual knowledge" of minor users even where the service has no actual knowledge. Further, it puts websites to the difficult choice of analyzing sensitive user information to try to infer the age of their users (even where they prefer to respect their users' privacy) or risking liability.

70.   Faced with potential liability, risk-averse platforms are likely to over-comply and restrict their services more broadly, thus restricting and disincentivizing speech. Some services will assume they are "likely to be accessed by minors" to avoid enforcement exposure. Once in that posture, services may feel compelled to treat unknown users as minors by default unless the user

affirmatively proves otherwise. When considered relative to the other provisions of the Act, such as exercising reasonable "care" to avoid certain sensitivities specific to minors, this creates a strong incentive to either ensure all content is appropriate for even the youngest children or implement universal age-screening mechanisms.

71.  Universal age-screening, however, carries significant operational challenge and potential privacy costs. It requires the collection and processing of additional personal information that, for good reason, many users are wary to provide and many websites do not want to collect because it magnifies the security risk associated with online activity.

72.  For example, services could require users to provide state-issued ID to confirm their age, which is a known and significant security risk. This is dually problematic because it excludes individuals who do not have such IDs from creating accounts with different services.

73.  In addition, age inference from user data, including machine learning analyses of uploaded selfies and the like, is an evolving but imperfect science. At the scale at which these systems operate, even 98% accuracy would leave 2% wrongly categorized users. It's an obvious point, but Snapchat has at least 100 million users in the United States alone, and if the age inference system fails in 2% of cases, that is 2 million incorrect age categorizations and the stifling of millions of individuals expressive activities.

74.  **Duty of care.** The duty of care itself appears nearly impossible to implement in a content-neutral manner. Assessing whether design features, recommendations, or service experiences could lead to harms for minors requires evaluating the nature of the content being delivered and the context in which users interact with it. It also requires inferences about how users will

Docusign Envelope ID: A5E34AE2-7BD9-4FA9-A2EF-95FD258600F0

receive and react to particular kinds of experiences. Without personalization or user-specific assessment, platforms may be forced toward one-size-fits-all design restrictions that degrade the experience for adult users.

75.   For example, information about armed combat or weapons may be appropriate for users who are active-duty servicemembers or military historians, while the same content could be distressing or inappropriate for minors or pacifist. Exercise or dieting content may be exactly what a fitness influencer or gym owner wants to see, while harmful to other users that may be struggling with eating disorders. Scientific discussions or information about human reproduction may be important for certain kinds of scientists and doctors but inappropriate for minor users. And this list could go on. It is virtually impossible to assess whether specific content on a website could give rise to anxiety, depression, compulsive use, or physical or financial harm without *both* evaluating what content it provides or communications it enables *and* knowing a great deal about the person who is receiving and engaging with the content.

76.   Compounding these burdens, the Act employs ambiguous and highly subjective standards that make it difficult for services to determine what conduct is required or prohibited. That is because, as explained above, the nature of the risks in each case is likely to turn on highly individualized determinations. Faced with substantial enforcement risk and uncertain compliance obligations across a potential wide range of users, many services will likely adopt over-inclusive and speech-restrictive approaches to mitigate liability risk. The result will be reduced access to lawful information, diminished quality and usefulness of online services, and significant disruption to interstate communications.

77.   **Disablement tools and restriction of "design features."** Online services and users themselves derive significant value from enabling users to connect with communities, networks,

Docusign Envelope ID: A5E34AE2-7BD9-4FA9-A2EF-95FD258600F0

groups, and ideas aligned with their interests. The Act would significantly curtail those connections for users in South Carolina, isolating them from broader online conversations. At the same time, it would limit the ability of users outside South Carolina to interact and engage with individuals in the State, fragmenting what are otherwise nationwide and global conversations and communities.

78. The Act's required settings would disable personalization for minors, or prohibit covered services from using systems that "suggest, promote, or rank content" for known minors. § 39-80-10(12); § 39-80-30(B). This, in effect, automatically limits minors' ability to connect with broader online conversations and communities. The law would disable the very tools users rely on to discover speakers, topics, and communities of interest. These disablement tools would result in a service with a chronological or otherwise uncurated mass of posts that creates a sea of information visible to minors that does not reflect their interests, relationships, or prior engagement. It would be substantially more difficult for minors to find educational resources, civic discussions, creative communities, support networks, or other lawful and protected expression tailored to their needs and interests. As a result, minors would, by default, be cut off from a wide range of protected expression.

79. Moreover, the Act contains a further "design feature" restrictions (unless features are "necessary"), § 39-80-30(A)(1), which are vague and will be difficult, if not entirely unworkable, for services to implement. The Act never defines what a "design feature" is, and given the complexity of services, it could be elements as basic as font size and color to more complex components such as page layout; use of images, icons, and banners; settings and navigation structures; search bars and filters; content categories and warnings; and many more. It is unclear what disablement would lead to: blank websites, only black and white apps; apps without photos; again, the list could go on.

Docusign Envelope ID: A5E34AE2-7BD9-4FA9-A2EF-95FD258600F0

80. **Advertising restrictions.** The Act also restricts advertising practices by prohibiting covered services from "facilitat[ing] targeted advertising to minors," § 39-80-40(C), and from facilitating "ads directed to minors for products prohibited for minors," such as narcotic drugs, tobacco products, gambling, or alcohol, when the service "know[s]" the user is a minor, § 39-80-60(B). These provisions are unusually broad because they hinge on the concept of "facilitating," which appears to impose liability even when the service itself does not create the advertisement and plays only an indirect role in its delivery. In practice, modern online advertising systems depend heavily on automated, self-serve platforms in which third-party advertisers create, upload, and distribute ads through platform tools. While many services already employ extensive screening to evaluate third-party ads for age appropriateness, it is not technologically feasible to manually review every advertisement distributed through these large-scale automated systems which in many instances operate in real-time.

81. Even with such measures, however, compliance may remain uncertain. Absent a flawless screening process, covered services could face strict liability for "facilitating" an advertisement that inadvertently reaches a minor—even if the underlying product or activity is entirely lawful for adults and even if the platform attempted to prevent such outcomes. Ensuring that restricted ads never reach minors becomes especially difficult where platforms cannot reliably determine which users are minors or cannot use personalization and targeting tools that typically help direct ads toward appropriate audiences and away from restricted ones. Because the prohibition extends beyond ads that platforms create or directly review to those generated and distributed by third parties through automated tools, services may feel compelled to monitor and screen all advertising content or significantly restrict the operation of their ad systems. The result will be overbroad suppression.

Docusign Envelope ID: A5E34AE2-7BD9-4FA9-A2EF-95FD258600F0

82. **Interstate reach.** The Act's burdens extend well beyond South Carolina's borders. Because most online services do not pinpoint users' precise locations, they would have to apply the Act's restrictions to users whose location they cannot definitively confirm, including users in neighboring states who happen to appear close to the South Carolina border. Travelers passing through or near the state would encounter a completely different version of services they rely on at home. That jarring experience will frustrate users and degrade the value of services that millions of Americans use daily, regardless of where those users actually live.

83. As noted above, the effects would not stop at or around the South Carolina state line. Users across the country could experience changes as platforms alter their services to comply with the Act. For example, an aunt in California hoping to use social media to view and interact with photos or updates shared by her niece and extended family in South Carolina may find that certain features are restricted or unavailable, or that the content cannot be viewed or engaged with in the same way. For example, the aunt would be unable to view her niece's account at all or send a connection request unless the niece changed the mandatory defaults imposed by the Act. And even if the aunt is able to connect with her niece, certain feedback she attempts to send (such as liking a post) would not be visible to the niece unless the niece changes her defaults. These disruptions would undermine ordinary, everyday uses of online services that allow families, businesses, and communities to stay connected across state lines.

84. The Act would also fragment broader online communities by changing how people inside and outside South Carolina can communicate with each other. Social media platforms are built around interactions that cross geographic boundaries, allowing users to share posts, messages, and media seamlessly with friends, family, and communities regardless of where they live. By

Docusign Envelope ID: A5E34AE2-7BD9-4FA9-A2EF-95FD258600F0

imposing restrictions that apply only to users located—or believed to be located—in South Carolina, the Act would force platforms to limit or alter these interactions, creating barriers between users in the state and those elsewhere. The result would be fractured conversations, inconsistent user experiences, and weakened online communities.

85.    If all 50 states, or even some subset of them, were to follow suit and pass similar legislation, it would fragment the internet in ways that would make it drastically less useful.

\*      \*      \*

86.    Taken together, the Act's sweeping scope, ambiguous standards, heavy compliance burdens, and significant liability risks will predictably chill lawful expressive activity. Services are likely to respond by limiting features, reducing personalization, over-filtering content, or restricting access altogether. Users and creators, in turn, will face diminished opportunities to speak, discover information, build audiences, and participate in online communities.

## VII.    Immediate Compliance Is Impossible

87.    Based on my expertise, the sweeping changes South Carolina seeks to impose through the Act are impossible for online services to immediately comply with.

88.    To comply with South Carolina's Act, companies would have to rebuild many of the features of their websites.

89.    To remove or disable integrated features—which are core architectural components woven throughout the technology, such as personalization engines that drive content recommendations and algorithmic curation systems that determine content surfacing—online services would have to refactor and re-imagine their websites. They would have to design alternative content

Docusign Envelope ID: A5E34AE2-7BD9-4FA9-A2EF-95FD258600F0

presentation methods that would require new ranking algorithms, create age-appropriate experi-ences with different logic paths, and design content-filtering systems that work as well as is pos-sible without personalization data.

90.    They would also have to redesign underlying data architectures that drive user flows, update user interface and user experience (UI/UX) components across multiple device platforms (web, iOS, Android, embedded devices), and ensure consistent behavior across all user surfaces.

91.    And for services that do not currently link parental oversight accounts, they would have to change their identity infrastructure to allow for parental account linking, and to give par-ents visibility over certain data (such as time spent) and control over the minor-linked account (such as to set access during certain hours).

92.    This all would require rebuilding at least five functions of online services.

93.    **Content quality filtering.** Without personalization, a new content organization method will be necessary. The most obvious alternative is chronological sorting. But chronological organization comes with many potential issues. Pure chronological time-stamping (to simply show content in the order in which it was received) is a recipe for low quality content overwhelming the service. AI content generation, which is now possible and cheap, makes this not just a theoretical concern but a very real one. From a content perspective, chronological sorting with a mass of AI-generated content would be the conceptual equivalent of a distributed denial of service (DDoS) attack in cyber security. A DDoS attack is when thousands or millions of computers are hijacked simultaneously to flood a website or online service with fake traffic, thus overwhelming it, so legitimate users cannot get through. (This is the machine equivalent of thousands of prank callers jamming a phone line so real customers can't reach a business or an emergency 911 service.) With a chronological-sorting architecture, the attacker can simply overwhelm the system by uploading

a nearly infinite number of low-quality content elements, thus pushing out creators who put meaningful effort into the content they upload and who could not possibly match this cadence. Put differently, a chronological feed does not eliminate the ability to amplify certain kinds of content; it shifts amplification power from a personalization algorithm that is built and evolved by a platform owner, to whoever posts most frequently and at optimal times. And that favors attackers, particularly spam networks, who have the infrastructure and incentives to be better at gaming chronological feeds than individual creators or users do. Realistically, without personalization techniques, online services will likely need to resort to the old-fashioned content delivery methods traditionally used in analog systems, where teams of editors and content selectors made decisions about what audiences would see based on overall popularity metrics. These systems reduce the number of voices and decrease "niche" content in favor of mainstream options.

94. **Trust and safety functions.** A pure chronological feed, by definition, does not filter for trust and safety features, which are valuable to users, valuable to society, and commercially valuable to the platform. Online services would have to determine where certain kinds of personalization survive South Carolina's law and evaluate how to restructure their service while maintaining certain safety features.

95. **Ad delivery and monetization.** Ad relevance, pacing, frequency, and also yield optimization from ads all assume some personalization that helps online services place ads that are relevant and appropriate for users. If an online service were required to operate with a purely chronological feed, it would have to rebuild, almost from the ground up, a new ad system that could plausibly work in a purely chronological feed. Moreover, given other advertising restrictions in the Act, the service might be unable to serve certain categories of ads without personalization. As a result, it would need to significantly redesign its ad delivery strategy to comply with these

Docusign Envelope ID: A5E34AE2-7BD9-4FA9-A2EF-95FD258600F0

constraints or else find new monetization techniques (such as subscription fees that require users to pay for access) or shut down altogether.

96. **User interface and engagement architecture.** Online services built their notification systems, follow recommendations, and content feeds around one core assumption: that a set of algorithms is learning what each user wants to see. Many interface elements reflect that assumption. The "suggested for you" prompt, the notification badge, the ranked feed—each depends on a personalization engine running underneath it to inform these curation elements. A raw chronological feed sounds simple, but the sheer volume of content on any major platform makes an unfiltered stream functionally useless. Engineers at the different online services would be forced to design entirely new discovery and filtering tools built on something other than behavioral data, and those tools do not exist in finished form. They require original design, testing, and iteration before they can seek to replace what personalization currently does.

97. **Granular choice tools.** South Carolina's law in effect requires companies to build an entirely different website because it purports to provide users with the ability to express their preferences through opting in and out using different tools. This change faces many of the same rebuilding problems addressed above with the changes to user interfaces and engagement architecture. Even the basic design of an interface, which would permit users to "express their preferences," is an exceedingly complex technical and behavioral exercise in eliciting those preferences. Does the platform ask a series of questions and, if so, how many? Does it ask users to provide keywords or adjectives? Does it prompt users to describe in their own natural language what it is they want and do not want? There is no single best practice or generally agreed mechanism to operationalize this concept and particularly to do so at the scale at which digital platforms typically operate.

Docusign Envelope ID: A5E34AE2-7BD9-4FA9-A2EF-95FD258600F0

98.    But this is more than an engineering challenge. Before engineers write a single line of code, product managers, lawyers, policy teams, and business leaders must resolve foundational questions about what the service will become. Those decisions cascade. There are critical design, policy, and business decisions that have to be made in each step prior to, and alongside, the engineering work.

99.    The business questions alone are substantial. Personalization drives engagement and retention. Removing it requires deliberate choices about what replaces it and how the service justifies that trade-off to shareholders, advertisers, and users.

100. This engineering endeavor—including the phases of design, product management, development, product testing, quality assurance, and deployment—would take at least a year from start to finish, possibly much longer. It is impossible to assess with certainty the time required because the changes the Act appears to require are so substantial that there might be significant unanticipated engineering and operational obstacles encountered along the way. Each stage requires careful planning, iterative development, internal review, and validation to ensure that the final website functions reliably, meets safety and performance standards, and integrates properly with existing systems.

101. In sum, these requirements would force online services to rebuild a new website that would require fundamentally restructuring—and rethinking—how these covered online services work.

*       *       *

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Docusign Envelope ID: A5E34AE2-7BD9-4FA9-A2EF-95FD258600F0

Executed on March 7, 2026, in Rhinebeck, New York.

_____
Steven Weber