**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

NETCHOICE, LLC,

|  |  |
|---|---|
| *Plaintiff*, | |
| v. | |
| ALAN WILSON, in his official capacity as South Carolina Attorney General, | |
| *Defendant*, | |
| and | |
| HENRY DARGAN MCMASTER, in his official capacity as Governor of the State of South Carolina, | |
| *Intervenor-Defendant*. | |

Civil Action No.: 3:26-cv-543-sal

**RESPONSE TO
MOTION FOR
PRELIMINARY INJUNCTION**

Henry Dargan McMaster, in his official capacity as Governor of the State of South Carolina, and Alan Wilson, in his official capacity as South Carolina Attorney General, submit this response in opposition to NetChoice, LLC's Motion for Preliminary Injunction (ECF No. 22).

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

STATEMENT OF THE CASE ...............................................................................................2

      A.     The South Carolina Social Media Regulation Act ....................................................2

      B.     Procedural history ....................................................................................................4

LEGAL STANDARD...............................................................................................................4

ARGUMENT ...........................................................................................................................5

    I.     NetChoice is not likely to prevail on the merits.................................................................5

        A.     NetChoice cannot show a substantial likelihood that it has standing........................5

           1.     NetChoice lacks associational standing..............................................................5

           2.     NetChoice cannot assert the interests of its members' users..............................8

        B.     NetChoice is unlikely to prevail on its First Amendment claims.............................9

            1.     NetChoice's First Amendment claims fail based on the First Amendment's original public meaning .........................................................................................9

           2.     NetChoice's First Amendment claims fail under means-end scrutiny .........10

                 i.     Duty of "reasonable care" (§ 39-80-20(A)) .......................................11

                ii.     Personalization regulations (§§ 39-80-30(B), 39-80-40(F)) .............16

                iii.     Default requirements (§ 39-80-30(A), (C))........................................19

                iv.     Reporting requirements (§§ 39-80-60(E), 39-80-70) ........................21

                v.     Alleged censorship.............................................................................21

        C.     NetChoice is unlikely to prevail on its vagueness claims .....................................22

            1.     "Reasonable care" for "minors".......................................................................23

            2.     "Harm".............................................................................................................25

            3.     "Design features" .............................................................................................28

            4.     "Expressed preferences"..................................................................................30

5. "Dark patterns" ..................................................................................... 31

6. "Personal data" .................................................................................... 33

D. NetChoice is unlikely to prevail on its preemption claims ................................... 33

1. Section 230 does not preempt the Act ........................................................ 33

2. COPPA does not preempt the Act ............................................................. 38

E. NetChoice is unlikely to prevail on its Commerce Clause claim ........................... 40

F. NetChoice is unlikely to prevail on its due process claim .................................... 42

II. The other factors do not support granting a preliminary injunction ............................... 43

A. NetChoice will not suffer irreparable harm .................................................... 43

B. The remaining factors cut against an injunction ............................................... 44

III. NetChoice seeks relief the Court cannot grant .................................................... 45

CONCLUSION ........................................................................................... 45

**INTRODUCTION**

The internet has become the "modern public square." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017). But this square is more dangerous for children than the traditional one. So governments have been working for decades to protect children from these new threats.

The South Carolina Social Media Regulation Act marks the latest such effort. As the Governor noted in signing it into law, the Act "provide[s] parents with critical tools to protect their children from the harmful effects of excessive social media use and their children's privacy online." Governor's Signing Statement (Feb. 5, 2026). The Act—which the General Assembly passed unanimously—creates common-sense, straightforward rules for covered online services that will help parents protect their children. Who could be against that?

Giant Internet companies. That's who. Through their trade association, NetChoice, they challenged this Act. That alone is a problem, as NetChoice lacks associational standing. NetChoice brings claims that typically require individualized consideration (that is, things that aren't facial claims), but associational standing typically doesn't work for as-applied claims.

But even if NetChoice could get over its standing problems, it has not shown that it's likely to prevail on the merits. Some problems pervade NetChoice's arguments. For instance, its generalized arguments fall far short of what *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), requires for facial challenges—a theme throughout its motion. And NetChoice repeatedly fails to develop arguments about specific members that are necessary for as-applied challenges. Speaking of not developing arguments, NetChoice objects to many parts of the Act, but it frequently doesn't fully work out why it says those parts are problematic. It just throws out a hypothetical or two and then cites a case. And on the subject of citations, NetChoice points to a lot of cases it has litigated across the country, but it doesn't cite many of the more recent decisions that cut against it.

On top of these problems, NetChoice's merits arguments are unpersuasive. The First Amendment isn't often implicated by the Act, which generally regulates conduct, not speech. But even if traditional means-end scrutiny applied, NetChoice's tailoring analysis undersells the Act's impact and overstates any burdens. Its scattershot vagueness claims turn largely on misreading the Act, while ignoring critical parts of jurisprudence. Its preemption claims identify nothing in the Act that would be an obstacle to the purposes of section 230 or COPPA. Its Commerce Clause claim would impose a per se rule to bar States from any sort of internet regulation, but the Supreme Court has rejected that logic because of our interconnected economy. And its due process claim just asks the Court to pause (or better yet, enjoin) the Act's effectiveness until NetChoice's members (or the whole world—NetChoice has asserted a facial challenge) say they can comply.

NetChoice's shortcomings don't stop with the merits. It has not shown any irreparable harm, and no one is facing any enforcement action right now. The public interest and equities favor the State too. South Carolina is trying to protect children, and NetChoice has admitted that "South Carolina has a compelling interest in protecting minors." ECF No. 22-1, at 30.[1]

Ultimately, the Act regulates diverse platforms and features, and NetChoice doesn't develop the factual record or legal arguments to justify the sweeping relief it seeks. The Court should therefore deny the motion.

## **BACKGROUND**

### A.      **The South Carolina Social Media Regulation Act**

The Act does multiple things to protect children online. First, it requires a covered online service to "exercise reasonable care" regarding both a minor's personal data and the "design and operation" of its site to avoid specific harms like compulsive usage, identity theft, and depression.

---

[1] All page cites are to the ECF-generated page numbers at the top of each page.

S.C. Code Ann. § 39-80-20(A). As part of that design, a user must have "easily accessible and easy-to-use tools" for things like disabling certain design features, limiting the time that can be spent on the site, limiting the value of financial purchases on the site, restricting who can view a minor's account, and restricting access to a user's location. *Id.* § 39-80-30(A). These tools must be the default settings if the covered online service knows the account belongs to a minor. *Id.* § 39-80-30(C). Along with these features, a covered online service must allow a user to opt out of personalized recommendation systems. *Id.* § 39-80-30(B). And a covered online service may not direct certain ads (like drugs, tobacco, gambling, and alcohol) at minors or use dark patterns (an interface that manipulates the user's autonomy and subverts his independent decisionmaking). *Id.* § 39-80-60(B)–(C).

The Act also protects children's personal data. A covered online service may "only collect, use, or share the minimum amount of a minor's personal data necessary to provide" the service with which the child "has knowingly engaged." *Id.* § 39-80-40(A). This data "may not be used for reasons other than those for which it was collected." *Id.* And the covered online service may keep the data only "as long as necessary" to provide the service. *Id.* § 39-80-40(B). Plus, it generally may not, by default, collect a minor's geolocation. *Id.* § 39-80-40(D).

Other protections exist too. For instance, a covered online service must provide users with "accessible and easy-to-use tools to prevent notifications and push alerts" at certain times. *Id.* § 39-80-40(E). This includes offering the option to turn off alerts for a minor's account at night and during the school day. *Id.*

Parents likewise must have "accessible and easy-to-use tools" that help "protect and support minors." *Id.* § 39-80-50(A). Parents must have the ability to change and control the child's privacy and account settings and limit the child's purchasing on the site. *Id.* § 39-80-50(B). Parents

3

must also be given a tool to monitor and limit the total time that a child spends on a site, including restricting the child's access at certain hours. *Id.* § 39-80-50(C).

Finally, the Act includes various reporting requirements. One type of reporting is for parents, minors, and schools to have a way to report harms to minors from using a covered online service. *Id.* § 39-80-60(A). Another type of reporting requirement is for covered online services, which must annually issue a public report from an independent third-party auditor detailing various aspects of its compliance with the Act. *Id.* § 39-80-70(A).

### B.    Procedural history

NetChoice urged the Governor to veto the Act. The Governor declined that entreaty and signed the Act into law on February 5, 2026.

A few days later, NetChoice sued, challenging the Act's constitutionality. NetChoice attacks multiple provisions in the Act. It asserts ten claims under myriad theories, including the First Amendment, the Fourteenth Amendment, the Commerce Clause, and section 230. ECF No. 1. On this motion, NetChoice seeks a preliminary injunction on five theories: the First Amendment, vagueness, the Commerce Clause, preemption, and due process. ECF No. 22.

### LEGAL STANDARD

A preliminary injunction "is an extraordinary and drastic remedy" and "is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (internal quotation mark omitted). A plaintiff must show four elements to obtain it: (1) likelihood of success on the merits, (2) irreparable harm, (3) the balance of the hardships tips in his favor, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

4

## ARGUMENT

### I.     NetChoice is not likely to prevail on the merits.

#### A.     NetChoice cannot show a substantial likelihood that it has standing.

"Standing is a threshold jurisdictional question," *Pye v. United States*, 269 F.3d 459, 466 (4th Cir. 2001), yet NetChoice brushes it aside in a single footnote, ECF No. 22-1, at 27 n.4. But context is key here. This isn't a motion to dismiss, where the defendants have the burden to prove that a plaintiff has not alleged plausible facts about standing. Instead, this is a motion for a preliminary injunction, so NetChoice bears the burden to show "a substantial likelihood that [it] ha[s] standing." *Delmarva Fisheries Ass'n v. Atl. States Marine Fisheries Comm'n*, 127 F.4th 509, 514 (4th Cir. 2025). If a plaintiff can't make that showing, it cannot obtain a preliminary injunction. *See Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162, 174 (4th Cir. 2025).

#### 1.     NetChoice lacks associational standing.

**i.** Associational standing is "in tension" with Article III's traditional standing requirements. *Ass'n of Am. Physicians & Surgeons v. FDA,* 13 F.4th 531, 540 (6th Cir. 2021). Thus, for many years, courts have treated associational standing claims with considerable skepticism. *See, e.g.*, *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21, 44 (1974). That skepticism continues today. *See, e.g.*, *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 399 (2024) (Thomas, J., concurring).

This skepticism is warranted. One, associational standing skirts the "constitutional minimum" of an injury-in-fact. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Two, it creates remedy problems because it gives relief to a group that "has not suffered [an] injury." *Ass'n of Am. Physicians & Surgeons*, 13 F.4th at 540. And three, it allows a plaintiff to essentially "bring a class action without satisfying any of the ordinary requirements" of Rule 23. *All. for Hippocratic Med.*, 602 U.S. at 402 (Thomas, J., concurring).

5

**ii.** Given these concerns, courts should closely scrutinize claims of associational standing. To establish associational standing, NetChoice must show three things: (1) the organization's members would otherwise have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief request requires the participation of individual members of the organization in the lawsuit. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023).

NetChoice's shortcoming with associational standing is most apparent with respect to the third prong. NetChoice's challenge is twofold. First, it seeks a preliminary injunction on a variety of theories, including First Amendment claims, vagueness claims, preemption claims, a Dormant Commerce Clause claim, and a due process claim. These types of constitutional claims traditionally require some degree of individualized inquiry to assess their merits. *See, e.g.*, *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 329 (2006) (a "statute may be invalid as applied to one state of facts and yet valid as applied to another"). Second, NetChoice asserts both facial and as-applied claims on behalf of its members. But courts have generally been reluctant to find that associations have standing to bring as-applied constitutional challenges. *See Ass'n for Accessible Meds. v. Bonta*, 766 F. Supp. 3d 1020, 1028 (E.D. Cal. 2025).

When confronted with another sweeping NetChoice lawsuit, the Ninth Circuit recently held that "it was not an abuse of discretion to find that NetChoice lacked associational standing on behalf of its members" on a claim about minors' access to personalized recommendation algorithms. *NetChoice, LLC v. Bonta* ("*CA9 Bonta II*"), 152 F.4th 1002, 1014 (9th Cir. 2025). The Ninth Circuit emphasized the "fact intensive" nature of NetChoice's First Amendment claims, noting that the analysis would vary from "platform to platform." *Id.* An individualized analysis

was required because each NetChoice member had a "unique design" for its platforms and algorithms. *Id*. Some designs, which implement "human editorial directions," might be entitled to some First Amendment protections, but other designs, which merely respond to user interactions, might not be. *Id*. These same individualized considerations apply to NetChoice's challenge here.

True, NetChoice cites a handful of cases that support its claim of associational standing, but those decisions cannot withstand scrutiny. For starters, cases that offer a conclusory analysis on the third prong of associational standing don't tell this Court much. *See NetChoice v. Jones*, No. 1:25-CV-2067 (PTG/LRV), 2026 WL 561099, at *5 (E.D. Va. Feb. 27, 2026); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105, 1119 (D. Utah 2024); *NetChoice, LLC v. Griffin*, No. 5:23-CV-05105, 2023 WL 5660155, at *10 n.6 (W.D. Ark. Aug. 31, 2023).

This lack of rigor is even more troubling on closer review. Neither the Eastern District of Virginia nor the District of Utah discussed *Moody*'s impact on what type of standing analysis is required for a First Amendment challenge. The Ninth Circuit correctly recognized that *Moody* plays an important role here: "The First Amendment analysis is fact intensive and will surely vary from platform to platform," so "the merits of 'the claim asserted' and the 'relief requested' requires the participation of individual NetChoice members." *CA9 Bonta II*, 152 F.4th at 1014 (cleaned up). "[A]ssociational standing" is therefore "inappropriate." *Id.*

Plus, many of the cases NetChoice cites dealt with laws that are materially different from the Act. For instance, several cases dealt with laws that sought to ban minors from having certain online accounts absent parental consent. *See*, *e.g.*, *NetChoice, LLC v. Fitch*, 787 F. Supp. 3d 262, 269 (S.D. Miss. 2025). South Carolina's act does no such thing. These laws thus present different constitutional questions, which, in turn, raise different concerns around associational standing.

7

### 2.     NetChoice cannot assert the interests of its members' users.

NetChoice also conclusorily claims that it "has standing to assert the rights of its members' users." ECF No. 22-1, at 27 n.4. Courts generally view such arguments with disfavor. *See Maryland v. U.S. Dep't of Agric.*, 151 F.4th 197, 212 (4th Cir. 2025).

This disfavor should be heightened here because NetChoice takes the extraordinary step of "stacking" standing exceptions when it invokes the rights of its members' users. NetChoice doesn't explain anything about these users. NetChoice doesn't even identify any of its members' users. It just claims that it can assert these unidentified people's rights. But whose? NetChoice could even be trying to assert the Court's rights here, depending on what, if any, social media sites the Court uses. So too with members of the South Carolina General Assembly, which enacted the Act that NetChoice now challenges.

Even if stacking were allowed, NetChoice lacks third-party standing for two reasons. One, to have third-party standing, NetChoice must still demonstrate its own Article III injury. *See Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004). As discussed, NetChoice has failed to establish associational standing, and it has not even attempted to invoke its own organizational standing.

And two, NetChoice cannot satisfy the prudential limitations that come with third-party standing. Those requirements are (1) that "the party asserting the right has a 'close' relationship with the person who possesses the right"; and (2) that there "is a 'hindrance' to the possessor's ability to protect his own interests." *Id*. at 130 (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)).

On the first limitation, unlike vendors bringing claims on behalf of their customers, NetChoice itself has no direct relationship with its members' users. *Cf. Md. Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 216 (4th Cir. 2020) ("[A] vendor has third-party standing to pursue claims on behalf of its customers."). Put another way, Google, Pinterest, Snap, and other NetChoice

8

members aren't asserting claims on their customers' behalf. There's another link in the chain—a link that undermines the logic of letting the vendor sue on behalf of its customer. *Virginia v. American Booksellers Ass'n* doesn't compel a different result because bookstores (unlike Google, Pinterest, or Snap here) were plaintiffs in the case. *See* 484 U.S. 383, 388 n.3 (1988).

Turning to the second limitation, there is nothing to suggest that any of NetChoice's members' users—who number in the millions—are hindered from bringing these claims. Presumably at least one of those users, if he thought the Act harmed him somehow, could challenge it. NetChoice never tries to explain why a user couldn't bring a case. Nor does NetChoice assure the Court that there is no possible conflict of interest between it and the users. *See June Med. Servs. L.L.C. v. Russo*, 591 U.S. 299, 402 (2020) (Alito, J., dissenting) (no third-party standing when "there is a potential conflict of interest between the plaintiff and the third party"). After all, users may like the Act because it protects minors.

**B.      NetChoice is unlikely to prevail on its First Amendment claims.**

**1.      NetChoice's First Amendment claims fail based on the First Amendment's original public meaning.**

Courts historically interpreted constitutional rights by examining "the history of the times in the midst of which the provision was adopted." *Reynolds v. United States*, 98 U.S. (8 Otto) 145, 162 (1878). In other words, the scope of rights is determined by the text's original public meaning, not ad hoc judicial balancing. That changed in the past century. Following footnote 4 in *United States v. Carolene Products Co.*, 304 U.S. 144, 152 n.4 (1938), courts began employing a means-end scrutiny in cases involving constitutional rights, *see, e.g.*, *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942) ("strict scrutiny" for sterilization law).

In recent years, the Supreme Court has wisely moved away from such tests. It "decline[d] to adopt" a means-end scrutiny for the Second Amendment, looking instead to text, history, and

tradition for historical analogues. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 117 (2022). And it relied on "original meaning and history" to guide Establishment Clause decisions. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 536 (2022). So it should be with the Free Speech Clause.

Under this proper framework, NetChoice's claims fail. That's because "'the freedom of speech,' as originally understood, does not include a right to speak to minors (or a right of minors to access speech) without going through the minors' parents or guardians." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 821 (2011) (Thomas, J., dissenting).[2] In *Brown*, Justice Thomas traced parental authority over children through the New England Puritans, the Revolution, and the early nineteenth century. *Id.* at 823–34. The "founding generation . . . believed parents to have complete authority over their minor children and expected parents to direct the development of those children." *Id.* at 834. So "the founding generation would not have understood 'the freedom of speech' to include a right to speak to children without going through their parents." *Id.* at 835. The Act therefore does not violate the First Amendment—no balancing required.

### 2.      NetChoice's First Amendment claims fail under means-end scrutiny.

NetChoice's claims still fail under means-end scrutiny. Though NetChoice claims to bring facial and as-applied First Amendment challenges, *see* ECF No. 1, at 33 (Count I), 41 (Count III), 44 (Count IV), 54 (Count VI), it does not distinguish between these challenges in its motion and argues these claims as facial challenges (given the lack of individualized discussion).

Some First Amendment background is useful at the outset. The Ninth Circuit explained this framework in NetChoice's recent challenge to a California law. First, a court must "determine

---

[2] Justice Thomas dissented in *Brown*, but that's no issue. The petitioner there didn't make an originalist argument. It argued that violent video games were like obscene materials that fell outside the First Amendment. *See* Pet.'s Br., No. 08-1448 (U.S. July 12, 2010). So while Justice Thomas addressed the originalist argument, the Court didn't have to reject it to rule as it did.

whether the regulation implicates protected expression" to trigger the First Amendment's protection. *NetChoice, LLC v. Bonta* ("*CA9 Bonta III*"), ___ F.4th ___, No. 25-2366, 2026 WL 694471, at *6 (9th Cir. Mar. 12, 2026). Second, a court must determine whether a law "is content based or content neutral." *Id.* And third, a court must apply the appropriate level of scrutiny. *Id.*

When a plaintiff brings a facial challenge as NetChoice does, there is more. To prevail on that challenge, a plaintiff must show that "a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Moody*, 603 U.S. at 723 (internal alteration omitted). A court must therefore determine the law's scope (the denominator) and then decide which applications violate the First Amendment (the numerator) to determine whether a law survives the facial challenge. *CA9 Bonta III*, 2026 WL 694471, at *6.

All NetChoice's First Amendment theories have problems on both fronts. On the steps, the first one is a problem for NetChoice. The Act generally regulates platform features that shape user experience—not expressive activity—so the Act isn't subject to any stringent First Amendment review. And on the type of claims, NetChoice offers no evidence for either the numerator and denominator to prevail on a facial challenge.

### i.     Duty of "reasonable care" (§ 39-80-20(A))

A covered online service must "exercise reasonable care in the use of a minor's personal data and the design and operation" of its service "to prevent" certain "harm to minors." S.C. Code Ann. § 39-80-20(A). Such harms include "compulsive usage," "anxiety," "depression," and "highly offensive intrusions on the minor's reasonable privacy expectations." *Id.*

**a.** NetChoice challenges this subsection of the Act as a "proxy" for speech restrictions that triggers the First Amendment. *See* ECF No. 22-1, at 29. NetChoice is incorrect. Section 39-80-20(A) regulates how a covered online service uses a minor's data and how it designs and operates

11

its site to avoid harming minors. The "use" of data doesn't regulate speech but conduct, and NetChoice never explains how that part of section 39-80-20(A) restricts speech.

That leaves the "design and operation" of a site. That does not automatically qualify for sweeping First Amendment protection. Take the "operation." If that is driven chiefly by artificial intelligence rather than people, there may be no expressive activity. That *computer v. human* issue "might have constitutional significance." *Moody*, 603 U.S. at 746 (Barrett, J., concurring).

And the "design" covers more than just how a covered online service "prioritizes the dissemination of one type of content over another." *M.P. by & through Pinckney v. Meta Platforms Inc.*, 127 F.4th 516, 525 (4th Cir. 2025) (quoted at ECF No. 22-1, at 29).[3] Ultimately, there's a difference in "content moderation" (which might implicate speech) and "engagement maximization" (which does not). *See Moody*, 603 U.S. at 736 n.5. Many covered design features—including infinite scroll, autoplay, and notifications—are not expressive. *See* Edelson Decl. ¶ 14. And even if there were some "incidental burdens on speech" with this part of the Act, that does not automatically mean that the law triggers heightened First Amendment scrutiny. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). Government can regulate "economic activity" while incidentally burdening speech. *Id.* Otherwise, virtually every economic regulation would be unconstitutional.

**b.** Even if the Act implicated the First Amendment, NetChoice's challenge to section 39-80-20(A) still fails for two reasons. *First*, there's the lack of evidence. When it comes to a facial challenge, NetChoice just proffers hypotheticals about news reports, ballet videos, and violent video games. *See* ECF No. 22-1, at 29–30. NetChoice cannot succeed on a facial challenge by

---

[3] *Pinckney* is an awkward authority for NetChoice. That was a section 230 case. *See* 127 F.4th at 521. There's an inherent tension in insisting that the design of your website is expressive activity but what your website says isn't your speech. NetChoice can't have it both ways.

12

speculating "about 'hypothetical' or 'imaginary' cases," *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008).

Plus, NetChoice never tries to explain when or how the Act regulates its members' speech (or other services' speech) compared to other applications. In other words, NetChoice fails to try to show the numerator and denominator for the plainly-legitimate-sweep analysis. *See CA9 Bonta III*, 2026 WL 694471, at \*6. No doubt, "dealing with a broad swath of varied platforms and functions in a facial challenge" is "a daunting, if not impossible, task." *Moody*, 603 U.S. at 745 (Barrett, J., concurring). But that's the "cost" of a facial challenge. *Id.* at 723 (majority opinion). Without evidence and argument on this front, NetChoice's facial challenge fails.

NetChoice fares no better when it comes to arguments about its members for an as-applied challenge. Such a claim requires "sufficiently concrete circumstances" so that a court "can . . . resolve[]" whether the law violates a plaintiff's rights on those facts. *Richmond Med. Ctr. For Women v. Herring*, 570 F.3d 165, 169 (4th Cir. 2009) (en banc). NetChoice's argument lacks those required specifics. It invokes hypotheticals about posts from yoga studios, ECF No. 22-2, at ¶ 29 (Baird); "certain" (unnamed) books, ECF No. 22-5, at ¶ 13 (Roin); combat, weapons, dieting, and human reproduction, ECF No. 22-6, at ¶ 75 (Weber); the Civil War and LGBT movement, ECF 22-4, at ¶ 84 (Paolucci); or paragraphs from declarations that don't provide even hypotheticals, *see* ECF No. 22-3, at ¶¶ 44–46 (Cleland). But no specifics about members' users. Without "particular facts" about the law applied to the plaintiff, that plaintiff cannot win an as-applied challenge. *United States v. Hasson*, 26 F.4th 610, 616 (4th Cir. 2022).

*Second*, NetChoice's analysis of the tailoring is flawed. *See* ECF No. 22-1, at 30–32. The State's interest is easy: NetChoice does "no[t] dispute that South Carolina has a compelling interest in protecting minors." *Id.* at 30.

13

So NetChoice's claim turns on tailoring. While NetChoice insists the law must be narrowly tailored because the Act must survive strict scrutiny, the Act need only satisfy intermediate scrutiny because it is content neutral. Section 39-80-20(A) does not regulate anything based on what a site says, so it's not content-based on its face. It only regulates how a covered online service's use of data, design, or operation might harm a minor. It's the impact of the use, design, or operation on the minor that matters. This section can therefore "be justified without reference to the content of the regulated speech," and South Carolina didn't adopt it "because of disagreement with the message the speech [if there is any] conveys." *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015) (cleaned up).

Nothing NetChoice says on the tailoring question is compelling (no matter the level of tailoring required). NetChoice (understandably) doesn't really challenge that covered design features harm minors. Research on "infinite scroll" features, for instance, shows that they make it "difficult to disengage from" a site and lead to habitual usage. Edelson Decl. ¶¶ 19–22. Same with autoplay features. *Id.* ¶¶ 24–26. The addictive nature is true whether the design feature is expressive or not. As one example, gamification (which might be nonexpressive in some contexts) "works by turning participation itself into a goal to pursue, preserve, and avoid losing." *Id.* ¶ 30.

Instead, NetChoice claims the Act is overinclusive because it "governs many websites that offer significant informational value and pose little risk of harm, such as language apps, online calculators, and dictionary apps." ECF No. 22-1, at 31. What harm is reasonably foreseeable from a calculator or dictionary? This sky-is-falling argument ignores the statutory requirement that a covered online service take "*reasonable* care." S.C. Code Ann. § 39-80-20(A) (emphasis added). There's no sensitive-person veto for what "*some* user(s) in *some* contexts" might find problematic. ECF No. 22-1, at 31. Plus, NetChoice treats section 39-80-20(A) as focused solely on what a minor

sees online. That misreads the Act. Section 39-80-20(A) focuses on harms to minors. It covers, for instance, anything that would cause "compulsive usage." *Id.* § 39-80-20(A)(1). So this isn't really about "averting [anyone's] eyes." *NetChoice v. Griffin*, No. 5:25-CV-5140, 2025 WL 3634088, at *8 (W.D. Ark. Dec. 15, 2025). And in any event, "reasonable care" is already something that NetChoice's members should be exercising because of the codes of ethics that govern them (not to mention state tort law). *See* Edelson Decl. ¶¶ 52–57.

NetChoice next argues that section 39-80-20(A) is underinclusive because section 39-80-20(C) still allows a minor to search for any content she wants. ECF No. 22-1, at 31–32. That does not make section 39-80-20(A) underinclusive. Rather, it shows that section 39-80-20(A) does not target speech but aims to prevent harm. Nor does NetChoice's invocation of the "physical world" move the needle. *Id.* at 32. The internet causes unique harms that require different remedies from the harms that happen on the playground. Jonathan Haidt, *The Anxious Generation* 11 (2024) (describing the "four foundational harms" from minors' time online: "sleep deprivation, social deprivation, attention fragmentation, and addiction").

None of NetChoice's proposed alternatives to the Act is credible. *See* ECF No. 22-1, at 32. One, NetChoice says its members are already incentivized to filter content or block material. *See id.* ("as many already do"). Two, NetChoice waxes poetic about all the tools that parents already have to monitor children online. *See id.* at 20–22 (citing dozens of paragraphs in the declarations about existing tools). And three, NetChoice says criminal laws that could protect children.

Those aren't viable options, so requiring "reasonable care" is necessary. Neither one nor two is working, given the ongoing harms to children. Or consider protecting minors' privacy. People generally do not fully understand what privacy they are giving up on social media sites. McCoy Decl. ¶¶ 12–13. And companies are misrepresenting what they are doing with users'

15

information. *Id.* ¶¶ 15–16. This is all particularly harmful to minors, who are, for example, having child predators recommended as "friends" or connections at a shockingly high rate. *Id.* ¶ 14.

### ii.     Personalization regulations (§§ 39-80-30(B), 39-80-40(F))

Social media sites often use automated systems to rank or promote content for each user, based on an automated processing of a user's personal data. In other words, these sites try to put on each user's screen content that the user is likely to find interesting and keep him on the site.

The Act prohibits covered online services from making this automated personalized recommendation system the default for any minor's account. S.C. Code Ann. § 39-80-30(B). Any user must have the option to turn off such a system. *Id.* And covered online services cannot profile any user that the service knows to be a minor unless the minor has "knowingly requested" to use an aspect of the online service that requires profiling. *Id.* § 39-80-40(F).

**a.** NetChoice attacks these sections as a burden on its speech, *see* ECF No. 22-1, at 33–34, leaning heavily on the *Moody* majority's assertion that "social-media platforms are in the business, when curating their feeds, of combining 'multifarious voices' to create a distinctive expressive offering." 603 U.S. at 738. Game over, says NetChoice, for the express-activity question.

Not quite. Once again, maximizing user engagement does not necessarily implicate speech because curating a feed to show a user what she wants does not make any editorial decision about content. *See Moody*, 603 U.S. at 736 n.5.

Plus, Justice Barrett (who joined the *Moody* majority) observed that differences between human and algorithmic feed curation "might have constitutional significance." *Id.* at 746 (Barrett, J., concurring). "[T]he analysis is bound to be fact intensive," Justice Barrett explained, "and it will surely vary from function to function and platform to platform." *Id.* at 747. The Ninth Circuit recognized the same thing in rejecting NetChoice's argument. *See CA9 Bonta II*, 152 F.4th at 1021.

16

None of the declarations that NetChoice cites begin to provide sufficient evidence for that fact-intensive review or explain the role that people—rather than computers—play in this process. *See* ECF No. 22-1, at 33 (citing ECF No. 22-2, at ¶¶ 30–31 (Baird); ECF No. 22-3, at ¶¶ 40–42 (Cleland); ECF No. 22-5, at ¶ 15 (Roin); ECF No. 22-6, at ¶ 39 (Weber)).

Another way to confirm that the Act doesn't implicate expressive activity on this front is that NetChoice points to the "infinite scroll" rules as proof that the Act "target[s]" speech. ECF No. 22-1, at 34. But infinite scroll technology has been patented. *See* Edelson Decl. ¶ 18. That's telling because copyright—not patent law—protects expression. *Design Basics, LLC v. Signature Constr., Inc.*, 994 F.3d 879, 889 (7th Cir. 2021).

**b.** NetChoice also offers no evidence of how the Act impacts anyone *other than* NetChoice's members. That's fatal to its facial challenge, which considers *all* a law's potential applications. *See Moody*, 603 U.S. at 723–24. As the Ninth Circuit recently observed in ruling against NetChoice's facial challenge to a California law, a plaintiff bringing a facial challenge must "develop a record that would allow the court to determine the law's full set of applications, cataloging what activities, by what actors the law regulates." *CA9 Bonta III*, 2026 WL 694471, at *10 (cleaned up). NetChoice can't leave to the Court to "speculate whether a law unduly burdens expression without a developed record that explains not only how NetChoice's platforms work, but also how a wide range of third-party services operate" because that "information is necessary to characterize the denominator of a law's applications." *Id.* (cleaned up).

NetChoice's problem doesn't stop with its lack of evidence. More fundamentally, it's not certain that NetChoice has the law right. The parts of *Moody* that NetChoice relies on are on "nonbinding dicta." *Moody*, 603 U.S. at 766 (Alito, J., concurring in the judgment). NetChoice, in other words, puts more weight on *Moody* than it can bear by trying to shoehorn its sweeping facial

17

claims within *Moody*'s scope by avoiding its clear holding on facial challenges. But the *Moody* majority (in a part that wasn't dicta) observed that "[t]he online world is variegated and complex." *Id.* at 725 (majority opinion); *see also id.* at 736 n.5 (recognizing that the Court wasn't deciding certain questions). It is therefore "not hard to see how the answers might differ" depending on the covered online service or even the features of each service. *Id.* at 725. So NetChoice has failed to show that it can prevail on a facial challenge to sections 39-80-30(B) and 39-80-40(F).

This tracks tort cases against social media sites. Those claims were allowed to proceed over those sites' First Amendment objections because the plaintiffs sought relief for "non-expressive and intentional design choices to foster compulsive use in their minor users." *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 754 F. Supp. 3d 946, 978 (N.D. Cal. 2024).

**c.** But even if NetChoice were correct that sections 39-80-30(B) and 39-80-40(F) fall within the First Amendment's ambit and were allowed to litigate this claim as a facial challenge, its tailoring analysis is flawed. The intermediate scrutiny standard NetChoice attempts to apply says a law "need not be the least speech-restrictive means of advancing the Government's interests." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 662 (1994). The law simply must "not burden substantially more speech than is necessary to further the government's legitimate interests." *Id.* (internal quotation mark omitted).

NetChoice ignores the State's interest in protecting children. "[R]esearch suggests that social media are having a devastating effect on many young people, leading to depression, isolation, bullying, and intense pressure to endorse the trend or cause of the day." *Moody*, 603 U.S. at 768 (Alito, J., concurring in the judgment). As the *Moody* majority put it, "today's social media pose dangers not seen earlier: No one ever feared the effects of newspaper opinion pages on adolescents' mental health." *Id.* at 733 (majority opinion); Edelson Decl. ¶¶ 19, 20, 24, 25, 29, 30,

31, 33, 37, 41, 42, 48, 49. Another leading researcher found that a "phone-based childhood" causes "four foundational harms: sleep deprivation, social deprivation, attention fragmentation, and addiction." Haidt, *supra*, at 11. These follow from many minors being online "almost constantly." *Id.* at 119. And the best way to remedy those harms is to make being online less addictive. Social media's purported benefits cannot compel a different result.

### iii.     Default requirements (§ 39-80-30(A), (C))

The Act requires covered online services provide users "easily accessible and easy-to-use tools" for things like limiting the time a user spends online, the money a user may spend on the site, and who can search for a user's account. S.C. Code Ann. § 39-80-30(A). These limits must be the default setting for anyone the covered online service knows is a minor. *Id.* § 39-80-30(C).

NetChoice says these are content-based restrictions that fail any level of scrutiny. ECF No. 22-1, at 35–36. Once again, NetChoice is mistaken: Default requirements do not implicate expressive activity. At its core, NetChoice treats sections 39-80-30(A) and (C) as a blanket prohibition on what a covered online service may say. That's not the case. These provisions require two things. One, tools to disable certain features must be easy to find. Put differently, online services may not obscure how to turn off various features. That does not limit the services' expressive activity. Having to have these features accessible does not, in other words, turn on "the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163. Instead, they are merely regulations of "economic activity or, more generally, . . . nonexpressive conduct" that do not trigger the First Amendment. *Sorrell*, 564 U.S. at 567. Again, among the features that NetChoice points to is "autoplay" of videos, ECF No. 22-1, at 35, but that's another feature that's been patented, Edelson Decl. ¶ 23. So it can't be expressive. *Design Basics, LLC*, 994 F.3d at 889. Same with notification design features, which are also patented. Edelson Decl. ¶ 36.

19

And two, for minors, the default must be that certain features are turned off. Those features can be turned back on. There's nothing wrong with changing the default rule for minors because "a child—like someone in a captive audience—is not possessed of that full capacity for individual choice which is the presupposition of First Amendment guarantees." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 214 n.11 (1975). Knowing the harm that social media sites can cause minors, South Carolina has taken a modest, reasonable step of requiring minors to choose to turn on certain features for these sites, rather than forcing minors to turn them off. The State has therefore not "bar[red] . . . dissemination" of anything to minors. *Id.* at 213. It's simply required an opt-in system, rather than an opt-out one. An opt-in scheme can trigger only intermediate scrutiny and such opt-in schemes can pass constitutional muster based on the privacy interests involved. *See, e.g.*, *Trans Union Corp. v. F.T.C.*, 267 F.3d 1138, 1143 (D.C. Cir. 2001) (upholding opt-in scheme in the Fair Credit Reporting Act for sale of customer information).

But if some of these settings (such as "quantification of engagement," or more colloquially, "likes," and appearance-altering filters) might be expressive, the tailoring analysis cuts against an injunction. Users are drawn to access social media sites more frequently to see how many "likes" a post has and to modify their behavior to get more "likes." Edelson Decl. ¶¶ 33–35. Appearance-altering filters cause body-image issues from seeing versions of people that are "not naturally achievable." *Id.* ¶¶ 48–50. This is no different in purpose than the other covered design features. Notifications are intended to draw users back onto a site. *Id.* ¶¶ 38–39. In-game purchases are designed to push minors to spend more money through "the same reinforcement principle that underlies slot machines and other forms of gambling." *Id.* ¶ 43. The Act, in other words, directly targets the cause of the harms it seeks to remedy.

20

#### iv.      Reporting requirements (§§ 39-80-60(E), 39-80-70)

NetChoice next challenges the Act's reporting requirement as violating the "right to refrain from speaking." *See* ECF No. 22-1, at 36–37. NetChoice doesn't really build out the argument. Instead, it cites a couple cases in a single paragraph and says the result should be the same here.

But the Court shouldn't blindly follow what the Ninth Circuit said because the state laws are different. That court described the challenged laws in other States as requiring companies to "opin[e] on whether and how certain controversial categories of content should be moderated." *X Corp. v. Bonta*, 116 F.4th 888, 901 (9th Cir. 2024) (discussing California's law). South Carolina's law simply requires information to be reported under section 39-80-70 and provided to users under section 39-80-60(E). This information doesn't require NetChoice's members to opine on anything. Instead, they must simply describe how they are complying with the Act.

Under NetChoice's view, any number of regulatory reporting or disclosure requirements already on the books would trigger (and presumably fail) strict scrutiny. South Carolina requires physicians to submit reports about patients with tuberculosis. S.C. Code Ann. § 44-31-10. Another mandates that lobbyists submit a semi-annual report to the State Ethics Commission. *Id.* § 2-17-30(A)(1). And to be sure, the federal government has plenty of its own reporting requirements.

#### v.      Alleged censorship

As a final argument, NetChoice claims the Act "[c]ombine[s]" to require its members to be "censors for the State." ECF No. 22-1, at 37. The Court need not dwell on this claim because NetChoice doesn't develop it at all. In a couple of sentences with a couple of case cites and sweeping references to declarations, NetChoice breezily claims that its members are censors. That's not enough. *Cf. Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief or by failing to develop its

21

argument—even if its brief takes a passing shot at the issue." (cleaned up)).

But even if NetChoice had tried to develop this argument, it would have failed. This is just a mash-up of its other arguments. Those arguments fail on their own, and they fail together.

### C. NetChoice is unlikely to prevail on its vagueness claims.

NetChoice claims to bring both facial and as-applied challenges, ECF 1, at 46, but its motion makes no effort to show how the "law is . . . vague as applied to" NetChoice and its members specifically, *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 49 (2017); *see, e.g.*, ECF 22-1, at 42 (discussing only "covered online services" generally). So really, NetChoice is seeking a preliminary injunction on a facial vagueness claim.

And that claim is "hard to win." *Moody*, 603 U.S. at 723. In a non-First Amendment case, as long as the law has a "plainly legitimate sweep," "a plaintiff cannot succeed on a facial challenge." *Id.* To be sure, NetChoice's vagueness claim is a non-First Amendment claim. "Vagueness doctrine is an outgrowth not of the First Amendment, but of the Due Process Clause." *United States v. Williams*, 553 U.S. 285, 304 (2008).

NetChoice fairly points out "statute[s] capable of reaching expression sheltered by the First Amendment" receive heightened review under the "[vagueness] doctrine." ECF 22-1, at 38 (alteration in original) (quoting *Ctr. for Individual Freedom, Inc. v. Tennant*, 706 F.3d 270, 280 (4th Cir. 2013)). But "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)). Courts still routinely reject vagueness challenge despite this "heightened standard." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 21 (2010) (collecting cases).

NetChoice claims that "*[a]ll* the Act's challenged speech restrictions are invalid" because they are "subjective and abstract." ECF No. 22-1, at 38 (emphasis added). But NetChoice only

22

identifies a handful of specific provisions that supposedly meet that description. Because the ultimate inquiry on a vagueness challenge is whether the "[w]ords . . . are vague," *United States v. Cardiff*, 344 U.S. 174, 176 (1952), NetChoice's argument must be limited to the six specific provisions it references. "It is not the Court's role to analyze and consider every word, phrase, or provision in all of the . . . statute[] upon the Defendants' suggestion or conclusory argument that some portion of some statute may be so vague as to deem it unconstitutional." *United States v. Carlson*, Crim. No. 12-305(DSD/LIB), 2013 WL 5125434, at *11 (D. Minn. Sept. 12, 2013).

### 1. "Reasonable care" for "minors"

**i.** NetChoice argues that asking covered services to exercise "reasonable care" to avoid harming "minors" is problematic because it cannot tell whether that duty applies to minors "generally or minors in different age ranges." ECF 22-1, at 38. As a threshold problem, exercising "reasonable care" is something that NetChoice's members should understand and be doing already. It's part of their codes of ethics. *See* Edelson Decl. ¶¶ 52–57.

In any event, that objection misstates how statutes regulating harms to minors operate. The Act does not require providers to calibrate their conduct to every conceivable child from infancy through age 17. Instead, it directs services to exercise reasonable care to prevent "harm to minor*s*," S.C. Code Ann. § 39-80-20(A)—plural—which refers to harms affecting minors as a class rather than the most sensitive or youngest imaginable child. *See CA9 Bonta III*, 2026 WL 694471, at *16 (contrasting use of the singular "child," which suggests liability based on "a single child's response"). That framing reflects a familiar and administrable approach. The statute contemplates the narrow category of conduct that would reasonably be understood to harm minors across age groups, including older adolescents, not edge-case reactions at the margins.

Courts interpreting comparable "harmful to minors" statutes have long rejected the notion

23

that such provisions must be evaluated from the perspective of the youngest possible child or the most sensitive audience member. Instead, they ask whether material would impact a "legitimate minority of normal, older adolescents." *Virginia v. Am. Booksellers Ass'n*, 372 S.E.2d 618, 621, 624 (Va. 1988); *see also Am. Booksellers Ass'n v. Webb*, 919 F.2d 1493, 1504–05, 1513 (11th Cir. 1990). The same principle applies here. Although the Act defines "minor" as any consumer under 18, it sensibly operates with reference to minors as a group—including older adolescents—rather than requiring covered services to tailor their conduct to the youngest conceivable child.

Beyond any legal doctrines, research already connects covered design features with specific harms. Infinite scroll, autoplay, and gamification, for instance, promote compulsive usage, Edelson Dec. ¶¶ 22, 26, 31, while in-game purchases cause financial harm, *id.* ¶ 44, and appearance-altering filters cause psychological issues, *id.* ¶ 51. Based on this research, there's a core meaning to what reasonable care looks like.

**ii.** NetChoice's related claim—that liability turns on the varying "sensitivities" of individual minors—fares no better. ECF 22-1, at 39. As an initial matter, that argument is untethered from the Act's text. NetChoice broadly gestures to "assess[ing] . . . risk" to minors in the abstract, but fails to engage with the specific, defined harms the Act regulates. *See id.* at 38–39. But vagueness analysis turns on the statute's terms, not abstract descriptions of what a law might cover. *See Cardiff*, 344 U.S. at 176.

Looking at that language, the Act does not impose liability based on amorphous or purely subjective reactions. Rather, it identifies concrete harms, defined by reference to objective criteria and examples. *See* S.C. Code Ann. § 39-80-20(A). By ignoring those definitions, NetChoice's "sensitivities" argument attacks a statute that does not exist.

**iii.** Another issue for NetChoice here is its invocation of cases involving criminal statutes.

24

Both the Arkansas law in *Griffin*, 2025 WL 3634088, at *12, and the Colorado law in *Counterman v. Colorado*, 600 U.S. 66, 70 (2023), subjected people to criminal penalties. South Carolina's Act does not, *see* S.C. Code Ann. § 39-80-80, and courts have "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe," *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982).

### 2.     "Harm"

**i.** NetChoice says "the Act's references to various 'harms'" that covered services should take reasonable care to prevent are too subjective. ECF 22-1, at 39. Despite this sweeping claim that each statutory harm is vague, NetChoice only identifies a few examples. *See id.* at 39–40.

The limited harms NetChoice does identify—compulsive usage, severe psychological and emotional harms—are not facially vague. "Compulsive usage" "means the persistent and repetitive use of a covered online service that substantially limits one or more of a user's major life activities including, but not limited to, sleeping, eating, learning, reading, concentrating, communicating, or working." S.C. Code Ann. § 39-80-10(1). It's a defined term—and the subject of much research. *See* Edelson Decl. ¶¶ 19, 20, 24, 25, 29, 30, 31, 33, 37 (citing studies).

NetChoice's objection here is nothing more than line-drawing questions asking how much use is "persistent," when life activities are "substantially limit[ed]," and when ordinary behavior becomes "compulsive." ECF 22-1, at 39–40 (five sentence argument of five questions). But margin probing isn't a vagueness argument. Any statute raises "a close question" "in marginal situations." *Doe v. Cooper*, 842 F.3d 833, 842 (4th Cir. 2016). But "[t]hat some smidgen of ambiguity remains is no reason to find a statute unconstitutionally vague." *Recht v. Morrisey*, 32 F.4th 398, 415 (4th Cir. 2022). Whether a law has a plainly legitimate sweep—not whether its margins are always

25

clear—is what matters in a facial vagueness challenge. NetChoice's attack on the outer bounds of these terms effectively concedes that it has a knowable "core." *Cooper*, 842 F.3d at 842.

NetChoice's challenge to the harms of "severe psychological harm" and "severe emotional distress" also falls flat. This objection poses a single hypothetical about discomfort from reading Anne Frank's diary and says that "covered services have no way to know whether this discomfort" would fall under the statutory language. ECF 22-1, at 40. But "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack." *Hill v. Colorado*, 530 U.S. 703, 733 (2000).

Beyond the sole-hypothetical problem, NetChoice doesn't even pretend to do any analysis on whether the law has a plainly legitimate sweep. It doesn't discuss what the law covers and what is understandable compared to what is not. That's another fatal shortcoming.

**ii.** Beyond its inability to mount a proper facial vagueness challenge, the little substance NetChoice does offer is unavailing. These terms provide notice in the core of cases. "Compulsive usage" is defined using ordinary, widely used language: "persistent," "repetitive," and conduct that "substantially limits . . . major life activities." S.C. Code Ann. § 39-80-10(1). "[R]un-of-the-mill statutory phrases" like these do not create vagueness problems. *Recht*, 32 F.4th at 415. Terms such as "persistent" and "repetitive" appear dozens of times each in the South Carolina Code and hundreds of times in the U.S. Code. And "substantially limits" reflects a familiar degree-based standard courts have long upheld. *See, e.g.*, *United States v. Miselis*, 972 F.3d 518, 545 (4th Cir. 2020) (recognizing "serious" and "substantial" as "perfectly constitutional" qualitative standards). The statute further clarifies its scope by listing concrete examples of "major life activities," S.C. Code Ann. § 39-80-10(1)—sleeping, eating, learning, reading, concentrating, communicating, or working—which provide an obvious basis for analogy, as courts routinely do when applying

26

statutory terms. *Cap. Associated Indus., Inc. v. Stein*, 922 F.3d 198, 210–11 (4th Cir. 2019).

"Severe psychological harm" and "emotional distress" do not pose "inescapable" vagueness problems either. ECF 22-1, at 40. These terms are easily understood by people of common intelligence. For one, "severe psychological harm" is further tailored by the referenced examples of "anxiety, depression, self-harm [and] suicidal ideations." S.C. Code Ann. § 39-80-20(A)(2). And "severe" isn't only a matter of degree commonly condoned in statutory drafting, *Nash v. United States*, 229 U.S. 373, 377 (1913) ("the law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree"), it's a go-to evaluative criterion. The Diagnostic and Statistical Manual of Mental Disorders, standard in psychology, references "severe" over 1,000 times. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. text rev. 2022). Indeed, "severe depression" and "severe anxiety" are recognized and distinct conditions. *See id.* at 82, 156. And again, there's research on this harm. Edelson Decl. ¶ 48.

"Emotional distress," likewise legion in the psychological world, is also "easily understood" in the law. *United States v. Conlan*, 786 F.3d 380, 386 (5th Cir. 2015). For example, it's "[a] familiar term from tort law," where people—NetChoice members included—are asked to behave reasonably to avoid infliction of "emotional distress." *United States v. Uhlenbrock*, 125 F.4th 217, 224 (5th Cir. 2024) (rejecting a vagueness challenge to "substantial emotional distress"); *United States v. Osinger*, 753 F.3d 939, 945 (9th Cir. 2014) (same). In other words, the General Assembly didn't pull these terms from thin air. It used standard terms in life and law.

That's enough to reject NetChoice's argument on this front. But if somehow any remaining vagueness exists in the specific harms that NetChoice challenges, it is fully "remedied" by the "reasonable care" limitation. *Munn v. City of Ocean Springs*, 763 F.3d 437, 441 (5th Cir. 2014).

27

### 3.    "Design features"

**i.** NetChoice also attacks the Act's requirement to disable unnecessary, covered design features. This requires covered online services to provide users easy access to opt out of "design features including, but not limited to, all covered design features, that are not necessary to provide the covered online service." S.C. Code Ann. § 39-80-30(A)(1). The thrust of NetChoice's vagueness argument is that "design feature," as opposed to "covered design feature," isn't defined—meaning this provision could extend to boundless website features from font size to search bars. ECF 22-1, at 40. But that argument isolates the phrase "design features" from the statutory context in an effort to inject vagueness into a law where it isn't.

Section 39-80-30(A)(1), like the rest of the Act, is concerned with engagement-maximizing product mechanics that drive compulsive use and result in significant harm. That's why "covered design feature," which *is* defined, encompasses services that "encourage or increase" a minor's time online, including features like infinite scroll, auto-playing videos, gamification and the like. S.C. Code Ann. § 39-80-10(3). The Act repeatedly returns to that defined category. Covered services must exercise reasonable care in the design and operation of their services "including, but not limited to, covered design features." *Id.* § 39-80-20(A). And annual reports must describe these features. *Id.* § 39-80-70(A)(6). This consistent emphasis demonstrates that the statute's regulatory target is not arbitrary interface elements like font size, but the specifically defined class of engagement-driving features. *See Grayned*, 408 U.S. at 112 (the "purpose" of a statute can furnish the "particular context" in which "fair notice" can be evaluated for other terms).

So when 39-80-30(A)(1) opens with the technically broader "design features," expressly inclusive of "all covered design features," that does not create a new free-floating regulatory category. *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 162 (2012) ("includ[ing]"

28

is "illustrative, not exhaustive"). The most natural reading of this section is that "design features" captures the defined category of "covered design features" and functionally similar engagement-driving mechanisms that may not have been listed. After all, "covered design features" includes the same non-limited language in its definition. S.C. Code Ann. § 39-80-10(3).

**ii.** That brings up another underdeveloped argument NetChoice makes: It can't tell when a feature is "necessary." ECF 22-1, at 40. But the Act's use of "necessary" reflects a functional, service-specific inquiry. Section 39-80-30(A)(1) asks whether a feature is "necessary to provide the covered online service," which directs the analysis to the service's core operation as delivered to users. A feature is "necessary" if it is integral to providing the service in a usable form; it is unnecessary if the service can operate coherently without it. That distinction maps directly onto the statute's definition of "[c]overed design feature[s]," which identifies engagement-maximizing mechanics such as infinite scroll, autoplay, and engagement counters, S.C. Code Ann. § 39-80-10(3), which are not often required to deliver the service's core functionality. "Necessary" is thus a "comprehensible normative standard." *Cooper*, 842 F.3d at 842.

NetChoice can press this standard by saying certain covered design features like "notifications and push alerts" might be integral to providing a particular service. S.C. Code Ann. § 39-80-10(3)(e). Maybe that's a tough case with some service. But the Act can't be "void for vagueness [merely] because it is unclear in *some* of its applications to the conduct of . . . other hypothetical parties." *Vill. of Hoffman Ests.*, 455 U.S. at 495. That's the price of a facial challenge.

**iii.** What "disabling" unnecessary design features looks like under the Act is not vague either. ECF 22, at 40. Section 39-80-30(A)(1) requires services to "disable design features . . . by allowing users to opt out of the use of all such design features." So while "disable" can be different things in context, this context makes clear what "disable" means here: "allow[] users to opt out."

*See Williams*, 553 U.S. at 306 ("narrowing context" can eliminate vagueness). And opting out is a clear standard on its face. What it looks like in a particular circumstance is an as-applied problem.

**iv.** NetChoice last attacks the defined term "covered design feature" itself, saying it could "apparently refer[] to any design or content judgment a user might like." ECF 22-1, at 40–41. That's wrong. The statute defines "covered design feature" as features that "encourage or increase a minor's frequency, time spent, or activity" on a covered online service and then provides a list of examples—such as infinite scroll, autoplay, and engagement counters—that illustrate that category. S.C. Code Ann. § 39-80-10(3). As the Supreme Court has explained, terms like "including" introduce illustrative examples, not an unbounded expansion of the category. *See Christopher*, 567 U.S. at 162. And under ordinary interpretive principles, general language is read in light of the examples that accompany it. *See Williams*, 553 U.S. at 294. That's why a "statutory definition [that] provides a lengthy but unexhaustive list of what does and doesn't" fall within its ambit gives "a person of ordinary intelligence . . . fair notice of what" the statute prohibits. *Cap. Associated Indus.*, 922 F.3d at 210–11. So far from meaning "any design . . . a user might like," ECF 22-1, at 41, the term "covered design features" is narrowed by seven enumerated examples to encompass those features and related ones only.

### 4.     "Expressed preferences"

NetChoice's claim that the Act provides "no guidance" as to what constitutes a user's "expressed preferences" is incorrect. ECF 22-1, at 41. The Act defines that term as "a freely given, considered, specific, and unambiguous indication of a user's preferences." S.C. Code Ann. § 39-80-10(6)(a). It then goes further, expressly identifying what does *not* qualify, including inferences drawn from time spent on a service or routine user interactions like comments or reshares. *Id.* § 39-80-10(6)(b). That combination of affirmative definition and negative limitation provides precisely

30

the kind of guidance vagueness doctrine requires—especially in a facial challenge. *See Holder*, 561 U.S. at 21 ("add[itional] narrowing definitions . . . increase[] the clarity of the statute's terms").

These concepts that the statutory definition employs are not novel or indeterminate. They track familiar markers of voluntary, informed consent long recognized across the law. *See, e.g.*, *Williams*, 553 U.S. at 306 ("[C]ourts and juries every day pass upon knowledge, belief and intent— the state of men's minds—having before them no more than evidence of their words and conduct, from which, in ordinary human experience, mental condition may be inferred."). NetChoice's position would render vast swaths of consent-based regulation unconstitutional. At most, applying those standards may require judgment at the margins, but (once again) that is not a constitutional defect. *See Nat'l Dairy Prods. Corp.*, 372 U.S. at 32.

### 5.     "Dark patterns"

NetChoice's challenge to the Act's prohibition on "dark patterns" is not really a vagueness argument. Other than a passing reference to "no guidance," NetChoice primarily asserts that the definition could reach a broad range of expressive or persuasive design choices. *See* ECF 22-1, at 41. But that's a First Amendment objection to the statute's scope, not a claim that it lacks fair notice. *See Vill. of Hoffman Ests.*, 455 U.S. at 494–98 (treating overbreadth and vagueness distinctly). Its reliance on analogies to novels and operas only confirms the point. Those examples assume—rather than establish—that interface design is expressive, and then fault the statute for reaching too much of that activity. That's a category error. The Act regulates the functional design of user interfaces, not the communicative content of expression, and NetChoice never defends the premise that "dark patterns" are speech at all. It does not advance that theory in its First Amendment claims, underscoring that the analogy is doing argumentative work unique to its vagueness challenge. And that matters for vagueness analysis: Heightened vagueness scrutiny is

31

reserved for laws regulating speech, not for ordinary conduct-based or economic regulation. *See Moody*, 603 U.S. at 723. Consistent with that distinction, courts have expressed skepticism that "dark patterns" constitute protected expression. *See, e.g.*, *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1123 (9th Cir. 2024). If NetChoice seeks the benefit of heightened vagueness scrutiny, it must first establish that "dark patterns" are protected expressive conduct.

In any event, the definition itself is constrained. A "dark pattern" is not any interface design, but one "designed or manipulated with the substantial effect of subverting or impairing user autonomy, decision making, or choice." S.C. Code Ann. § 39-80-10(5). NetChoice isolates the word "subverting" while ignoring the limiting language that surrounds it. ECF 22-1, at 41. But read as a whole—and unlike the expressive analogies NetChoice invokes—the statute does not reach any design that merely influences user behavior. Instead, it targets interfaces deliberately structured to undermine a user's decisionmaking, which confines the provision to calculated, outcome-oriented design choices, not ordinary efforts to engage users writ-large. Those features also supply the kind of narrowing context and scienter-like limitation that mitigate vagueness concerns. *See Vill. of Hoffman Ests.*, 455 U.S. at 498–99. At most, NetChoice suggests that companies may struggle to identify the exact point at which a design "cross[es] the line." ECF 22-1, at 41. But (again) marginal cases do not render a statute facially vague. *See Cooper*, 842 F.3d at 842. And NetChoice's quick citations to the declarations attached to its motion—which provide little substantive evidence or guidance on "dark patterns"—do not make their hypotheticals any less marginal. *See, e.g.*, ECF No. 22-3, at ¶ 61 (Cleland) (conclusorily saying that "'dark patterns' provides no guidance on when an interface crosses a line") (cited at ECF No. 22-1, at 41). All of this makes "dark patterns" in the Act distinguishable from the California term was preliminarily enjoined. *See CA9 Bonta III*, 2026 WL 694471, at *16 (problems included harms not defined,

"child" in singular, and lack of statutory guidance).

### 6.     "Personal data"

NetChoice says that if "personal data" means "any data that 'alone or in combination with other information' is linkable to a user," then all data is "personal" because "*all* data is 'linkable' to a user via 'other information.'" ECF 22-1, at 41. But NetChoice selectively quotes "linkable" and omits the definition's narrowing context. "Personal data" does not include "other information" that is merely "linkable" to unique identifiers. It includes information that "is linked or reasonably linkable" to unique identifiers. S.C. Code Ann. § 39-80-10(11)(a). The full text supplies statutory bounds NetChoice overlooks and ends the vagueness argument where it begins.

### D.     NetChoice is unlikely to prevail on its preemption claims.

Federal law controls over conflicting state law, U.S. Const. art. VI, cl. 2, and preemption comes in three forms: conflict, express, and field, *Murphy v. NCAA*, 584 U.S. 453, 477 (2018).

NetChoice bears the burden of proving preemption, *J.O.C. Farms, L.L.C. v. Fireman's Fund Ins. Co.*, 737 F. App'x 652, 654 (4th Cir. 2018), and it must do so with a presumption *against* preemption because Congress has legislated in an area of "traditional state authority," *GenBioPro, Inc. v. Raynes*, 144 F.4th 258, 271 (4th Cir. 2025). Thus, Congress's intent to preempt States in these areas must be "clear and manifest." *Id.*

### 1.     Section 230 does not preempt the Act.

Section 230 of the Communications Decency Act prohibits a "provider or user of an interactive computer service" from being "treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). It permits enforcement of "any State law that is consistent with [section 230]" and prohibits bringing a cause of action or imposing liability that is "inconsistent" with that section. *Id.* § 230(e)(3).

33

Despite section 230's "narrow focus," "[s]ocial-media platforms have increasingly used § 230 as a get-out-of-jail free card." *Doe Through Roe v. Snap, Inc.*, 144 S. Ct. 2493, 2493–94 (2024) (Thomas, J., dissenting from denial of certiorari, joined by Gorsuch, J.). Ironically, "[m]any platforms claim that users' content is their own First Amendment speech," but "[w]hen it comes time for platforms to be held accountable for their websites, . . . they argue the opposite." *Id.* at 2494. These platforms—and NetChoice on behalf of a group of them—can't have it both ways.

"When a federal law contains an express preemption clause, [courts] focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent." *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 594 (2011) (internal quotation mark omitted). Here, section 230's plain wording does not express an intent to preempt the Act because it bars only "inconsistent" State regulation—not *all* state regulation. 47 U.S.C. § 230(e)(3).

Thus, the analysis hinges on the definition of "inconsistent." The Fourth Circuit has explained that the word "inconsistent" should be given "its ordinary dictionary meaning: 'lacking consistency: incompatible, incongruous, inharmonious, so related that both or all cannot be true.'" *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 509–10 (4th Cir. 2015) (cleaned up). "[I]nconsistent" provisions must be "fundamentally at odds" and "direct[ly in] conflict." *Id.* at 510.

That makes this a question of conflict preemption, *Metrophones Telecomm., Inc. v. Glob. Crossing Telecomm., Inc.*, 423 F.3d 1056, 1073 (9th Cir. 2005), and "[t]here are two types of conflict preemption," *GenBioPro, Inc.*, 144 F.4th at 275. The type that NetChoice invokes is when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," often called obstacle preemption. *Id.* (internal quotation marks omitted).

**i.** Because NetChoice relies on obstacle preemption, ECF No. 22-1, at 42, it must show that the Act is an "obstacle" to section 230's "purposes and objectives." *GenBioPro, Inc.*, 144 F.4th at

34

275. NetChoice cannot do so.

What are section 230's purposes and objectives? Go back to its origins. In "a 1995 New York state court case," "an interactive computer service" was subjected to publisher liability for "defamatory statements" posted on its bulletin boards. *Pinckney*, 127 F.4th at 523. Congress saw this as a "threat[ to] 'the vibrant and competitive free market that [existed] for the Internet and other interactive computer services.'" *Id.* (second alteration in original) (quoting 47 U.S.C. § 230(b)(2)). So Congress enacted section 230 to reverse the "imposition of tort liability on service providers for the communications of others." *Id.* at 524 (cleaned up).

At the same time, Congress also sought "to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services." 47 U.S.C. § 230(b)(3). And Congress specifically aimed to "empower parents to restrict their children's access to objectionable or inappropriate online material." *Id.* § 230(b)(4).

The Act fits those purposes and objectives like a glove. *First*, the Act seeks to give parents control over what information their children receive and to empower parents to restrict access to objectionable online material. *See, e.g.*, S.C. Code Ann. § 39-80-50(A) (requiring covered online services to "provide parents with accessible and easy-to-use tools to help parents protect and support minors" online). It also equips schools to be partners in that process. *See, e.g.*, *id.* § 39-80-60(A) (requiring a reporting mechanism for schools, parents, and minors).

*Second*, the Act does not hamper the competitive free market. It does not prevent anyone from accessing the internet or even a social media site. It simply requires service providers to set age-appropriate defaults for minors, which can be modified.

*Third*, the Act does not interfere with section 230's immunity. In fact, the Act explicitly

35

avoids conflict with section 230. *See* S.C. Code Ann. § 39-80-20(B). NetChoice acknowledges this in a single footnote. *See* ECF No. 22-1, at 44 n.8. And it tries to inject confusion into the Act's meaning by claiming that "Section 230 does not allow liability for some harms but not others." *Id.* But that's exactly what section 230's "narrow focus" does. *Snap, Inc.*, 144 S. Ct. at 2493 (Thomas, J., dissenting from the denial of certiorari, joined by Gorsuch, J.). For instance, section 230 contains specific carveouts for liability under both civil and criminal laws relating to sex trafficking. 47 U.S.C. § 230(e)(5). That alone is sufficient to puncture NetChoice's fiction that "Section 230 does not allow liability for some harms but not others." ECF No. 22-1, at 44 n.8; *see also NetChoice, LLC v. Reyes*, No. 2:23-CV-00911-RJS-CMR, 2024 WL 3510919, at *9 (D. Utah July 22, 2024) ("NetChoice's preemption argument stretches Section 230 immunity beyond what the plain text of the law supports.").

Plus, section 230's immunity is narrow in other ways. It "does not directly regulate the activities of interactive computer service providers" but "is addressed only to the bringing of a cause of action." *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 334 (4th Cir. 1997). The Act, on the other hand, directly regulates the activities of interactive computer service providers. The Act regulates something that section 230 does not, so section 230 cannot preempt the Act.

As more proof that NetChoice's preemption argument falls flat, read *Pinckney* (which NetChoice cites frequently) closely. Absent from the majority opinion in that case is the word "preemption." Or "preempted." Or "preempt." In fact, Judge Rushing's concurrence in part uses a variant of "preempt" only once. *Pinckney*, 127 F.4th at 529. And that concurrence argued that section 230 does *not* bar claims relating to a social media site recommending a group, person, or event because such recommendations are the site's "own speech, not that of a third party." *Id.* at 531. *Pinckney* therefore doesn't do much for NetChoice.

36

**ii.** To bolster its preemption argument, NetChoice first looks to the Act's requirement that a covered online service exercise reasonable care, but it tries to paint that requirement as applying to "publishing third-party speech." ECF No. 22-1, at 44. The Act's text refutes that claim. The Act requires covered online services to "exercise reasonable care *in the use of a minor's personal data* and the *design and operation of the covered online service* including, but not limited to, *covered design features*." S.C. Code Ann. § 39-80-20(A) (emphasis added). The use of a minor's personal data has nothing to do with "publishing third-party speech." And section 230 says nothing about the use of a minor's data.

The Act's regulation of the design and operation of covered online services fares no worse. The Act defines "covered design features" and lists examples of covered design features, such as those that automatically load and display content. S.C. Code Ann. § 39-80-10(3). Requiring reasonable care in how websites are designed is not the same as assigning liability for published third-party speech. Section 230, of course, says nothing about website design.

NetChoice also lists various disablement tools and defaults the Act mandates and then makes the conclusory statement that those provisions relate to "aspects of websites' 'design and architecture' that are 'inextricably intertwined with [a website's] role as a publisher of third-party content.'" ECF No. 22-1, at 45. But NetChoice doesn't even try to explain *how* that is the case for the websites that NetChoice purports to represent. Such conclusory arguments are no basis for enjoining a validly enacted state law.

Lastly, NetChoice argues that the Act's restrictions on targeted advertising to minors violate section 230. *Id.* at 45–46. It claims that section 230 prohibits liability against "interactive service[] provider[s]" for third-party advertising and then blanketly states that the Act imposes liability "on third-party advertising." *Id.* (internal quotation mark removed). Not so. Under the Act,

37

covered online services "may not *facilitate* targeted advertising to minors," S.C. Code Ann. § 39-80-40(C), and may not "*facilitat[e]* ads directed to minors for products prohibited for minors . . . to users the covered online services know are minors." *Id.* § 39-80-60(B) (emphasis added). In other words, the Act does not impose liability "on third-party advertising." It merely regulates service providers' conduct by prohibiting them from *facilitating* targeted advertising to minors. Section 230 does not come into play.

### 2.     COPPA does not preempt the Act.

The Children's Online Privacy Protection Act (COPPA) sets minimum requirements for businesses that offer online services directed toward children under 13. Those requirements include obtaining parental consent before collecting, using, or disclosing children's personal information; providing notice of their privacy policies; and giving parents the ability to review and change their children's personal information collected by the operator. 15 U.S.C. §§ 6501–6506.

As with section 230, NetChoice argues that COPPA preempts the Act. *See* ECF No. 22-1, at 46. COPPA's express preemption provision for state laws "inconsistent" with its provisions, 15 U.S.C. § 6502(d), also calls for an obstacle-preemption analysis, s*ee Jones*, 73 F.4th at 642.

And as with section 230, NetChoice is wrong because the Act poses no obstacle. COPPA's "originally stated goals" are "to minimize the collection of personal information from children and create a safer, more secure online experience for them, even as online technologies, and children's uses of such technologies, evolve." 78 Fed. Reg. 3972-01, 3972 (Jan. 17, 2013). COPPA did not seek to shut out the States. In fact, COPPA specifically contemplates state attorneys general bringing civil actions as *parens patriae*. 15 U.S.C. § 6504(a)(1).

The Act's objectives, if anything, complement COPPA's purposes. The Act defines "parent" to have "the same meaning as defined in" COPPA. S.C. Code Ann. § 39-80-10(10). It

38

also defines "[r]easonably likely to be accessed by a minor" to include online services that are "directed to children as defined by" COPPA. *Id.* § 39-80-10(17)(a)(ii).

And yet the Act is not simply a copy of COPPA as applied to 13–17-year-olds. South Carolina sought to innovate and protect minors in new ways, but which are still consistent with COPPA's objectives. For example, the Act restricts addictive features. *See, e.g.*, *id.* §§ 39-80-30(A); 39-80-40(E). It also restricts personalized recommendation systems. *See, e.g.*, *id.* §§ 39-80-30(B); 39-80-40(F); 39-80-60(D)).

COPPA's express-preemption clause only bars "inconsistent" liability for "an activity or action described in this chapter," which includes "collecting personal information from a child" under 13 years old. 15 U.S.C. § 6502(a)(1), (d). But the Act never imposes liability for "collecting personal information from a child" in a way "incompatible" with COPPA's treatment of such actions. None of the challenged provisions—sections 39-80-20 through -40 and 39-80-60—are "incompatible" or "direct[ly in] conflict" with COPPA. *Goldfarb*, 791 F.3d at 510. NetChoice never even tries to explain how they could be.

Instead, NetChoice claims that the Act is "inconsistent" with COPPA because the Act imposes rules on minors unregulated by COPPA (13–17-year-olds) and because it "imposes several substantive requirements that COPPA does not." ECF No. 1, ¶¶ 251–52. Of course, a law that covers collecting personal information from a child under 13 cannot be fundamentally at odds with a statute "regulat[ing] . . . minors aged 13 to 17." ECF No. 1, ¶¶ 249, 251.

At most, NetChoice protests that the Act adds requirements on organizations that might also be separately subject to COPPA. *Id.* at ¶ 252. NetChoice not only ignores the Fourth Circuit's definition of "inconsistent," but also "read[s] the word 'inconsistent' out of COPPA's preemption provision." *Jones*, 73 F.4th at 642. Congress knew how to bar state requirements if it wanted to. It

39

has done so many times. *See, e.g.*, 15 U.S.C. §§ 78o(i)(1), (2)(B); 7 U.S.C. § 136v(b). Here, it didn't do that. It barred only *inconsistent* state regulation.

This understanding is consistent with how other courts have read COPPA. For example, this Court has suggested that there would be no preemption issue if South Carolina regulated "conduct beyond that regulated by COPPA." *Manigault-Johnson v. Google, LLC*, No. 2:18-cv-1032-BHH, 2019 WL 3006646, at *6 (D.S.C. Mar. 31, 2019). That tracks with the Congressional Research Service's observation that COPPA "set a federal floor rather than a federal ceiling." Chris D. Linebaugh, Cong. Rsch. Serv., R48667, Preemption and Privacy Law 6 (2025).

**E.     NetChoice is unlikely to prevail on its Commerce Clause claim.**

NetChoice's Commerce Clause claim rests on the Dormant Commerce Clause. *See* ECF No. 22-1, at 50–53. Under that doctrine, "the Commerce Clause not only vests Congress with the power to regulate interstate trade; the Clause also contains a further, negative command" that forbids state regulations that impermissibly burden out-of-state industry and business. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 368 (2023) (cleaned up).

The Act doesn't facially discriminate against interstate commerce, so NetChoice "begin[s] in a tough spot." *Id.* at 370. It can prevail only if the Act unduly burdens such commerce. *See Pike v. Bruce Church*, 397 U.S. 137, 142 (1970). *Pike* is a "deferential" two-part test. *Colon Health Ctrs. of Am., LLC v. Hazel*, 733 F.3d 535, 545 (4th Cir. 2013). A court first "looks at the legitimacy of the state's interest," and then "weighs the burden on interstate commerce in light of the local benefit derived from the statute." *PSINet, Inc. v. Chapman*, 362 F.3d 227, 240 (4th Cir. 2004).

NetChoice does not challenge the State's interest. Indeed, it already conceded that "South Carolina has a compelling interest in protecting minors." ECF No. 22-1, at 30. And for good reason. "It is evident beyond the need for elaboration that a State's interest in safeguarding the

40

physical and psychological well-being of a minor is compelling." *New York v. Ferber*, 458 U.S. 747, 756–57 (1982) (cleaned up). So this claim turns on the second part of the *Pike* balancing test.

On that front, NetChoice leans heavily on the idea that any state internet regulation will automatically unduly burden interstate commerce. But the Court has rejected this per se extraterritorial argument, saying it "falters out of the gate." *Nat'l Pork Producers*, 598 U.S. at 371. [I]n "our interconnected national marketplace, many (maybe most) state laws have the 'practical effect of controlling' extraterritorial behavior," *id.* at 374, so it's no surprise that courts have rejected such arguments when it comes to the internet, *see, e.g.*, *Quik Payday, Inc. v. Stock,* 549 F.3d 1302, 1312 (10th Cir. 2008); *SPGGC, LLC v. Blumenthal*, 505 F.3d 183, 195 (2d Cir. 2007).

*PSINet* is not to the contrary. For one, South Carolina's Act is not a "blanket regulation of Internet material." 362 F.3d at 240. The Act regulates how covered online services relate to users in South Carolina. For another, reading *PSINet* as a per se rule both overreads that holding and ignores more recent Supreme Court cases like *National Pork Producers*. Virtually everything that NetChoice says about the internet was also true of the pork producers in that case. And for a third, geographical identification and filtering technologies help businesses operating in multiple jurisdictions comply with the law in a way that was impossible in 2004. *See* Jack Goldsmith & Eugene Volokh, *State Regulation of Online Behavior: The Dormant Commerce Clause and Geolocation*, 101 Tex. L. Rev. 1083, 1107 (2023); McCoy Decl. ¶ 10.

Unable to rely on a per se rule, NetChoice turns to a hypothetical about someone's aunt in California. ECF No. 22-1, at 51. That's not enough. *Pike* still hews to the "antidiscrimination rule that lies at the core of [the Court's] dormant Commerce Clause jurisprudence." *Nat'l Pork Producers*, 598 U.S. at 377. *Pike* simply "serves as an important reminder that a law's practical effects may also disclose the presence of a discriminatory purpose." *Id.* If anything, NetChoice's

41

hypothetical shows that the Act has no discriminatory motive. It doesn't treat out-of-state covered online services any differently than in-state ones. *See NetChoice, LLC v. Bonta*, 770 F. Supp. 3d 1164, 1214 (N.D. Cal. 2025) (rejecting Dormant Commerce Clause claim on preliminary injunction motion), *aff'd in part, vacated in part, CA9 Bonta III.*

### F.     NetChoice is unlikely to prevail on its due process claim.

NetChoice's procedural due process claim is merely an attempt to pause the Act so that its members (and the rest of the world) can take at least a year to comply with it. *See* ECF No. 22-1, at 53. This claim fails for at least three reasons.

*First*, courts have long rejected procedural due process challenges to legislative action. *See, e.g.*, *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915). In fact, courts have rejected the idea that procedural due process somehow requires a tolling period for new statutes. *See, e.g.*, *Torres v. INS,* 144 F.3d 472, 475 (7th Cir. 1998).

The few cases NetChoice cites on this front change nothing. Start with its lead authority, *Pacific Telephone & Telegraph Co. v. City of Seattle*, 291 U.S. 300 (1934). That case was a vagueness challenge, which was ultimately dismissed on ripeness. *See id.* at 301, 304. Any suggestion that due process requires a reasonable "opportunity to comply" was dicta without meaningful discussion. Or consider *Planned Parenthood Great Northwest v. Cameron*, 599 F. Supp. 3d 497 (W.D. Ky. 2022). The analysis there largely focused on a purported violation of *substantive* due process about abortion pre-*Dobbs*. *Id.* at 507. Hardly an on-point authority.

*Second*, NetChoice provides little detail about how long compliance would supposedly take. Once again, it cites some paragraphs of the declarations without much (if any) discussion. Nor does NetChoice explain the specific challenges facing its members. Generalized assertions cannot be enough to enjoin the entire Act for a year or more—particularly when NetChoice has

agreed that "South Carolina has a compelling interest in protecting minors." ECF No. 22-1, at 30. Plus, "[c]ompliance with the Act isn't some Herculean engineering feat" but would be "straightforward" based on existing technology. McCoy Decl. ¶ 10.

*Third*, any due process argument ignores the lack of an enforcement action against anyone. *See Thomas v. City of New York*, 143 F.3d 31, 35 (2d Cir. 1998).

## II.     The other factors do not support granting a preliminary injunction.

NetChoice argues that because it is likely to succeed on its claims, the remaining "preliminary injunction factors tip in its favor." *See* ECF No. 22-1, at 53. Aside from assuming the merits, that gets the law wrong. The four-factor test for a preliminary injunction "is supposed to set a high bar" because a preliminary injunction represents drastic relief. *Am. Fed'n of Tchrs.*, 152 F.4th at 169. The bar is high in part because a movant must carry its burden of persuasion by a "clear showing." *Id*. And it is high in part because of its "asymmetry": "[E]very factor" must be met before a court may grant a preliminary injunction. *Id*.

### A.     NetChoice will not suffer irreparable harm.

To show irreparable harm, NetChoice points to its alleged First Amendment injuries and compliance costs associated with the Act. *See* ECF No. 22-1, at 53–54. But courts have repeatedly said that compliance costs are generally insufficient to establish irreparable harm at this stage. In fact, one district court rejected NetChoice's precise argument, explaining that "unrecoverable compliance costs may represent a harm—perhaps even a substantial one—but that does not mean that such harm is irreparable for purposes of the preliminary-injunction analysis." *NetChoice v. Skrmetti*, No. 3:24-CV-01191, 2025 WL 1710228, at *14 (M.D. Tenn. June 18, 2025).

Turning to its purported First Amendment injury, although it may be true that the loss of First Amendment freedoms might constitute irreparable injury, NetChoice still retains the burden

of proving the constitutional violation. And as explained, NetChoice has failed to meet this burden.

Further undermining any claim of irreparable harm is that the Attorney General has not "instituted or even threatened" an enforcement action against any of NetChoice's members. *Id.* at *11. NetChoice's members therefore do not face a "certain and immediate" threat. *Id.*

### B. The remaining factors cut against an injunction.

Although the last two requirements merge when the government is the party opposing the injunction, *Nken v. Holder*, 556 U.S. 418, 435 (2009), NetChoice retains the burden to "clear[ly] show[]" that both factors are met, *Am. Fed'n of Tchrs.*, 152 F.4th at 169. It has not done so.

NetChoice generally points to the importance of "access" to the internet and avoiding its "balkanization." ECF No. 22-1, at 54. It also points to its own potential choice to "turn off the lights for minors in South Carolina" rather than comply with the Act. *Id*. at 55. These arguments are unconvincing. For one, NetChoice has not clearly shown how the Act would unduly limit internet access or contribute to its balkanization. For another, NetChoice's own business decisions should not play into this Court's analysis. *Cf. Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (a litigant may not "complain about damage inflicted by its own hand").

Making matters worse, these arguments minimize the "irreparable harm on the State" from not being able "to enforce its duly enacted" law. *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018). And they outright ignore the State's interest in protecting minors online "even when the laws have operated in the sensitive area of constitutionally protected rights." *Ferber*, 458 U.S. at 757.

But it's not just the harm to the State. It's also the harm to minors. Being addicted to social media sites is harmful, and predators lurk online. *See* Haidt, *supra*, at 11; Edelson Decl. ¶¶ 19–22, 24–26; McCoy Decl. ¶ 14. The Court shouldn't make young South Carolinians suffer while giant internet companies litigate their ability to maximize the time these young people spend online.

44

**III.    NetChoice seeks relief the Court cannot grant.**

NetChoice demands that the Court enjoin the Act "on its face." ECF No. 22-1, at 55. This is a request to enjoin Defendants from enforcing the law against anyone: a universal injunction.

But the Court cannot grant such relief. "A universal injunction can be justified only as an exercise of equitable authority, yet Congress has granted federal courts no such power." *Trump v. CASA, Inc.*, 606 U.S. 831, 841 (2025). Courts can't issue injunctions that "are broader than necessary to provide complete relief to each plaintiff with standing to sue." *Id.* at 861.

NetChoice doesn't engage with this issue at all. Instead, it simply says: *facial challenge*! ECF No. 22-1, at 55–56. That's not enough. The Fourth Circuit has recognized that *CASA* changes how courts think about injunctive relief on facial challenges. *United States v. Lierman*, 151 F.4th 530, 543 (4th Cir. 2025). Courts must "tailor equitable relief 'to each plaintiff.'" *Id.* (quoting *CASA*, 606 U.S. at 861). That's true even when the plaintiff is an "association[] with many members" and when it may be "hard to tell how far an injunction can sweep to give [that] Plaintiff[] 'complete relief.'" *Id.* (quoting *CASA*, 606 U.S. at 853).

So however the Court might grant injunctive relief to give complete relief to NetChoice's members, that relief cannot extend to nonparties except in "incidental" ways. *CASA*, 606 U.S. at 852. Enjoining any enforcement of the Act doesn't incidentally benefit nonparties. It gives them complete relief, no different from what NetChoice's members get.

**CONCLUSION**

The Court should deny the Motion for Preliminary Injunction.[4]

---

[4] The Governor and Attorney General request that the Court stay any injunction pending appeal under Federal Rule of Civil Procedure 62 and Federal Rule of Appellate Procedure 8(a)(1).

Respectfully submitted,

s/Thomas T. Hydrick
Thomas T. Hydrick (Fed. Bar. No. 13322)
*Solicitor General*
Joseph D. Spate (Fed. Bar. No. 13100)
*Deputy Solicitor General*
OFFICE OF THE
SOUTH CAROLINA ATTORNEY GENERAL
1000 Assembly St.
Columbia, South Carolina 29201
(803) 734-4127
thomashydrick@scag.gov
josephspate@scag.gov

*Counsel for Attorney General Wilson*

s/Wm. Grayson Lambert
Wm. Grayson Lambert (Fed. Bar No. 11761)
*Chief Legal Counsel*
Erica W. Shedd (Fed. Bar No. 13206)
*Deputy Legal Counsel*
Tyra S. McBride (Fed. Bar No. 13324)
*Deputy Legal Counsel*
Cameron R. Cox (Fed. Bar No. 14698)
*Deputy Legal Counsel*
OFFICE OF THE GOVERNOR
South Carolina State House
1100 Gervais Street
Columbia, South Carolina 29201
(803) 734-2100
glambert@governor.sc.gov
eshedd@governor.sc.gov
tmcbride@governor.sc.gov
ccox@governor.sc.gov

*Counsel for Governor McMaster*

April 6, 2026
Columbia, South Carolina

46