**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | |
|---|---|
| NETCHOICE, LLC, <br><br> *Plaintiff,* <br><br> v. <br><br> ALAN WILSON, in his official capacity as South Carolina Attorney General, <br><br> *Defendant,* <br><br> and <br><br> HENRY DARGAN MCMASTER, in his official capacity as Governor of the State of South Carolina, <br><br> *Intervenor-Defendant.* | Civil Action No.: 3:26-cv-543-sal <br><br> **DECLARTION OF** <br> **LAURA EDELSON, PH.D.** |

I, Laura Edelson, Ph.D., declare and state as follows:

1.      I submit this declaration in support of Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction.

**BACKGROUND AND QUALIFICATIONS**

2.      I am an Assistant Professor of Computer Science at Northeastern University. My research focuses on large online networks, including the algorithmic systems used by social media platforms, user safety systems and algorithms, and user-facing transparency systems and tools.

3.      I received a Ph.D. in Computer Science from New York University in 2022 and a B.S. in Computer Science from Pace University in 2008. My curriculum vitae, which sets forth my experience and credentials more fully, is attached as Exhibit A.

1

4.      My research and professional work have focused on how large online platforms are designed and operated, including how they rank, recommend, and present content to users; how they measure and moderate user activity; and how platform design choices affect user experience, transparency, and safety. Before joining Northeastern University, I served as Chief Technologist of the Antitrust Division of the United States Department of Justice.

5.      My recent work includes scholarship directly relevant to the issues in this case. In 2025, I co-authored "A Comparative Survey of Algorithmic Feed Recommendation System Designs," published in *ACM Transactions on Recommender Systems*, which surveys how major social media platforms design and operate algorithmic feed systems.[1]

6.      I have also authored and co-authored work concerning platform governance, transparency, and moderation systems, including "Measurement and Metrics for Content Moderation: The Multidimensional Metrics of Engagement and Content Removal on Facebook" which develops a framework for measuring the efficacy of content moderation and applies that framework to measure the impact on user experience of content removal on Facebook.[2] To conduct this survey and related systems and algorithm audits, I relied heavily on source code analysis in cases where platforms made the code for their services publicly inspectable and patent analysis in cases where they did not.

7.      I have also co-authored research on youth safety features on social media platforms, including the report "Teen Accounts, Broken Promises: How Instagram is Failing to Protect

---

[1] Edelson, L., Haugen, F., & McCoy, D. (2025). A Comparative Survey Of Algorithmic Feed Recommendation System Designs. *ACM Transactions on Recommender Systems*.

[2] Edelson, L., Kovba, B., Yershova, H., Botelho, A., McCoy, D., & Lauinger, T. (2025). Measurement and Metrics for Content Moderation: The Multi-Dimensional Dynamics of Engagement and Content Removal on Facebook. *Journal of Online Trust and Safety*, *2*(5).

Minors," which evaluates whether Instagram's publicly described youth-safety features operate as represented in practice.

8. Prior to my academic career, I worked as a software engineer at multiple companies, ending my industry career at Palantir. During this time, I became well acquainted with general industry practices of software engineering, and professional ethics within this domain.

9. My opinions in this declaration are based on my education, training, research, professional experience, and review of the materials identified in this declaration, including the South Carolina Age-Appropriate Code Design Act ("Act"), a number of patents describing the design features at issue, and other technical materials discussed below.

10. I am being compensated in this matter at an hourly rate of $400 per hour. My compensation is not contingent on the outcome of this case.

**SUMMARY OF OPINIONS**

11. The covered design features identified in the Act do not describe a single, uniform type of technology. They instead refer to materially different kinds of product features, including interface mechanics, monetization mechanics, displayed informational features, and features that alter visual content. Understanding how the Act operates in practice requires attention to the concrete technical facts of how a particular feature is actually implemented on a particular service.

12. The most technically accurate way to evaluate the covered design features is to read each one narrowly, using patents or other authoritative technical materials to identify what the feature is and how it works. When the features are analyzed in that way, the understanding of fit between a feature and the Act's enumerated harms can be feature-specific rather than uniform. Some features are most specifically related to compulsive usage, while others are more specifically

3

related to material financial injury, or psychological harm. The available research support for those relationships also varies by feature.

13.     Additionally, the services operated by different NetChoice members are themselves not uniform, and the analysis of which members' services are implicated by the act is most accurately determined by an evaluation of the presence or absence of each covered design feature in that member's service. A full analysis of the services of all NetChoice members is beyond the scope of this declaration, but at minimum some NetChoice members operate services that employ only one covered design feature, while others operate services that employ all of them.

14.     The covered design features named in the Act fall into three categories. I perform a full analysis of each feature in the sections below, but to summarize: First, infinite scroll, autoplay, and notifications are non-expressive interface mechanics. They do not create, alter, or present user-generated content. Instead, they control how content is delivered (infinite scroll, autoplay) or how users are prompted to return to the service (notifications). Each of these features is most directly associated with the Act's enumerated harm of compulsive usage. Infinite scroll and autoplay work by removing stopping cues that would otherwise naturally prompt a user to decide whether to continue, while notifications work by providing service-initiated re-entry cues that pull users back into the service from outside.

15.     Second, in-game purchases are a monetization feature that involves, in part, commercial creative content in the form of purchase interfaces and virtual currency systems. In-game purchases are most directly associated with material financial injury, particularly where virtual currency obscures real cost or where chance-based mechanics encourage repeated spending. In the form of variable-ratio reward purchase mechanics such as loot boxes, they are additionally associated with compulsive use and at-risk and problem gambling in adolescents.

16.     Third, gamification, quantification of engagement, and appearance-altering filters each involve the creation or presentation of new non-commercial content to users, in the form of badges, streak warnings, and leaderboards (gamification), visible numerical counts of user engagement (quantification of engagement), or digitally altered depictions of the user's own face (appearance-altering filters). Among these, gamification is most directly associated with compulsive usage through reinforcement, goal progress, and loss avoidance. Quantification of engagement is associated with compulsive usage through visible social reward feedback. Appearance-altering filters are associated with severe psychological harm and severe emotional distress particularly for adolescents through self-objectification, appearance comparison, and the internalization of digitally generated beauty ideals.

17.     In my field, it is ordinary to evaluate foreseeable user risks and to consider alternative designs that reduce or mitigate those risks. That understanding is consistent with established professional norms in computing. For example, the Association for Computing Machinery Code of Ethics and Professional Conduct states that computing professionals should "avoid harm," explains that avoiding harm begins with careful consideration of the potential impacts of technical decisions on affected people, and separately emphasizes responsibilities to respect privacy and to use personal information only for legitimate ends.[3] In my opinion, the idea that designers and operators of online services should consider foreseeable harms associated with product features and data usage is consistent with established professional practice in computing.

---

[3] ACM, *ACM Code of Ethics and Professional Conduct* (2018), https://www.acm.org/code-of-ethics.

**INFINITE SCROLL**

18.      The most authoritative technical source for infinite scroll is the Facebook patent family filed by Parker, Odio, and Mosseri: US20120011430A1, "Infinite Scrolling" (filed July 9, 2010), and its continuation, US10055507B2 granted August 21, 2018.[4,5] This patent explains that when a user initially loads a social network website with many embedded items, the site might initially render only some of them. Then, as the user navigates the page by scrolling down, the website loads more items. To create the impression of a continuous feed of content, the system uses "place markers" so that the scrollbar reflects where the user is in an ever-growing feed. Fundamentally, infinite scroll changes the user interface so that more items load when the user scrolls either by swiping on a phone screen or using a mouse instead of requiring the user to click a "next page" button, as was the standard web design prior to this patent. The feature does not create new content or alter the presentation or appearance of user-generated content. Alternative designs remain widely used. The historically standard alternative is paginated loading, in which content is delivered in discrete pages with an explicit "next page" or "load more" button. That design has a natural stopping cue between batches of content, without changing the underlying content, the recommendation algorithm, or the user's ability to access all the same material. Paginated feeds remain common across e-commerce sites, search engines, and many other web applications.

19.      The direct research on infinite scroll is limited but points in a consistent direction. Rixen et al. (2023), in a study published in *Proceedings of the ACM on Human-Computer*

---

[4] U.S. Patent Application No. 2012/0011430 A1, *Rendering Structured Documents with Place-Markers* (Parker et al., assigned to Facebook, Inc., filed July 9, 2010; published Jan. 12, 2012), https://patents.google.com/patent/US20120011430A1/en.
[5] U.S. Patent No. 10,055,507 B2, *Infinite Scrolling* (Parker et al., assigned to Facebook, Inc., granted Aug. 21, 2018), https://patents.google.com/patent/US10055507B2/en.

*Interaction*, investigated how people actually experience infinite scrolling in social media apps.[6] They found that users frequently described infinite scroll as a loop, with their sessions stretched on until something outside the app, like a phone call or a physical need, broke the cycle. Natarajan (2024), in a study of teenagers published in the *International Journal of Communication*, found that teens often try to create their own stopping points to counteract what the author describes as the frictionless design of social media feeds.[7] The literature supports a concern that infinite scroll can create a pattern of what Rixen et al. term "regretful use," which young users report as difficult to disengage from, leading them to sometimes adopt external or self-imposed mechanisms to stop.

20.     The behavioral mechanism at play is straightforward: When people do something repeatedly, whether they continue or stop is influenced by cues in their environment. Wood and Neal (2007), in a widely cited paper in *Psychological Review*, describe how behaviors become habitual through repeated pairing with contextual cues.[8] Once the association is strong enough, encountering the context can trigger the behavior without much conscious deliberation.

21.     This literature is relevant to infinite scroll because the nature of the feature is that it removes stopping cues. In a paginated design, the user reaches the bottom of a page and must decide whether to click to the next one, creating a cue for a moment of decision. Infinite scroll eliminates that moment. The same easy action that the user is performing to navigate the page (scrolling) is overloaded, and now additionally retrieves the next batch of content with no pause, eliminating user choice in the matter or whether to load more content or not. Research from other behavioral domains, including eating, smoking, and cannabis use supports the idea that the

---

[6] Rixen, J. O., Meinhardt, L. M., Glöckler, M., Ziegenbein, M. L., Schlothauer, A., Colley, M., ... & Gugenheimer, J. (2023). The loop and reasons to break it: Investigating infinite scrolling behaviour in social media applications and reasons to stop. *Proceedings of the ACM on Human-Computer Interaction*, *7*(MHCI), 1-22.

[7] Natarajan, N. (2024). Do they stop? How do they stop? Why do they stop? Whether, how, and why teens insert "frictions" into social media's infinite scroll. *International Journal of Communication*, *18*, 20-20.

[8] Wood, W., & Neal, D. T. (2007). A new look at habits and the habit-goal interface. *Psychological review*, *114*(4), 843.

presence or absence of such cues impacts human behavior.[9,10,11] These studies demonstrate the broader point that whether a person continues or stops a repeated behavior is materially affected by whether their environment provides cues to pause.

22.     Infinite scroll is most connected to the Act's enumerated harm of compulsive usage, which the Act defines as, "persistent and repetitive use of a covered online service that substantially limits one or more major life activities, including sleeping, eating, learning, reading, concentrating, communicating, or working."[12] The connection is direct: The design keeps the session going by removing the natural cues that would otherwise prompt a user to decide whether to continue, and it turns the same action the user employs to navigate the page into the trigger for the next load of content.

**AUTOPLAY VIDEOS**

23.     The authoritative technical source describing autoplay is Google's US9071867B1 filed by Ray and Lewis, "Delaying automatic playing of a video based on visibility of the video" (filed July 17, 2013).[13] This patent describes a system that monitors how much of a video player is visible on the user's screen. When the video player becomes sufficiently visible, for example because the user has scrolled down to it in a feed, the system automatically begins playing the video. When the video is no longer visible, the system pauses it. In practical terms, this means that

---

[9] McGreen, J., Kemps, E., & Tiggemann, M. (2024). The effectiveness of Go/No-Go and Stop-Signal training in reducing food consumption and choice: A systematic review and meta-analysis. Appetite, 195, 107215. https://doi.org/10.1016/j.appet.2024.107215

[10] Hughes, J. R., Naud, S., Fingar, J. R., Callas, P. W., & Solomon, L. J. (2015). Do environmental cues prompt attempts to stop smoking? A prospective natural history study. Drug and Alcohol Dependence, 154, 146-151. https://doi.org/10.1016/j.drugalcdep.2015.06.044

[11] Hughes, J. R., Naud, S., Budney, A. J., Fingar, J. R., & Callas, P. W. (2016). Environmental cues and attempts to change in daily cannabis users: An intensive longitudinal study. Drug and Alcohol Dependence, 161, 15-20 https://doi.org/10.1016/j.drugalcdep.2015.09.033

[12] S.C. Code Ann. § 39-80-10(1)

[13] U.S. Patent No. 9,071,867 B1, *Delaying Automatic Playing of a Video Based on Visibility of the Video* (Ray & Lewis, assigned to Google Inc., granted June 30, 2015), https://patents.google.com/patent/US9071867B1/en.

as a user scrolls through a social media feed or navigates through a set of videos, each video begins playing on its own as it comes into view, without the user pressing a play button. Similar to infinite scroll, autoplay is fundamentally a user interface mechanism that starts and stops video playback in response to the user scrolling, instead of a button click. It is an interface design choice that, like infinite scroll, removes a stopping cue from that interface. Alternate designs are possible and remain widely used across the internet: most simply, video playback can be initiated when the user clicks a "play" button.

24.     Schaffner et al. (2025), in an experimental study of 76 U.S. Netflix users published in *Proceedings of the ACM on Human-Computer Interaction*, found that when autoplay was disabled, participants watched on average about 21 fewer minutes per day and their sessions were roughly 17 minutes shorter.[14] A second study by Chen et al. (2024), published in the *International Journal of Human-Computer Studies* with 394 participants, examined different modes of autoplay on a video platform.[15] The authors found that autoplay increased inattentiveness to the content being recommended and heightened participants' perception of being drawn into a "rabbit hole" of continued viewing.

25.     Autoplay operates through the same basic mechanism described above for infinite scroll: It removes a stopping cue. Without autoplay, when one video ends, there is a pause, and the user must decide whether to play the next video and press a button to do so. That pause is a moment of decision, a natural point at which the user might choose to stop. Autoplay eliminates that

---

[14] Schaffner, B., Ulloa, Y., Sahni, R., Li, J., Cohen, A. K., Messier, N., Gao, L., & Chetty, M. (2025). An Experimental Study of Netflix Use and the Effects of Autoplay on Watching Behaviors. Proceedings of the ACM on Human-Computer Interaction, 9(2), 1-22. DOI 10.1145/3710928 https://dl.acm.org/doi/abs/10.1145/3710928

[15] Chen, C., Kang, J., Sajjadi, P., & Sundar, S. S. (2024). Preventing users from going down rabbit holes of extreme video content: A study of the role played by different modes of autoplay. International Journal of Human-Computer Studies, 190, 103303. DOI 10.1016/j.ijhcs.2024.103303 https://www.sciencedirect.com/science/article/pii/S1071581924000879

moment, so the next video begins on its own, and the user's only options are to keep watching (which requires no action at all) or to actively intervene to stop. The broader behavioral literature on stopping cues, described in the infinite scroll section above, applies here as well. Autoplay removes the natural cue to the user to consider whether they want to continue use by initiating playback of a video from an action the user took to navigate the site. Here again, the cross-domain evidence from McGreen et al. (2024) on response inhibition and from Hughes et al. (2015, 2016) on environmental cues and stopping behavior further supports the general principle that whether a person continues or stops a repeated behavior depends in part on whether they encounter cues to pause.[16, 17, 18]

26.     Again, similar to infinite scroll, autoplay is most connected to the Act's enumerated harm of compulsive usage. The connection is supported by direct experimental evidence. The Netflix study shows that when the feature is turned off, people watch less and their sessions are shorter. The mechanism is also straightforward. Autoplay removes the pause between videos that would otherwise give the user a natural moment to decide whether to continue.

**GAMIFICATION**

27.     The authoritative technical source for gamification is Wu's US9105044B2, "Gamification for online social communities" (filed March 21, 2013), and its related patent family.[19] This patent describes a system designed to increase user participation in an online

---

[16] McGreen, J., Kemps, E., & Tiggemann, M. (2024). The effectiveness of Go/No-Go and Stop-Signal training in reducing food consumption and choice: A systematic review and meta-analysis. Appetite, 195, 107215. https://doi.org/10.1016/j.appet.2024.107215
[17] Hughes, J. R., Naud, S., Fingar, J. R., Callas, P. W., & Solomon, L. J. (2015). Do environmental cues prompt attempts to stop smoking? A prospective natural history study. Drug and Alcohol Dependence, 154, 146-151. https://doi.org/10.1016/j.drugalcdep.2015.06.044
[18] Hughes, J. R., Naud, S., Budney, A. J., Fingar, J. R., & Callas, P. W. (2016). Environmental cues and attempts to change in daily cannabis users: An intensive longitudinal study. Drug and Alcohol Dependence, 161, 15-20 https://doi.org/10.1016/j.drugalcdep.2015.09.033
[19] U.S. Patent No. 9,105,044 B2, *Gamification for Online Social Communities* (Wu, assigned to Lithium Technologies, Inc., granted Aug. 11, 2015), https://patents.google.com/patent/US9105044B2/en.

community by adding gameplay-like elements to the experience. The system measures how much a user participates, and then provides feedback through several different interfaces. These include achievement badges awarded when a user's activity crosses certain thresholds, leaderboards that rank users against one another, time-limited missions that ask a targeted group of users to complete specific actions by a deadline, and trophies for sustained high performance, such as remaining on a leaderboard for five consecutive weeks. In practical terms, the system converts ordinary participation into a structured cycle of measurement, progress tracking, feedback, and reward, all designed to encourage users to come back and participate more over time. It does not create, alter, or present user-generated content. However, while some elements of gamification (tracking user participation) are non-expressive, other elements involve creating and presenting new content to users, typically in the form of badges or other design elements that reward users for participation and warning or error messages that incentivize users to participate by threatening the loss of a "streak," or in the form of leaderboards that create an overall presentation of users' ranking, enabling social comparison as a tool to incentivize participation.

28.     Alternative designs are possible. Services can provide the same underlying content and social features without attaching streak counters, mission timers, or leaderboards to participation. They additionally could retain incentives for new participation that are not associated with previous participation. Some services already offer versions of their products without these features, or allow users to disable streak notifications. The gamification layer can be removed without altering the content, the social connections, or the core functionality of the service.

29.     The empirical literature strongly supports the understanding that gamified reward systems can increase how often and how much people use a service. Garaialde, Cox, and Cowan (2021), in two online studies, found that users selected applications more frequently when rewards

were placed closer to the beginning of the interaction, and that this effect held for both monetary rewards and for gamified, points-based leaderboard rewards.[20] Lindström et al. (2021), in a study published in *Nature Communications*, found that behavior on social media follows the same patterns predicted by reward-learning theory.[21] Their accompanying experiment confirmed that manipulating social rewards caused changes in behavior in the predicted direction.

30.    Behaviorally, gamification works through a different mechanism than infinite scroll or autoplay. Instead of extending use by removing stopping cues, gamification works by turning participation itself into a goal to pursue, preserve, and avoid losing. A streak, badge, or mission gives the user something to earn and something to protect, which creates its own reason to return and continue. Three main lines of research help explain this mechanism. First, the reward-learning research described above (Lindström et al., 2021) establishes that social rewards on platforms can shape subsequent behavior in ways consistent with well-established principles of how people learn from rewards. Second, research on goal progress helps explain why partially completed goals are motivating. Nunes and Drèze (2006) found that giving people artificial advancement toward a goal (i.e., pre-stamping a loyalty card) increased their persistence and decreased the time it took them to complete the goal.[22] The key insight is that a goal that feels partly underway is more motivating than one that has not yet begun. Streaks and badge ladders work through similar logic. They make progress visible, which can motivate further repetition to maintain or extend that progress. Third, the research on streaks specifically sharpens the point. Silverman and Barasch (2024), across seven

---

[20] Garaialde, D., Cox, A. L., & Cowan, B. R. (2021). Designing gamified rewards to encourage repeated app selection: Effect of reward placement. International Journal of Human-Computer Studies, 153, 102661. DOI: 10.1016/j.ijhcs.2021.102661

[21] Lindström, B., Bellander, M., Schultner, D. T., et al. (2021). A computational reward learning account of social media engagement. Nature Communications, 12, 1311. DOI: 10.1038/s41467-020-19607-x.

[22] Nunes, J. C., & Drèze, X. (2006). The Endowed Progress Effect: How Artificial Advancement Increases Effort. Journal of Consumer Research, 32(4), 504–512. DOI: 10.1086/500480.

studies, found that when people were shown that they had an intact streak in their behavioral history, they were more likely to continue the behavior than when they were shown a broken streak, even when their actual prior behavior was identical in both conditions.[23] That finding is directly relevant to streak-based design on social media platforms, where maintaining a streak (such as Snapchat's "Snapstreaks") can become a motivation independent of the underlying activity.

31.     Gamification's direct connection to the Act's enumerated harm of compulsive usage is well supported in the literature. The youth-specific evidence most closely connected to the statutory language comes from van Essen and Van Ouytsel (2023), in a study of 2,483 early adolescents published in *Telematics and Informatics Reports*. That study found that engagement in Snapchat streaks was associated with repetitive, problematic smartphone use. It also reported correlations between "streak intensity" and "fear of missing out." The connection runs through the mechanisms described above: gamification converts ordinary participation into tracked, rewarded goal pursuit, which gives users reasons to return and repeat their activity that are independent of the content itself. A user maintaining a streak or working toward a badge may continue using the service not because of what the service is showing them, or their enjoyment of the service, but because breaking the streak or missing the badge would feel like a loss.

**QUANTIFICATION OF ENGAGEMENT**

32.     Unlike other covered design features, there is no single patent that defines the basic technical construction of quantification of engagement. The clearest description comes from academic literature on social media design. Ljungberg, Stenmark, and Zaffar (2017) describe social buttons generally as single-click actions whose results are rendered into visible

---

[23] Silverman, J., & Barasch, A. (2023). On or Off Track: How (Broken) Streaks Affect Consumer Decisions. Journal of Consumer Research, 49(6), 1095–1117. DOI: 10.1093/jcr/ucac029

measurements.[24] The feature works in three steps. First, a user performs a standardized interaction, such as liking, reacting, viewing, or clicking on a piece of content. Second, the platform records that interaction as a discrete event associated with the content item. Third, the platform displays an aggregate numerical value next to the content item, visible to other users. This feature presents new content to users, in the form of the numerical counts displayed. That displayed number is itself an informational statement, distinct from the underlying post.

33.     The research on visible engagement metrics has been conducted primarily against measurement of "Likes." Martinez-Pecino and Garcia-Gavilán (2019), in a study published in *Cyberpsychology, Behavior, and Social Networking*, found that likes affected problematic Instagram use among teenagers, with self-esteem moderating the relationship.[25] Teenagers with lower self-esteem were more susceptible to problematic use patterns associated with like-seeking behavior. A 2025 systematic review by Dores et al., published in *Healthcare*, examined the effects of social feedback through the Like feature on brain activity.[26] The review concluded that positive social feedback through likes activates reward-related neural systems and influences subsequent online interaction. That finding is consistent with the reward-learning account described in the gamification section.

34.     The mechanism for quantification of engagement is social reward and social comparison. Unlike gamification, which works primarily through reinforcement and goal progress, visible engagement counts work by providing users with a public, numerical signal of social approval or attention attached to their content or to the content they view. For the user who posts

---

[24] Ljungberg, J., Stenmark, D., & Zaffar, F. O. (2017, July). Like, share and follow: A conceptualisation of social buttons on the web. In *Scandinavian Conference on Information Systems* (pp. 54-66).

[25] Martinez-Pecino, R., & Garcia-Gavilán, M. (2019). Likes and problematic Instagram use: the moderating role of self-esteem. *Cyberpsychology, Behavior, and Social Networking*, *22*(6), 412-416.

[26] Dores, A. R., Peixoto, M., Fernandes, C., Marques, A., & Barbosa, F. (2025, January). The effects of social feedback through the "like" feature on brain activity: a systematic review. In *Healthcare* (Vol. 13, No. 1, p. 89). MDPI.

content, a visible like count functions as feedback. A high count signals approval; a low count can signal rejection or indifference. This creates an incentive to check back, to monitor how a post is performing, and potentially to modify future posting behavior in pursuit of higher counts. For the user who views content, visible engagement counts provide a social comparison signal: This post received many likes, that one received few. Research on social comparison, tracing back to Festinger's (1954) foundational theory, establishes that people have a persistent tendency to evaluate themselves by comparing their outcomes to others.[27] Visible engagement counts make such comparisons easy, constant, and numerically precise. The combination of social reward feedback and social comparison helps explain why visible like counts in particular are associated with repeated checking and engagement behavior. The user is not just consuming content; the user is receiving ongoing, quantified feedback about their own social standing and about the relative standing of the content they encounter.

35.     As with gamification, direct connection to the Act's enumerated harm of compulsive usage is well supported in the literature. The available literature described above supports the proposition that visible social-reward metrics, especially likes, can reinforce checking behavior and repeated engagement.

**NOTIFICATIONS AND PUSH ALERTS**

36.     The authoritative patent source for notifications and push alerts, currently assigned to Meta Platforms is US8751636B2, granted June 10, 2014.[28] This patent describes a system that

---

[27] Festinger, L. (1954). A theory of social comparison processes. *Human relations*, *7*(2), 117-140.

[28] U.S. Patent No. 8,751,636 B2, *Timing for Providing Relevant Notifications for a User Based on User Interaction with Notifications* (Tseng & Braginsky, assigned to Facebook, Inc., granted June 10, 2014), https://patents.google.com/patent/US8751636B2/en.

tracks how individual users respond to notifications and then adjusts the frequency, type, and timing of future notifications so that they arrive when the user is most likely to engage with them. The patent gives concrete examples: lower default push rates during working hours and higher push rates during evening hours, along with learned patterns based on when individual users have historically responded. In practical terms, this patent describes a prompt system that is initiated by the service rather than the user, can interrupt the user's current activity, and can be tuned over time based on each user's response patterns to maximize the likelihood that the user will come back to the service. Notifications do not create new content, but instead primarily vary when content is delivered to the user, for the purpose of prompting particular user behavior. Alternative designs exist and are already in use. The most straightforward alternatives include batching notifications into scheduled delivery windows (as tested by Fitz et al., with positive well-being results) or other user-defined delivery schedules.[29]

37.    The academic literature describes that notifications can function as re-entry prompts that increase engagement. Morrison et al. (2017), in an exploratory trial published in *PLOS ONE*, found that users in more frequent notification conditions viewed and acted on more notifications, and concluded that frequent notifications may encourage greater exposure to app content without deterring engagement.[30]

38.    Notifications work through a different but related mechanism to infinite scroll and autoplay. Where those mechanisms remove stopping cues for an activity, notifications and push alerts work by providing starting cues and re-entry prompts. They interrupt whatever the user is

---

[29] Fitz, N., Kushlev, K., Jagannathan, R., Lewis, T., Paliwal, D., & Ariely, D. (2019). Batching smartphone notifications can improve well-being. Computers in Human Behavior, 101, 84–94. https://doi.org/10.1016/j.chb.2019.07.016.

[30] Morrison, L. G., Hargood, C., Pejovic, V., Geraghty, A. W. A., Lloyd, S., Goodman, N., Michaelides, D. T., Weston, A., Musolesi, M., Weal, M. J., & Yardley, L. (2017). The Effect of Timing and Frequency of Push Notifications on Usage of a Smartphone-Based Stress Management Intervention: An Exploratory Trial. PLOS ONE, 12(1), e0169162. https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0169162.

currently doing, redirect attention, and create a fresh occasion for checking the service. The habit and cueing literature described in connection with earlier design features applies here, but from the opposite direction. Wood and Neal (2007) and Bouton (2021) describe how repeated behaviors become associated with contextual cues such that encountering the cue can trigger the behavior without much conscious deliberation.[31][32] A push notification can serve exactly this function: It becomes a learned cue that prompts the user to pick up the device and re-enter the service. Over time, the association between the notification cue and the checking behavior can become habitual, meaning that the user responds to the prompt more or less automatically.

39.     Notifications and push alerts are most directly connected to the Act's enumerated harm of compulsive usage. The connection runs through the mechanism described above: Notifications serve as service-initiated, behaviorally optimized re-entry cues that can prompt repeated, compulsive return to the service.

**IN-GAME PURCHASES**

40.     The primary patent source for this feature is US10226691B1, "Automation of in-game purchases" (granted March 12, 2019).[33] This patent describes a virtual shop embedded inside an online game where users can obtain virtual items through purchase rather than by earning them through gameplay. The system receives purchase instructions from the user, applies price criteria, debits the user's currency (which can be real money or virtual currency), and delivers the purchased virtual item. The items are usable within the game itself, meaning the purchase system is tied directly to gameplay rather than to generalized e-commerce. A

---

[31] Wood, W., & Neal, D. T. (2007). A new look at habits and the habit-goal interface. *Psychological review*, *114*(4), 843.

[32] Bouton, M. E. (2021). Context, attention, and the switch between habit and goal-direction in behavior. Learning & Behavior, 49, 349–362. https://pubmed.ncbi.nlm.nih.gov/34713424/.

[33] U.S. Patent No. 10,226,691 B1, *Automation of In-Game Purchases* (DeLaet & Oshima, originally assigned to Kabam, Inc., later reassigned to Electronic Arts Inc., granted Mar. 12, 2019), https://patents.google.com/patent/US10226691B1/en.

supplemental source is US20150005054A1, "System and method for facilitating gifting of virtual items between users in a game" (filed June 30, 2014; abandoned).[34] Although this application was not granted, it is a useful descriptive source for the Act's specific clause covering purchased items that can be shared with another user. It describes users being awarded or purchasing virtual items during gameplay and then having the option to keep the item or share at least part of it with one or more other users. Taken together, these sources describe a monetization system embedded in the play experience in which users buy digital items or tokens using virtual currency or real money, and in which purchased items can be transferred or gifted to other users. This feature does not present expressive content, but instead regulates a payment and transaction architecture: What currency is used, how the purchase is structured, and whether the item can be shared. Alternative designs exist and are well understood. Most trivially, they simply require transactions outside of the gameplay loop and can also include transparent real-money pricing instead of multistep virtual currency exchanges, and deterministic purchases of known items instead of randomized loot boxes.

41.     The research literature on in-game purchases has primarily focused on specific purchase mechanisms, which I will describe in detail below. However more general research identifying player motivation and spending has also been conducted. On ordinary purchase motivations, Hamari et al. (2017), in a survey of 519 players, identified several different motivational dimensions for buying in-game content, and found that unobstructed play, social interaction, and economical rationale were associated with increased spending.[35] That finding is

---

[34] U.S. Patent No. 20,150,005,054 A1, *System and method for facilitating gifting of virtual items between users in a game* (Smalley et al., originally assigned to Kabam, Inc., later reassigned to Electronic Arts Inc., Filed July 1, 2013, abandoned) https://patents.google.com/patent/US20150005054A1/en

[35] Hamari, J., Alha, K., Järvelä, S., Kivikangas, J. M., Koivisto, J., & Paavilainen, J. (2017). Why do players buy in-game content? An empirical study on concrete purchase motivations. Computers in Human Behavior, 68, 538-546.

helpful for understanding the mechanics by which in-game purchases increase spending because it shows that design choices like artificial limitations on gameplay and social features can drive in-game purchase behavior.

42.     On the most well-studied purchase mechanisms of in-game purchasing, loot boxes and chance-based purchases specifically, the evidence of harm is strong particularly for minors. Montiel et al. (2022), in a scoping review of loot-box research, concluded that engagement with loot boxes is frequently associated with problematic gaming and gambling indicators.[36] Raneri et al. (2022) found that microtransaction engagement is associated with gaming and gambling disorder measures, while emphasizing that loot boxes appear to pose greater risk than other types of microtransactions.[37] Hing et al. (2022) found that adolescent loot-box purchasing remained associated with at-risk and problem gambling even after controlling for monetary gambling participation.[38]

43.     In-game purchases increase user spending through three related behavioral mechanisms. First, they reduce spending friction and induce the user to make purchasing decisions when they are in the middle of a play session. Second, they obscure the real cost of a purchase through virtual currency intermediation And third, for loot boxes and chance-base purchases specifically, they employ variable-ratio reinforcement. When a game uses virtual currency, the user first converts real money into a platform-specific token (such as gems, coins,

[36] Montiel, I., Basterra-González, A., Machimbarrena, J. M., Ortega-Barón, J., & González-Cabrera, J. (2022). Loot box engagement: A scoping review of primary studies on prevalence and association with problematic gaming and gambling. *PloS one*, *17*(1), e0263177. https://doi.org/10.1371/journal.pone.0263177

[37] Raneri, P. C., Montag, C., Rozgonjuk, D., Satel, J., & Pontes, H. M. (2022). The role of microtransactions in Internet Gaming Disorder and Gambling Disorder: A preregistered systematic review. Addictive behaviors reports, 15, 100415. https://doi.org/10.1016/j.abrep.2022.100415

[38] Hing, N., Rockloff, M., Russell, A. M. T., Browne, M., Newall, P., Greer, N., King, D. L., & Thorne, H. (2022). Loot box purchasing is linked to problem gambling in adolescents when controlling for monetary gambling participation. Journal of behavioral addictions, 11(2), 396–405. https://doi.org/10.1556/2006.2022.00015

or V-bucks) and then spends those tokens inside the game. This two-step process can make the actual cost of each purchase feel less real to users because they are spending tokens rather than dollars. The CFPB has identified this structure as a consumer protection concern, noting that the conversion step, combined with currency bundles that do not align neatly with item prices (leaving leftover balances), can reduce price transparency and make it easier for users, especially minors, to spend more than they intend.[39] Additionally, the core mechanism of loot boxes, variable-ratio reinforcement, is one of the most extensively studied principles in behavioral psychology. With loot boxes, the user may receive a rare and valuable item, or they may receive something common and unwanted. That uncertainty can encourage repeated purchasing in pursuit of the desired outcome, following the same behavioral principle that underlies slot machines and other variable-ratio reward schedules. Ferster and Skinner (1957) established that variable-ratio schedules produce the highest and most persistent response rates of any reinforcement schedule, meaning the behavior continues even during extended periods without reward.[40] This is the same reinforcement principle that underlies slot machines and other forms of gambling.

44.     In-game purchases are most directly connected to the Act's enumerated harm of material financial injury.[41] As described above, there is strong support in the literature for users, including adolescents, spending more, and more than they intend, in settings with in-game purchasing mechanics. The connection is strongest where virtual currency obscures real cost, where exchange rates are confusing, where stored payment methods reduce friction, or where chance-based mechanics encourage repeated spending. Also as described above, a second

---

[39] CFPB, *Consumer Advisory: Video Games Are Targeting Your Children to Get into Your Wallet* (Aug. 2024), https://www.consumerfinance.gov/about-us/newsroom/consumer-advisory-video-games-are-targeting-your-children-to-get-into-your-wallet/.

[40] Ferster, C. B., & Skinner, B. F. (1957). Schedules of reinforcement.

[41] S.C. Code Ann. 39-80-20(A)(7)

connection exists to compulsive usage in adolescents, when in-game purchasing involves repeated or randomized purchasing systems such as loot boxes as described in Hing et al. (2022).[42]

## APPEARANCE-ALTERING FILTERS

45.     The primary patent sources for this feature are US10152778B2, "Real-time face beautification features for video images" (filed September 11, 2015) and US11328496B2, "Scalable real-time face beautification of video images" (granted May 10, 2022), both of which are currently assigned to Intel.[43,44] Together, these patents describe a system that detects a user's face in a video feed, identifies a set of facial landmark points (including points around the eyes, lips, and other features), and then uses those landmarks to perform "beautification operations." These operations include skin smoothing, face brightening, face whitening, red lips, big eyes, slim face, wrinkle removal, eye-bag removal, and dark-eye-circle removal. In plain terms, the system detects the user's face, maps its features, and then digitally alters its appearance. This is not the same as placing a sticker, or pair of cartoon ears on top of a photo. Novelty overlays add a separate graphic on top of the image, whereas appearance-altering filters change the underlying depiction of the person's own face using face detection, landmarking, and warping. That distinction means that the provision should be read to cover algorithmic appearance modification specifically, not every augmented-reality or camera effect.

---

[42] Hing, N., Rockloff, M., Russell, A. M. T., Browne, M., Newall, P., Greer, N., King, D. L., & Thorne, H. (2022). Loot box purchasing is linked to problem gambling in adolescents when controlling for monetary gambling participation. Journal of behavioral addictions, 11(2), 396–405. DOI: 10.1556/2006.2022.00015

[43] U.S. Patent No. 10,152,778 B2 *Real-time face beautification features for video images* (Chen et al., assigned to Intel Corp., granted Dec. 11, 2018), https://patents.google.com/patent/US10152778B2/en

[44] U.S. Patent No. 11,328,496 B2 *Scalable real-time face beautification of video images* (Chen et al., originally assigned to Intel Corp., later assigned to Tahoe Research Ltd., granted May 10, 2022) https://patents.google.com/patent/US11328496B2/en

46. This feature presents new, expressive content. Unlike infinite scroll, autoplay, notifications, or gamification, which operate on how content is delivered or how participation is incentivized, appearance-altering filters change the visual content of the user's own image or video.

47. Alternative designs are possible. The most straightforward alternative is to offer novelty overlays (hats, ears, stickers, backgrounds, artistic effects) without offering appearance-altering filters that algorithmically reshape the user's facial or body features. A platform can provide a full creative camera experience without including filters that smooth skin, enlarge eyes, slim faces, or whiten complexions. Some platforms already distinguish between these categories in their filter libraries.

48. The research literature on appearance-altering filters is extremely well developed in the cross-sectional and experimental literature, and it focuses primarily on body image, self-perception, and appearance-related distress. Ozimek et al. (2023), in a study published in *BMC Psychology*, found that photo-editing behavior on social media was negatively related to self-perceived attractiveness and self-esteem.[45] The relationship was mediated through self-objectification and physical appearance comparisons, meaning that the pathway ran from editing one's own photos, through increased self-objectification and comparison with others, to lower self-perceived attractiveness. A 2025 experiment published in *Computers in Human Behavior* specifically tested slimming beauty filters and found that using a slimming filter increased desire to lose weight, self-objectification, and anti-fat attitudes.[46] Body dysmorphia and social self-

---

[45] Ozimek, P., Lainas, S., Bierhoff, H. W., & Rohmann, E. (2023). How photo editing in social media shapes self-perceived attractiveness and self-esteem via self-objectification and physical appearance comparisons. *BMC psychology*, *11*(1), 99.

[46] Schroeder, M., & Behm-Morawitz, E. (2025). Digitally curated beauty: The impact of slimming beauty filters on body image, weight loss desire, self-objectification, and anti-fat attitudes. *Computers in Human Behavior*, *165*, 108519.

comparison were important mediators of these effects. Fioravanti et al. (2022), in a systematic review of 43 experimental studies published in *Adolescent Research Review*, concluded that exposure to idealized beauty content on social networking sites generally has a negative effect on body image.[47] The review identifies appearance comparison as a central explanatory pathway.

49.     Appearance-altering filters work through a fundamentally different mechanism than the other covered design features. The mechanism here is the invitation to compare one's actual appearance to a digitally altered and idealized version of oneself. When a user applies a beautification filter, they see their own face with smoother skin, larger eyes, a slimmer jaw, or other modifications that conform to prevailing beauty ideals. The user then has the experience of seeing what they "could" look like, and of comparing that altered version to their unfiltered appearance. The psychological literature on self-objectification, tracing back to Fredrickson and Roberts (1997), describes how habitual monitoring and evaluation of one's own body from an external perspective can contribute to shame, anxiety, and reduced well-being.[48] Appearance-altering filters operationalize this process by providing a concrete, digitally generated comparison point: the filtered self versus the unfiltered self.

50.     The appearance comparison pathway is also relevant. When users see filtered images of others (or post filtered images of themselves), they are comparing against a standard that is not naturally achievable. This is consistent with the broader social comparison literature and with Fioravanti et al.'s finding that appearance comparison is a central pathway between idealized social media content and negative body image outcomes.

---

[47] Fioravanti, G., Bocci Benucci, S., Ceragioli, G., & Casale, S. (2022). How the exposure to beauty ideals on social networking sites influences body image: A systematic review of experimental studies. *Adolescent research review*, *7*(3), 419-458.
[48] Fredrickson, B. L., & Roberts, T. A. (1997). Objectification theory: Toward understanding women's lived experiences and mental health risks. Psychology of women quarterly, 21(2), 173-206.

51.     Appearance-altering filters are most directly connected to the Act's enumerated harms of severe psychological harm and severe emotional distress.[49] The connection runs through self-objectification, appearance comparison, and the internalization of beauty ideals that the filters themselves generate and reinforce. For appearance-altering filters, as described above there is plentiful evidence that they contribute to appearance-related anxiety, lower self-esteem, and body dissatisfaction, particularly among adolescents.

**"REASONABLE CARE" AND SOFTWARE ENGINEERING PROFESSIONAL ETHICS**

52.     The Act requires covered online services to exercise "reasonable care" in the use of a minor's personal data and in the design and operation of the service, including covered design features, to prevent enumerated harms to minors. NetChoice characterizes this standard as vague and unprecedented. But exercising reasonable care with respect to user data and platform design is not a novel or unusual obligation. It is the expected ethical norm for professional software engineers and computing professionals, as articulated by the field's own professional organizations.

53.     The Association for Computing Machinery Code of Ethics and Professional Conduct, last updated in 2018, is the primary ethical code for computing professionals worldwide.[50] The Association for Computing Machinery (or "ACM") is the world's largest computing professional society. The Code's preamble states that it is formulated on the understanding that the public good is always the primary consideration. Principle 1.1 provides that computing professionals should contribute to society and to human well-being and that an essential aim is to minimize negative consequences of computing, including threats to health, safety,

---

[49] S.C. Code Ann. §§ 39-80-20(A)(2), -20(A)(3)
[50] ACM, *ACM Code of Ethics and Professional Conduct* (2018), https://www.acm.org/code-of-ethics.

personal security, and privacy. Principle 1.2 provides that computing professionals should avoid harm, and states that avoiding harm begins with careful consideration of potential impacts on all those affected by decisions. The Code further provides that when harm is unintended, those responsible are obliged to undo or mitigate the harm as much as possible, and that to minimize the possibility of indirectly or unintentionally harming others, computing professionals should follow generally accepted best practices. Principle 1.6 requires computing professionals to respect privacy, and the Code specifically notes that the consequences of data aggregation and emergent properties of systems should be carefully analyzed.

54.     The joint ACM/IEEE-CS (the Institute of Electrical and Electronics Engineers Computer Society) Software Engineering Code of Ethics and Professional Practice, adopted by both ACM and the IEEE Computer Society, is similarly direct.[51] Its preamble states that in all professional judgments, concern for the health, safety, and welfare of the public is primary. Its first principle provides that software engineers shall act consistently with the public interest. Its third principle provides that software engineers shall ensure that their products and related modifications meet the highest professional standards possible.

55.     The IEEE's own Code of Ethics, applicable to all IEEE members, states as its first commitment that members agree to hold paramount the safety, health, and welfare of the public; to strive to comply with ethical design and sustainable development practices; and to protect the privacy of others.[52]

56.     These are not aspirational statements from a fringe movement. ACM and IEEE are the two largest professional organizations for computing and engineering worldwide. Their ethical codes represent the profession's own articulation of what responsible practice requires. The

---

[51] ACM, *ACM Code of Ethics and Professional Conduct* princ. 1.2 (2018), https://www.acm.org/code-of-ethics.
[52] IEEE, *IEEE Code of Ethics* (2020), https://www.ieee.org/about/corporate/governance/p7-8.

obligation they describe, to consider the potential impacts of one's design decisions on users, to minimize harm, to respect privacy, and to prioritize the public good, is precisely the kind of obligation the Act's "reasonable care" standard codifies. A reasonable computing professional, acting in accordance with the ethical norms of the profession, would already be expected to consider how design features affect users, including vulnerable users such as minors, and to take steps to mitigate foreseeable harms.

57.     In that sense, the Act's "reasonable care" standard does not impose an alien obligation on the technology industry. It asks covered services to do what the profession's own ethical codes already say professionals should be doing.

I declare under penalty of perjury pursuant to 28 U.S.C. §1746, that the foregoing is true and correct to the best of my knowledge.

_L Edelson_

_____

Laura Edelson, Ph.D.

April 6, 2026

26

# Laura Edelson, Ph.D.
(203) 803-6953
laura.edelson@gmail.com

## SUMMARY

I am a computer scientist with expertise in large online networks and extensive real-world experience building big data machine learning augmented systems. My current research involves large-scale analysis of ads and harmful content on major platforms such as Instagram, TikTok, and X, and auditing of algorithms, user-facing safety systems, and AI systems. I co-lead Cybersecurity for Democracy, a multi-university research lab, am a co-PI for the Institute for Information, the Internet, and Democracy at Northeastern University, and am an Assistant Professor of Computer Science at Northeastern University. I am the former Chief Technologist of the Antitrust Division (2022-2023) and the Civil Rights Division (2024) of the Department of Justice.

## EDUCATION

- Ph.D. Computer Science, New York University, 2022
  Dissertation: Characteristics of Misinformation and Political Content in Online Information Spaces
    Advisor: Damon McCoy
- B.S. Computer Science, Pace University, 2008

## REFEREED CONFERENCE & JOURNAL PUBLICATIONS

A Comparative Survey of Algorithmic Feed Recommendation System Designs, 2025. ACM Transactions on Recommender Systems. Laura Edelson, Frances Haugen, Damon McCoy.

Characterizing the Usability and Usefulness of Ad Transparency, 2025. USENIX Security. Kevin Bryson, Arthur Borem, Phoebe Moe, Omer Akgul, Laura Edelson, Tobais Lauinger, Michelle L. Mazurek, Damon McCoy, Blase Ur.

Measurement and Metrics for Content Moderation: The Multi-Dimensional Dynamics of Engagement and Content Removal on Facebook, 2025. Journal of Online Trust & Safety, Volume 2.5. Laura Edelson, Borys Kovba,  Hanna Yershova, Austin Botelho, Damon McCoy, and Tobias Lauinger.

AI Regulation: Competition, Arbitrage & Regulatory Capture, 2025. Theoretical Inquires in Law Journal. Filippo Lancieri, Laura Edelson, Stefan Bechtold.

Captured Innovation: Technology Monopoly Response to Transformational Development, 2025. The University of Chicago Business Law Review, Volume 4.1. Reed Showalter, Laura Edelson.

Propaganda Política Pagada: Exploring U.S. Political Facebook Ads en Español, 2023. Proceedings of the ACM Web Conference (WWW). Bruno Coelho, Tobias Lauinger, Laura Edelson, Ian Goldstein, and Damon McCoy.

An Audit of Facebook's Political Ad Policy Enforcement, 2022. USENIX Security. Victor LePochat, Laura Edelson, Tom Van Goethem, Wouter Joosen, Damon McCoy, and Tobias Lauinger.

Understanding Engagement with US (Mis) information News Sources on Facebook, 2021. Proceedings of the 21st ACM Internet Measurement Conference (IMC). Laura Edelson, Minh-Kha Nguyen, Ian Goldstein, Oana Goga, Damon McCoy, Tobias Lauinger.

A Security Analysis of the Facebook Advertising Library, 2020. IEEE Symposium on Security and Privacy (S&P). Laura Edelson, Tobias Lauinger and Damon McCoy.

## GRANTS

Through over $3M in grants awarded to Damon McCoy which I contributed to writing, my work has been supported by the NSF, Reset.tech, Democracy Fund, Emerson Collective, NetGain, and Wellspring.
- NSF Collaborative Research: SaTC: CORE: Medium: Methods and Tools for Effective, Auditable, and Interpretable Online Ad Transparency ($1.2M with $383,395 NYU share)
- Belfer Fellowship ($50,000), Anti-Defamation League, 2022
- Online Political Advertising Transparency Project ($800,000) Democracy Fund, 2019-2022
- Cybersecurity for Democracy ($1,400,000) Wellspring Philanthropic Fund,  2019-2022
- Cybersecurity for Democracy ($100,000 NYU) Emerson Collective, Gift Funds 2021
- Cybersecurity for Democracy ($100,000 NYU) NetGain, Gift Funds, 2021
- Political Transparency in German Elections ($37,500 NYU), Reset.tech, 2021
- Digital Ecosystem Research Challenge ($37,822 NYU) Government of Canada, 2019-2020
- Online Political Advertising Transparency Project ($175,000 NYU) Luminate, 2019

## GOVERNMENTAL TESTIMONY

U.K. Parliament. "Joint Committee on the Online Safety Bill". October 14th, 2021
U.S. House of Representatives Science Committee. "The Disinformation Black Box: Researching Social Media Data". Sept. 28th, 2021
Washington State Public Disclosure Commission. "Big Data, Big Dollars: Shining a Light Digital Political Advertising". Jan. 16th, 2020

## OTHER WRITINGS

Teen Accounts, Broken Promises, Oct. 2025. With Arturo Bejar.
We Need Product Safety Regulations for Social Media, Nov. 2023. Scientific American.
It's Time to Open the Black Box of Social Media, Apr. 2022. Scientific American. With Reneé DiResta, Brendan Nyhan, and Ethan Zuckerman.
Platform Transparency Legislation: The Whos, Whats and Hows, Apr. 2022. Lawfare.
How Facebook Hinders Misinformation Research, Sept. 2021. Scientific American. With Damon McCoy.
We Research Misinformation on Facebook. It Just Disabled Our Accounts, Aug. 2021. New York Times. With Damon McCoy.

## NON-REFEREED JOURNAL AND OCCASIONAL PAPERS

The Locknet: How China Controls Its Internet and Why It Matters, July 2025, China File
Into the Driver's Seat With Social Media Content Feeds, March 2025. Knight First Amendment Institute Ocasional Papers Series. Laura Edelson, Frances Haugen, and Damon McCoy.
A Standard for Universal Digital Ad Transparency, Dec. 2021. Knight First Amendment Institute Occasional Papers Series. Laura Edelson, Jason Chuang, Erika Franklin-Fowler, Michael Franz, and Travis Ridout.
Political Advertisement and Personal Data, Jan. 2020. *In* Understanding the Digital Ecosystem: Findings from the 2019 Federal Election. Laura Edelson, Divam Jain and Damon McCoy
An Analysis on United States Online Political Advertising Transparency, 2019, Laura Edelson, Shihkar Sakuja, Ratan Dey, and Damon McCoy. [56 Citations]

**PROJECTS**
Ad Observatory, 2020-2023, Website to increase practical transparency of Facebook political advertising.
Ad Observer, 2020 - 2023, Browser extension to crowdsource observations of Facebook and YouTube political ads.

**SELECTED PRESENTATIONS & TALKS**
Computational Antitrust: The US DoJ Keynote, Computational Antitrust 2nd Annual Conference, 2022
Workshop on Technology & Consumer Protection (ConPro 2022) Keynote
Data: Sharing While Protecting?, 2022
Pursuing Platform Transparency in 2022, 2022
Online Political Ad Transparency, 2021
A Security Analysis of Facebook's Political Ad Library, 2019

**AWARDS & FELLOWSHIPS**
Pearl Brownstein Doctoral Research Award, New York University Tandon School of Engineering, 2022
Belfer Fellowship, Anti-Defamation League, 2022
Deborah Rosenthal, MD Award for Best Qualifying Exam, New York University Tandon School of Engineering, 2019

**SERVICE**
USENIX Security, Program Committee 2023-2025
Workshop on Technology & Consumer Protection (ConPro 2023), Co-Chair 2023-2025
USENIX Security, Differential Privacy Session Chair, 2022
Workshop on Technology & Consumer Protection (ConPro 2022), Program Committee 2022
Workshop on Technology & Consumer Protection (ConPro 2021), Program Committee 2021
IEEE International Symposium on Technology and Society, Program Committee 2021

Editorial Board, Journal of Online Trust and Safety, 2021 - Present

 I have volunteered with the IEEE extensively and have served in many roles. Some of my roles have included:
- Chair, Humanitarian Activities Committee, 2016-2017 - Managed a team of staff and volunteers to execute IEEE's humanitarian goals. Oversaw a $2 million annual budget.
- President, Society on Social Implications of Technology, 2013-2014 - Led a team of volunteers managing the affairs of the society, including conferences, publications,  partnership arrangements with other non-profits, and membership development.

**GOVERNMENT SERVICE**
Chief Technologist, United States Department of Justice Civil Rights Division          6/24 - 12/24

Chief Technologist, United States Department of Justice Antitrust Division          8/22 - 7/23

**EMPLOYMENT**

Chief Scientist, Sigma Ratings                                                                          6/17 – 5/18
- Developed proprietary machine learning algorithm to detect financial crime risk to banking institutions Built and led technology team, including remote data collection teams to deliver Sigma's commercial offerings, including a low-cost screening platform as well as customized financial crime rating product

Software Engineer, Palantir Technologies                                                          8/13 – 7/15
- Worked with the Data Science team to implement original bucketing algorithms for Machine Learning offering
- Integrated open source machine learning library mllib into Palantir's broader Data Warehousing offerings allowing it to be used on massive scale data sets.
- Developed a new API for Palantir's deployment toolset that was adopted company-wide.

Senior Software Engineer, FactSet Research Systems, Inc.                                9/08 – 7/13
- Technical Lead for Quote Alerts, a real-time notification server of market threshold events. Developed proprietary algorithms for high-speed function evaluation.
- Developed a novel algorithm to project future dividend amounts and calculate the Fair Value of futures contracts for stock indexes,  allowing FactSet to be the first to market with a streaming Fair Value product.
- Developed custom data compression scheme for transmission of market data, maintaining a high degree of compression (>80%) while being flexible enough to not require pre-defined message formats.