# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### COLUMBIA DIVISION

NETCHOICE, LLC,

        *Plaintiff*,

v.

ALAN WILSON, in his official capacity as South Carolina Attorney General,

        *Defendant*,

and

HENRY DARGAN MCMASTER, in his official capacity as Governor of the State of South Carolina,

        *Intervenor-Defendant*.

Civil Action No.: 3:26-cv-543-sal

**BRIEF OF AMICUS CURIAE ELECTRONIC PRIVACY INFORMATION CENTER IN SUPPORT OF DEFENDANT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................III

INTEREST OF AMICUS CURIAE.........................................................1

INTRODUCTION ................................................................................1

ARGUMENT .......................................................................................5

I.      Content moderation decisions can be expressive.............................5

II.     The use of surveillance data to generate addictive feeds is not expressive. ...7

    A.    Behavioral profiling in recommendation systems generates content choices based on users' behavior, not the message or viewpoint of content. ...............................................9

    B.    Using revenue-maximizing behavioral profiling algorithms is not an exercise of protected editorial discretion......................13

    C.    The use of machine learning to behaviorally profile users further undermines the expressiveness of the content decisions. ...............................................................................21

    D.    Behavioral profiling is a functional, not expressive, aspect of feed creation. .........................................................25

CONCLUSION ...................................................................................29

# TABLE OF AUTHORITIES

**Cases**

*303 Creative LLC v. Elenis*,
  600 U.S. 570 (2023)................................................................................7, 24

*Bernstein v. Dep't of Justice*,
  176 F.3d 1132 (9th Cir. 1999) .........................................................................33

*Brown v. Ent. Merchants Ass'n*,
  564 U.S. 786 (2011).........................................................................................25

*Burns v. Town of Palm Beach*,
  999 F.3d 1317 (11th Cir. 2021) ......................................................................34

*Clark v. Cmty. for Creative Non-Violence*,
  468 U.S. 288 (1984).........................................................................................32

*Committee for Reasonable Regulation of Lake Tahoe v. Tahoe Regional Planning
  Agency*,
  311 F. Supp. 2d 972 (D. Nev. 2004)...............................................................34

*Free Speech Coal., Inc. v. Paxton*,
  606 U.S. 461 (2025).........................................................................................32

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
  515 U.S. 557 (1995).............................................................................18, 19, 21, 22

*Masterpiece Cakeshop v. Colorado Civil Rights Commission*,
  584 U.S. 617 (2018).........................................................................................24

*Miami Herald Pub. Co. v. Tornillo*,
  418 U.S. 241 (1974).........................................................................................18

*Moody v. NetChoice,*
  603 U.S. 707 (2024)...................................................................................passim

*NetChoice v. Bonta*,
152 F.4th 1002 (9th Cir. 2025)...................................................................3, 17

*NetChoice v. Bonta*,
170 F.4th 744 (9th Cir., Mar. 12, 2026).........................................................2

*NetChoice v. Bonta*,
761 F.Supp.3d 1202 (N.D. Cal. 2024)....................................................passim

*Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of California*,
475 U.S. 1 (1986).......................................................................................18

*PruneYard Shopping Center v. Robins*,
447 U.S. 74 (1980).....................................................................................20

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*,
547 U.S. 47 (2006).....................................................................................20

*Sorrell v. IMS Health, Inc.*,
564 U.S. 552 (2011) ................................................................................8, 25

*Turner Broad. Sys., Inc. v. F.C.C.*,
512 U.S. 622 (1994)...................................................................................19

*United City Studios, Inc. v. Corley*,
273 F.3d 429 (2d Cir. 2001) ...................................................................31, 33

*United States v. O'Brien*,
391 U.S. 367 (1968)...............................................................................23, 31

**Statutes**

S.C. Code Ann. § 39-80-30(B). ......................................................................7

S.C. Code Ann. § 39-80-10(12)..................................................................7, 13

**Other Authorities**

Arturo Béjar, et al., *Teen Accounts, Broken Promises: How Instagram Is Failing To Protect Minors* (Sep. 2025)................................................................12, 13

iv

Arvind Narayanan, *Understanding Social Media Recommendation Algorithms*, The Knight First Amendment Institute at Columbia University (2023) ..........9, 10

Brett Frischmann & Evan Selinger, Re-Engineering Humanity (2018)............11, 17

Brett M. Frischmann & Peter Ormerod, *Regulating Manipulative Design Is Not Preempted by Section 230 or the First Amendment*, 75 Emory L.J. __ (forthcoming May 2026).......................................................................11, 19

*Community Standards*, Meta (2026).............................................................6

Compl., *Massachusetts v. TikTok Inc. et al.*, No. 2484-cv-2638-BLS-1 (Mass. Sup. Ct. Feb. 3, 2025).......................................................................12

Jason Kohler, *Instagram 'Error' Turned Reels Into Neverending Scroll of Murder, Gore, and Violence*, 404Media (Feb. 27, 2025) ...........................................24

Knight Georgetown Institute, *Better Feeds: Algorithms That Put People First* (2025).......................................................................................12, 17

Kyle Langvardt, *Crypto's First Amendment Hustle*, 16 Yale J.L. & Tech. 130 (2023).......................................................................................27

Mackenzie Austin & Max Levy, *Speech Certainty: Algorithmic Speech and the Limits of the First Amendment*, 77 Stan. L. Rev. 1 (2025)................22, 23, 24

Mark Zuckerberg, *A Blueprint for Content Governance and Enforcement*, Facebook (May 5, 2021) ...............................................................29

Neil Richards & Woodrow Hartzog, *Against Engagement*, 104 Boston U. L. Rev. 1151 (2024) .....................................................................8, 10, 28

Ravi Iyer, *Feed Algorithms Contain Both Expressive and Functional Components*, USC Neely Center for Ethics and Technology (Dec. 10, 2024) ...............9, 10

Sam Schechner, et al., *How Facebook Hobbled Mark Zuckerberg's Bid to Get America Vaccinated*, Wall St. J. (Sep. 17, 2021).........................................25

Tim Wu, *Machine Speech*, 161 U. Pa. L. Rev. 1495 (2013) ............................15, 26

v

**INTEREST OF AMICUS CURIAE**

The Electronic Privacy Information Center ("EPIC") is a public interest research center in Washington, D.C., established in 1994 to focus public attention on emerging privacy and civil liberties issues.[1] EPIC regularly participates as amicus in cases concerning the First Amendment implications of platform regulation. See EPIC, *The First Amendment* (2026).[2]

**INTRODUCTION**

The Supreme Court's decision in *Moody v. NetChoice,* 603 U.S. 707 (2024), set out a rigorous standard for First Amendment challenges to platform regulations. Facial challenges are "disfavored," *Moody,* 603 U.S. at 744, because they "often rest on speculation" and "threaten to short circuit the democratic process by preventing duly enacted laws from being implemented in constitutional ways." *Id.* at 723 (internal citations omitted). Because of the dangers facial challenges pose, the decision to challenge a statute on its face "comes at a cost." *Id.* That cost is a heightened evidentiary burden. In the First Amendment context, a court must be able to determine "a law's full set of applications, evaluate which are constitutional

---

[1] *Amicus* certifies that no person or entity, other than *Amicus*'s own staff or counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief, in whole or in part. Both parties consented to this filing.
[2] https://epic.org/issues/platform-accountability-governance/the-first-amendment-and-platform-regulation/.

1

and which are not, and compare the one to the other." *Id.* at 718. A law can be facially invalidated "only if the law's unconstitutional applications substantially outweigh its constitutional ones." *Id.* at 724.

NetChoice has not come close to meeting the facial challenge standard in this suit. This is a common pattern. As the Ninth Circuit recently remarked:

> The Supreme Court has been clear, and our court has since emphasized, that facial challengers must clear a high bar. . . . NetChoice has been a party to many such cases—several before our court and the Supreme Court— and is presumably aware of the expectations for a facial challenge. At the risk of repetition, we offer similar guidance to NetChoice today.

*NetChoice v. Bonta*, 170 F.4th 744, 751 (Mar. 12, 2026).

This amicus brief demonstrates the level of analysis and detail required to analyze a facial challenge to just one provision of H. 3431—the regulation of personalized feeds—as applied to just one design feature: a content recommendation system. Even then, the brief discusses content recommendation systems in general terms. Because the provision may burden different companies in different ways depending on how their content recommendation systems actually work, NetChoice—or its members—would have to provide additional evidence and argument to explain how the law applies in each of its applications. *Moody*, 603 U.S. at 724–26. In fact, a district court in California and the Ninth Circuit have both rejected NetChoice's facial and as-applied attacks to a similar California law

regulating companies' use of addictive feeds. *See NetChoice v. Bonta*, 152 F.4th 1002, 1019–22 (9th Cir. 2025); *NetChoice v. Bonta*, 761 F.Supp.3d 1202, 1218–1223 (N.D. Cal. 2024).

Under *Moody*, some of the decisions a company makes to generate an algorithmic feed may be expressive choices protected by the First Amendment. H. 3431's requirement that companies allow users to choose whether personal data that does not reflect their express preferences is used to suggest, promote, or rank content—and the requirement that companies not, by default, use known minors' personal data unless that data reflects their express preferences—does not burden those expressive choices. Companies do not use the regulated categories of personal data to make expressive choices, and empowering consumers to limit the use of this data does not impact the feed generation choices that *are* expressive.

Rather, the personalized recommendation provisions of H. 3431 target a particularly harmful and invasive aspect of feed generation in which a company builds and compares behavioral profiles of users to predict the content that is most likely to lead to user behavior that will maximize ad revenue. The Supreme Court has questioned whether use of these kinds of "algorithms [that] respond solely to how users act online—giving them the content they appear to want, without any regard to independent content standards," is expressive. *Moody*, 603 U.S. at 736 n.5. And for good reason.

3

Behavioral profiling for feed generation is very different than the content moderation practices the *Moody* Court recognized may be expressive. Content moderation involves companies removing and downranking content that violates their policies. These curatorial decisions are closely analogous to those long recognized as protected editorial judgement. Laws that override content moderation decisions may compel companies to publish messages and viewpoints they deem unfit to publish.

H. 3431 does not force companies to publish messages they do not think are fit for publication, nor does it prevent them from publishing messages they wish to publish. The use of behavioral profiling for feed generation is unlike any exercise of editorial discretion recognized in precedent. Behavioral profiling algorithms do not select and arrange content based on a company's judgment that the message is fit for publication. The curatorial choices do not depend on an evaluation of the content's message, nor do they reflect any human intent to communicate a coherent message, idea, or theme. They are designed to evaluate users, not messages, and so are blind to the meaning of the media selected and how that meaning impacts the message sent by the overall compilation. In fact, these algorithms often amplify messages that the companies claim they do not wish to publish at all. That is in large part because humans give the machines a non-expressive goal—maximize usage of the platform—and the machine decides the rules for selecting and ranking

4

content to accomplish that goal. The machines are not directed to understand—or care—what messages they are selecting and amplifying.

Courts have long recognized in a variety of contexts that conduct can have both expressive and non-expressive components. Feed generation involves both expressive and non-expressive activities, and behavioral profiling more resembles the kinds of functional, non-expressive activities that courts have recognized occur alongside expression. Because behavioral profiling is not inextricably intertwined with content moderation, the state can regulate it without impacting companies' expression.

## ARGUMENT

### I.      Content moderation decisions can be expressive.

In *Moody*, the Supreme Court signaled that a law compelling a social media company to publish what it would rather exclude restricts the company's exercise of editorial discretion. *See Moody*, 603 U.S. at 728. The process by which companies exclude or otherwise express disapproval of unwanted content is called content moderation. *Id.* at 719. Content moderation is similar to traditional editorial discretion because both involve a speech compiler deciding whether to include or exclude pieces of media based on how each piece would affect the overall message of the compilation. *Id.* at 731–32.

Content moderation begins with the employees of a social media company establishing content guidelines for the platform. These guidelines "list the subjects or messages the platform prohibits or discourages—say, pornography, hate speech, or misinformation on select topics." *Moody*, 603 U.S. at 719. Content guidelines are heavily laden with humans' value judgments about the semantic content of the media, prohibiting media judged to be distasteful, low-quality, or irrelevant. *See, e.g.*, *Community Standards*, Meta (2026).[3] While content moderation may not be perfect, it reflects companies' conscious efforts to avoid publishing content they do not think is fit for publication.

The *Moody* Court signaled in dicta that content moderation can be protected editorial discretion. "When the platforms *use their Standards and Guidelines to decide* which third-party content those feeds will display, or how the display will be ordered and organized, they are making expressive choices." *Moody*, 603 U.S. at 740 (emphasis added). In the Court's view, a social media company, through content moderation systems, decides "whether—and, if so, how—to convey posts having a certain content or viewpoint," and "[t]hose choices rest on a set of beliefs about which messages are appropriate and which are not." *Id.* at 738. A company that does not want to spread pro-Nazi beliefs, say, acts expressively when excluding pro-Nazi media. A law that "direct[s] a company to accommodate

---

[3] https://transparency.meta.com/policies/community-standards/.

messages it would prefer to exclude" thus infringes on the company's protected editorial discretion. *Id.* at 731.

The *Moody* Court saw their decision as a direct application of decades of Supreme Court precedent recognizing the rights of speech compilers to exclude messages and viewpoints they do not wish to carry. *See id.* at 728–33 (discussing the Court's editorial discretion precedent). The editorial discretion cases are themselves part of the Court's compelled speech precedent that prohibits the government from "coopt[ing] an individual's voice for its own purposes." *303 Creative LLC v. Elenis*, 600 U.S. 570, 592 (2023). They involve the government overriding a person's or group's choice not to speak on a given topic or to not express a specific viewpoint or message. To the extent that companies' content moderation decisions reflect the editorial judgements of their leaders and employees, they fit squarely within this precedent.

## II. The use of surveillance data to generate addictive feeds is not expressive.

H. 3431 regulates online service providers' use of personal data to "suggest, promote, or rank content" in users' feeds. S.C. Code Ann. 39-80-10(12). Specifically, the law requires that users be provided the option to opt out of the use of their personal data—except for those reflecting their expressed preferences—to generate their feed, and to provide this opt-out as the default for known minors. *Id.* § 39-80-30(B). While limits on the use of personal data may trigger First

Amendment scrutiny if they "are based on the content of speech and are aimed at a particular viewpoint," *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 565 (2011), there is no general rule that data use regulations automatically implicate or run afoul of the First Amendment. What's more, social media companies do not generally use the regulated categories of personal data to engage in expressive content moderation, but rather to fuel revenue-maximizing components of their recommendation systems that extend usage of their products. Unlike content moderation algorithms, which evaluate the message or viewpoint of content to determine whether it violates a company's policies, revenue-maximizing algorithms evaluate users by measuring how likely it is the user will interact with a given piece of media, regardless of its message or viewpoint. *See* Neil Richards & Woodrow Hartzog, *Against Engagement*, 104 Boston U. L. Rev. 1151, 1154 (2024). This behavioral profiling lacks required characteristics of protected editorial judgement. It is functional, not expressive. It matters little that companies combine non-expressive behavioral profiling with expressive content moderation to generate a single algorithmic feed. Courts have long recognized that conduct can have both expressive and non-expressive elements. When the State regulates a non-expressive element, the First Amendment is implicated, at most, only incidentally. Since behavioral profiling and content moderation are entirely separate processes, regulating the former has no incidental impact on the latter.

### A.     Behavioral profiling in recommendation systems generates content choices based on users' behavior, not the message or viewpoint of content.

Companies use multiple types of algorithms to generate an algorithmic feed. As discussed in Part I, some of these algorithms implement a company's views on the value of certain messages, topics, or viewpoints. Companies do not use individuals' *personal data* for this purpose but for another: the revenue-maximizing aspects of their recommendation systems. These algorithms evaluate user behavior to maximize the probability that a specific user will engage in behavior that increases the company's ad revenue. *See* Ravi Iyer, *Feed Algorithms Contain Both Expressive and Functional Components*, USC Neely Center for Ethics and Technology (Dec. 10, 2024).[4] For many companies, the behavior they are trying to maximize is "engagement," or the probability that the user will interact with a specific piece of content. *See* Arvind Narayanan, *Understanding Social Media Recommendation Algorithms*, The Knight First Amendment Institute at Columbia University 20 (2023).[5]

The primary fuel for revenue-maximizing algorithms is user behavioral data collected through surveillance, not explicit user feedback or the topic, meaning, or

---

[4] https://neely.usc.edu/2024/12/10/algorithms-contain-both-expressive-and-functional-components/.

[5] https://s3.amazonaws.com/kfai-documents/documents/4a9279c458/Narayanan---Understanding-Social-Media-Recommendation-Algorithms_1-7.pdf.

viewpoint of content. *See* Narayanan, *supra*, at 18. The behavioral data used by these algorithms can include likes, clicks, comments, time spent watching, time spent lingering, and other indications that a piece of content held a user's attention. *Id.* at 18–19.

To create these revenue-maximizing algorithms, social media companies use machine learning techniques to direct a computer to determine what combination of the surveillance data best predicts the behavior they are trying to maximize— e.g., engagement. *See* Richards & Hartzog, *supra*, at 1162–63. It is thus the computer, and not humans, that analyzes users' personal data and determines the specific rules for how the data will influence the content shown to a given user and in what order. The algorithm then constructs profiles of users from the surveillance data, uses these profiles to compare each user to other users, and shows users media that users with similar profiles engaged with heavily. *See* Narayanan, *supra*, at 22.

In contrast to content moderation, which evaluates the message expressed by media and whether to publish that message, revenue-maximizing behavioral profiling algorithms do not evaluate the viewpoint, topic, or quality of media. Companies use them not to shape a coherent message out of the media selected but to accomplish the functional task of inducing profitable user behavior. *See* Iyer, *supra*; *see generally* Brett Frischmann & Evan Selinger, Re-Engineering Humanity

(2018). Any message goes—including content that violates the company's own policies—so long as it maximizes profitable user behavior. Indeed, separate content moderation algorithms are necessary to remove violative content precisely because the revenue-maximizing algorithms are not designed to select or rank content based on the message expressed.

The behavioral profiling technology companies use to generate revenue-maximizing algorithmic feeds is unlike any curation method used by traditional publishers. Brett M. Frischmann & Peter Ormerod, *Regulating Manipulative Design Is Not Preempted by Section 230 or the First Amendment*, 75 Emory L.J. __ (forthcoming May 2026) (manuscript at 31–33).[6] Newspapers, magazines, television networks, and film studios may consider aggregate audience data to determine what topics, ideas, and viewpoints their audiences are interested in, but they do not surveil individuals' reading or viewing habits and generate personalized publications for each person based on this behavior. What covered entities are doing with user data is like a cable operator using subscribers' viewing habits to choose the programming that appears on their televisions without knowing or caring what programs they are picking—to, essentially, change the channel on subscribers in a pattern most likely to maximize their revenues. Notably, H. 3431 does not prohibit companies from using aggregate user data to

---

[6] *Available at* https://ssrn.com/abstract=5587430.

generate algorithmic feeds, and so regulated entities are still able to be responsive to audience preferences in the same ways traditional publishers are.

It is also worth noting that behavioral profiling is not synonymous with personalization. *See generally* Knight Georgetown Institute, *Better Feeds: Algorithms That Put People First* (2025).[7] Indeed, NetChoice's characterization of covered businesses' recommendation systems as tools "to deliver content that will be most beneficial to their users, that their users want to see," Compl. ¶ 159, is disingenuous, as such feeds do not reflect—and often override—the actual preferences of users. *See, e.g.*, Compl. ¶ 265–72, *Massachusetts v. TikTok Inc. et al.*, No. 2484-cv-2638-BLS-1 (Mass. Sup. Ct. Feb. 3, 2025) (explaining how TikTok introduced a "Refresh" tool for users to reset their engagement data if they were unhappy with their feed, then decided to degrade the tool's effectiveness when users' fondness for it caused their engagement numbers to drop); Arturo Béjar, et al., *Teen Accounts, Broken Promises: How Instagram Is Failing To Protect Minors* 34 (Sep. 2025) (finding that Meta's "not interested" feature "did not significantly alter the type of content recommended by Instagram"). NetChoice also claims that personalization is "one of the most important tools websites have for ensuring that minor users receive age-appropriate content," Compl. ¶ 164. But

---

[7] https://kgi.georgetown.edu/wp-content/uploads/2025/02/Better-Feeds_-Algorithms-That-Put-People-First.pdf.

some of its members' age-appropriate features have been found to not work as claimed. *See, e.g.*, Béjar, *supra* at 33–40 (finding that Instagram's filters for sensitive content do not operate as promised).

There are many other ways companies might provide personalized feeds, like giving users effective tools to specify for themselves what content they would like to appear in their feed. H. 3431 leaves companies with ample room to provide such personalization. A video platform can still, for instance, provide minors with feeds containing content that reflects their express preferences, including content from channels they subscribe to. It can also curate its own channels for various interests, like college basketball, crochet, or cats, and allow users to add these channels to their personalized feeds. It can further refrain from publishing certain messages to certain people, as H. 3431 only restricts the use of personal data to suggest, promote, or rank media, not to *remove* it. S.C. Code Ann. 39-80-10(12). And it could still rank the content in personalized feeds in any number of ways, including quality, popularity, timeliness, or any other non-user-specific metric. Such personalization would be *more* likely to give users what they want, not less, and better respect their privacy and autonomy.

> **B.    Using revenue-maximizing behavioral profiling algorithms is not an exercise of protected editorial discretion.**

The *Moody* Court recognized that behavioral profiling is distinct from content moderation and that this distinction is constitutionally salient. While laws

overriding companies' content moderation decisions fall squarely within the Court's prior precedent on editorial discretion and compelled speech, the same is not true of laws that regulate the use of algorithms that "respond solely to how users act online." *Moody*, 603 U.S. at 736 n.5. As Justice Barrett wrote in her concurrence, "The First Amendment implications . . . might be different" for "a platform's algorithm [that] just presents automatically to each user whatever the algorithm thinks the user will like—e.g., content similar to posts with which the user previously engaged." *Id.* at 746 (Barrett, J., concurring) . The Ninth Circuit has also observed that these feed generation decisions are "probably not expressive." *NetChoice v. Bonta*, 152 F.4th 1002, 1014 (9th Cir. 2025).

Indeed, the use of behavioral profiling to make revenue-maximizing decisions lacks every characteristic of protected editorial discretion. Behavioral profiling does not involve the company choosing to include or exclude content based on the message, idea, or theme communicated. It also does not reflect any intent to communicate a message. As a result, the company does not actually communicate any coherent message, idea, or theme to users through the behavioral profiling process.

Expressive editorial decisions involve evaluating the communicative content of third-party speech and choosing to include or exclude based on the message expressed. *See* Tim Wu, *Machine Speech*, 161 U. Pa. L. Rev. 1495, 1521, 1528

14

(2013) (noting "knowing selection" as a signature of expression). Most of the tentpole editorial discretion cases concern the government's interference with a speech compiler's choice to exclude third-party speech based on the message communicated by the third-party speech. The parade organizers in *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995), wanted to exclude a float because they thought its pro-LGBTQ message was inappropriate for an event celebrating Irish-American heritage. *Id.* at 562. The Miami Herald in *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241 (1974), refused to publish a response from a political candidate whose viewpoint the paper did not think merited publishing. *Id.* at 256. The power utility in *Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of California*, 475 U.S. 1 (1986), did not want to include messages from a citizens rights group in its customer mailings that would likely critique or contradict the views of the company. *Id.* at 12–13. And *Moody* concerned social media companies' decisions not to "convey posts having a certain content or viewpoint." *Moody*, 603 U.S. at 738.

The expressiveness of a choice to include third-party speech in a compilation also depends on whether the decision relates to what the third-party speech communicates, either individually or collectively, and whether the compiler's choices reflect their *own* message. For instance, in *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622 (1994), cable operators were recognized to be engaged in

15

expression when they chose channels to include in their cable packages because they "[sought] to communicate messages on a wide variety of topics and in a wide variety of formats." *Id.* at 636 (quoting *Los Angeles v. Preferred Communications, Inc.*, 476 U.S. 488, 494 (1986)). In other words, cable operators were engaged in expression not because they chose whatever cable channels viewers wanted to see, but because each individual channel was chosen, *based on its topic*, to contribute variety to the overall package. By limiting the number of channels that cable operators were able to pick themselves, the government limited the specific messages, topics, and formats the cable operators could choose to include, and consequently constrained the intentionally curated variety of their offerings. *Id.* at 637. Similarly, marches and parades are the expression of the organizers when they make a "collective point" that reflects the organizers' view or theme—for instance, celebration of Irish-American heritage. *Hurley*, 515 U.S. at 568. When parade organizers select marchers to include, they choose them based on the message they express so that the collective point is readily apparent to those watching. The *Moody* Court noted that *Tornillo* and its progeny are distinguishable from *PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980), and *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47 (2006), because, in the latter two cases, the government's action "did *not* affect the complaining party's own expression." *Moody*, 603 U.S. at 730.

16

Companies' revenue-maximizing behavioral profiling algorithms do not evaluate the message, topic, viewpoint, or speaker of content when deciding whether to include it in a user's feed and, consequently, do not use this information to determine what content to select. *See* Knight Georgetown Institute, *supra*, at 12–13 (describing non-content signals to which engagement-maximizing algorithms respond). That is because companies are not trying to communicate anything through the individual or collective decisions of their revenue-maximizing algorithms. Companies deploy behavioral profiling with the sole aim of engineering a specific behavioral response in users—with no regard for the message that including or excluding the content sends to the user. *See* Frischmann & Selinger, *supra*.

Because companies design their behavioral profiling algorithms to "solely respond to prior user activity, there is no apparent message [of the company] being conveyed" by those algorithms' decisions. *NetChoice, LLC v. Bonta*, 761 F. Supp. 3d 1202, 1221 (N.D. Cal. 2024) (NetChoice I). Consider a feed dictated by such decisions. When a company's algorithm selects third-party speech for inclusion in the feed, the "overall message is distilled from the individual presentations along the way, and each unit's expression is perceived by spectators as part of the whole." *Hurley*, 515 U.S. at 577. A feed's overall message should thus derive from the messages of the individual posts the algorithm selects, which "in the aggregate

17

[] give the feed a particular expressive quality." *Moody*, 603 U.S. at 738. But because behavioral profiling algorithms choose content for inclusion based purely on the probability that it will induce a user into staying on the platform, not on the message expressed by the content, the resulting compilations are often a hodge-podge of messages that lack a "common theme." *Hurley*, 515 U.S. at 576. The output is equivalent to a group of people walking together carrying a random assortment of signs with no collective purpose and no coherent message, theme, or viewpoint. Each participant in this walk may be engaged in expression through their individual signs and chants, but the *organizers* failed to craft any message through their decision making and selection process. And just as a parade or a protest without a message is "just motion," *id.* at 569, feed personalization through behavioral profiling is just an endless scroll.

The only potential message many covered businesses' use of behavioral profiling algorithms might send is something along the lines of, "this is the content we believe is most relevant, interesting, or useful for you." *See* Compl. ¶ 162. These are not the "creator's message." *NetChoice I*, 761 F.Supp.3d at 1222. They are not the same as the companies *themselves* saying "we think this content is interesting." These are just ways of saying "we personalized this feed for you," which in turn is just a description of the conduct that the Plaintiffs say they are engaged in. What's more, this message is not "distilled from the individual

18

presentations along the way." *Hurley*, 515 U.S. at 577. Indeed, it is unlikely that a user would understand this message just by looking at the content selected for the feed. To the extent users understand that their feeds are personalized, it is likely because companies typically communicate that their algorithmic feeds are personalized in other ways, e.g., by labeling the feeds as such, providing user interface controls that indicate personalization, or through branding.

The generic personalization messages Plaintiffs claim to communicate could also be attributed to pretty much all personalized conduct, which would lead to all personalization "becom[ing] expressive and receiv[ing] speech protections" even though "the Supreme Court has made clear that there is not [a] 'limitless variety of conduct that can be labeled "speech" [even when] the person engaging in the conduct intends thereby to express an idea.' " *NetChoice I*, 761 F. Supp. 3d at 1222 (quoting *United States v. O'Brien*, 391 U.S. 367, 376 (1968)). Many products and services use consumers' personal data to generate personalized outputs. Frischmann & Ormerod, *supra*, at 22. A smart thermostat, for instance, collects and uses its owner's personal data to predict the temperature that is best for them. *Id.* at 20. By Plaintiffs' logic, when the thermostat sets the temperature based on the owner's personal data, the thermostat company is saying, "This temperature takes into account your preferences," so any regulation of the company's collection and use of personal data is subject to First Amendment scrutiny. Similarly, a liquor

19

store clerk who hands a minor a six pack of beer based on the minor's preference for something fruity could be understood to say, "You will find this beer interesting," so the sale of the beer should be protected by the First Amendment.

When personalization does communicate something, it isn't the sort of vague, generic message that Plaintiffs claim they are sending, but a message in the speaker's own voice. In cases where the Supreme Court has found the personalization of a product expressive, such as a personalized wedding website, *303 Creative*, 600 U.S. at 587, and a personalized wedding cake, *Masterpiece Cakeshop v. Colorado Civil Rights Commission*, 584 U.S. 617, 626 (2018), the message the Court found expressive was not "this is the best website for you" or "you'll find this cake interesting" but a message in the speaker's own voice: "This is a marriage I want to celebrate." Similarly, in *Sorrell*, the pharmaceutical companies challenging a regulation of physician prescribing data used that data to decide what words and ideas would best persuade individual physicians to prescribe their drugs. U.S. 552 at 557–58. The companies' marketers thus used the data not to say, "You may find this advertisement interesting," but to personalize a message in their own voice along the lines of, "Prescribe Brand Name Drug X because it's more effective than Drug Y you currently prescribe for Condition Z." Covered entities, meanwhile, are not trying to persuade users to believe or do anything—besides stay on their platforms longer. And while the Supreme Court

20

found that personalization did not disqualify interactive video games from being expressive, personalization itself was not the reason the games were expressive: it was that the game creators "communicate ideas—and even social messages" through the game's features and storytelling mechanics. *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 790 (2011).

Personalization might also communicate something about the relationship between two people, although not in the context of behavioral profiling for addictive feeds. A person who picks out a gift for a friend that reflects the friend's interests does not say, through their gift-giving, "This is something I think you will find interesting," but, instead, "I care about you." Humans have limited time and attention, and devoting some of it to choosing a gift for a person reflects the gift giver's feelings toward the person. Revenue-maximizing algorithms, deployed at scale, do not express a similar message through their personalization, because the personalization is, in fact, *im*personal: it is performed by a computer, in a matter of moments, with little marginal cost to the company, to benefit the company, not the user.

### C. The use of machine learning to behaviorally profile users further undermines the expressiveness of the content decisions.

When companies use behavioral profiling to generate personalized feeds, humans do not dictate the rules for what to include and how to rank it. As discussed in Part I.B., companies use machine learning to train their behavioral

profiling algorithms. The companies give the computer a goal—maximize time spent on the platform—and a set of potential parameters, and let the machine make its own rules for what content to select and how to rank it. The machine then executes the rules without human supervision. As a result, the human creators of the algorithm cede their ability to control, explain, understand, or predict the algorithm's output. *See Moody*, 603 U.S. at 795 (Alito, J., concurring in the judgement) (contrasting newspaper editors' expressive curation with algorithms that "prioritize content based on factors that the platforms have not revealed and may not even know."); Mackenzie Austin & Max Levy, *Speech Certainty: Algorithmic Speech and the Limits of the First Amendment*, 77 Stan. L. Rev. 1, 63–64 (2025).

This undermines a claim to protected editorial discretion. In editorial discretion cases, the curator expresses themselves through the decision to publish or not publish something. If the social media company delegates the decision-making process to an algorithm, it is not at all clear that the decision can be attributed to the humans in the company. That is why at least four justices and some scholars believe that the use of machine-learning algorithms may attenuate the expressiveness even of *content moderation* decisions that otherwise have all the hallmarks of editorial discretion.

22

Machine learning algorithms are inscrutable black boxes that create their own rules with limited guidance from their human creators. Austin & Levy, *supra*, at 39–43. It is not clear that every output of a machine learning algorithm reflects a human's expressive choice such that the output can be treated as the human's speech, *id.* at 42–43, 79–81, and it would be a shocking break from precedent to recognize that anything other than a human or a group of humans has First Amendment rights. As Justice Barrett wrote in her concurrence, "technology may attenuate the connection between content-moderation actions (e.g., removing posts) and human beings' constitutionally protected right" of expression. *Moody*, 603 U.S. at 746 (Barrett, J., concurring). She further noted, "If the AI relies on large language models to determine what is 'hateful' and should be removed, has a human being with First Amendment rights made an inherently expressive 'choice . . . not to propound a particular point of view'?" *Id.*

The human creators of machine-learning algorithms are also not able to fully explain why the algorithms make any given decision nor to predict with any level of certainty what the algorithms will output in any given case. *See* Austin & Levy, *supra*, at 63–64. As Justice Alito observed, "[W]hen AI algorithms make a decision, even the researchers and programmers creating them don't really understand why the models they have built make the decisions they make. Are such decisions equally expressive as the decisions made by humans?" *Moody*, 603

23

U.S. at 795 (Alito, J., concurring in the judgement) (quotation marks and citations omitted). No court has ever ruled that a speaker engages in editorial expression when they compile speech using metrics that they can neither understand nor explain, *see* Austin & Levy, *supra* at 30–33, and whose output they cannot control and must frequently disavow, *see, e.g.*, Jason Kohler, *Instagram 'Error' Turned Reels Into Neverending Scroll of Murder, Gore, and Violence*, 404Media (Feb. 27, 2025) (summarizing Meta's apology for erroneously causing many users' feeds to be filled with videos of humans and animals being violently killed).[8]

If the expressiveness of content moderation decisions can be attenuated by the use of machine learning algorithms, then the case for the expressiveness of *behavioral profiling* using machine learning is even weaker because such conduct lacks any characteristic of editorial discretion. *See* Part II.B. There is also clear evidence that revenue-maximizing algorithms do not reflect companies' editorial judgment because they sometimes amplify media that violates the company's own content policies. *See, e.g.*, Sam Schechner, et al., *How Facebook Hobbled Mark Zuckerberg's Bid to Get America Vaccinated*, Wall St. J. (Sep. 17, 2021).[9] This shows that the people in the company lack control over what messages and

---

[8] https://www.techpolicy.press/an-advocates-guide-to-automated-content-moderation/.

[9] https://www.wsj.com/articles/facebook-mark-zuckerberg-vaccinated-11631880296.

24

viewpoints are selected by the algorithm. When platforms lack curatorial control, they can hardly claim to be exercising editorial judgement. It would be as if the parade committee in *Hurley* delegated authority to choose parade units to a random unvetted third party, told them the only constraint was to choose participants whose banners were eye-catching, and then tried to claim the third party's curatorial decisions represented their own pro-Irish expression even when the third party placed a float defaming Irish people at the vanguard of the parade.

But analogies between the decision making of machine-learning algorithms and that of humans will inevitably be strained because the way that machine-learning algorithms make decisions is so alien to human decision making. Humans may consider their audience when making editorial choices, but unlike a machine-learning algorithm designed to behaviorally profile users, humans cannot and do not consider information about the audience in a vacuum, ignoring all information about the message, viewpoint, topic, or speaker of the content they recommend. It would be a major leap in First Amendment law to extend the editorial discretion precedent—grounded firmly in human evaluations of content—to this activity.

### D. Behavioral profiling is a functional, not expressive, aspect of feed creation.

Courts have long recognized that some communications "combin[e] nonspeech and speech elements, i.e., functional and expressive elements." *United City Studios, Inc. v. Corley*, 273 F.3d 429, 451 (2d Cir. 2001). This "de facto

functionality doctrine" allows the "state to regulate the functional aspects of the communication process, while protecting its expressive aspects." Wu, *supra*, at 1496–97. Behavioral profiling is a functional aspect of feed creation. This functional aspect is not inextricably intertwined with the expressive aspects of feed creation. The State can regulate the use of behavioral-profiling algorithms without impacting a company's ability to select and rank content based on a company's views about the messages expressed.

First Amendment doctrine has long recognized that conduct can contain both speech and nonspeech elements. *See O'Brien*, 391 U.S. at 376; *see also Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 296 (1984) (enforcement of a no-camping-in-the-park law targeted the "facilitative" aspect of a protest). "When speech has both protected and unprotected features . . . 'the unprotected features of the [speech] are, despite their [communicative] character, essentially a 'nonspeech' element' for purposes of the First Amendment." *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 492 (2025) (quoting *R.A.V. v. St. Paul*, 505 U.S. 377, 386 (1992)). In a First Amendment challenge, then, courts do not just look at whether the conduct being regulated has *some* expressive element, but whether the specific practice that is regulated is expressive or non-expressive.

When considering limits on the distribution and use of computer code, courts have long focused on whether the law at issue regulates the expressive or

26

the functional aspect of the code. *See* Kyle Langvardt, *Crypto's First Amendment Hustle*, 16 Yale J.L. & Tech. 130, 146 (2023). The distribution of code is expressive when the code is "meant to be read and understood by humans" and when it communicates the "scientific ideas" of the programmer to others. *Bernstein v. Dep't of Justice*, 176 F.3d 1132, 1142, 1145 (9th Cir. 1999), *reh'g granted, op. withdrawn*, 192 F.3d 1308 (9th Cir. 1999). A use of code is functional when the code is instead used to accomplish the task that the software was programmed to achieve. *Corley*, 273 F.3d at 451. For example, when a researcher distributes code to communicate to other researchers how to design an encryption algorithm, such a use of code is expressive. *Bernstein*, 176 F.3d at 1141. But when a person distributes encryption software to an end user to decrypt an encrypted file, that use is functional. *Corley*, 273 F.3d at 451, 454. If a law regulates a functional aspect of code, courts determine whether the regulation would have an incidental impact on an expressive aspect of the code, and if so, subject the regulation to intermediate scrutiny. *See id.* at 454.

Similarly, courts have recognized that architecture combines both expressive and functional activities. *See, e.g.*, *Committee for Reasonable Regulation of Lake Tahoe v. Tahoe Regional Planning Agency*, 311 F. Supp. 2d 972, 1005 (D. Nev. 2004) (noting that while a building project "may involve an intent to convey an artistic, political, or self-expressive message, the great majority [of building

27

choices] are functional in nature and are not commonly associated with expression"). Whether a regulation of building practices triggers First Amendment scrutiny depends not on whether any aspect of building design is expressive (some of it surely is, such as the choice of Beaux-Arts or Brutalism) but on what aspect of the building process is being regulated and whether that aspect has the characteristics of expressive conduct. *See Burns v. Town of Palm Beach*, 999 F.3d 1317, 1335–43 (11th Cir. 2021), *cert. denied*, 142 S. Ct. 1361 (2022).

When online service providers use surveillance data to make curatorial decisions, they are not trying to—nor do they actually—send their own ideas or messages to the user. *See supra* Part II.B. Their behavioral profiling algorithms, instead, serve the functional purpose of organizing the media on a platform in a way that maximizes the amount of time users spend on the platform, which maximizes corporate profits. *See* Richards & Hartzog, *supra*, at 1162–63.

While companies may combine expressive content moderation with non-expressive behavioral profiling to create a single feed, regulation of the latter does not impact the former. The two are entirely separate processes. A company could re-engineer a feed to not use the surveillance data without changing their content moderation practices. *See* Mark Zuckerberg, *A Blueprint for Content Governance and Enforcement*, Facebook (May 5, 2021) (discussing content moderation and

28

engagement maximization as independent processes);[10] *NetChoice I*, 761 F.Supp.3d at 1223 ("if it is very easy to separate an algorithm's expressive content moderation functions from non-expressive user-activity-based functions, a law prohibiting personalized feeds from relying on user activity information may also only incidentally burden speech. A covered company could just remove the user activity factors from the recommendation algorithms driving its media feeds."). The feed would be just as expressive after that change because behavioral profiling is not responsible for the curation's expressiveness—content moderation is.

## CONCLUSION

For the foregoing reasons, *amicus* asks this Court to deny Plaintiff's request for preliminary injunction.

*[signature page follows]*

---

[10] https://www.facebook.com/notes/751449002072082.

Respectfully submitted,

/s/ Jason Scott Luck
Jason Scott Luck (#9696)
P.O. Box 47 (107 S. Parsonage St.)
Bennettsville, SC 29512
843.479.6863 (o)
843.479.7222 (f)
jason@luck.law

Megan Iorio (pro hac vice pending)
ELECTRONIC PRIVACY
INFORMATION CENTER
1519 New Hampshire Ave. NW
Washington, DC 20036
(202) 483-1140
iorio@epic.org

*Counsels for Amicus Curiae*
*Electronic Privacy Information Center*

April 13, 2026