**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | |
|---|---|
| NETCHOICE,<br>*Plaintiff*,<br>v.<br>ALAN WILSON, in his official capacity as the South Carolina Attorney General,<br>*Defendant*. | Civil Action No. 3:26-cv-00543 |

**CORRECTED DECLARATION OF DENISE PAOLUCCI IN SUPPORT OF PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

I, Denise Paolucci, declare as follows:

1. I am the co-owner of Dreamwidth Studios, LLC, which operates the website dreamwidth.org. I have co-owned and operated Dreamwidth since the site's inception and have worked in multiple roles for the website, including as the head of Trust and Safety, involving setting policy and handling reports of violations of policy, and as the head of product and feature development. Prior to cofounding Dreamwidth, I served in multiple roles, including as Director of Trust and Safety, for another social media site called LiveJournal from 2001-2007, and I offer free consultation for other independent social media sites on how to most effectively develop and implement content moderation and safety policies and processes.

2. I am older than 18, and I make this declaration from personal knowledge, professional experience, and a review of Dreamwidth's records kept in the ordinary course of business.

3. Dreamwidth determines the purposes and means of processing its users' personal data, has users in South Carolina, and receives the personal data of 50,000 or more devices or users per year. Dreamwidth also has users under 18.

4. Dreamwidth therefore may meet the definition of "covered online service" under the South Carolina Age-Appropriate Code Design Act, H.B. 3431 (the "Act"), codified at S.C. Code § 39-80-10(4)(a)(i)(B). Or it may not. I am uncertain on this fact due to the technical, logical, and functional incoherence of the Act, as explained below. Regardless, Dreamwidth would become subject to the Act immediately at any point a South Carolina minor began using our service and brought that fact to our knowledge. I must therefore plan accordingly. In particular, I must consider how we would comply with the Act because, as explained below, the Act imposes substantial technical burdens and compliance obligations that would take significant time and resources to implement, if we could implement them at all.

5. Dreamwidth is a member of NetChoice.

## I. About Dreamwidth

6. Dreamwidth is an open-source, social-networking, content-management, and personal-publishing website, founded in 2008 and opened to user registration in 2009. We are incorporated in Maryland but serve a devoted user base throughout the United States, including—as explained below—users in South Carolina. We consider ourselves home for creative people of all types, offering a service that is part social networking, part blogging, and part content management.

7. Our users rely on us to disseminate a wide variety of creative, educational, persuasive, and personal speech, such as: fictional stories and nonfictional essays, analyses of cultural trends in popular media, commentaries on news events ranging from a hyper-local perspective to a national or even global stage, political activism and advocacy, educational writing to inform or persuade, and writing seeking out and providing others with support for personal struggles. Users can post entries to their own journals or to shared, user-created "community" journals built around hundreds of specialized topics, such as geographic communities, book series, movies, sports, politics, or any other shared interests.

8. Dreamwidth operates according to a set of Guiding Principles and a Diversity Statement that encapsulate our business philosophy. *See Guiding Principles*, Dreamwidth, https://perma.cc/H53X-XE89; *Diversity Statement*, Dreamwidth, https://perma.cc/NAT6-ZGGZ.

9. Dreamwidth provides several privacy, security, and content-control features, allowing our users a high degree of control over their own data and online experience:

i. Our users control who sees their journal entries. One user might make an entry open to any visitor. Another might limit visibility to connected users. A third might keep an entry only visible to themselves.

ii. Our users can also control who may comment on their journal entries. One user may choose to allow comments from anyone who reads their post, including visitors who haven't registered an account ("anonymous comments"). Another may choose to only allow comments from people with whom they are connected. A third may choose not to accept comments on their entries at all.

iii. Users also control who may contact them. Users can disable private messaging entirely, only allow messages from users with whom they're connected, or allow messages from every user.

iv. Users also may choose the visibility for any personal information they choose to add to their profile.

10. Our fundamental commitment to allowing users control over their own data and how (and to whom) their expressive content is displayed extends beyond the visibility of entries users make and information they add to their profile. We founded Dreamwidth with the firm commitment—both as a company value and as an explicit promise to our users—that we will never accept or display advertising, never engage in buying or selling user data, and never require, gather, or log any data beyond what we need to operate the service or to prevent abuse of the service.

11. Our revenue comes entirely from our "freemium" model, where approximately 20% of our users pay a fee to access extra services and fund the site for the approximately 80% of our active users who use the site on an unpaid basis. We have never accepted any outside investment or venture capital. In addition to not displaying advertising, we also do not accept payment to promote posts, change the order or priority of content, or to target or direct content or posts to a subset of users.

12. Dreamwidth has approximately 4.3 million registered accounts and approximately 2 million unique visitors annually. We operate on an extremely limited budget and are staffed only by me and the company's other co-owner, both participating on a part-time basis, and two additional part-time employees. We are only able to continue operating because approximately 200 volunteers assist with technical support and troubleshooting, assist with customizing the look and design of users' journals, identify and escalate handling of spam, and provide programmatic bug fixes and feature additions to the open-source code running the site, among other tasks.

13. We do not provide a mobile application. The only way to access or interact with Dreamwidth is by opening a web browser and navigating to www.dreamwidth.org. We have chosen not to provide a mobile application in part because it is our view that no matter how carefully a programmer crafts a mobile application to be as privacy-protective as possible, there is a greater potential for users' personal data to be exposed to third parties than there is through a web browser, if only due to more parties being involved in the interaction.

14. As part of our commitment to interoperability and open standards, we provide an Application Programming Interface (API) that allows unauthenticated individuals to access publicly available (not access-restricted or private) content through programmatic means, such as for research and analysis, or to allow people with a Dreamwidth account to interact with the site's features or read the entries they have access to read in their choice of format. We also provide syndicated feeds of each individual journal and community, using the RSS and Atom open protocols, that contain only public (not access-restricted or private) entries made to the journal or community. This allows people to load publicly posted entries made to journals or communities they want to read into their preferred program that aggregates content from multiple feeds, from multiple independent sites, and presents and formats it in their preferred manner. There is no technical

way for us to control how someone uses the open data provided by these tools beyond a very limited form of connection blocking when we identify a specific connection as a source of abusive traffic. This means that users can create tools capable of accessing Dreamwidth or presenting content originally posted on Dreamwidth that Dreamwidth does not necessarily have any ability to control. I am not currently aware of any third-party mobile applications using the Dreamwidth API to access Dreamwidth content. But the nature of open protocols and APIs means Dreamwidth would have no way of knowing if someone had done so other than their volunteering that information to us.

15. We do not have in-house counsel, nor can we afford to pay a lawyer's retainer fees for timely consultation. Like most websites of our size that I've advised, we rely on pro bono attorneys to evaluate and help us comply with state laws.

## II. Child Protection

16. Dreamwidth does not deliberately target minors as an audience. Our intended audience is adults looking for a social media service that will respect their privacy. The data we collect on registration is therefore minimal: we require users to choose a username they will be known by, provide an email address at which they can receive and click on a confirmation link, and agree their use of a Dreamwidth account is governed by the provisions of our Terms of Service and Privacy Policy.

17. To comply with the Children's Online Privacy Protection Act (COPPA), we do not allow registration by users under the age of 13, and so we also require users to provide their date of birth. The birthdate field displays a notice that "This information is required by law" and "You must enter your real birthdate." If the user's provided birthdate indicates they are under 13 years old, we do not create the account, and we set a temporary browser cookie that lasts for 24 hours to flag the session as having been blocked by this process to prevent the user from simply hitting the

back button and changing their specified birthdate to one that would allow account registration. If the user's birthdate is over 13, we store the provided birthdate in a database table that is associated with the account. But that date is accessible and visible only to site employees with access to confidential user information, and—to respect our users' privacy—these employees do not access such information unless necessary to do so, for example to diagnose a technical problem a user has reported or to investigate reports of potential Terms of Service violations.

18. Users whose birthdates indicate they are over 13 but still a minor are subject to additional restrictions. For example, a user whose account is calculated as belonging to a minor cannot see any other post or account the owner (or Dreamwidth itself) has marked as inappropriate for viewing by minors, either on a per-post or per-account basis. We also exclude such content from certain search results and prevent accounts that are calculated as belonging to minors from connecting with accounts that have marked their entire account as being inappropriate for viewing by minors. We do not—and currently cannot, given our resources—conduct any automated analysis of posts or accounts to determine whether the account or individual posts should be marked as inappropriate for viewing by minors. Instead, we generally rely on user self-determination and classification. If we are made aware of any posts or accounts that we believe qualify as inappropriate for minors, through user reporting or the ordinary course of business, we will mark that post or account using site administrative tools. We only need to use this ability rarely; we have found our users are extremely conscientious about properly classifying their posts and accounts.

## III. Security and Data Minimization

19. We do not collect, store, or process any geolocation data about our users, whether at the time of account creation or afterwards. Under some circumstances, we do log the IP address associated with a connection when users take specific actions, for spam, abuse, and fraud preven-

tion purposes, but we do not have any system (nor can we afford access to any system) that associates the IP address assigned to a connection with a geographic location, and those systems are notoriously unreliable and error-prone.

20. The only geographic information we can act on comes from our upstream hosting provider's region-based connection blocking tools. Importantly, that geographic connection blocking is applied at the network level, before the connection reaches our servers, and we have no ability to associate our hosting provider's location data with any specific user account: at most we can return a custom error message stating why the connection has been blocked. Previously, we had only used this service to block connections from countries and regions outside of the United States that have historically been the source of elevated levels of spam, fraud, and other network abuse. This service only applies to blocking broad regions that may or may not correlate with state lines depending on the accuracy of our hosting provider's data, and it would not allow us to segment data or experiences by user.

21. Because we do not have the technological capability to ascertain the states where each of our users is located, and deliver state-specific experiences to them based on that location, state laws that impose unique compliance regimes that relate to the fundamental design of our website and user experience leave us with two choices: (1) either cease to provide service in that state by using our hosting provider's tools to block all connections from that state, or (2) risk liability for noncompliance. For the South Carolina Act, compliance is not an option for us as it would require us to fundamentally change our services for all users—at immense cost we cannot afford and in ways that would alienate our users.

22. When other states have enacted onerous laws that we cannot comply with, we therefore have made the choice to block users in that state. For example, after Mississippi adopted its

social media law in 2024, H.B. 1126, 2024 Reg. Sess. (Miss. 2024), and due to the barriers to compliance that I identified in my declaration in that case, we were forced to enable network-level geographic connection blocking for all connections identified by our hosting provider as originating in Mississippi. *See* @dw_news, *Mississippi Site Block, Plus a Small Restriction on Tennessee New Accounts*, Dreamwidth (Aug. 31, 2025, 12:28 pm), https://perma.cc/8C6F-5R3F. As a result, we are no longer open for business in Mississippi because serving that state means we would need to offer the "Mississippi experience" for users in every other state as well, due to our inability to segment user experiences by location.

23. Similarly, after Tennessee adopted a law imposing unique restrictions on services for minors, H.B. 1891, 113th Gen. Assemb., Reg. Sess. (Tenn. 2024), and given our inability to geolocate users to see if they triggered the State's new law, we limited new user registration in Tennessee to adults only. *See* @dw_news, *Mississippi Site Block, Plus a Small Restriction on Tennessee New Accounts*, Dreamwidth (Aug. 31, 2025, 12:28 pm), https://perma.cc/8C6F-5R3F (at sign-up, if a new user answers "yes" to being a Tennessee resident and they enter a birthdate that would make them under 18, we do not create the account and redirect them to a page apologizing that we can't allow them to register under Tennessee law).

24. Many of our users have chosen our site because they trust our promise to never collect more information about them than we absolutely have to. That promise to fight for our users' privacy and anonymity is the most frequent reason people cite for choosing Dreamwidth. For example, the site that inspired Dreamwidth, LiveJournal, is currently owned by Sberbank, the state bank of Russia. At the end of 2025, to comply with recent Russian age verification and identification laws, LiveJournal began to mandate age verification and deanonymization for every user who posted in the Russian language. Our "new accounts created by day" statistic rose from 128

newly created accounts on December 28, 2025, to 7,098 on January 2, 2026, and as high as 9,006 newly created accounts on January 23, 2026, as LiveJournal users moved to Dreamwidth instead. The new registration volume was significant enough to slow down our ability to import users' past posts from LiveJournal for several days. *See* @dw_news, *Привет! LiveJournal Imports May Be Slow*, Dreamwidth (Dec. 31, 2025, 8:24 pm), https://perma.cc/7EBY-RU6R. This shows how much our users value our minimization of data collection.

**IV. The South Carolina Age-Appropriate Code Design Act**

25. On February 5, 2026, Governor McMaster signed the Act into law.

26. On February 10, 2026, after careful consideration of the Act's requirements, we implemented restrictions in South Carolina similar to the ones in Tennessee. Now, in South Carolina, only adults can create user accounts on Dreamwidth. *See* @dw_news, *Update on Legal Cases: One New Victory! :) One New Restriction :(*, Dreamwidth (Feb. 10, 2026, 3:03 pm), https://perma.cc/FKV8-GDC9.

27. Multiple factors drove this decision. Primarily, we are deeply uncertain as to what the Act requires of a site like ours. Some of those questions and uncertainties include and involve: (a) whether we are included under the Act as a "covered service"; (b) the technical, logical, and functional incoherence of multiple definitions and provisions of the Act; (c) the inability to determine which (if any) of our features would be included in such vaguely-defined categorical definitions as "dark patterns," "design features," and "covered design features," and what it would mean to disable them; (d) the degree to which complying with the law would require us to significantly increase the amount of personal user data and sensitive personal user data we collect, store, and process; (e) the degree to which complying with the law would force us to introduce potential security vulnerabilities and degrade critical user safety measures; (f) the poorly defined scope and method of determination of the definitions of the newly imposed duty of care the Act seeks to

impose on covered services; and (g) the significant financial, technical, and logistical burdens complying with the law would impose upon us.

28. The Act, and particularly its immediate attachment of liability, is a significant burden to Dreamwidth for multiple reasons. Its passage has already forced us to make changes to our associations we did not want to make, forced us to limit the speech and associations of our users in ways we did not want to limit them, and forced us to break several of the foundational promises we've made to our users for the past 18 years—all against our will. Even more damaging, however, is that despite all these efforts, I still have no confidence that we accurately interpreted the Act's requirements or whether our actions satisfy those requirements.

**A. Inclusion Under the Act as a "Covered Service"**

29. At the outset, it is not clear that Dreamwidth is a covered service—but Dreamwidth has proceeded as though it is.

30. Despite our general antipathy towards transferring any amount of user data to a third party, we lack the resources internally to develop every critical technical, business, and analytical tool necessary to operate Dreamwidth. Therefore, like every small business, we must engage third-party vendors to provide those necessary services. Currently, those third-party vendors include Google Business Service's Google Analytics service. Google Analytics works through a small JavaScript snippet we place on a subset of Dreamwidth pages. When a user loads one of those pages, their browser sends technical data to Google's servers (browser type and version, device, operating system, hardware capabilities, and screen size, among other details). Google aggregates this data and lets us query the results. We use these insights to drive technical decisions, such as which browsers and versions we need to support, which web standards our users' devices have not yet implemented, and which assistive technologies our disabled users rely on (which informs the assistive technology we prioritize in our pre-release software testing).

31. To the best of my knowledge, the technical and device information Dreamwidth sends to Google Business Services through the Google Analytics JavaScript meets the definition of "personal data" under the Act, because that data could be linked to a specific user. § 39-80-10(11)(a).

32. To the best of my knowledge, we may meet the definition of "covered online service" under § 39-80-10(4)(a)(i)(B) because we have over 50,000 unique visitors annually and therefore receive information from those visitors.

33. Section 4 of the Act specifies the Act took immediate "effect upon approval by the Governor" on February 5, 2026. Absent any time to understand or comply with the Act, our only effective response to this immediate threat of liability was to block registration from users who identify themselves as residents of South Carolina and who are under 18.

34. Blocking registration from self-identified South Carolina residents under 18 was the simplest step available to us. The Act's complex technical requirements, by contrast, exceed our resources entirely. Even still, the Act's confusing and contradictory provisions prevent us from knowing whether even that change to block self-identified South Carolina minors is sufficient to meet our obligations.

**B. Technical, Logical, and Functional Incoherence**

35. Despite reviewing the Act multiple times, I still do not know what changes, if any, would be necessary to avoid being in violation of the Act. The Act makes a number of implicit assumptions about the technical and functional features of a covered online service that do not apply to our website, while leaving other key terms undefined. It also lumps together multiple unrelated concepts in single definitions in a way that leaves me unable to generalize from the examples given, despite the frequent usage of such language as "including, but not limited to."

36. For example, the threshold duty of the Act is to treat minors' accounts differently than adults' accounts. The Act defines "minor" as "a consumer who is less than eighteen years of age," § 39-80-10(8), and appears to assume that this determination is a simple matter and that, as a matter of course, all websites "attribute[] or associate[]" age data to user accounts for "marketing, advertising, or product development purposes," § 39-80-10(7). We do not. Instead, we collect a user's "self-identified age," § 39-80-10(7), to comply with COPPA. And if we are made aware that a user has made a statement on Dreamwidth that they are under the age of 13, we will remove the account even if the user's self-identified age at registration would make them over the age of 13.

37. We understand our procedure to satisfy COPPA and the Federal Trade Commission's (FTC) implementing regulations of that law. Section 39-80-10(7) of the Act here, however, defines "actual knowledge" as "all information and inferences known to the covered online service" regarding age. Despite not performing any age-inference operations, this definition could be interpreted to assign us actual knowledge of a user's age if the user had ever posted any reference to their age to the site, whether or not any Dreamwidth owner, employee, volunteer, or representative ever saw that post, in plain contrast to the much more stringent definition of "actual knowledge" commonly used in other laws.

38. Additionally, on multiple occasions, I have encountered situations where someone has written to us and lied about a user's age, hoping to force us to remove that user's account because of some interpersonal spat. Under the Act's definition, such a claim could assign us "actual knowledge" of a user's age, unless the targeted user were able to conclusively rebut that accusation by providing us documentation of their identity and birthdate, thus forcing us to collect privacy-

invasive information. Under COPPA's more stringent definition of "actual knowledge," we are able to dismiss those false claims.

39. Similarly, for creative purposes, we allow users to display different birthdays on their profile from the one we use at account creation. We allow users to show their birthday on their profile if they want, including month, day, and year or any combination thereof, but the birthday they enter for display on the profile is separate from the birthdate the user entered at account creation. Our users make frequent use of the distinction between account creation birthdate, which we promise them will be used only for performing calculations about their age, and profile birthday, which can be almost any date they want. For example, some users write from the perspective of a fictional or historical character and want to publicly display the character's birthdate, not their own, while privately providing us with their own birthdate. If, for example, one of our adult users wanted to create a real-time fictional project in which they took *The Diary of a Young Girl* by Anne Frank as the basis for a transformative work of fiction, they might want to specify a public birthdate that would cause the account to appear as though it belonged to a minor, even though the actual account holder was over the age of 18. Currently, in the case of a difference between the two pieces of data, we consider the birthdate provided at account creation authoritative, and the birthday provided for display on the profile to be cosmetic. The Act appears to consider any age information provided by a user, no matter where it is entered, as "actual knowledge" the user is a minor. If the Act is allowed to remain in effect, the account for that fictional project would need to be treated as a minor, even if it were operated by an adult.

40. Additionally, the Act creates confusion and uncertainty by conflating age "verification" and age "estimation," § 39-80-40(A), which have significantly different privacy and security implications and, critically, significantly different accuracy rates.

41. As Dreamwidth understands it, age verification requires a user to prove both their age and their identity. This typically means either submitting government-issued photo identification and comparing it to a live recording to confirm the identification belongs to the account holder, or scanning biometric points (hundreds of unique personal bodily characteristics) and comparing them against a governmental database tied to a specific person's identity. Age verification is highly intrusive on an individual's privacy, eliminates the right to speak and receive speech anonymously, and creates security risks regarding the recording, transmission, and processing of the documentation submitted, even if that information is deleted immediately after verification is performed. It also requires a user to have a government-issued photo ID (which most minors and a number of adults do not have, with the disparity in adult possession rates highly correlated to socioeconomic status and therefore more likely to exclude poor or marginalized people) and a device with a facing camera (which is more likely to exclude poor or marginalized people, as well as fully or partially blind people who cannot determine whether their face is in the necessary camera range and/or cannot see or follow the instructions displayed on the screen to accommodate the necessary movements).

42. As Dreamwidth understands it, age estimation is a less exacting standard that can be satisfied through the automated analysis of indirect indicators such as behavioral data, or through facial age estimation algorithms that scan a user's face and assign an estimated age based on a superficial analysis of visual appearances, without recording biometric data points or comparing them against an established database. All commercially available age-estimation systems based on visual appearances are scientifically unvalidated and inconclusive, have wide error ranges, perform to a different degree of accuracy based on the user's racial and ethnic background and whether the user has a disability involving facial structure, fail completely if a user is fully or

partially blind and cannot determine whether their face is within the necessary camera range and/or cannot follow the instructions displayed on the screen to accommodate the necessary positioning, and require the user to possess a device with a forward-facing camera that can create the necessary facial scan. A review by the National Institute of Standards and Technology (NIST) analyzing the performance of six commercially available facial age estimation algorithms used for age assurance found the false positive rate for 17 year olds (that is, what percentage of 17 year olds will be identified as over 18 by the age estimation algorithm) to range between 50% and 98%, while anywhere from 1% to 28% of 14-to-17-year olds will have their ages estimated as over 25. This is the mean average error for all demographic groups calculated together. The accuracy rate varies wildly across different combinations of racial and gender groups, with genders other than male and races other than white generally carrying a disproportionately higher burden of error. *See* Kayee Hanoaka et al., Nat'l Inst. of Standards & Tech., Face Analysis Technology Evaluation: Age Estimation and Verification, NISTIR 8525 (2024), https://perma.cc/P4TB-ZC9J.

43. We fundamentally object to collecting any unnecessary personal data about our users, and we especially object to burdening the most marginalized of our users, which the Act's age-associated requirements demand.

44. In addition, the Act's requirement that any data used for age determination "must be deleted after use," § 39-80-40(A), would prevent us from storing birthdates provided on signup and from making ongoing calculations regarding whether the user is still a minor for our established safety features. This would either require that Dreamwidth continue to treat a formerly-under-18 user as a minor even after their 18th birthday, thus burdening an adult's speech and conduct, or require the user to submit their sensitive age data to us again to update their age.

45. We do not impute, infer, or assemble any data about account owners, including "a user's economic situation, health, personal preferences, interests, reliability, behavior, location, or movements." § 39-80-10(15). We do, however, allow users to provide some of that data, on a voluntary and optional basis, on their profile as a means of self-expression. For example, users can choose to display their city, state, and/or country on their profile, and any user clicking the links for those locations sees a list of other users who have publicly self-identified as being in the same location. Given the definitions in the law, it appears that assembling the results of this search could qualify as "process[ing]" personal data under § 39-80-10(14), unless the fact that the user voluntarily provided the data makes us "a person to whom the individual has disclosed the data if the individual has not restricted the data to a specific audience," § 39-80-10(16)(a). This ambiguity becomes even harder to resolve considering the user can choose (and we respect for search purposes) to limit the visibility of profile data only to connected accounts, *i.e.*, "restrict[ing] the data to a specific audience." *Id*. By my reading of the Act, this interlocking set of definitions, along with the subsequent provisions of the Act, would only allow us to process this data for an account belonging to a minor if we removed the ability for users to set any more restrictive visibility than fully public—an obvious downgrade of the safety and privacy features we currently offer.

46. Likewise, the Act applies special treatment to "sensitive personal data," § 39-80-10(18), a special category of "personal data," § 39-80-10(11)(a). The categories of "sensitive personal data" include multiple topics a user might write about. For instance, a user posting a casual reference to attending Easter vigil services is disclosing their "religious or philosophical beliefs," § 39-80-10(18)(d); a user publicly celebrating their naturalization ceremony is disclosing their "citizenship or immigration status," § 39-80-10(18)(d); a user looking for peer support about dealing with disability or physical limitations is disclosing "personal data concerning an individual's

health," § 39-80-10(18)(h); or a scientist posting educational essays about the fundamentals of genetic testing and using some of their own results from a commercial genetic testing service as illustrative examples is posting "an individual's genetic data," § 39-80-10(18)(f). Our users post this type of information all of the time.

47. The definition of "personal data" carries the same ambiguity. Users can search the site for posts by keywords and phrases, including posts "restricted [] to a specific audience." § 39-80-10(16)(a). If the searching user has access to see the post, it appears in the search results. To assemble search results, we must programmatically index all posts made to the site, at the time of posting or editing. This indexing is "the performance of an operation, or a set of operations, by . . . automated means" and meets the definition of "process" under § 39-80-10(14). By my reading of the Act, this interlocking set of definitions would allow us to process a minor's post data only if the post were public. But users can change a post's security setting at any time, and it's not technically feasible to determine which posts contain "sensitive personal data." Practically speaking, this means we could not index the contents of any minor's account at all. This would not add any privacy or safety protection to minors the site does not already offer, because Dreamwidth users can already prevent their posts from appearing to others in search results. But the Act's prohibition would eliminate a user's ability to search their own journal for their own posts. Providing this feature, even in the most privacy-protective fashion, requires processing user data, which inherently may include "sensitive personal data." Because this processing must automatically be done at the time a post is made or edited, and because it is technically impossible to only create the index at the time a user performs the search, the exception in § 39-80-40—permitting the processing of "the minimum amount of a minor's data necessary to provide the specific elements of the covered online service with which a minor has knowingly engaged"—appears not to apply. If

the Act remains in effect, we could need to block minors from privately searching their own journals, depriving them of the helpful ability to search, locate, review, organize, and make use of their posts, while not offering any additional privacy protections. Removing the ability for minors to search their own journals would also create a safety issue that does not currently exist, because the ability to search past entries to identify and remove statements a user no longer wants to be public is vital.

**C. Vague Definitions Under § 39-80-10(3)**

48. The Act includes multiple vague definitions under § 39-80-10(3) that make our compliance obligations uncertain.

49. The Act defines "covered design features," § 39-80-10(3), as "any feature or component of a covered online service that will encourage or increase a minor's frequency, time spent, or activity on a covered online service." There is no reliable scientific, academic, or practical data to use to determine what features or components of the site might qualify as covered design features. The academic debate about design features and their relationship to site usage is vigorous, ongoing, and worlds away from reaching scientific consensus.

50. We do not have any form of "infinite scroll," § 39-80-10(3)(a), but we allow users to click a button to continue moving backwards in time to read the posts that appear on their "reading page," our equivalent of the "timeline." The only posts that appear on a user's reading page are posts made by accounts they've chosen to subscribe to. If a minor user has subscribed to a large number of accounts that post interesting and engaging writing, does the act of that minor spending a longer period of time reading and contemplating that writing transform the reading page into a "covered design feature" for that particular minor by "increas[ing] a minor's . . . time spent," whereas it might not be a "covered design feature" for a minor user who has only subscribed to a few accounts who post more rarely and is able to read through the posts made since

their last visit to the site more quickly? The Act has no answer to this question, provides no way for me to conduct that analysis, and gives me no idea of which sources the state would accept as evidence for or against a particular feature or category of features meeting that definition.

51. Section 39-80-10(3)(c) prohibits "gamification or any design feature that emulates gameplay." But the Act fails to define "gameplay" except through equally vague references to "motivat[ing] or caus[ing] more frequent or more extensive use" via, for example, "streaks, badges, or rewards." But there are games that don't provide those features and non-games that do. So we cannot determine which (if any) of our site features might qualify as "gamification" features.

52. Section 39-80-10(3)(d) defines "quantification of engagement" but does not define "engagement." We do not offer "likes" or "reactions," but a number of the Act's example "engagement" features, such as "clicks" and "views," are impossible to keep from users who use third-party tools such as a statistics counter. Like nearly every interactive website, we do offer the ability to post comments and, therefore, the ability to see the number of comments a particular post has received. The range of these examples is so wide that I cannot generalize from the specific examples given, to understand what other features qualify.

53. "Notifications and push alerts" are not defined under § 39-80-10(3)(e). Dreamwidth does not have a mobile application and can only be accessed via web browser; we cannot trigger mobile operating systems' notification function. We do, however, send users an email to their confirmed email address and deliver a notice to on-site "inboxes" for certain site activity, including when someone replies to a post. The Act does not define whether these emails constitute "notifications" under § 39-80-10(3)(e). This is particularly unclear because our emails could trigger a user's mobile email app to show a "push alert," which the State could attribute to Dreamwidth.

54. I am not aware of any research at all establishing that a site offering "appearance-altering filters," § 39-80-10(3)(g), may influence a user's time spent on a website. This item's inclusion on this list causes me to doubt that I can accurately predict the methodology by which the South Carolina legislature assembled the list or predict what non-enumerated design elements they might regard as included.

55. The only commonalities I am able to identify in the whole of § 39-80-10(3) are that (a) every example and category of a "covered design feature" is a feature implemented by larger sites; (b) some people who believe those sites cause harm to minors (despite the lack of scientific consensus and conflicting scientific findings) have theorized these features are responsible for that harm, in whole or in part; and (c) the state has chosen to accept these features as being responsible for that harm. As a site with significantly different feature design and data privacy practices than those larger sites, we cannot extrapolate from these examples to understand what behavior by Dreamwidth the Act prohibits.

56. If the Act remains in effect, the ambiguity and uncertainty regarding what constitutes a "covered design feature," combined with the uncertain penalties for violating the Act, means that we would be forced to err on the side of caution and restrict the tools we offer our users with which to express themselves. We will also be forced to downgrade or remove safety features.

**D. Vague Definitions Under § 39-80-10(5)**

57. The Act includes multiple vague definitions under § 39-80-10(5) that make our compliance obligations uncertain.

58. The Act defines a "dark pattern," § 39-80-10(5), as "a user interface designed or manipulated with the substantial effect of subverting or impairing user autonomy, decision making, or personal choice."

59. This definition provides no useful information about what conduct the Act prohibits. By a plain reading of the text, providing a user with a setting that can only have two choices, "on" or "off," could be "impairing user autonomy" by restricting their "personal choice" and thus could fall into the prohibition on "dark patterns." This uncertainty particularly concerns me because the Act's prohibition against the use of "dark patterns," § 39-80-60(C), is not limited only to accounts identified as belonging to minors. All use of "dark patterns" by a "covered online service" "shall constitute an unlawful trade practice under Section 39-5-20 of the South Carolina Unfair Trade Practices Act," § 39-80-60(C)(1), and any site using them is "subject to the provisions, penalties, and damages of the South Carolina Unfair Trade Practices Act," § 39-80-60(C)(2), over and above the penalties of this Act regarding the treatment of minors' accounts. Despite Dreamwidth being founded on the principles of user choice and autonomy, and even if we were to permanently prevent South Carolina minors from registering an account, the broadness and vagueness of this definition leaves South Carolina free to label any site element, setting, feature, or design choice as a "dark pattern" and impose onerous penalties.

**E. Vague Definitions Under § 39-80-30(1)**

60. The Act includes multiple vague definitions under § 39-80-30(1) that make our compliance obligations uncertain.

61. The Act requires covered websites to provide all users, both account holders and guests, the ability to "disable design features including, but not limited to, all covered design features, that are not necessary to provide the covered online service by allowing users to opt out of the use of all such design features or any combination of such design features." § 39-80-30(1). The State fails to define both "design feature" and "necessary," and further fails to set a standard for when a site has provided a sufficient opportunity to "opt out." By one possible reading, every element of the site is necessary to provide the service, because we don't add things unless we

believe they're necessary. By another possible reading, we would need to audit the entire site and break down every page into the smallest possible unit that could qualify, such that the act of "posting an entry" could be counted as anywhere between 13 and 17 distinct features. And the fact that after extensive contemplation I still can't decide upon a conclusive number of how many "features" the act of posting an entry would contain under that model illustrates how complicated and far-reaching that analysis would be. Regardless of which definition of "feature" we adopted, the requirement to provide an opt-out would be impossible for us to provide to logged-out visitors or guests to the website, who are viewing the site without identifying themselves and without the ability for us to change the site in any significant way. It would be similarly impossible for us to provide opt-outs to logged-in users of the website for all possible features the Act would require us to, because there is no meaningful definition of "opt out" for many of our features beyond "don't visit the page."

62. Providing opt-out settings for every element of the site also massively increases the complexity and cognitive burden placed on the user to read and understand each setting and why they should care (or not care) about it. User experience research has long shown that, with every additional setting a site adds, the number of people who meaningfully engage with the settings decreases as people get overwhelmed and give up.[1] To further our commitment to enabling user choice, we have carefully analyzed each potential setting we introduce, balancing the customizability of our privacy and security options against the chance of overwhelming our users. If the Act remains in effect, its settings requirements will override our professional editorial judgment about which settings matter most. We will be forced to make design changes we believe have a high

[1] *See* @dw~~-news~~-suggestions, *Why More Options Are Generally Bad UI*, Dreamwidth (Jan. 5, 2010, 9:26 am), https://perma.cc/8UAR-H5K2.

chance of inducing anxiety in users confronted with hundreds of choices. That same proliferation of options will reduce the number of users who meaningfully engage with the settings page and make changes suited to their individual privacy needs. Overwhelming users with too many options discourages them from making meaningful choices and forces us to harm their privacy, security, and well-being.

**F. Forced Data Collection and Disclosure**

63. The Act's requirements, if allowed to remain in effect, will force us to collect data we do not currently collect and do not want to collect about our users.

64. The Act will also force us to disclose user data to third parties against our will, and it will restrict the steps we can take to mitigate or protect our users against the misuse of that data, in ways that are offensive to our most fundamental and closely held beliefs.

65. As previously mentioned, we have no way to geolocate users. Users can voluntarily display their location on their profile, but we do not validate or confirm it if entered. Because of our users' general desire for privacy, comparatively few of our 4.3 million registered accounts specify their location: as of March 1, 2026~~,~~ (shortly before this declaration was originally signed), only 1,447 registered Dreamwidth users indicated they live in South Carolina. ~~(Only 17~~And as of ~~those~~August 10, 2026, shortly before executing this corrected declaration, only five of our registered South Carolina users provided a birthdate on registration indicating they are under 18~~.)~~. But we have no way to identify South Carolina users who have not self-identified their location, and we have no way of identifying non-registered visitors who reside in South Carolina.

66. The only way Dreamwidth could identify users in South Carolina would be to subscribe to a separate IP-based geolocation service, send information about every attempt to access the site to that geolocation service, and record and store the results that service reports. These services are extremely expensive. Their accuracy varies wildly and may change over time, and any

two given IP geolocation services may disagree. (For instance, the IP address of my home internet connection, which is physically located in Baltimore, Maryland, geolocates anywhere from a field in rural Delaware to the White House Rose Garden, depending on which geolocation database you consult.) Using one of these services is not only cost-prohibitive, it involves repeatedly sending user data to a third party, as well as storing and processing the resulting data, activities we work very hard to minimize to protect the privacy and security of our users.

67. As discussed above, some users, like Russians who may be unable to speak freely about their country without fear of persecution, greatly value our decision not to track users' locations. Changing that decision about how to run our site would thus chill speech. Users who currently rely on us to protect their anonymity could no longer do so and would be forced to change how they express themselves, what topics they feel safe discussing, and, in some cases, whether they feel safe maintaining a Dreamwidth account at all.

68. The Act requires us to implement tools to "limit the amount of time the user spends on the covered online service." § 39-80-30(A)(2). Limiting the amount of time a user spends on the site inherently involves tracking the amount of time a user spends on the site. We do not currently collect that data, and we do not want to collect that data. Moreover, it is technically impossible for a website, as compared to a mobile application, to track that data with any reasonable amount of accuracy without employing extremely intrusive measures. Dreamwidth has a considerable amount of long-form content that takes minutes or even hours to read—the maximum allowed length of a post is approximately the length of a commercially published novel. Once someone has opened an entry in a browser tab or window, we have no way to detect if they are actively engaging with the content or if they stepped away from the screen or changed focus to another tab (or even turned their computer off). The only way to accurately calculate length of active time on

the site would be to install scripting that attempts to capture whether or not the user has pressed the "page down" button or used their scroll bar or scroll wheel in the last few minutes. This sort of scripting is not only intrusive and privacy-invasive, but also indiscriminate as to what it captures from someone's computer, including "sensitive personal data" (such as banking and financial information, identification information, the contents of emails and messages loaded in other tabs or windows, passwords to other sites, and more). We do not want this data; we do not currently collect this data; we could not comply with the Act's time-tracking provisions without beginning to collect this data; we do not have the means or resources to process, store, encrypt and secure this data on an ongoing basis; and our users do not want us to collect and store this data about them.

69. The scripting capable of capturing this data is frequently and rightfully detected as malware or spyware by antivirus software, and it is frequently and rightfully blocked by browser extensions that protect a user's privacy. Visitors to the site receiving an alert that every page on our website contains malware or spyware would result in significant reputational and financial harm because it would correctly cause them to believe we had abandoned our promises about not collecting personal data.

70. Worse, § 39-80-30(A) requires us to extend this time-limiting setting to every visitor to the site, not only users with registered accounts. We do not require that someone register an account to read public content. We do not track the behavior, habits, or devices of people who visit the site anonymously. There is no feasible way for us to comply with this requirement without completely ending the ability for people to read public content without registering an account, as well as eliminating all forms of open protocol data feeds. These changes would be offensive to our most fundamental and closely held beliefs, not to mention burdensome and resource intensive.

71. Section 39-80-70 of the Act in its entirety requires us to submit a significant amount of information to "an independent third-party auditor" to be used in the preparation of a report that must be "issued" to the Attorney General of South Carolina, who is required to post it publicly. This section thus requires Dreamwidth to turn over data about our users and how we handle and safeguard that data not only to an unidentified third-party auditor, but also to the "experts" that the auditor consults in generating their report, and, additionally, to the State. *See* § 39-80-70(C). The Act thus threatens the safety of our users' data by mandating (at least) three separate disclosures that Dreamwidth does not want to make.

72. I am not aware of any independent third-party auditors who provide this service, much less for the amount we could afford to pay for it (namely, almost nothing). The obligation imposed upon sites by § 39-80-70(C) "to provide independent auditors that prepare reports required under this section full and complete cooperation and access to information and operations required to ensure that the report is comprehensive and accurate," the mandatory elements of the report that would risk or require the transfer of user data to a third party, and the requirement that independent auditors "prepare[] [reports] in consultation with experts on minors' use of covered online services" all mean we would be forced to transfer user data to a third party, who would themselves be obligated by law to transfer it to another third party.

73. We have nothing to hide about Dreamwidth itself: anyone can inspect the actual programming code that runs the site at any time. *See dreamwidth/dreamwidth*, GitHub, https://perma.cc/QFL9-TNP4. We have significant, well-founded, and fundamental objections, however, to being forced to provide such unlimited and sweeping access to every element of our business, including user data we have repeatedly promised to safeguard and reports of potential

Terms of Service violations (which can include highly personal information about sensitive matters) to any third party, much less one who is obligated by law to transfer it to another third party with whom we would have no contractual relationship and make subjective assessments about our "safety" for minors, and then publish those opinions to law enforcement officers.

**G. Forced Degradation of Safety and Security**

74. In addition to the examples already given, several of the Act's provisions will require us to downgrade, weaken, or remove elements of the site in a way that will endanger our users' safety and security, for every user of the site.

75. Section 39-80-30(5) of the Act requires us to allow all users, including visitors, the ability to "restrict the visibility of the minor's account and information posted by the minor to only users with connected accounts." We already allow users to select the privacy level of posts made to their account—whether an individual post or all posts as a whole. But § 39-80-30(5) would include regulating comments made on other users' accounts and posts and comments made in community accounts—places where the account or community owner controls privacy settings, not the minor user posting there. Treating minors' posts in these forums differently (*e.g.*, scrubbing their username or other information) would flag these posts as coming from minors and chill their contributions. Giving third parties the means to easily identify minor users by the differences in how their posts and comments are displayed also undermines, rather than promotes, online child safety.

76. Section 39-80-30(8) requires us to allow all users to "prohibit any other individual from viewing the user's connections to other users, regardless of the nature of the connection." Unlike the previous item, the lack of the word "minor" appears to mean we must offer this option to every account, including adults.

77. We offer several types of "connections" as the Act defines them, some of which a user can already choose to hide. The single list of connected accounts that cannot be hidden or removed from a user's or community's profile is the list of accounts the user has given access to read their locked posts (for user accounts) or the list of the members of the community, who are the individuals who can read locked posts to the community (for community accounts). This is a critical safety feature because someone who is making a locked post to a community account or who is making a comment in reply to a locked post to someone else's account must be able to know who else will be able to read their post or comment in order to make a risk evaluation about what they want to say (if anything at all). A user with a restraining order against their former partner needs to know if their former partner is a member of any community they might want to join; two users who have a history of personal conflict both need to know if the other can see a comment they're about to make in a third party's journal; a user replying to a friend's locked entry about an upcoming date with someone to warn them about a bad experience with the person their friend will be dating needs to know who can see the comment they're about to leave. Allowing someone to hide all their connections to other users would violate our fundamental principle of user safety—a user must always be able to understand what audience will view everything they write. Again, these requirements undermine, rather than promote, safety.

78. Section 39-80-50, as a whole, requires us to allow a minor user's parent to access the minor's account, change settings on the minor's account, set limits on the amounts of time the minor can access the site, and establish periods of time the minor user is not allowed to use the site. "Parent," as defined in § 39-80-10(10), refers to the definitions as given in COPPA and the FTC rules for websites regarding it. The definitions and procedures of COPPA are unfit for this purpose: they establish ways a parent can communicate their consent for their child under 13 to

hold an account, but are silent on how a site can authenticate whether the person they're communicating with is the user's parent at all.

79. During my time at LiveJournal and subsequently at Dreamwidth, my team and I have encountered multiple instances where someone falsely claimed another user was under the age of 18, that they were the user's parent, and that they were demanding access to the account, a tactic known as "social engineering." In many of those instances, the team was able to establish definitive, concrete proof that the person writing to us was the targeted user's peer, that the targeted user was over the age of 18, that the person writing to us was not the targeted user's parent, or, once, that the person writing to us was a noncustodial parent. Even if we have established that a particular user is a minor, which is difficult or impossible to do, providing access over their account to a third party who simply claims to be their parent would be both a security issue and a child safety issue. There is no national identity database that allows someone to verify a minor's identity, the legal relationship between a parent and a minor, or which parent has the authority to make binding decisions for a minor. Most minors do not yet have photo ID, and even if they did, there is no definitive way to authenticate or verify that any documents uploaded for identity verification purposes belong to the person who is uploading them, that the person who controls the account is the same person who provided the identifying documents, or that the documents are legitimate and not a forgery.

80. All of these problems are difficult enough to resolve when they merely concern which parent can provide consent for their child to hold an account at all. For determining whether to allow someone to control a minor's account, including access to and control over their personal data, the stakes are much higher. The Act's requirement to allow third party control over a minor's

account not only will increase our support burden to a degree we cannot accommodate, it formalizes a system by which a clever and determined adult, with access to even a small amount of knowledge about a minor's life and circumstances, could obtain nearly unlimited access to that minor's account simply by presenting themselves to us as the minor's parent in a sufficiently convincing manner.

81. This requirement poses daunting practical obstacles as well. We do not currently have any form of linked account structure or any way for a user to delegate control over one account to another account. Building such a system would require significant engineering changes and a thorough and detailed security audit to perform safely. Our login and account management code has been thoroughly hardened and security tested since the first lines of code were written in 1999. That work has been done by security experts who have donated their time, effort, and expertise throughout the years. Any change we make that even has the potential to affect account security goes through extra peer review to ensure the underlying logic is sound, the implementation code is bug-free, and the change doesn't introduce the opportunity for a malicious actor to exploit browser features, cross-site scripting, session hijacking, malformed HTML requests, or any one of dozens of security attack vectors to obtain unauthorized access to an account. Spotting the potential for those issues requires experience, knowledge, and time.

82. Since we founded Dreamwidth, our users have been requesting a way to link together multiple accounts they control—for instance, so that they can post their writings on disparate topics to separate accounts so that people who are interested in one aspect of their lives but not another can subscribe only to the material they want to read—and post to one account without having to log out of the other. We have tried to map out such a system, and the security audits it would require, multiple times. Each time, we've concluded the project would be too complicated

to handle at our current level of staffing and capacity, and that attempting to begin it without that capacity would carry an unacceptable level of risk to our users' account security. The Act forcing us to override our considered judgment and design and implement such a system anyway, in a way that would place the security of every account on our service at risk, is offensive to our most fundamental and closely held beliefs. It is also fundamentally beyond our capacity to do at all, much less to have done so immediately upon the Act being signed into law.

**H. Duty of Care Under § 39-80-20**

83. The Act requires us to "exercise reasonable care" in "the design and operation of the covered online service including, but not limited to, covered design features, to prevent" an enumerated list of harms to minors. § 39-80-20(A). Each of the harms we would be obliged to prevent are highly individualized to any specific minor, dependent on a minor's individual level of maturity and specific life situations.

84. For example, content that causes "anxiety, depression, self-harm, or suicidal ideations," § 39-80-20(A)(2), in one minor may alleviate it in another. One 14-year-old beginning to suspect they might be lesbian, gay, or transgender might experience "severe emotional distress," § 39-80-20(A)(3), by reading a news story about the number of state and federal laws attempting to restrict the civil rights of lesbian, gay, and transgender Americans. But another 14-year-old beginning to suspect they might be lesbian, gay, or transgender might read the part of the very same news story about the organizations and individuals fighting against those laws and find hope, encouragement, and a sense of community in how fiercely people are fighting to defend those rights. Reading an academic analysis of legal discrimination and societal animus against Black Americans ranging from the Civil War to the Civil Rights Act might render one teenager depressed or anxious, while leaving another teenager with a sense of positive progress and determination, and a third feeling ambiguity about how far we've come and how far they feel we have yet to go.

There is no way for Dreamwidth, or indeed for any site, to predict the reaction any minor might have to any particular speech or to guess what might meet the standard of "severe psychological harm," § 39-80-20(A)(2), or the other specified harms.

85. The provisions of § 39-80-20(C) that make exceptions for accessing resources designed for harm reduction still do not accommodate any of the informal, spontaneous, user-to-user harm reduction efforts that happen constantly, much less account for the fact that whether content and features will have a harm reduction or mitigation effect is itself inherently subjective, controversial, and user-specific.

86. Dreamwidth's internal policies regarding how we apply our Terms of Service to specific content adopt an explicit harm-reduction framework. For content that may have the potential to cause harm, we engage in an ongoing process, using our best judgment and guided by the available peer-reviewed scholarship about that topic, to determine the editorial boundaries of what speech we will allow and what speech we will remove, cognizant that excessively removing speech can also be harmful by suppressing important voices, information, and perspectives.

87. The process of developing such policy therefore involves, for Dreamwidth, evaluating a number of scenarios in which users post certain content or initiate certain communications; considering small variations in phrasing and nuance, down to complex grammatical analysis of verb tense, mood, and aspect and their semantic implications; identifying the broadest range possible of impacts and outcomes that could result, analyzing those potential outcomes, and classifying them as positive, negative, and neutral; and finally considering, for each of the negative outcomes, what the likelihood is that our intervention to moderate the content would increase or decrease the chance of harm resulting, until we arrive at the answer we feel is, on the balance of probabilities, the most likely to cause the least harm in the least number of people who would be

involved in that situation or exposed to that content. However, the decisions we make on these issues are unique to Dreamwidth and the types of content posted on Dreamwidth. It is very likely other websites would make them differently based on their unique content, users, and perspectives, and that the State would make them differently still.

88. Each harm the Act imposes a duty of care to prevent could fill an entire volume with examples of what we would consider in our analysis. Take the example "self-harm," § 39-80-20(A)(2). A website such as Dreamwidth considering risk mitigation in relation to two minors discussing a desire to self-harm needs to consider, as an extremely non-exhaustive list: (a) whether the post expresses a concrete, imminent intention to commit an act of self-harm; (b) whether other users are encouraging that intention or, by contrast, urging redirection, reconsideration, mitigation, or reframing techniques and other support; (c) whether the user has indicated they have the support of adults; (d) whether our potential intervention would increase the user's feelings of isolation, depression, or despair and dissuade them from seeking help or treatment; and (e) whether leaving the content in place would increase the chance that a responsible adult or peer can intervene and help the user obtain support and treatment. Answering these questions would necessarily require us to draw delicate, subjective, and context-based judgments that others might disagree with, even strongly.

89. Further, there is no consensus opinion on preventing the various harms the Act identifies. As a Trust and Safety professional, I read widely in the available literature, participate in professional discussions about the best way to handle the moderation of any number of sensitive and contentious topics, and consult a wide variety of experts, and I have for the entire length of my career. The opinions I have received in those consultations are numerous and varied, and often passionately held. The closest thing to expert consensus I have ever been able to determine is that

social media use is beneficial for many minors and potentially associated with harmful effects for others; that it is impossible to predict in advance which individuals might fall into which category; and that it is impossible to determine whether any observed effect of social media use on particular minors is due to correlation or causation (*i.e.*, whether more social media use makes minors anxious and depressed, or whether anxious or depressed minors use social media more in search of community or support).

90. Many of my peers in the Trust and Safety industry have privately told me they now fear conducting or advocating for internal research into design changes that might reduce harm to minors. They worry the act of conducting such research, or the results if any experimental interventions are not positive, could itself create liability of the kind this Act imposes. I believe much of the legislation intended to improve child safety has caused a significant, industry-wide chilling effect on designing or developing more effective child safety measures—beyond the ways, detailed throughout this declaration, in which such legislation often mandates changes that will themselves reduce child safety under threat of liability or financial penalty.

91. Due to lack of resources and capacity, Dreamwidth does not currently use any form of automated content moderation to analyze posts to determine the likelihood they are inappropriate for minors; machine learning or algorithmic signals to detect content that may be harmful, upsetting, or distressing to a specific and individual user; social-graph analysis to determine how likely it is a user knows or knows someone who knows a person who is making a comment; or sentiment analysis to automatically screen or hide comments that may be upsetting, stressful, anxiety-producing, or distressing to the comment's recipient.

92. Without the use of these tools, we are hampered in our ability to detect and respond to instances of such content being posted, and we are unable to change how we present and arrange

information posted by other users to "downrank," hide, screen, or otherwise alter the presentation of content.

93. The amount of content posted to Dreamwidth is currently small enough that we can rely upon user reporting to identify violations of the Terms of Service that need to be removed, but that process is simultaneously overinclusive and underinclusive. For example, users won't report posts made by their friends or people they like even if they may contain a violation of the Terms of Service, while users do report posts from people they dislike even if they don't contain a violation of the Terms of Service. Around 90% of our user reporting is for content that does not contain a violation of the Terms of Service, and we have no way to guess at how many violations of the Terms of Service are never reported. I do not know whether the Attorney General would agree that this approach satisfies the duty of "reasonable care."

94. Automated moderation would allow us to increase our accuracy and capacity for detection, while personalized sorting of content would allow us to reduce harm to specific individuals. But the Act's prohibitions on the processing of user data and profiling and its requirement to allow users to opt out of personalized systems would prevent us from deploying the best and most accurate tools possible to fulfill the duty of care it seeks to impose on us, even as it imposes significant liability for the failure to do so.

**I. Financial, Technical, and Logistical Burdens to Compliance**

95. If the Act remains in effect, it will force us to make a number of technical changes we do not have the resources and capacity to make.

96. We cannot treat minors' accounts differently than adults' accounts unless we can accurately determine who is an adult and who is a minor. The cost for every single method of potentially determining a user's age, to any reasonable degree of confidence, is prohibitively ex-

pensive. The advice I've received from my peers in the industry is the minimum a site of Dreamwidth's size and complexity should expect to pay a third-party vendor is approximately $1 for each age estimation, with the price increasing significantly if the age estimation fails and the user must proceed to more-stringent age verification. With approximately 4.3 million registered accounts, we cannot afford these costs.

97. Several elements of the Act appear to require us to determine the age of all visitors to the site, not only the age of users who have created an account, or at least create immense pressure to do so to minimize the risk we will be deemed noncompliant. This increases the complexity of the changes we will need to make and significantly multiplies the costs we will incur, both in engineering time and support and in the costs and frequency of age determination. With approximately 2 million unique visitors annually, we cannot afford these costs.

98. These costs increase where a user disputes they are a minor, where the user disputes the person claiming to be their parent is actually their parent, where a person claims to be a user's parent but is unable to substantiate or authenticate that claim, or where two or more parties claim to be the sole individual with legal decisionmaking authority over a minor child. We cannot afford these costs.

99. To the extent several elements of the Act require us to treat minors' accounts differently at different times of day, the technical difficulty of accurately doing so renders us unable to comply with those requirements. Determining the current time in a networked, global computing environment is notoriously difficult. The time reported by a user's device can never be trusted as an accurate representation of the time in the location they currently reside in because, for example, anyone can change the time zone settings in their device's configuration or manually set their device's clock to a different time. Detecting those discrepancies between the actual time in a user's

location and the time reported by the user's system clock would require significant engineering effort that we do not have the resources to perform.

100. Accurately identifying a user's location is technically impossible for us to do. The closest approximation, IP address-based geolocation, can only be done through purchasing access to one of several private databases that assign IP addresses to an approximate location. Access to these databases is extremely expensive. We cannot afford these costs.

101. In the course of my consulting work offering advice to others who are looking to replicate our success with building independent, advertising-free, user-supported, privacy-protective social media, multiple people have privately expressed to me that they fear the risk of incurring liability for their moderation or design decisions; that they cannot understand what laws such as the Act would require them to do; that they cannot afford to access the necessary legal advice; that they are uncertain about the degree of control laws such as the Act seek to establish over their content moderation decisions; and that laws like the Act would prohibit a wide range of content they would otherwise like to disseminate.

102. During that consulting work, some of the individuals I have advised have expressed to me their desire to advocate against the burdens the Act, and other such laws, would impose on them, but that they have refrained out of fear of being targeted for state enforcement.

103. Many of our users have stated they have already restricted, changed, or self-censored their speech out of fear that state age verification mandates will force them to associate their legal or governmental identity with their social media username.

104. We have already altered our speech, our associations, and our service in response to the Act. If it remains in effect, due to the degree of liability it imposes and the vagueness and

uncertainty of its definitions, we will be forced to continue denying service to minors from South Carolina.

105. For all of the above reasons, the Act's requirements are too intrusive and burdensome for us to attempt to implement, particularly in light of the fact that we currently know of only 17five minor users in the State of South Carolina—at least one of whom will no longer be a minor shortly after the date of execution of this declaration. If the Attorney General of South Carolina indicates he believes the Act requires us to perform any degree of age verification or age estimation beyond user self-attestation of age, we will be forced to block all connections from South Carolina entirely.

* * *

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed on March 7,August ___, 2026, in Baltimore, Maryland.

______________________________

Denise Paolucci